Richard Eppink (Bar No. 7503)
AMERICAN CIVIL LIBERTIES UNION
OF IDAHO FOUNDATION
P. O. Box 1897
Boise, ID 83701
United States
T: (208) 344-9750 ext. 1202
REppink@acluidaho.org

Gabriel Arkles*
James Esseks*
Chase Strangio*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.,
New York, NY 10004
T: (212) 549-2569
garkles@aclu.org
jesseks@aclu.org
cstrangio@aclu.org

Kathleen Hartnett*
COOLEY LLP
101 California Street 5th Floor
San Francisco, CA 94111-5800
T: (415) 693-2000
F: (415) 693-2222
khartnett@cooley.com

Elizabeth Prelogar*
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington D.C. 20004-2400
T: (202) 842-7800
F: (202) 842-7899
eprelogar@cooley.com

Andrew Barr*
COOLEY LLP
380 Interlocken Crescent, Ste. 900
Broomfield, CO  80021-8023
T: (720) 566-4000
F: (720) 566-4099
abarr@cooley.com

Catherine West*
LEGAL VOICE
907 Pine Street, Unit 500
Seattle, WA 98101
T: (206) 682-9552
F: (206) 682-9556
cwest@legalvoice.org

* *Pro hac vice* motion to be filed

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LINDSAY HECOX, and JANE DOE with her next friends JEAN DOE and JOHN DOE,<br><br>*Plaintiffs*,<br><br>v. | No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

BRADLEY LITTLE, in his official capacity as Governor of the State of Idaho; SHERRI YBARRA, in her official capacity as the Superintendent of Public Instruction of the State of Idaho and as a member of the Idaho State Board of Education; THE INDIVIDUAL MEMBERS OF THE STATE BOARD OF EDUCATION, in their official capacities; BOISE STATE UNIVERSITY; MARLENE TROMP, in her official capacity as President of Boise State University; INDEPENDENT SCHOOL DISTRICT OF BOISE CITY #1; COBY DENNIS, in his official capacity as superintendent of the Independent School District of Boise City #1;; THE INDIVIDUAL MEMBERS OF THE BOARD OF TRUSTEES OF THE INDEPENDENT SCHOOL DISTRICT OF BOISE CITY #1, in their official capacities; THE INDIVIDUAL MEMBERS OF THE IDAHO CODE COMMISSION, in their official capacities,

*Defendants.*

## NATURE OF ACTION

1.      Idaho's recently enacted H.B. 500a, to be codified at Idaho Code,

Title 33, Chapter 62 ("H.B. 500"), categorically bars women and girls who

2

are transgender,[1] and many who are intersex,[2] from participation in school sports consistent with their gender identity. It does so by requiring proof of "biological sex" based on criteria that intentionally disqualify all women and girls who are transgender and many who are intersex, and which threaten to intrude upon the privacy and bodily autonomy of all women and girls engaged in student athletics. This law is not just out of step with science and prevailing norms of inclusion adopted by athletic associations across the country and around the world, it is unconstitutional and violates federal law.

2.      Idaho is the first and only state in the United States to categorically bar the participation of a subset of women in women's student athletics because they are transgender and/or intersex. Not only does no other state have a categorical bar to girls and women who are transgender playing sports, but also no elite athletic body regulating sports nationally or globally – such as the National Collegiate Athletic Association ("NCAA") or the Olympics – has such a categorical bar. Nor do any arbitrarily restrict the participation of women and girls with intersex traits to the same extent as H.B. 500. Likewise, no other state or sports regulatory body with a policy addressing the participation of transgender and intersex athletes utilizes (as

---

[1] A transgender individual is someone who has a gender identity that does not align with the sex they were assigned at birth.

[2] Intersex is an umbrella term for unique variations in a person's chromosomes, genitals, hormone function, or internal organs like testes or ovaries. Some intersex traits are identified at birth, while others may not be discovered until puberty or later in life, if ever.

Idaho now will) intrusive genital examinations or chromosomal testing to restrict participation in women's sports. Idaho now stands alone in imposing the threat of unwanted, medically unnecessary invasions to bar and chill participation in women's and girls' athletics.

3.      Excluding women and girls who are transgender from participation in women's athletics is not just the *result* of H.B. 500: it was the very purpose of the law. According to bill sponsors, it was written to prevent even girls with female-typical hormone levels from participating in girls' sports if they are transgender. Prior to the passage of H.B. 500, the existing rules in Idaho already required girls who are transgender to "complete one year of hormone treatment related to the gender transition before competing on a girls team." There were no reported issues with the administration of that rule or its effect on athletics in Idaho. In fact, no transgender athlete had even availed herself of Idaho's preexisting rule.[3]  Unfounded stereotypes and false scientific claims led to the passage of H.B. 500 and are embodied within it. Idaho also enacted H.B. 500 amidst a global pandemic, in conjunction with a law barring the state from accurately reflecting the sex of transgender and some intersex individuals on birth certificates (after such a policy in Idaho had already been adjudicated unconstitutional). In short, H.B.

[3] Scott McIntosh, *Idaho is about to join national debate over transgender student-athletes*, Idaho Statesman (Jan. 12, 2020, 6:00 AM), https://www.idahostatesman.com/opinion/from-the-opinion-editor/article239121313.html.

500 is entirely unnecessary, was prompted by a campaign targeting transgender and intersex persons, and can be explained only as impermissible and baseless discrimination.

4.    In addition to precluding women and girls who are transgender and many who are intersex from participating in women's sports, H.B. 500 opens the door to severe privacy violations and the forced disclosure of women's and girls' sensitive medical information (including those who are neither transgender nor intersex, among others). H.B. 500 requires women and girls, upon a "dispute regarding" their sex, to submit to invasive physical examinations and genetic testing in order to "verify" a vague and indeterminate notion of "biological sex." Idaho Code § 33-6203(3) (engrossment), attached as Exhibit A.

5.    By barring women and girls who are transgender, and many who are intersex, from student athletic participation, H.B. 500 impermissibly discriminates on the basis of sex and transgender status and invades fundamental privacy rights. It will cause severe and entirely unnecessary harms and distress, including to a subset of women and girls who already face exceedingly high rates of suicidality due to ongoing societal inequities caused by discrimination of the sort H.B. 500 perpetuates.

## PARTIES

**Plaintiffs**

6.      Lindsay Hecox is an adult woman and athlete in Idaho. She will soon finish her freshman year at Boise State University, and she plans to try out for the Boise State cross country team in August 2020. Lindsay is transgender.

7.      Jane Doe is a 17-year old girl and athlete in Idaho.  She appears in this case through her mother and next friend, Jean Doe, and her father and next friend, John Doe. She will soon finish her junior year at Boise High School, and she plans to try out for soccer in August 2020. Jane is not transgender.

**Defendants**

8.      Defendant Bradley Little ("Governor Little") is Governor of the State of Idaho. Article VI, section 5 of the Idaho Constitution states: "The supreme executive power of the state is vested in the governor, who shall see that the laws are faithfully executed."  Idaho Const. art. IV, § 5. Governor Little is responsible for upholding and ensuring compliance with state statutes prescribed by the legislature, including H.B. 500. He also bears the authority and responsibility for the formulation and implementation of policies of the executive branch. In addition, he appoints all members of the eight-person State Board of Education other than the Superintendent of Public Instruction. Idaho Code § 33-102. The Governor's appointees serve for

five-year terms. *Id*. Governor Little is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law as to the allegations in this complaint. Governor Little's official residence is in Ada County, Idaho, within the District of Idaho. He is sued in his official capacity.

9.      Defendant Sherri Ybarra is Superintendent of Public Instruction in Idaho. She is responsible for carrying out policies, procedures, and duties authorized by law regarding secondary school matters. She is also a member of the Idaho State Board of Education. She is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law as to the allegations in this complaint. Superintendent Ybarra resides in Idaho. She is sued in her official capacity.

10.      The individual members of the Idaho State Board of Education (Defendants Debbie Critchfield, David Hill, Emma Atchley, Linda Clark, Shawn Keough, Kurt Liebich, and Andrew Scoggin) have responsibility for the general supervision of Idaho's state educational institutions and its public school system. The Board of Education is required, under H.B. 500, to promulgate rules for schools and institutions to follow to comply with the law. Idaho Code § 33-6203(3) (engrossment). The Board of Education also acts as the board of trustees for Boise State University, and is responsible for the university's supervision, government, and control. Idaho Code § 33-4002. As the university's board of trustees, the Board of Education is responsible for supervising students at the university, including Plaintiff Hecox. Idaho Code

7

§ 33-4005. The Board of Education's members are each persons within the meaning of 42 U.S.C. § 1983 and act under color of state law as to the allegations in this complaint. All reside in Idaho. They are sued in their official capacities. Idaho's state educational institutions, including Boise State University, and Idaho's public school system are education programs receiving Federal financial assistance. These Defendants are referred to in this Complaint collectively as the "State Board of Education Defendants."

11.     Defendant Boise State University is a public research university located in Boise, Idaho. Its intercollegiate athletic teams are classified as NCAA Division 1. Boise State University is an education program receiving Federal financial assistance.

12.     Defendant Dr. Marlene Tromp is the President of Boise State University.  She is responsible for carrying out the policies of Boise State University and reports to the State Board of Education. She is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law as to the allegations in this complaint. She resides in Idaho and is sued in her official capacity.

13.     Defendant Independent School District of Boise City #1 ("Boise School District") is a public school district located in Boise, Idaho. It is an education program receiving Federal financial assistance.

14.     Defendant Coby Dennis is the superintendent of the Boise School District. He is responsible for carrying out the policies of the Boise

School District, recommending policies to the District's board of trustees, and making decisions for the District when the board of trustees is in recess. He is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law as to the allegations in this complaint. He resides in Idaho and is sued in his official capacity.

15.     The individual members of the Boise School District's board of trustees (Defendants Nancy Gregory, Maria Greeley, Dennis Doan, Alicia Estey, Dave Wagers, Troy Rohn, and Beth Oppenheimer) are responsible for governing the District in compliance with state law and rules of the State Board of Education. Idaho Code § 33-512(13). The District's board of trustees adopts and oversees the District's policies regarding student athletics and students' participation in interscholastic athletic programs. The board of trustees' members are each persons within the meaning of 42 U.S.C. § 1983 and act under color of state law as to the allegations in this complaint. The board of trustees' members all reside in Idaho and they are all sued in their official capacity. Boise High School, where Plaintiff Jane Doe is a student, is a part of the Boise School District. The Boise School District and Boise High School are education programs receiving Federal financial assistance. Defendant Dennis and the individual members of the Boise School District's board of trustees are referred to in this Complaint collectively as the "Boise School District Defendants."

16. The individual members of the Idaho Code Commission (Defendants Daniel Bowen, Andrew Doman, and Jill Holinka) are also sued in their official capacity and all reside in Idaho. The Code Commission's members are each persons within the meaning of 42 U.S.C. § 1983 and act under color of state law as to the allegations in this complaint. The Idaho Code Commission is an office of the Secretary of State established by statute. Idaho Code §§ 73-201–73-221. The Commission's purpose is to keep the Idaho Code up to date by indicating changes to laws, including constitutional changes, and providing annotations, and the Commission has all power and authority necessary to accomplish that purpose. It has the specific power to keep the Idaho Code up to date, to provide annotations to the Code, and to provide references in the Code to decisions of the federal courts. Idaho Code § 73-205. These Defendants are referred to in this Complaint collectively as the "Idaho Code Commission Defendants."

## JURISDICTION AND VENUE

17. This action arises under 42 U.S.C. § 1983 to redress the deprivation under color of state law of rights secured by the United States Constitution and under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*. ("Title IX").

18. This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under laws of the United States, including laws providing

for the protection of civil rights, and because this suit seeks redress for the deprivation, under color of state law, for rights secured by the United States Constitution.

19.     Venue is proper in the District of Idaho under 28 U.S.C. § 1391(b)(1) and (2) because the Defendants reside in the District and because a substantial part of the events or omissions giving rise to the claims occurred in the District.

20.     This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

21.     This Court has personal jurisdiction over Defendants because they are domiciled in Idaho and because their denial of Plaintiffs' rights under the United States Constitution and the laws of the United States occurred within Idaho.

## FACTUAL ALLEGATIONS

**A.     Plaintiffs' Participation in Student Athletics**

**Lindsay Hecox**

22.     Lindsay Hecox is a nineteen-year-old woman currently attending Boise State University.

23.     A recent photo of Lindsay:



24.     Lindsay loves to run. It helps her stay fit and motivated. It helps her feel alive.

25.     Lindsay ran track and cross-country on co-ed teams in high school. She loved being on the teams. She is shy, and being on sports teams gave her a way to make friends. She bonded with her teammates.

26.     Lindsay chose to go to Boise State University because she fell in love with the running trails and natural beauty around Boise State. She also

knew Boise State had strong track and cross country teams. She was excited at the idea of participating in college athletics.

27.    Lindsay is transgender. She is a woman who was assigned the sex of male at birth.

28.    Lindsay didn't join the track or cross-country teams her first year at Boise State because she wanted to focus on her medical gender transition.

29.    As part of her treatment for gender dysphoria, a medical condition caused by the disconnect between her assigned sex at birth and her female gender identity, Lindsay is treated with both testosterone suppression and estrogen. This treatment lowers her circulating testosterone levels and affects her bodily systems and secondary sex characteristics. For example, her hormone treatment redistributes fat to her hips and breasts, softens her skin, and decreases her muscle mass and size.

30.    Lindsay's health and well-being depends on being able to live and express herself as a woman.

31.    While beginning her hormone treatment, Lindsay started a co-ed running club at Boise State. The club was just for people to run together for fun and exercise. The club has not participated in competitions. She enjoyed the club experience, but she really missed the camaraderie and motivation that comes with being on a team. Running with people every now and then is not the same feeling as competing together as a team with

regular practices, uniforms, and a coach. Being an athlete and on a sports team is important to Lindsay.

32.     Under existing NCAA rules for inclusion of transgender athletes, Lindsay will be eligible to compete in women's sports this fall.

33.     Lindsay has been training, and she intends to train all summer. She plans to try out for the women's cross-country team at Boise State in fall 2020. She also plans to try out for track in the spring.

34.     Under NCAA eligibility rules, Lindsay only has five potential years to participate in athletics. If she is barred by H.B. 500 from competing in the Fall 2020 season, she will lose a season of NCAA eligibility, which she will never be able to get back.

35.     Lindsay was crushed when she learned about H.B. 500 and how it could impact her. The tests for "biological sex" set out in H.B. 500 would exclude her from joining a team with other women. Idaho Code § 33-6203(3) (engrossment).

36.     Running on a men's team is not an option for Lindsay. She is not a man, and as a woman who is transgender, it would be painful and humiliating to be forced to be the only woman on a men's team. It would also be contrary to her medical treatment plan for her gender dysphoria, which requires that she live her life in all respects as the woman she is. She is also worried that she would face harassment from other members of the men's team or people who attend meets. In the past, she has seen runners

14

physically jostle or push each other at meets. She has not met any other women athletes at Boise State who are transgender.

37.     Lindsay also feels that H.B. 500, particularly combined with the other bills targeting transgender people that were introduced and passed, has sent a message that it is okay to discriminate against transgender people. She is afraid that she will face more harassment, discrimination, or even violence because of it in her daily life.

38.     If H.B. 500 were in effect at the start of the Fall 2020 athletic season, Lindsay would not be able to participate in college athletics at all. She would miss the opportunities to make friends with other women running on the team, and the motivation, challenge, camaraderie, and joy that sport has brought her in the past.

**Jane Doe**

39.     Jane Doe is a 17-year-old girl currently attending Boise High School as a junior.

40.     Jane has played sports since she was four years old. She plays soccer and runs track.

41.     Jane believes sports have shaped her into the person she is today. She has learned about pushing her limits and tolerating discomfort from challenging track events. She has learned grace and found perseverance from losing to the same team over and over again in soccer. She has felt the satisfaction of her hard work and effort paying off from winning tournaments

at the national level with her club soccer team. She has learned what
community and family are from her high school soccer team, where they not
only share their love for the game but their love for uniting the school.

42.    Jane is cisgender.[4] She is a girl who was assigned the sex of
female at birth.

43.    Jane has never had any problems with girls who are
transgender or intersex being allowed to play sports. She would welcome the
opportunity to compete against girls who are transgender or intersex in the
future.

44.    In fact, a big part of what Jane loves about sport is the way that
sport brings people together and helps a diverse group of young people learn
to support each other and work toward a common goal as teammates. She
wants everyone to have access to the joy sport brings, including girls who are
transgender or intersex.

45.    Jane wants to play soccer in the fall of her senior year of high
school, like usual. Practice would start on or around August 10.

46.    With H.B. 500 becoming law, Jane fears for her privacy and
security, both emotionally and physically, if she continues to play sports. She
worries that one of her competitors might decide to "dispute" her sex just to

---

[4] A cisgender individual is someone who has a gender identity that aligns
with the sex they were assigned at birth.

try to keep her from playing. H.B. 500 has created a system that other people could use to bully or harass her.

47.     Jane does not commonly wear skirts or dresses, and most of her closest friends are boys. She also has an athletic build. Because of these things, people sometimes think of her as masculine. She worries that people might use that as an excuse to "dispute" her gender.

48.     Jane has had to get a physical once every two years in high school to play school sports. Those physicals usually take less than ten to fifteen minutes. Jane and her family fill out a questionnaire. The healthcare provider asks her a few questions and performs a short physical exam that involves listening to her heart and lungs and looking at her spine. She does not get any other tests or exams as part of her sports physical, and her medical providers have never taken her blood or looked at her fully undressed as part of this exam. Her family has not had to pay for her sports physicals because one was covered by insurance and the other was provided free of charge. While she has not gone herself, she knows that some students go to an annual event where health care providers complete the regular sports physical exam for many students on the same day. She thinks those physicals cost around $20.

49.     Jane does not want to have to go through an invasive or uncomfortable test just to prove that she meets the state's new criteria for being deemed a girl. She finds it horrifying that a doctor might have to

examine her genitals just so she can play sports. She has never had a genetic test, hormone test, or transvaginal pelvic ultrasound (insertion and manipulation of a probe with a camera several inches into the vagina), and her pediatrician has never told her that she needs one. She does not want any of those tests or a pelvic examination unless she needs one for her health. She thinks it is unfair that girls will potentially have to go through invasive physical examinations to play sports, when boys will not.

50.     If H.B. 500 is in effect during the Fall 2020 athletic season, Jane would worry about whether she might be seen as "too good" or "too masculine," and so have her sex disputed. She would fear the invasion of her privacy, and she would be subject to different treatment than boys.

**B.    Background of Sex Testing in Sport**

51.     As women and girls gained greater access to athletic competition throughout the twentieth century, their participation led to accusations that successful female athletes were not "really" women. This led to various unfounded, invasive, and destructive so-called "sex verification" practices directed at female athletes, which, over time, became obsolete after informed scientific, medical, ethical, and public consideration. H.B. 500 would retrench such discredited practices.

52.     For example, beginning in the 1960s, international competition organizations required female athletes to parade naked in front of a panel of three female doctors to "prove" that they were women. After ethicists and scientists, in addition to the athletes themselves, protested this humiliating,

unscientific, and inhumane practice, it was abandoned and replaced (for a time) with chromosomal testing.[5]

53.     Until the 1990s, the buccal (cheek/mouth) swab was used to test for chromosomes and regulate women's competition by the International Olympic Committee ("IOC") and the International Association of Athletics Federations ("IAAF"), now known as World Athletics. However, these organizations abandoned this practice after the case of a female Spanish pole vaulter named María José Martínez-Patiño.

54.     Martínez-Patiño had an intersex variation known as Complete Androgen Insensitivity Syndrome ("CAIS"), in which a person has XY chromosomes and internal testes producing high levels of testosterone, but androgen receptors that are unable to process the testosterone. As such, testosterone has none of its usual effects on the person's body. Individuals with CAIS typically have a vulva and are assigned female at birth. Absent intervention, they develop secondary sex characteristics like breasts and hips consistent with a typical puberty without the impact of high levels of testosterone on the body. Most identify as girls and women.

55.     In 1985, Martínez-Patiño "failed" the buccal swab because it revealed, unbeknownst to her, that she had XY chromosomes. As a result of that revelation, she was disqualified from women's international competition.

---

[5] Vanessa Heggie, *Testing sex and gender in sports; reinventing, reimagining and reconstructing histories*, 34(4) Endeavor 157, 160 (2010), https://doi.org/10.1016/j.endeavour.2010.09.005

When she tried to participate the 1986 Spanish national championships, she was publicly shamed, her sports scholarship was revoked, and her times were removed from the country's athletic records. Ultimately, she successfully fought her disqualification from women's international competition, obtained her IAAF license, and was permitted to attempt to qualify for the 1992 Olympics in Barcelona, Spain. She failed to do so by ten hundredths of a second, ending her athletic career.

56.     Martínez-Patiño faced great personal and professional harm as a result of the misguided belief that she was unfit to participate in women's sports due to her intersex variation. As Martínez-Patiño explains, "I paid a high price for my license—my story was told, dissected, and discussed in a very public way— and my victory was bittersweet."[6]

## C.     Current Policies of International Sports Bodies

57.     Currently, no international sports body regulates sport (as Idaho now would) through chromosomal testing, endogenous hormone levels (intrinsic levels without medical intervention), or genital and internal reproductive organ examinations. These methods have been determined by geneticists, other scientists and medical professionals, as well as human rights experts and international athletic regulatory bodies, to be neither accurate nor ethical proxies for sex or athletic ability.

---

[6] María José Martínez-Patiño, *Personal Account: A women tried and tested*, 366 The Lancet (Special Issue) S38 (2005), https://doi.org/10.1016/S0140-6736(05)67841-5.

58.     There are myriad genetic variations among athletes that can enhance athletic performance that are not related to sex characteristics – and have not been targeted for intrusive scrutiny or regulation. As just one example, variations in mitochondrial DNA have been associated with greater endurance capacity and greater mitochondrial density in muscles.

59.     Under current IOC regulations and World Athletics regulations, transgender athletes are eligible to compete consistent with their gender identity. This means that women who are transgender are able to compete in women's sports in the Olympics and other international elite competitions.

60.     The IOC recognizes that "[i]t is necessary to ensure insofar as possible that trans athletes are not excluded from the opportunity to participate in sporting competition."[7]

61.     IOC rules allow women who are transgender to compete in the women's category with proof that they have declared a female gender identity and can establish testosterone suppression under 10 nMol/L for a period of one year.

62.     World Athletics has a similar rule to the IOC for women who are transgender to compete in women's events, but has set the testosterone suppression to 5 nMol/L.  Similarly, World Athletics does not bar

---

[7] IOC Consensus Meeting on Sex Reassignment and Hyperandrogenism (November 2015), https://stillmed.olympic.org/Documents/Commissions_PDFfiles/ Medical_commission/2015-11_ioc_consensus_meeting_on_sex_reassignment_ and_hyperandrogenism-en.pdf.

participation by women with intersex traits in women's events.  Under guidance issued in 2018, for certain track events, women with elevated testosterone who are androgen sensitive must suppress testosterone to a level below 5 nMol/L in order to compete in the women's category.

63.     Eligibility to participate in international elite athletics for women who are transgender and intersex is not determined based on an athlete's chromosomes, reproductive anatomy, or endogenous hormone levels.

64.     After substantial research and consultation, experts in endocrinology, ethics, athletics, genetics, and other specialties determined that the standards set by the IOC and World Athletics are consistent with treatment guidelines for transgender individuals and consistent with the broader goals of elite international athletic competition.

65.     H.B. 500, which would bar competition in women's sports by all women who are transgender and many women with intersex traits, is far more restrictive than the policies of the most elite athletic regulatory bodies in the world.

**D.     State and NCAA Policies Prior to H.B. 500**

66.     In the United States, high school interscholastic athletics are generally governed by state interscholastic athletic associations, such as the Idaho High School Activities Association ("IHSAA").

67.     The NCAA sets policies for member colleges and universities, including Boise State University and other member colleges and universities in Idaho.

68.     Each state and the NCAA set their own standards, if any, for inclusion of transgender individuals in athletic activities.

69.     The policies developed by World Athletics and the IOC for participation of transgender athletes, described above, derived from the particular context of elite international competition. Because of that unique context, most interscholastic bodies have *less* stringent rules for participation in high school competition.

70.     Prior to the passage of H.B. 500, no state had ever passed a law categorically excluding all women and girls who are transgender from participating in high school or collegiate athletic competition consistent with their gender identity.

71.     Prior to the passage of H.B. 500, the policy for transgender

inclusion in K-12 athletics in Idaho was set by the IHSAA. Under the 2019-20

IHSAA Rules and Regulations, the policy governing athletes who are

transgender allowed participation as follows:

---

**11-3     TRANSGENDER STUDENT PARTICIPATION**

A transgender student, defined as a student whose gender identity differs from the student's assigned birth gender, shall be eligible to participate in interscholastic athletics that is consistent with the student's gender identity, under the following conditions:

a.  A female-to-male transgender student athlete who is taking a medically prescribed hormone treatment under a physicians care for the purposes of gender transition may participate only on a boys team.

b.  A male-to-female transgender student athlete who is not taking hormone treatment related to gender transition may participate only on a boys team.

c.  A male-to-female transgender student athlete who is taking medically prescribed hormone treatment under a physicians care for the purposes of gender transition may participate on a boys team at any time, but must complete one year of hormone treatment related to the gender transition before competing on a girls team.

d.  Process: A student athlete who has completed, plans to initiate, or is in the process of taking hormones under a physician's care as part of a gender transition shall submit the request to participate on a sports team to the administration of the student's school and to the IHSAA. The request shall include a letter from the student's physician documenting the student's intention to transition or the student's transition status if the process has already been initiated. This letter shall identify the prescribed hormonal treatment for the student's gender transition and the date the hormone treatment was initiated. The Executive Director shall make a determination whether the student is eligible to compete under the above criteria.

e.  Once the transgender student has been granted eligibility to participate in the sport consistent with his/her gender identity, the eligibility is granted for the duration of the students participation and does not need to be renewed every sports season or school year.

f.  Once the transgender student selects the gender or the team on which the student wishes to participate, the student thereafter must consistently participate on teams of that gender in all sports for the duration of their high school career.

g.  Appeals: The decision of the Executive Director may be appealed to the Eligibility Committee. The decision of the Eligibility Committee may be appealed to the IHSAA Board of Directors for a review and hearing.

h.  Confidentiality: All discussions among involved parties and the required written supporting documentation shall be kept confidential.

---

Idaho High School Activities Association, Rules and Regulations, 2019-20,

Rule 11-3.

72.     The policy does not reference athletes with intersex traits. Most

high school athletic associations do not have policies restricting participation

for intersex athletes.

24

73.     The IHSAA policy for transgender athletes was among the most restrictive policies in the country even prior to the passage of H.B. 500. In order to compete in girls' athletics under IHSAA Rule 11-3, a girl who is transgender must have undergone one year of prescribed hormone therapy under the care of a physician for the purposes of gender transition. Many transgender high school students are likely unable to meet that criterion due to limited access to health care providers in rural areas, cost of care not covered by insurance, and potentially unsupportive parents or guardians unwilling to consent to treatment.

74.     In contrast to IHSAA Rule 11-3, at least 17 states and the District of Columbia permit individuals to participate in athletics consistent with gender identity without any proof of medical transition. A small minority of states with policies on participation of athletes who are transgender have policies comparable to IHSAA Rule 11-3. Prior to H.B. 500, no state categorically barred the participation of women and girls who are transgender from women's sports. Nor did any state restrict athletic competition based on a physician's evaluation of chromosomes, endogenous hormones, or reproductive anatomy.

75.     Like the IHSAA policy, the NCAA policy governing athletes who are transgender allows a woman who is transgender to participate in women's sports after one year of hormone therapy suppressing testosterone.

This NCAA policy was implemented in 2011 after consultation with medical, legal, and sports experts and has been in effect since that time.

76.     Millions of student-athletes have competed in the NCAA since 2011, with no reported examples of any disturbance to women's sports as a result of transgender inclusion. The NCAA reports that 460,000 student-athletes compete in 24 sports each year.[8]  This likely includes only a handful of athletes who are transgender.

**E.     The Enactment of H.B. 500**

77.     On February 13, 2020, H.B. 500, titled "Fairness In Women's Sport Act," was introduced in the Idaho House by Rep. Barbara Ehardt ("Rep. Ehardt"). The only aspect of "women's sport" regulated by the Act concerned the exclusion of women and girls from women's sports teams if their sex was "dispute[d]" and they could not "verify" their "biological sex" based on enumerated criteria that categorically exclude participation by all women and girls who are transgender and many who are intersex. Idaho Code § 33-6203(3) (engrossment).

78.     The genesis of this legislation during a time of growing national pandemic was a "national campaign backed by the Scottsdale-based Alliance Defending Freedom ["ADF"]."[9]  Idaho Rep. Ehardt "received assistance with

---

[8] NCAA, Student-Athletes, http://www.ncaa.org/student-athletes (last visited Apr. 12, 2020).
[9] Bob Christie, *Arizona bill would ban transgender girls, women from sports teams*, PBS News Hour (Jan. 24, 2020, 9:27 PM), https://www.pbs.org/newshour/education/arizona-bill-would-ban-transgender-girls-women-from-teams, *archived at* https://perma.cc/N2XK-DMRM.

the bill's language" from ADF, which "has been involved in similar legislative

efforts across the country."[10]  Pervasively referring to women and girls who

are transgender as male, ADF claims that "Coronavirus Is Not the Only

Thing Threatening to Cancel Women's Sports,"[11] which, according to ADF,

are "facing a potentially fatal risk" from transgender athletes that "may

mean the end of women's sports."[12]

     79.    The operative language of H.B. 500 as introduced provided:

---

[10] Dan Levin, A Clash Across America Over Transgender Rights, N.Y. Times (Mar. 12, 2020), https://www.nytimes.com/2020/03/12/us/transgender-youth-legislation.html, *archived at* https://perma.cc/L8EA-KS2H (reporting interview with Ms. Ehardt).

[11] Maureen Collins, *Coronavirus Is Not the Only Thing Threatening to Cancel Women's Sports*, Blog,Alliance Defending Freedom (Mar. 26, 2020), https://www.adflegal.org/detailspages/blog-details/allianceedge/2020/03/26/coronavirus-is-not-the-only-thing-threatening-to-cancel-women-s-sports, *archived at* https://perma.cc/9W32-RRRP.

[12] Maureen Collins, *Idaho Governor Signs Landmark Bill to Save Women's Sports*, Blog, Alliance Defending Freedom (Apr. 7, 2020), https://www.adflegal.org/detailspages/blog-details/allianceedge/2020/04/07/idaho-governor-signs-landmark-bill-to-save-women-s-sports, *archived at* https://perma.cc/3WVE-6XWQ.

```
    33-6203.   DESIGNATION OF ATHLETIC TEAMS. (1) Interscholastic, inter-
collegiate, intramural, or club athletic teams or sports that are sponsored
by a public school or any school that is a member of the Idaho high school
activities association or a public institution of higher education or any
higher education institution that is a member of the national collegiate
athletic association (NCAA), national association of intercollegiate ath-
letics (NAIA), or national junior college athletic association (NJCAA)
shall be expressly designated as one (1) of the following based on biological
sex:
    (a)  Males, men, or boys;
    (b)  Females, women, or girls; or
    (c)  Coed or mixed.
    (2)  Athletic teams or sports designated for females, women, or girls
shall not be open to students of the male sex.
    (3)  If disputed, a student may establish sex by presenting a signed
physician's statement that shall indicate the student's sex based solely on:
    (a)  The student's internal and external reproductive anatomy;
    (b)  The student's normal endogenously produced levels of testosterone;
    and
    (c)  An analysis of the student's genetic makeup.
```

Idaho Code § 33-6203.

80.   On February 19, 2020, the House State Affairs Committee heard testimony on H.B. 500. When asked at that hearing whether any person in Idaho had ever challenged an athlete's eligibility based on gender, Rep. Ehardt admitted that this had never occurred, but speculated that "it is just around the corner."[13]

81.   Ty Jones, Executive Director of the IHSAA, answered questions at the hearing and noted that no student had ever complained of participation by transgender athletes, and no transgender athlete had ever competed under the existing policy regulating inclusion of transgender athletes.

---

[13] Idaho Education News, *Lawmakers hear emotional testimony but take no action on transgender bill*, Idaho News 6 (Feb. 20, 2020, 9:46 AM), https://www.kivitv.com/news/education/making-the-grade/lawmakers-hear-emotional-testimony-but-take-no-action-on-transgender.

82.     On February 21, 2020, H.B. 500 was passed out of the House committee.

83.     On February 25, 2020, the Idaho Office of the Attorney General warned in a written opinion letter that H.B. 500 raised serious constitutional and other legal concerns due to the disparate treatment and impact that both transgender and intersex athletes would face, as well as the potential privacy intrusion all student-athletes would face.[14]

84.     On February 26, 2020, the House debated the bill. Rep. Ehardt, the bill sponsor, referred to two girls in high school and one woman in college who are transgender and participating on teams for women and girls. She claimed that the mere fact of the athletes' participation exemplified the "threat" the bill sought to address. Remarks of Rep. Ehardt, House Floor Debate, Feb. 26, 2020 at 43:30. The bill passed the House floor.

85.     After passage in the House, H.B. 500 was heard in the Senate State Affairs Committee and was passed out of committee on March 9, 2020.

86.     The next day, on March 10, 2020, the bill was sent to the Committee of the Whole Senate for amendment, where minor amendments were made. The amended version retained the categorical exclusion of transgender women and girls and many intersex athletes and allowed invasive testing upon a "dispute regarding a student's sex," requiring

---

[14] Letter from Attorney General Lawrence Wadsen to Representative Ilana Rubel (Feb. 25, 2020), https://www.idahopress.com/attorney-generals-opinion-hb-500/pdf_4ebb604a-83eb-5bd4-a232-b13a64f4be47.html.

examination of "the student's reproductive anatomy, genetic makeup, or

normal endogenously produced testosterone levels."  H.B. 500, S. amend.,

65th Leg., 2d Regular Sess. – 2020 (Idaho 2020).

87.     The engrossed version of H.B. 500 as amended that went to the

Senate floor (and that ultimately was signed into law) read, in relevant part:

```
     33-6203.   DESIGNATION OF ATHLETIC TEAMS. (1) Interscholastic, inter-
collegiate, intramural, or club athletic teams or sports that are sponsored
by a public primary or secondary school, a public institution of higher edu-
cation, or any school or institution whose students or teams compete against
a public school or institution of higher education shall be expressly desig-
nated as one (1) of the following based on biological sex:
     (a)  Males, men, or boys;
     (b)  Females, women, or girls; or
     (c)  Coed or mixed.
     (2)  Athletic teams or sports designated for females, women, or girls
shall not be open to students of the male sex.
     (3) A dispute regarding a student's sex shall be resolved by the school
or institution by requesting that the student provide a health examination
and consent form or other statement signed by the student's personal health
care provider that shall verify the student's biological sex.  The health
care provider may verify the student's biological sex as part of a routine
sports physical examination relying only on one (1) or more of the following:
the student's reproductive anatomy, genetic makeup, or normal endogenously
produced testosterone levels.  The state board of education shall promul-
gate rules for schools and institutions to follow regarding the receipt and
timely resolution of such disputes consistent with this subsection.
```

Idaho Code § 33-6203(3) (engrossment).

88.     The bill does not specify what reproductive anatomy, genetic

makeup, or normal endogenously produced testosterone levels would need to

be identified to "verify" a student's "biological sex." Idaho Code § 33-6203(3)

(engrossment).

89.     The day after the bill was sent to the Committee of the Whole

Senate, on March 11, 2020, the World Health Organization declared COVID-

19 a pandemic.[15]  Many states adjourned state legislative sessions
indefinitely or adjourned sine die to protect lawmakers and constituents from
the spread of the virus.

90.    In contrast, the Idaho Senate remained in session and passed
H.B. 500 as amended on March 16, 2020. The House concurred in the Senate
amendments on March 18, 2020. The next day, the bill was delivered to
Defendant Governor Brad Little.

91.    Professor Doriane Lambelet Coleman, whose work was
misleadingly cited in the H.B. 500 legislative findings, urged Governor Little
to veto the bill, explaining that her work was misused and "there is no
legitimate reason to seek to bar all trans girls and women from girls' and
women's sport, or to require students whose sex is challenged to prove their
eligibility in such intrusive detail." Professor Coleman endorsed the existing
NCAA rule, which mirrors IHSAA Rule 11-3, and stated: "No other state has
enacted such a flat prohibition against transgender athletes, and Idaho
shouldn't either."[16]

---

[15] World Health Organization, WHO Timeline – COVID-19,
https://www.who.int/news-room/detail/08-04-2020-who-timeline---covid-19
(Last visited Apr. 13, 2020).
[16] Betsy Russell, *Professor whose work is cited in HB 500a, the transgender
athletes bill, says bill misuses her research and urges veto*, Idaho Press (Mar.
19, 2020), https://www.idahopress.com/eyeonboise/professor-whose-work-is-
cited-in-hb-a-the-transgender/article_0e800202-cac1-5721-a769-
3268665316a8.html, *archived at* https://perma.cc/NTA7-NJP5.

92.     Five former Idaho Attorneys General likewise urged Governor Little to veto the bill "to keep a legally infirm statute off the books."[17]  They observed that their successor, the incumbent Idaho Attorney General Lawrence Wasden, had identified a "number of legal infirmities" in the statute, including an "apparent conflict with the Equal Protection Clause," making the law "subject to invalidation in federal court proceedings."  They urged Governor Little to "heed the sound advice" of Attorney General Wasden, who had "raised serious concerns about the legal viability and timing of this legislation."

93.     On March 30, 2020, Governor Little signed H.B. 500 into law. It becomes effective on July 1, 2020.

94.     Also signed into law by Governor Little on March 30, 2020 was H.B. 509, a law barring the state from accurately reflecting the sex of transgender and some intersex individuals on Idaho-issued birth certificates. This Court had already ruled that Idaho's previous policy for restricting updates to the sex designation on birth certificates was unconstitutionally discriminatory, with State of Idaho defendant officials admitting its irrationality. *See F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018). Yet, H.B. 509's supporters urged reenactment of the policy deemed

---

[17] Tony Park, Wayne Kidwell, David Leroy, Jim Jones, and Al Lance, *5 former Idaho attorneys general urge transgender bill veto*, Idaho Statesman (Mar. 17, 2020), https://www.idahostatesman.com/opinion/readers-opinion/article241267071.html.

unconstitutional because, according to supporters of the bill, "Boys are boys and girls are girls, and no doctor, no judge, no Health & Welfare Department is going to change that reality."[18]

**F.      Transgender Individuals and Appropriate Medical Treatment**

95.      "Gender identity" is the medical term for a person's internal, innate sense of belonging to a particular sex.

96.      Medical consensus supports that there is a significant biologic component underlying gender identity.

97.      Everyone has a gender identity. An individual's gender identity is durable and cannot be changed by medical intervention.

98.      The term "biological sex" is imprecise. A person's sex encompasses several different biological attributes, including certain chromosomes, certain genes, gonads, the body's production of and response to certain hormones, internal and external genitalia, secondary sex characteristics, and gender identity. Those attributes are not always aligned in typical ways.

99.      When a child is born, a sex designation usually occurs at birth based on the infant child's genitals. This designation is then recorded and usually becomes the designation listed on the infant's birth certificate. Most

---

[18] Betsy Russell, *Senate votes 27-6 in favor of HB 509, the transgender birth certificate bill, sending it to Gov. Little*, Idaho Press: Eye on Boise, Mar. 17, 2020, https://www.idahopress.com/eyeonboise/senate-votes-27-6-in-favor-of-hb-509-the-transgender-birth-certificate-bill-sending/article_1d9fad0f-3f4d-5b79-abef-3fe56f2cc1bf.html, *archived at* https://perma.cc/9ZPL-7WRW (quoting Idaho Sen. Lee Heider).

people have a gender identity that aligns with the sex they are assigned at birth.

100.    A transgender individual is someone who has a gender identity that does not align with the sex they are assigned at birth. This lack of alignment experienced by transgender individuals can create significant distress that is felt by children as young as two years old.

101.    According to the American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders ("DSM-V"), "gender dysphoria" is the diagnostic term for the condition where clinically significant distress results from the lack of congruence between a person's gender identity and the sex they are designated at birth.

102.    Gender dysphoria is a serious medical condition that, if left untreated, can result in severe anxiety and depression, self-harm, and suicidality.

103.    Attempted suicide rates in the transgender community are over 40%. The only treatment to avoid this serious harm is to recognize the gender identity of patients with gender dysphoria and follow appropriate treatment protocols to affirm gender identity and alleviate distress.

104.    The Endocrine Society and the World Professional Association for Transgender Health have published widely accepted standards of care for treating individuals with gender dysphoria. The goal of medical treatment for

gender dysphoria is to eliminate the clinically significant distress by helping

a transgender person live in alignment with their gender identity.

105.   Every major medical association in the United States agrees

that the medically necessary treatment for gender dysphoria is safe,

necessary, and effective.

106.   The precise treatment for gender dysphoria depends on each

person's individualized need, and the medical standards of care differ

depending on whether the treatment is for a pre-pubertal child, an

adolescent, or an adult.

107.   For transgender individuals of all ages, a critical part of

treatment is affirming "social transition": the process by which a person

expresses themselves consistent with gender identity. It undermines social

transition to force a person with gender dysphoria to live in a manner that

does not align with the person's gender identity. For example, requiring a girl

who is transgender to use facilities or participate in single-sex activities for

boys can be deeply harmful and disruptive to treatment. In the context of

activities like athletics, forcing a girl who is transgender out of spaces

designated for girls is extremely harmful and can result in serious health

consequences.

108.   For many transgender adolescents, going through endogenous

puberty can cause extreme distress. Puberty-blocking treatment allows

transgender youth to avoid going through their endogenous puberty, thereby

avoiding the heightened gender dysphoria and permanent physical changes that puberty would cause.

109.   Puberty-blocking treatment pauses endogenous puberty at whatever stage it is at when the treatment begins. This has the impact of limiting the influence of a person's endogenous hormones on the body. For example, a girl who is transgender who undergoes puberty-blocking treatment will experience none of the impacts of testosterone that would be typical if she underwent her endogenous puberty.

110.   The overwhelming majority of youth who are treated with puberty-blocking treatment continue treatment and initiate medically necessary, gender-affirming hormone therapy to initiate puberty consistent with gender identity. For girls who are transgender this means administering both testosterone-suppressing treatment as well as estrogen to initiate hormonal puberty consistent with gender identity and preventing the impacts of testosterone that would result from their endogenous puberty. For boys who are transgender this means administering testosterone.

111.   Treatment protocols for adults also recommend gender-affirming therapy for patients to alleviate distress when deemed medically necessary.

112.   Hormone therapy and social transition significantly change a person's physical appearance and bodily systems.

113.   After the age of majority, and in some cases beginning around the age of 16, transgender individuals may be treated with surgery to bring

their body into further alignment with their gender identity. Some surgical treatment alters hormone production and reduces or eliminates the need for patients to administer exogenous hormones as part of treatment of gender dysphoria. Not all transgender people need surgical treatment to alleviate their dysphoria.

**G.   Intersex Individuals**

114.   Intersex people, who comprise up to 2% of the population, are born with variations in physiological characteristics associated with sex. These variations may appear in a person's chromosomes, genitals, internal organs like testes or ovaries, secondary sex characteristics, or hormone production or response.

115.   Not all intersex traits are discovered at birth. Some might become apparent at puberty, later in adulthood, or never. In cases where there are clear variations among sex attributes, experts may disagree on the "correct" sex to designate an intersex child in infancy.

116.   However, medical experts agree that when an individual's sex attributes conflict, the attribute that should be determinative is their self-attested gender identity once it is known. Therefore, if a sex designation in infancy is made that later conflicts with a person's gender identity, the appropriate course of action is to re-designate the individual's sex in line with gender identity.

117.   Often, children discovered to be intersex in infancy are subjected to nonconsensual, harmful, and irreversible "normalizing" surgical

interventions, including reducing the size of the clitoris, creating a vaginal opening, and removing hormone-producing gonads in an attempt to erase their intersex differences based on notions of what is "normal" for boys' or girls' bodies. These interventions, when performed without the consent of the affected individual, have been condemned by every human rights organization to have considered the issue. Though the practice is increasingly under question by authorities, many intersex individuals, including youth, have extreme medical trauma related to nonconsensual genital interventions.

118.    There are roughly forty variations in which a person's sex characteristics (such as chromosomes, genitalia, hormones) do not all align in typical male or female ways. In addition to CAIS (described above with respect to María Martínez-Patiño), these variations include Partial Androgen Insensitivity Syndrome (PAIS), Swyer Syndrome, Turner Syndrome, Mosaicism, Ovotesticular DSD, Congenital Adrenal Hyperplasia (CAH), and 5-Alpha Reductase Deficiency (5-ARD), among others.

119.    In an estimated one out of every 1,000 to 2,000 live births, the infant's genitals do not appear typically male or female. Many intersex traits are not visible at birth. Given that approximately 2% of the population has an intersex variation, in any given school district, there are likely to be multiple students with intersex traits.

120.    The type of sex verification testing that H.B. 500 requires could reveal intersex traits, in some instances for the first time. For example, a

genetic test could reveal that someone had XY chromosomes despite having been assigned female at birth (as for María Martínez-Patiño). It could also reveal that a person had less common chromosomal combinations, like XO, XXY, or mosaicism (a different chromosome combination in different cells of the body). An examination of internal reproductive anatomy could reveal that someone did not have a uterus or ovaries, despite having been born with female-typical external anatomy. A hormone test could reveal an unexpected level of one or more hormones associated with sex. Because any one test required under H.B. 500 might produce atypical results for an intersex girl or woman, she might have to undergo additional tests in an attempt to prove her sex under the law.

**H.    H.B. 500 Is Directed at and Harms Only Women and Girls, Including Women and Girls Who Are Transgender and Intersex**

121.    Under H.B. 500, all women and girls who are transgender are barred from athletic activities for women and girls. This is so because transgender women will not be able to establish a "biological sex" of female based on the deliberately limited bases of "proof" available under H.B. 500: internal and external reproductive anatomy, chromosomes, or endogenous testosterone levels (intrinsic levels without medical intervention). Even women who have had gender-affirming genital surgery to treat gender dysphoria, and therefore may meet the test imposed by H.B. 500 as to external reproductive anatomy, would not have a uterus or ovaries, and so would not meet it as to internal reproductive anatomy. The vast majority of

women who are transgender have XY chromosomes. And even women who are transgender whose circulating testosterone levels are within a range typical of non-transgender women would be disqualified because those testosterone levels are influenced by treatment for gender dysphoria, and thus not "endogenous."

122.    Under H.B. 500, some women and girls with intersex traits will be completely barred from athletics consistent with their gender identity as well, because they will likewise be unable to establish a "biological sex" of female based on reproductive anatomy, chromosomes, or endogenous testosterone levels. Intersex girls with congenital adrenal hyperplasia, for example, may be judged to have genitals that appear "too masculine." Intersex girls with CAIS (like María Martínez-Patiño) could be disqualified on the basis of their XY chromosomes, testosterone levels, or internal testes, despite the fact that their bodies are not responsive to the testosterone they produce. Other women and girls with intersex traits might be permitted to participate on women's teams, but only after enduring invasive and traumatizing examinations to assess their sex characteristics, and after sharing information from those examinations with school officials.

123.    H.B. 500 is expressly directed at only women's and girls' sports; it does not restrict participation in men's and boys' sports. It states that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex," with no comparable provision for men's

and boys' sports, and then sets out the only criteria that may be used to determine "sex" for this purpose. Idaho Code § 33-6203(2).

124.    H.B. 500 authorizes, and includes no mechanisms to protect athletes from, unwarranted intrusion into their bodies and disclosure of private medical information. Nor does H.B. 500 protect against further disclosure of private medical information by school officials to others.

125.    The language of H.B. 500 does not limit who may "dispute" an individual's sex as not being "biological[ly]" female.

126.    Female athletes who are successful, who have features that are considered masculine, or who simply become someone's target, may have their sex "dispute[d]" and may then be subjected to invasive medical testing.

127.    The purpose of a sports physical is to make sure that a student-athlete does not have an underlying health condition that could result in serious injury or death while participating in athletics. Genetic tests, internal and external reproductive anatomy exams, and blood tests for endogenous hormone levels – the exclusive means of testing for "biological sex" as required by H.B. 500 – are not part of any standard athletic physical or other examination that women and girls typically undergo. In addition, the tests laid out in H.B. 500 can be very expensive, and a student-athlete and her family may be forced to bear the costs of the testing.

128.    Genetic testing, pelvic examinations, transvaginal pelvic ultrasounds, and blood tests can and do reveal a significant amount of extremely private personal information.

129.    Genetic testing, pelvic examinations, transvaginal pelvic ultrasounds, and blood tests can cause trauma and trigger past sexual and other types of trauma.

130.    The language of H.B. 500 does not impose any limits on school officials disclosing information they receive about these tests to others.

131.    Fear of being subject to such invasive testing will deter female athletes, including but not limited to women and girls who are transgender and intersex, from participating in athletics.

132.    Athletics offer a range of benefits to children and young adults that are experienced throughout life. For example, athletes who participate in high school sport are more likely to finish college and more likely to be actively engaged in planning for their future after their sport career ends. One study found that women who participated in high school sport enjoyed greater success in the business world.

133.    Athletics offer students in school a range of physical and emotional health benefits, including an opportunity to gain confidence, to develop important social and coping skills, and to build social connections.

134.    Policies that bar subsets of women and girls from athletic competition for women and girls limit the benefits of athletics for *all* women

42

and girls. Such policies also discourage, rather than encourage, participation in athletics.

135.    Excluding girls who are transgender and intersex from athletics alongside their peers increases shame and stigma and contributes to negative physical and emotional health outcomes for those who are excluded.

136.    Often young girls who are transgender or intersex are not known to be transgender or intersex in their schools and by their peers. H.B. 500 thus could force them to either abandon participation in sports or disclose this private information. Both options risk stigma, shame, isolation, and physical and emotional harm.

137.    Policies that exclude girls and women who are transgender from activities for girls and women interfere with treatment for gender dysphoria, increase risk of suicide, and contribute to negative health outcomes.

## CLAIMS FOR RELIEF

### COUNT I
Deprivation of Equal Protection
U.S. Const. Amend. XIV
Plaintiff Hecox against Defendant Little, State Board of Education
Defendants, and Defendant Tromp
Plaintiff Doe against Defendant Little, Defendant Ybarra, State Board of
Education Defendants, and Boise School District Defendants

138.    Plaintiffs incorporate paragraphs 1 through 137 as though fully set forth herein.

139.    Plaintiffs bring this Count against Defendant Little and the State Board of Education Defendants. Plaintiff Hecox also brings this Count

against Defendant Tromp. Plaintiff Doe also brings this Count against Defendant Ybarra and the Boise School District Defendants.

140.   The Equal Protection Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

141.   Under the Equal Protection Clause, discrimination by the government based both on sex and transgender status is tested under heightened scrutiny and is therefore presumptively unconstitutional absent a showing by the government that the discrimination is substantially related to an important state interest.

142.   Transgender individuals as a group possess all the indicia of a suspect class that have been identified by the Supreme Court as triggering heightened scrutiny, including: (1) transgender people have experienced a history of discrimination; (2) transgender people are a discrete and insular minority who lack the political power to protect themselves through the legislative process; (3) being transgender does not limit or affect one's ability to contribute to society; and (4) being transgender is a core part of one's identity so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

143.    H.B. 500 singles out women, individuals who depart from sex stereotypes, transgender people, and intersex people for discriminatory treatment.

144.    Under H.B. 500, only those competing in women's sports are subject to being excluded if their sex is "disputed" and they do not submit to invasive treatment in order to "verify" they are women; those competing in men's sports may participate without having to undergo invasive testing under the new law.

145.    Under H.B. 500, girls and women who are transgender and intersex girls and women deemed insufficiently female or insufficiently feminine are barred from athletic competition consistent with their gender identity.

146.    H.B. 500 is an extreme departure from athletic policy anywhere in the world.

147.    H.B. 500 was passed in the midst of a global pandemic, along with another bill targeting transgender people.

148.    H.B. 500 was passed based on unfounded stereotypes and false scientific claims.

149.    H.B. 500 was passed even though Idaho had a preexisting policy regarding transgender athletes that was consistent with the most stringent standards in national and international athletic competition. H,B. 500 was passed even though there were no reported issues of people misusing Idaho's

preexisting policy; in fact, there was no record of any athletes using that policy at all.

150.    H.B. 500 is not substantially related to any important state interest.

151.    H.B. 500 is not rationally related to any legitimate state interest.

**COUNT II**
Deprivation of Substantive Due Process
Infringement Upon Right to Informational Privacy
U.S. Const. Amend. XIV
Plaintiff Hecox against Defendant Little, State Board of Education
Defendants, and Defendant Tromp
Plaintiff Doe against Defendant Little, Defendant Ybarra, State Board of
Education Defendants, and Boise School District Defendants

152.    Plaintiffs incorporate paragraphs 1 through 151 as though fully set forth herein.

153.    Plaintiffs bring this Count against Defendant Little and the State Board of Education Defendants. Plaintiff Hecox also brings this Count against Defendant Tromp. Plaintiff Doe also brings this Count against Defendant Ybarra and the Boise School District Defendants.

154.    The Due Process Clause of the Fourteenth Amendment places limitations on state action that deprives individuals of life, liberty, or property.

155.    Substantive protections of the Due Process Clause include the right to avoid disclosure of sensitive, personal information.

156.    There is a fundamental right of privacy in preventing the release of, and in deciding in what circumstances to release: (1) personal information that, if disclosed, could subject an individual to bodily harm; and (2) information of a highly personal and intimate nature, including medical information.

157.    By forcing women and girls to undergo invasive internal and external reproductive examinations and turn over sensitive information to the government to participate in athletic activities, H.B. 500 infringes Plaintiffs' right to privacy.

158.    There is no compelling state interest that is furthered by H.B. 500, nor is H.B. 500 narrowly tailored or the least restrictive alternative for promoting a state interest. H.B. 500 is not even rationally related to a legitimate state interest.

159.    In addition, the privacy interests of women and girls subjected to the forced disclosure of sensitive information, including genetic information and information about their genital and reproductive anatomy, outweigh any purported interest the government could assert.

160.    Because the government lacks a sufficient interest in subjecting women and girls to intrusive and offensive testing and learning the privacy-invasive results of those tests, H.B. 500 violates Plaintiffs' right to privacy.

161.   H.B. 500 further violates Plaintiffs' right to privacy because it lacks safeguards to prevent unauthorized disclosure by school officials of the sensitive information learned through this intrusive and offensive testing.

**COUNT III**
Unconstitutional Search & Seizure
U.S. Const. Amend. IV
Plaintiff Hecox against Defendant Little, State Board of Education Defendants, and Defendant Tromp
Plaintiff Doe against Defendant Little, Defendant Ybarra, State Board of Education Defendants, and Boise School District Defendants

162.   Plaintiffs incorporate paragraphs 1 through 161 as though fully set forth herein.

163.   Plaintiffs bring this Count against Defendant Little and the State Board of Education Defendants. Plaintiff Hecox also brings this Count against Defendant Tromp. Plaintiff Doe also brings this Count against Defendant Ybarra and the Boise School District Defendants.

164.   The Fourth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated . . ." U.S. Const. amend. IV.

165.   A government-compelled medical test is a search under the Fourth Amendment.

166.    Government-compelled and medically unnecessary pelvic examinations, transvaginal pelvic ultrasounds, blood tests, and genetic tests are searches under the Fourth Amendment.

167.    A government-compelled disclosure of private medical information is a search under the Fourth Amendment.

168.    Subjecting women and girls to invasive medical testing that is not medically necessary or appropriate, and forcing them to disclose the results of this testing to the government, is unreasonable.

169.    The government has no legitimate basis for the forced testing or disclosure of private medical information of girls and women.

170.    The searches involve invasive and offensive intrusions on the bodies of girls and women, and obtain information that is highly sensitive and private.

171.    By forcing athletes subjected to a "dispute" over their sex to disclose to their school private medical information, including information about their genetics, hormones, and/or genitals, H.B. 500 subjects female athletes in Idaho to unreasonable searches in violation of the Fourth Amendment.

**COUNT IV**
Violation of Title IX
20 U.S.C. § 1681, *et seq.*
Plaintiff Hecox against Defendant Boise State University
Plaintiff Doe against Boise School District

172.   Plaintiff incorporates paragraphs 1 through 171 as though fully set forth herein.

173.   Plaintiff Hecox brings this Count against Boise State University. Plaintiff Doe brings this Count against Defendant Boise School District.

174.   Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

175.   Under Title IX, discrimination "on the basis of sex" encompasses discrimination against individuals because they are transgender, because they are women and girls (whether cisgender or transgender), and because they depart from stereotypes associated with sex (which can include stereotypes about sex characteristics that are or are not typically associated with being male or female).

176.   The statutory language of Title IX does not exempt athletic programs from the broad prohibition on discrimination. The implementing regulations for Title IX permit sports teams to be separated by sex but do not mandate such separation.

177.   Neither Title IX, its regulations, nor its guidance purports to define "sex" based on endogenous hormone levels, internal or external reproductive anatomy, or chromosomes, nor do they specify what constitutes separation of sex for purposes of athletic activities, should a school choose to separate certain sports teams by sex.

178.   Pursuant to H.B. 500, Defendants Boise State University and the Boise School District are required to obtain from a student athlete whose sex is "disputed": "a health examination and consent form or other statement signed by the student's personal health care provider that shall verify the student's biological sex." Idaho Code § 33-6203(3) (engrossment).

179.   Only girls and women can be excluded from participation in sports under H.B. 500.

180.   By barring Plaintiff Hecox from girls' and women's athletic teams, Defendants exclude her from, deny her the benefits of, and subject her to discrimination in educational programs and activities "on the basis of sex," in violation of her rights under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

181.   By subjecting Plaintiff Doe to potential "dispute" over her sex and exposing her to invasive, expensive, and unnecessary medical testing, Defendants deny her the benefits of, and subject her to discrimination in educational programs and activities "on the basis of sex," in violation of her

rights under Title IX of the Education Amendments of 1972, 20 U.S.C. §

1681, *et seq*.

## COUNT V
Lack of Fair Notice
U.S. Const. Amend. XIV
Plaintiffs against the Idaho Code Commission Defendants

182.   Plaintiff incorporates paragraphs 1 through 181 as though fully

set forth herein.

183.   Plaintiffs bring this Count against the members of the Idaho

Code Commission in their official capacities.

184.   Because H.B. 500 is unconstitutional, the Idaho Code misleads

and deceives school officials, other government actors, students, and the

general public about the requirements of the law. The publication of H.B.

500's provisions in the official Idaho Code without clear notice stating that

the law is unconstitutional and unenforceable coerces compliance with the

law despite its unconstitutionality and illegality, chills women and girls from

participating in student sports, and promotes unconstitutional and illegal

enforcement of the law by school officials and other government actors.

185.   The lack of fair notice of the unconstitutionality and

unenforceability of H.B. 500 in the Idaho Code violates the due process clause

of the Fourteenth Amendment to the U.S. Constitution.

186.   Under 42 U.S.C. § 1983, Plaintiffs are entitled to injunctive

relief requiring defendants to publish clear notice in the official Idaho Code of

the Act's unconstitutionality and unenforceability.

187.    Plaintiffs are also entitled under 28 U.S.C. §§ 2201–2202 to a declaratory judgment declaring that official publication of Idaho Code §§ 33-6201–6206 without clear notice of those provisions' unconstitutionality and unenforceability is unconstitutional.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter orders and judgment:

A.    Declaring that the provisions of and enforcement by Defendants of H.B. 500 as discussed above violate Plaintiffs' rights under the Equal Protection and Due Process Clauses of the Fourteenth Amendment and the Fourth Amendment to the United States Constitution;

B.    Declaring that the provisions of and enforcement by Defendants of H.B. 500 as discussed above violate Plaintiffs' rights under Title IX;

C.    Declaring that official publication of Idaho Code §§ 33-6201–6206 without clear notice of those provisions' unconstitutionality and unenforceability is unconstitutional;

D.    Preliminarily and permanently enjoining enforcement or any threat of enforcement by Defendants and their employees, agents, appointees, or successors of H.B. 500 as discussed above;

E.    Preliminarily and permanently enjoining the individual members of the Idaho Code Commission and their employees, agents,

appointees, and successors to publish clear notice that Idaho Code §§ 33-6201–6206 are unconstitutional, unenforceable, null, and void;

     F.     Waiving the requirement for the posting of a bond as security for entry of temporary or preliminary injunctive relief;

     G.     Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

     H.     Granting such other and further relief as the Court deems just and proper.

Dated: April 15, 2020

Respectfully submitted,

/s/ Richard Eppink

Richard Eppink (Bar No. 7503)
AMERICAN CIVIL LIBERTIES UNION
OF IDAHO
FOUNDATION
P. O. Box 1897
Boise, ID 83701
United States
T: (208) 344-9750 ext. 1202
REppink@acluidaho.org

Gabriel Arkles*
James Esseks*
Chase Strangio*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.,
New York, NY 10004
T: (212) 549-2569
garkles@aclu.org
jesseks@aclu.org
cstrangio@aclu.org

Kathleen Hartnett*
COOLEY LLP
101 California Street 5th Floor
San Francisco, CA 94111-5800
T: (415) 693-2000
F: (415) 693-2222
khartnett@cooley.com

Elizabeth Prelogar*
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington D.C. 20004-2400
T: (202) 842-7800
F: (202) 842-7899
eprelogar@cooley.com

Andrew Barr*
COOLEY LLP
380 Interlocken Crescent, Ste. 900
Broomfield, CO  80021-8023
T: (720) 566-4000
F: (720) 566-4099
abarr@cooley.com

Catherine West*
LEGAL VOICE
907 Pine Street, Unit 500
Seattle, WA 98101
T: (206) 682-9552
F: (206) 682-9556
cwest@legalvoice.org

*<em>Pro Hac Vice</em> Motion To Be Filed

# EXHIBIT A

LEGISLATURE OF THE STATE OF IDAHO

Sixty-fifth Legislature                    Second Regular Session - 2020

IN THE HOUSE OF REPRESENTATIVES

HOUSE BILL NO. 500, As Amended in the Senate

BY EDUCATION COMMITTEE

1          AN ACT
2  RELATING TO THE FAIRNESS IN WOMEN'S SPORTS ACT; AMENDING TITLE 33, IDAHO
3      CODE, BY THE ADDITION OF A NEW CHAPTER 62, TITLE 33, IDAHO CODE, TO
4      PROVIDE A SHORT TITLE, TO PROVIDE LEGISLATIVE FINDINGS AND PURPOSE, TO
5      PROVIDE FOR THE DESIGNATION OF ATHLETIC TEAMS, TO PROVIDE PROTECTION
6      FOR EDUCATIONAL INSTITUTIONS, TO PROVIDE FOR A CAUSE OF ACTION, AND TO
7      PROVIDE SEVERABILITY.

8  Be It Enacted by the Legislature of the State of Idaho:

9      SECTION 1.  That Title 33, Idaho Code, be, and the same is hereby amended
10 by the addition thereto of a NEW CHAPTER, to be known and designated as Chap-
11 ter 62, Title 33, Idaho Code, and to read as follows:

12                    CHAPTER 62
13              FAIRNESS IN WOMEN'S SPORTS ACT

14     33-6201.  SHORT TITLE. This chapter shall be known and may be cited as
15 the "Fairness in Women's Sports Act."

16     33-6202.  LEGISLATIVE FINDINGS AND PURPOSE. (1) The legislature finds
17 that there are "inherent differences between men and women," and that these
18 differences "remain cause for celebration, but not for denigration of the
19 members of either sex or for artificial constraints on an individual's op-
20 portunity," United States v. Virginia, 518 U.S. 515, 533 (1996);
21     (2)  These "inherent differences" range from chromosomal and hormonal
22 differences to physiological differences;
23     (3)  Men generally have "denser, stronger bones, tendons, and liga-
24 ments" and "larger hearts, greater lung volume per body mass, a higher red
25 blood cell count, and higher haemoglobin," Neel Burton, The Battle of the
26 Sexes, Psychology Today (July 2, 2012);
27     (4)  Men also have higher natural levels of testosterone, which affects
28 traits such as hemoglobin levels, body fat content, the storage and use of
29 carbohydrates, and the development of type 2 muscle fibers, all of which re-
30 sult in men being able to generate higher speed and power during physical
31 activity, Doriane Lambelet Coleman, Sex in Sport, 80 Law and Contemporary
32 Problems 63, 74 (2017) (quoting Gina Kolata, Men, Women and Speed. 2 Words:
33 Got Testosterone?, N.Y. Times (Aug. 21, 2008));
34     (5)  The biological differences between females and males, especially
35 as it relates to natural levels of testosterone, "explain the male and female
36 secondary sex characteristics which develop during puberty and have life-
37 long effects, including those most important for success in sport:  cate-
38 gorically different strength, speed, and endurance," Doriane Lambelet Cole-
39 man and Wickliffe Shreve, "Comparing Athletic Performances:  The Best Elite
40 Women to Boys and Men," Duke Law Center for Sports Law and Policy;

2

(6)  While classifications based on sex are generally disfavored, the Supreme Court has recognized that "sex classifications may be used to compensate women for particular economic disabilities [they have] suffered, to promote equal employment opportunity, [and] to advance full development of the talent and capacities of our Nation's people," United States v.  Virginia, 518 U.S. 515, 533 (1996);

(7)  One place where sex classifications allow for the "full development of the talent and capacities of our Nation's people" is in the context of sports and athletics;

(8)  Courts have recognized that the inherent, physiological differences between males and females result in different athletic capabilities. See e.g.  Kleczek v.  Rhode Island Interscholastic League, Inc., 612 A.2d 734, 738 (R.I. 1992) ("Because of innate physiological differences, boys and girls are not similarly situated as they enter athletic competition."); Petrie v. Ill. High Sch. Ass'n, 394 N.E.2d 855, 861 (Ill. App. Ct. 1979) (noting that "high school boys [generally possess physiological advantages over] their girl counterparts" and that those advantages give them an unfair lead over girls in some sports like "high school track");

(9)  A recent study of female and male Olympic performances since 1983 found that, although athletes from both sexes improved over the time span, the "gender gap" between female and male performances remained stable. "These suggest that women's performances at the high level will never match those of men." Valerie Thibault et al., Women and men in sport performance: The gender gap has not evolved since 1983, 9 Journal of Sports Science and Medicine 214, 219 (2010);

(10) As Duke Law professor and All-American track athlete Doriane Coleman, tennis champion Martina Navratilova, and Olympic track gold medalist Sanya Richards-Ross recently wrote:  "The evidence is unequivocal that starting in puberty, in every sport except sailing, shooting, and riding, there will always be significant numbers of boys and men who would beat the best girls and women in head-to-head competition. Claims to the contrary are simply a denial of science," Doriane Coleman, Martina Navratilova, et al., Pass the Equality Act, But Don't Abandon Title IX, Washington Post (Apr. 29, 2019);

(11) The benefits that natural testosterone provides to male athletes is not diminished through the use of puberty blockers and cross-sex hormones. A recent study on the impact of such treatments found that even "after 12 months of hormonal therapy," a man who identifies as a woman and is taking cross-sex hormones "had an absolute advantage" over female athletes and "will still likely have performance benefits" over women, Tommy Lundberg et al., "Muscle strength, size and composition following 12 months of gender-affirming treatment in transgender individuals: retained advantage for the transwomen," Karolinksa Institutet (Sept. 26, 2019); and

(12) Having separate sex-specific teams furthers efforts to promote sex equality.  Sex-specific teams accomplish this by providing opportunities for female athletes to demonstrate their skill, strength, and athletic abilities while also providing them with opportunities to obtain recognition and accolades, college scholarships, and the numerous other long-term benefits that flow from success in athletic endeavors.

3

1   33-6203.   DESIGNATION OF ATHLETIC TEAMS. (1) Interscholastic, inter-
2   collegiate, intramural, or club athletic teams or sports that are sponsored
3   by a public primary or secondary school, a public institution of higher edu-
4   cation, or any school or institution whose students or teams compete against
5   a public school or institution of higher education shall be expressly desig-
6   nated as one (1) of the following based on biological sex:
7       (a)  Males, men, or boys;
8       (b)  Females, women, or girls; or
9       (c)  Coed or mixed.
10      (2)  Athletic teams or sports designated for females, women, or girls
11  shall not be open to students of the male sex.
12      (3)  A dispute regarding a student's sex shall be resolved by the school
13  or institution by requesting that the student provide a health examination
14  and consent form or other statement signed by the student's personal health
15  care provider that shall verify the student's biological sex.  The health
16  care provider may verify the student's biological sex as part of a routine
17  sports physical examination relying only on one (1) or more of the following:
18  the student's reproductive anatomy, genetic makeup, or normal endogenously
19  produced testosterone levels.  The state board of education shall promul-
20  gate rules for schools and institutions to follow regarding the receipt and
21  timely resolution of such disputes consistent with this subsection.

22      33-6204.   PROTECTION FOR EDUCATIONAL INSTITUTIONS. A government
23  entity, any licensing or accrediting organization, or any athletic associa-
24  tion or organization shall not entertain a complaint, open an investigation,
25  or take any other adverse action against a school or an institution of higher
26  education for maintaining separate interscholastic, intercollegiate, in-
27  tramural, or club athletic teams or sports for students of the female sex.

28      33-6205.   CAUSE OF ACTION. (1) Any student who is deprived of an ath-
29  letic opportunity or suffers any direct or indirect harm as a result of a vi-
30  olation of this chapter shall have a private cause of action for injunctive
31  relief, damages, and any other relief available under law against the school
32  or institution of higher education.
33      (2)  Any student who is subject to retaliation or other adverse action by
34  a school, institution of higher education, or athletic association or organ-
35  ization as a result of reporting a violation of this chapter to an employee
36  or representative of the school, institution, or athletic association or or-
37  ganization, or to any state or federal agency with oversight of schools or
38  institutions of higher education in the state, shall have a private cause of
39  action for injunctive relief, damages, and any other relief available under
40  law against the school, institution, or athletic association or organiza-
41  tion.
42      (3)  Any school or institution of higher education that suffers any di-
43  rect or indirect harm as a result of a violation of this chapter shall have a
44  private cause of action for injunctive relief, damages, and any other relief
45  available under law against the government entity, licensing or accrediting
46  organization, or athletic association or organization.
47      (4)  All civil actions must be initiated within two (2) years after the
48  harm occurred.  Persons or organizations who prevail on a claim brought pur-

4

1   suant to this section shall be entitled to monetary damages, including for
2   any psychological, emotional, and physical harm suffered, reasonable attor-
3   ney's fees and costs, and any other appropriate relief.

4        33-6206.   SEVERABILITY. The provisions of this chapter are hereby de-
5   clared to be severable and if any provision of this chapter or the applica-
6   tion of such provision to any person or circumstance is declared invalid for
7   any reason, such declaration shall not affect the validity of the remaining
8   portions of this chapter.