Richard Eppink (Bar No. 7503)
AMERICAN CIVIL LIBERTIES UNION OF
IDAHO FOUNDATION
P. O. Box 1897
Boise, ID 83701
T: (208) 344-9750 ext. 1202
REppink@acluidaho.org

Gabriel Arkles*
James Esseks*
Chase Strangio*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.,
New York, NY 10004
T: (212) 549-2569
garkles@aclu.org
jesseks@aclu.org
cstrangio@aclu.org

Kathleen Hartnett*
COOLEY LLP
101 California Street 5th Floor
San Francisco, CA 94111-5800
T: (415) 693-2000
F: (415) 693-2222
khartnett@cooley.com

*Attorneys for Plaintiffs*

Elizabeth Prelogar*
COOLEY LLP
1299 Pennsylvania Avenue, NW Suite 700
Washington D.C. 20004-2400
T: (202) 842-7800
F: (202) 842-7899
eprelogar@cooley.com

Andrew Barr*
COOLEY LLP
380 Interlocken Crescent, Ste. 900
Broomfield, CO  80021-8023
T: (720) 566-4000
F: (720) 566-4099
abarr@cooley.com

Catherine West*
LEGAL VOICE
907 Pine Street, Unit 500
Seattle, WA 98101
T: (206) 682-9552
F: (206) 682-9556
cwest@legalvoice.org

* Admitted *Pro Hac Vice*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| LINDSAY HECOX, et al., | No. 1:20-cv-184-CWD |
|---|---|
| *Plaintiffs,* | |
| v. | **MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| BRADLEY LITTLE, et al., | |
| *Defendants.* | |

## INTRODUCTION

Idaho's newly enacted House Bill 500a ("H.B. 500") completely bans all women and girls who are transgender, and many who are intersex, from playing school sports in Idaho at any level.[1]  The bill takes effect on July 1, 2020, and, if not preliminarily enjoined before tryouts begin in August, will bar this subset of Idaho women and girls from school sports this fall.  The bill will also force all women and girl athletes to endure invasive and medically unnecessary testing if anyone "disputes" their sex.

By design, H.B. 500's process to "verify" a student's "biological sex" excludes all women and girls who are transgender.  Rules governing high school sports in every other state in the country, national college sports, and the most elite world competitions, including the Olympics, permit women and girls who are transgender to compete in the women's category.  Idaho now stands alone in enacting a wholesale bar on participation.  H.B. 500 overrides the state's previous policy regulating transgender inclusion in high school sports and contradicts National Collegiate Athletic Association ("NCAA")

---

[1] A **transgender** person has a gender identity that does not align with the sex they were assigned at birth.  The term **gender identity** is the medical term for a person's internal, innate sense of belonging to a particular sex. (Expert Declaration of Joshua D. Safer, MD, FACP, FACE ("Safer Decl.") ¶ 17.)  An individual's gender identity is durable and cannot be changed by medical intervention.  (*Id.* ¶ 18.)  A **cisgender** person has a gender identity that aligns with the sex they were assigned at birth.  An **intersex** person is born with variations in certain physiological characteristics associated with sex, such as chromosomes, genitals, internal organs like testes or ovaries, secondary sex characteristics, or hormone production or response.  (Expert Declaration of Deanna Adkins, MD ("Adkins Decl.") ¶ 41.)

rules governing collegiate athletics across the country.  The Legislature took this course of action without any evidence of problems under existing Idaho rules.

Plaintiff Lindsay Hecox is a Boise State University ("BSU") student who intends to try out for BSU's cross-country team this fall.  H.B. 500 will bar her from doing so because she is transgender.  Plaintiff Jane Doe is an athlete at Boise High School.  Under H.B. 500, she could be forced to submit to invasive and unnecessary testing because she participates in girls' sports.  H.B. 500 violates the Equal Protection Clause and will subject Plaintiffs to irreparable harm if it takes effect.  This Court should preserve the status quo until Plaintiffs' claims can be vindicated.

## STATEMENT OF FACTS

### I.    H.B. 500's Enactment.

On March 30, 2020, Idaho enacted H.B. 500 into law.  Idaho Code, Chapter 62, Title 33 (attached as Complaint Exhibit A (Dkt. 1 at 57)). Despite being titled the "Fairness in Women's Sport Act," H.B. 500's purpose and effect is to *categorically exclude* all women and girls who are transgender, and many who are intersex, from participating in school sports.  H.B. 500 also requires women and girl athletes to suffer discredited, invasive, and harmful testing to "verify" their "biological sex."

Specifically, H.B. 500 requires all school sports to be "expressly designated" as male, female, or co-ed "based on biological sex."  Idaho Code

§ 33-6203(1).  The term "biological sex" is not defined in the law.[2]  H.B. 500

mandates that "[a]thletic teams or sports designated for females, women, or

girls shall not be open to students of the male sex[,]" with no parallel

provision for male-designated teams.  *Id.* § 33-6203(2).  It also dictates that

women and girls whose sex is "dispute[d]" must undergo invasive and

medically unnecessary examinations:

> A dispute regarding a student's sex shall be resolved by the
> school or institution by requesting that the student provide a
> health examination and consent form or other statement signed
> by the student's personal health care provider that shall verify
> the student's biological sex.  The health care provider may verify
> the student's biological sex as part of a routine sports physical
> examination relying only on one (1) or more of the following:  the
> student's reproductive anatomy, genetic makeup, or normal
> endogenously produced testosterone levels.  The state board of
> education shall promulgate rules for schools and institutions to
> follow regarding the receipt and timely resolution of such
> disputes consistent with this subsection.

*Id.* § 33-6203(3).

Under H.B. 500, all women and girls who are transgender are barred

from athletic activities—and that was the law's express purpose.  The criteria

do not permit consideration of gender identity, even though gender identity is

---

[2] "[T]he terms 'biological male or female' should be avoided because not all
individuals have physical attributes that align perfectly with biological
maleness or femaleness, such as individuals with XY chromosomes
who may have female-appearing genitalia."  *Grimm v. Gloucester Cty. Sch.
Bd.*, 302 F. Supp. 3d 730, 743 (E.D. Va. 2018) (citing Endocrine Society
Guidelines); (*see also* Safer Decl. ¶ 23 ("A person's sex encompasses the sum
of several different biological attributes, including sex chromosomes, certain
genes, gonads, sex hormone levels, internal and external genitalia, other
secondary sex characteristics, and gender identity.  Those attributes are not
always aligned in the same direction.")).

a key component of sex, and transgender people who are not permitted to live consistently with their gender identity risk negative outcomes, including suicide.  (Adkins Decl. ¶¶ 18, 22, 28.)  They also do not permit consideration of circulating testosterone, the only sex-related characteristic with a documented relationship to athletic ability.  (Safer Decl. ¶ 25.)

Instead, the criteria focus on physiological characteristics that are designed to exclude women and girls who are transgender:  (1) reproductive anatomy, (2) genetic makeup, and (3) endogenous testosterone levels, *i.e.,* levels the body produces without medical intervention.[3]  With respect to reproductive anatomy, girls under age 18 generally cannot obtain gender-affirming genital surgery to treat gender dysphoria,[4] and therefore will not have a vulva and vagina.  (Adkins Decl. ¶ 36.)  Many women over age 18 who are transgender also have not had genital surgery, either because it is not consistent with their individualized treatment plan for gender dysphoria or because they cannot afford it.  (*Id.*)  Even after surgery, women who are transgender do not have a uterus or ovaries.  (*Id.*)  With respect to genetic makeup, the overwhelming majority of women who are transgender have XY

---

[3] Some girls with intersex traits will thus be excluded because they cannot establish a "biological sex" of female based on these "verif[ication]" metrics. (Safer Decl. ¶ 41.)

[4] Gender dysphoria is a serious medical condition experienced by transgender people that, if untreated, can result in severe anxiety and depression, self-harm, and suicidality.  (Adkins Decl. ¶ 20.)  Gender dysphoria is treated by recognizing the patient's gender identity and following appropriate treatment protocols to affirm gender identity and alleviate distress.  (*Id.* ¶ 25.)

chromosomes.[5]  And by focusing on "endogenous" testosterone levels,
H.B. 500 even excludes women who are transgender whose circulating
testosterone levels are within a range typical for cisgender women.

Prior to H.B. 500's enactment, Idaho's Attorney General issued a
written opinion letter stating that the bill raised serious constitutional
concerns.  The Attorney General explained that H.B. 500 authorized the
unequal treatment of all women compared to men, raised equal protection
concerns based on the exclusion of women who are transgender or intersex
from women's sports, and required women to endure invasive medical tests
that could constitute a privacy intrusion.[6]  Five of Idaho's prior Attorneys
General echoed these concerns in a letter urging Governor Little to veto the
bill due to an "apparent conflict with the Equal Protection Clause."[7]  Though
the Legislature made minor amendments to H.B. 500, those amendments did
not resolve the legal concerns that these letters identified.

## II.   H.B. 500 Is an Outlier Ban that Rests on Discredited Tests of "Biological Sex."

The examinations and testing H.B. 500 requires to "verify" a woman's

---

[5] The exceptions are transgender women with intersex traits who were
assigned male at birth while having XO, XXY, XX, or mosaic chromosomes.
(Adkins Decl. ¶ 48(f), 48(g).)
[6] Letter from Attorney General Lawrence Wadsen to Representative Ilana
Rubel (Feb. 25, 2020), https://www.idahopress.com/attorney-generals-opinion-
hb-500/pdf_4ebb604a-83eb-5bd4-a232-b13a64f4be47.html.
[7] Tony Park et al., *5 former Idaho attorneys general urge transgender bill veto*,
Idaho Statesman (Mar. 17, 2020, 10:53 AM),
https://www.idahostatesman.com/opinion/readers-
opinion/article241267071.html.

or girl's "biological sex" are invasive and not part of any "routine sports physical examination." Student sports physicals are brief examinations, the purpose of which is to promote students' health and ensure that students have no health conditions that could result in serious injury or death. (Expert Declaration of Sara Swoboda, MD ("Swoboda Decl.") ¶ 17.) In contrast, the invasive examination and testing that H.B. 500 prescribes do not serve any medical purpose and cannot, in fact, "verify" a woman's "biological sex" at all. (*See* Adkins Decl. ¶ 51; Safer Decl. ¶¶ 41–42; Swoboda Decl. ¶ 25.)

H.B. 500 revives archaic, discredited practices of excluding athletes who are transgender and intersex from sport and requiring women athletes to undergo invasive and humiliating tests to "prove" their sex. Today, leading sports organizations—including the Olympics, World Athletics, and the NCAA—allow women athletes who are transgender to participate in women's sports after suppressing their circulating testosterone levels for one year. (Safer Decl. ¶¶ 34–35; Expert Declaration of Helen Carroll ("Carroll Decl.") ¶ 27.) Most states permit girls who are transgender to compete on girls' teams without any testosterone suppression. (Carroll Decl. ¶¶ 18–19.)

Moreover, other than Idaho, no international or domestic sports body completely bans athletes from participating in women's sports as a result of their sex chromosomes, endogenous hormone levels, or reproductive anatomy. (Safer Decl. ¶ 43.) Tests disqualifying athletes from women's competition

based on the appearance of their genitals or their chromosomes have been wholly discredited by geneticists, medical professionals, human rights experts, and leading athletic regulatory bodies.[8]

Circulating testosterone is the only sex-related characteristic that has a documented effect on athletic ability.  (*Id.* ¶ 25.)  Despite this, H.B. 500 overrides the existing transgender inclusion policies of the Idaho High School Athletic Association ("IHSAA") and the NCAA, both of which focus on circulating testosterone as the metric for inclusion in women's sports.[9]

There are no known issues with the implementation of those rules in Idaho or anywhere else.  Indeed, the Legislature heard testimony that there has not been a single instance of a transgender athlete having ever competed under the IHSAA policy.[10]  Nevertheless, the Idaho Legislature stayed in session amidst the global COVID-19 pandemic to become the first and only state to bar all women and girls who are transgender from participating in school sports, thereby resurrecting outdated sex "verification" procedures that

---

[8] Vanessa Heggie, *Testing sex and gender in sports; reinventing, reimagining and reconstructing histories*, 34(4) Endeavor 157, 160 (Dec. 2010), https://doi.org/10.1016/j.endeavour.2010.09.005; (*see* Safer Decl. ¶ 43.)

[9] Idaho High School Activities Association, Rules and Regulations, 2019–20, Rule 11-3, https://idhsaa.org/asset/RULE%2011.pdf (last accessed Apr. 29, 2020); NCAA, *NCAA Inclusion of Transgender Student-Athletes* (Aug. 2011), https://www.ncaa.org/sites/default/files/Transgender_Handbook_2011_Final.pdf (NCAA's Policy on Transgender Student-Athlete Participation).

[10] Idaho Education News, *Lawmakers hear emotional testimony but take no action on transgender bill*, Idaho News 6 (Feb. 20, 2020, 9:46 AM), https://www.kivitv.com/news/education/making-the-grade/lawmakers-hear-emotional-testimony-but-take-no-action-on-transgender.

have long been abandoned in the rest of the world.

## III.   H.B. 500 Inflicts Substantial Harm.

Plaintiffs Lindsay Hecox and Jane Doe, like most avid athletes, love participating and competing on teams and have gained immense benefits from those experiences.  But H.B. 500 bars Lindsay from participating and conditions Jane's participation on enduring invasive examinations should her sex be disputed.

Participation in school sports promotes fitness and has significant lifelong benefits in academics and business.  (Expert Declaration of Mary Fry, PhD ("Fry Decl.") ¶¶ 45–46.)  These benefits are maximized when schools promote an inclusive atmosphere encouraging students to participate, work together, and improve their own performance.  (*Id.* ¶¶ 34–35.)  When students are excluded from sport, they are deprived of these benefits, with detrimental effects for all student-athletes exposed to that climate of exclusion.  (*Id.* ¶¶ 48–50.)

### *Lindsay Hecox*

Plaintiff Lindsay Hecox is a woman athlete who is transgender. (Declaration of Lindsay Hecox ("Hecox Decl.") ¶¶ 1, 21.)  She lives in Idaho and attends BSU as a freshman.  (*Id.* ¶ 1.)  Since September 2019, as part of her treatment for gender dysphoria, Lindsay has been treated with testosterone suppression and estrogen, which lower her circulating testosterone levels and affect her bodily systems and secondary sex characteristics.  (*Id.* ¶ 17.)  Her health and well-being depend on her living

and expressing herself as a woman.

Lindsay is a life-long runner who intends to try out for the BSU women's cross-country team in Fall 2020 and for the women's track team in Spring 2021.  (*Id.* ¶¶ 3, 4, 20.)  Under the current NCAA rules, Lindsay could compete at NCAA events in September—after one year of hormone treatment.  (*Id.* ¶ 21.)  But H.B. 500 has eliminated Lindsay's opportunity to compete on the BSU cross-country and track teams.

Running on the men's team is not a viable option for Lindsay.  She is a woman.  (*Id.* ¶ 37.)  Not only would being forced onto a men's team be contrary to Lindsay's medical treatment for her gender dysphoria,[11] it would also be painful and humiliating, and potentially subject her to harassment and further discrimination.  If H.B. 500 is in effect for the Fall 2020 season, Lindsay will not be able to participate in college sports at all.

### Jane Doe

Plaintiff Jane Doe is a 17-year old girl and athlete who is cisgender. (Declaration of Jane Doe ("Doe Decl.") ¶¶ 1, 3, 13.)  Jane has played sports since she was four, and competes on the varsity soccer and track teams at Boise High School, where she is a junior.  (*Id.* ¶ 3–4.)  She intends to play on

---

[11] (*See* Adkins Decl. ¶ 37 (describing how patients "suffer and experience worse health outcomes when they are ostracized from their peers through policies that exclude them from spaces and activities that other boys and girls are able to participate in consistent with gender identity.")); *see also* Br. of American Academy of Pediatrics, et al., *Grimm v. Gloucester Cty. Sch. Bd.*, No. 19-1952, ECF 32-1 (4th. Cir.).

the soccer team again in Fall 2020, after tryouts in early August.  (*Id.* ¶¶ 5–6.)  Because of H.B. 500, she is anxious about having to undergo the invasive examinations now required by law if anyone "dispute[s]" her sex.  (*Id.* ¶ 13.)

Jane does not commonly wear skirts or dresses and has an athletic build.  Because of these attributes, people sometimes think of her as masculine.  (*Id.* ¶ 13.)  Jane worries that one of her competitors may use these attributes as an excuse to dispute her sex, forcing her to undergo the testing H.B. 500 requires.  (*Id.*)  Jane has never had a genetic test, hormone test, or transvaginal pelvic ultrasound.  (*Id.* ¶ 10.)  Under H.B. 500, Jane could be subject to these forms of testing at any time, with her athletic career on the line if she fails to comply.

## ARGUMENT

## I.     Preliminary Injunction Standard.

A preliminary injunction is warranted where a party (1) is likely to succeed on the merits of her claim, (2) is likely to suffer irreparable harm in the absence of preliminary relief, (3) can show that the balance of hardships tips in her favor, and (4) can show that the injunction is in the public interest.  *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 399 (9th Cir. 2015).  "When the government is a party, these last two factors merge."  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  Preliminary injunctive relief can also be warranted where "serious questions going to the merits [are] raised and the balance of hardships tips sharply in the plaintiff's favor."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

1134–35 (9th Cir. 2011) (citation omitted).  And where, as here, the ultimate burden to justify H.B. 500 under the Equal Protection Clause "rests entirely on the State," *United States v. Virginia*, 518 U.S. 515, 533 (1996) (hereinafter "*VMI*"), the burden to show a likelihood of success shifts to Defendants at the preliminary injunction stage as well.  *See Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 429 (2006) ("The point remains that the burdens at the preliminary injunction stage track the burdens at trial.").

## II. Plaintiffs Are Likely to Succeed on Their Equal Protection Claim.[12]

On its face, H.B. 500 discriminates on the basis of both transgender status and sex by establishing criteria for verifying sex that are designed to categorically bar women and girls who are transgender from women's athletics.  H.B. 500 also subjects all women student-athletes, whether or not they are transgender, to the risk of having to undergo invasive, unnecessary tests to "verify" their sex, while permitting men to participate in men's sports without any such risk.  When a law discriminates on the basis of transgender status or sex, it must withstand heightened equal protection scrutiny to be constitutional.  H.B. 500 cannot meet this "exacting" test.  *VMI*, 518 U.S. at 555.  Indeed, it fails even the most deferential standard of review.  Thus, Lindsay and Jane are likely to succeed on their equal protection claims.

---

[12] Plaintiffs reserve the right to seek preliminary relief on their remaining claims.

**A.      H.B. 500 Discriminates Against Women and Girls Who Are Transgender Based on Transgender Status and Sex.**

H.B. 500 discriminates against Lindsay and other women and girls who are transgender on the basis of their transgender status and sex. H.B. 500's express purpose was to prevent women who are transgender from participating in women's sports.  H.B. 500 requires that women's teams be restricted based on "biological sex" verified only by criteria that women who are transgender cannot meet:  (1) reproductive anatomy; (2) genetic makeup; or (3) endogenous hormone levels.  These criteria have no correlation to athletic ability, but instead correlate to whether a person was assigned male at birth.[13]  Women who are assigned male at birth are all, by definition, transgender.  (Adkins Decl. ¶ 13.)  Whether understood as discrimination on the basis of transgender status or discrimination on the basis of sex, H.B. 500 is subject to heightened scrutiny.

Indeed, the focus of the legislative debate was on the exclusion of women and girls who are transgender.  Legislators repeatedly described women and girls who are transgender as "biological male[s]" and "biological boys."  (Declaration of Andrew Barr ("Barr Decl.") ¶¶ 3–5, Exs. A–C.)  One of H.B. 500's legislative findings refers specifically to "a man [sic] who identifies as a woman and is taking cross-sex hormones."  Idaho Code § 33-6202(11).

---

[13] As noted above, the only sex-related characteristic with a documented effect on athletic ability is circulating testosterone in those whose bodies respond typically to testosterone.  (Safer Decl. ¶ 25.)  H.B. 500 does not permit consideration of that characteristic.

The lead bill sponsor in the House described the "threat" H.B. 500 was designed to address as two high school girls, both transgender, who run track in Connecticut, and a college woman, also transgender, who runs track in Montana.  (Barr Decl. Exs. B, C.)

Under H.B. 500, only transgender students are categorically barred from participating on athletic teams consistent with their gender identity. Laws that force people into sex-specific spaces based on their assigned sex rather than their gender identity constitute discrimination based on transgender status.  In *Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019), the Ninth Circuit held that a policy forcing people to serve in the military consistent with "biological sex" amounted to discrimination based on transgender status.  *See also Grimm*, 400 F. Supp. at 457 (discrimination based on transgender status occurs when "[t]ransgender students are singled out, subjected to discriminatory treatment, and excluded from spaces where similarly situated students are permitted").

Here, H.B. 500 operates to single out Lindsay and force her out of activities consistent with her gender identity.  Lindsay wants (and is entitled to) the opportunity to try out for the women's team, like any other woman at her university, and to make friends, work together, and improve her own performance with her teammates.  (Hecox Decl. ¶¶ 30–34.)  But H.B. 500 targets and stigmatizes Lindsay solely because she is transgender, making

her (perhaps) the only woman athlete at BSU who is categorically barred from participating on a women's sports team.

Government discrimination based on transgender status triggers heightened scrutiny. *See Karnoski*, 926 F.3d at 1201 (finding that because policy "treats transgender persons differently" "something more than rational basis but less than strict scrutiny applies."). This Court reached the same conclusion, applying heightened scrutiny because:

> (1) transgender people have been the subject of a long history of discrimination that continues to this day; (2) transgender status as a defining characteristic bears no "relation to ability to perform or contribute to society"; (3) transgender status and gender identity have been found to be "obvious, immutable, or distinguishing characteristic[s];" and (4) transgender people are unarguably a politically vulnerable minority.

*F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018).

Discrimination against people for being transgender also constitutes sex discrimination, which independently triggers heightened scrutiny. *See Schwenk v. Hartford*, 204 F.3d 1187, 1202 (9th Cir. 2000) (holding that discrimination against a woman who is transgender is sex discrimination for purposes of the Gender Motivated Violence Act); *see also Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015) ("[D]iscrimination against transgender individuals is a form of gender-based discrimination subject to intermediate scrutiny."). Idaho cannot satisfy intermediate scrutiny here.

### B.   H.B. 500 Discriminates Against Women Based on Sex.

H.B. 500 also discriminates against all women and girl athletes, including Lindsay and Jane. On its face, H.B. 500 treats women and girl

athletes differently and less favorably than men and boy athletes. Only women and girls are subject to the potential of a "dispute" procedure that will require them to undergo invasive tests, obtain results considered sufficient to "verify" their "biological sex," and share those results to participate in sports.

This differential treatment of women is written into the statute. H.B. 500 provides that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex." Idaho Code § 33-6203(2). The bill contains no parallel provision for teams and sports designated for male students. Only a woman or girl must therefore provide her school with a "statement signed by the student's personal health care provider" verifying her "biological sex" based on "the student's reproductive anatomy, genetic makeup, or normal endogenously produced testosterone levels" if her sex is challenged. *Id.* § 33-6203(3).

Singling out student-athletes on girls' teams for different and less favorable treatment than those on boys' teams is sex discrimination, which triggers heightened scrutiny. *VMI*, 518 U.S. at 555 ("[A]ll gender-based classifications today warrant heightened scrutiny") (internal quotation marks omitted).

## C. H.B. 500 Lacks A Substantial Relationship to Any Important Governmental Interest.

Discrimination based on sex or transgender status "denigrates the dignity" of those affected and requires "an exceedingly persuasive justification." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 141 n.12 (1994)

(citation omitted).  Under intermediate scrutiny, that burden is "demanding" and "rests entirely on the State." *VMI*, 518 U.S. at 533.  The government must show that the challenged action is substantially related to an important government interest, and must not use sex or transgender status as "an inaccurate proxy for other, more germane bases of classification." *Craig v. Boren*, 429 U.S. 190, 198 (1976); *see Latta v. Otter*, 771 F.3d 456, 491 (9th Cir. 2014).  The law cannot "rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *VMI*, 518 U.S. at 516, 533.

Three justifications for H.B. 500 were offered during the legislative session:  (1) protecting cisgender girls from competing against those who could have superior "strength, speed, and endurance"; (2) promoting benefits of sport for women; and (3) ensuring access to athletic scholarships for women.  Idaho Code § 33-6202.  Even assuming the government could establish that each of these interests are important, H.B. 500 is not substantially related to any of them and so fails intermediate scrutiny.

### 1.    H.B. 500 does not protect cisgender women.

Describing the athletic ability of women as inferior to men, proponents of H.B. 500 claimed the bill would prevent cisgender women and girls from competing on girls' or women's teams against athletes presumed to have greater strength, speed, or endurance.  (Barr. Decl. Ex. C.)  H.B. 500's legislative findings focus on the "'gender gap' between male and female performances," which the bill attributes to higher levels of testosterone in

17

men.  Idaho Code § 33-602(4)(5).  But banning all women who are transgender (and many who are intersex) from women's sports is not substantially related to a purported interest in protecting women based on asserted competitive advantages.

The *only* physical sex characteristic with a documented effect on athletic performance is circulating (not endogenous) testosterone levels. (Safer Decl. ¶¶ 25, 51.)  This is why the policies of the Olympics, World Athletics, NCAA, and IHSAA regulate women's events based on circulating testosterone.  (*Id.* ¶ 45.)  But H.B. 500 discards these rules and *prohibits* consideration of circulating testosterone levels.  Instead, H.B. 500 requires consideration of only reproductive anatomy, genetic makeup, and *endogenous* testosterone levels, even though none of these characteristics has any documented effect on athletic performance independent of circulating testosterone levels.  (*Id.* ¶¶ 41, 43.)

Many women and girls who are transgender do not have circulating testosterone levels typical of cisgender men.  Some women and girls who are transgender never go through their endogenous puberty, and therefore their bodies experience none of the impacts of testosterone at puberty and beyond. (Adkins Decl. ¶¶ 30–31; Safer Decl. ¶¶ 47–49.)  Others suppress testosterone through prescribed hormone therapy as part of treatment for gender dysphoria after puberty, thereby minimizing the impact of testosterone on the body.  (Safer Decl. ¶¶ 49–52.)

As explained by Plaintiffs' expert Dr. Safer, the "legislative findings for H.B. 500 contend that even after receiving gender-affirming hormone therapy, women and girls who are transgender have 'an absolute advantage' over non-transgender girls.  This assertion is based on speculation and inferences that have not been borne out by any evidence."  (*Id.* ¶ 46.)  "The only study examining the effects of gender-affirming hormone therapy on the athletic performance of transgender female athletes" found that, after treatment had lowered testosterone levels, "the athletes' performance had reduced so that relative to non-transgender women their performance was now proportionally the same as it had been relative to non-transgender men prior to any medical treatment."  (*Id.* ¶ 51.)  H.B. 500 ignores all these realities.  Even the legal scholar cited in H.B. 500's legislative findings urged Idaho's Governor to veto the bill, explaining that "Idaho is misusing" her work and "there is no legitimate reason to seek to bar all trans girls and women from girls' and women's sport, or to require students whose sex is challenged to prove their eligibility in such intrusive detail."[14]

Furthermore, H.B. 500's unscientific assumptions that all those it considers men are physically superior to all those it considers women "are laden with the very 'baggage of sexual stereotypes' the Supreme Court has repeatedly disavowed."  *Latta*, 771 F.3d at 491 (Berzon, J., concurring); *see*

---

[14] Betsy Russell, "Professor whose work is cited in HB 500a, the transgender athletes bill, says bill misuses her research and urges veto," Idaho Press: Eye on Boise, Mar. 19, 2020, *archived at* https://perma.cc/NTA7-NJP5.

*also Saint v. Nebraska Sch. Activities Ass'n*, 684 F. Supp. 626, 629 (D. Neb. 1988) (rejecting "paternalistic gender-based classification" that prevented girls, regardless of strength, from wrestling while permitting boys with lesser strength to wrestle).  H.B. 500's focus on "protecting" women athletes from hypothetical opponents is based on unwarranted paternalism toward cisgender women, and such "romantic paternalism" never justifies sex discrimination.  *Frontiero v. Richardson*, 411 U.S. 677, 684 (1973); *see also Adams v. Baker*, 919 F. Supp. 1496, 1504 (D. Kan. 1996) (noting that "it is certainly improper to subject boys to greater danger than girls").[15]

> ## 2.   H.B. 500 is not substantially related to the goal of ensuring benefits of sports for women.

The legislative findings also refer to protecting benefits that women can access by participating in women's sport.  But H.B. 500 actually undermines these benefits.  A principal goal of school athletics (as opposed to

---

[15] In *Clark v. Arizona Interscholastic Association*, 695 F.2d 1126 (9th Cir. 1982), the Ninth Circuit rejected an equal protection claim by high school boys seeking to play on high school girls' volleyball teams.  The court relied on record evidence that boys would substantially displace girls, and ruled that gender can be a proxy only when it is "an accurate proxy."  *Id.*  The *Clark* court emphasized that "archaic and overbroad generalizations" cannot justify sex-based discrimination.  *Id.* (internal quotation marks and citations omitted).  The "physiological differences" at issue in *Clark* are inapposite here.  (Safer Decl. ¶¶ 46–51; Adkins Decl. ¶¶ 26–34.)  And as the Idaho Attorney General's opinion letter on H.B. 500 recognized, "transgender students are a very small minority of the population" and Idaho has not identified any evidence that "non-transgender female athletes are actually displaced by transgender female athletes to a substantial extent," as *Clark* deemed necessary to warrant differential treatment.  (Idaho A.G. Opinion Letter at 4.)

elite athletics) is for students to develop skills, make friends, increase physical activity, and learn valuable life lessons—which can contribute to greater success in college and throughout life.  (Fry Decl. ¶¶ 45–46.)  These are precisely the type of benefits Lindsay and Jane have experienced from participating in sport in the past.  For Lindsay, running gave her a way to make friends, stay motivated, and feel alive.  (Hecox Decl. ¶¶ 6–9.)  For Jane, soccer and track have helped her cultivate perseverance, tolerate discomfort, work collaboratively with peers, and find joy.  (Doe Decl. ¶ 7.)

Encouraging student-athletes to focus on improving their own performance and cooperation with teammates maximizes the benefits of athletics for all women.  (Fry Decl. ¶¶ 26, 30, 47.)  Where coaches create an environment in which student-athletes feel safe, valued, and respected, performance is improved and the benefits of sport are maximized.  (*Id.* ¶¶ 22, 42.)  Excluding students for no other reason than because they are transgender or intersex eliminates the benefits of sports for them and diminishes those benefits for all women and girls.  (*Id.* ¶¶ 49, 50.)  H.B. 500's dispute mechanism to challenge a girl's sex also creates a means that could be used to bully girls perceived as less feminine or unpopular and to chill them from participating.  Men and boy athletes in Idaho do not face similar threats to their ability to participate and compete on a boys' team.

In short, instead of ensuring "long-term benefits that flow from success in athletic endeavors" for women and girls, Idaho Code § 33-6202(12),

H.B. 500 hinders those benefits by subjecting women and girls to unequal treatment, excluding some from participating at all, incentivizing exclusionary behavior, and authorizing invasive bodily examinations. Defendants cannot show that H.B.500 is substantially related to a governmental interest in ensuring benefits of sport for women.

       3.    **H.B. 500 is not substantially related to advancing an interest in equitable access to athletic scholarships for women.**

H.B. 500 does nothing to ensure athletic scholarships are offered equitably to women and men.  There is not even a tenuous relationship between ensuring athletic scholarships for women and H.B. 500's sweeping ban on women who are transgender from participating in school sports. There is no evidence that H.B. 500 will result in increased athletic opportunities for cisgender women or girls—but it is clear that the bill will end athletic opportunities for women and girls who are transgender and many who are intersex.

First, there is no record of any women athletes who are transgender competing against (much less defeating) cisgender women in Idaho.  Less than one percent of the population is transgender.[16]  There may only be 700 transgender people between the ages of 13 and 17 in Idaho,[17] and the head of

---

[16] *See* Jody Herman et al., *The Age of Individuals who Identify as Transgender in the United States*, UCLA School of Law, Table 1 (Jan. 2017), http://thewilliamsins.wpengine.com/wp-content/uploads/Age-Trans-Individuals-Jan-2017.pdf.
[17] *Id.*

the IHSAA testified he was not aware of any girl who is transgender ever

playing high school girls' sports in Idaho.[18]  Second, athletic scholarships are

based on multiple factors including academics, athletic performance, and

sportsmanship.  (Carroll Decl. ¶ 25.)  There is no evidence that being defeated

in competition by a transgender athlete, if such an event were to occur, would

limit scholarship opportunities for cisgender athletes.  (*Id*.)

Both the legislative record and national data show it is unlikely that

significant numbers of women and girls who are transgender will ever

participate in athletics in Idaho, let alone displace scholarship opportunities

for cisgender women and girls.[19]  There is no report of any transgender

person ever receiving any athletic scholarship in Idaho.  In the entire

legislative debate over H.B. 500, the only high school athletes referenced

were two Connecticut runners who are transgender, and both of them were

---

[18] Idaho Education News, *Lawmakers hear emotional testimony but take no action on transgender bill*, Idaho News 6 (Feb. 20, 2020, 9:46 AM), https://www.kivitv.com/news/education/making-the-grade/lawmakers-hear-emotional-testimony-but-take-no-action-on-transgender.

[19] Unfortunately, women and girls who are transgender experience high rates of poverty, homelessness, violence, and suicide compared to the general population.  As a result, they are less likely to remain in school and go on to college.  In a large national study, 86% of those perceived as transgender in a K–12 school in Idaho experienced some form of harassment, and for 12% the harassment was so severe they left school.  According to that same study, 48% of transgender people in Idaho had experienced homelessness in their lifetime, and 25% were currently living in poverty.  National Center for Transgender Equality, *2015 U.S. Transgender Survey: Idaho State Report* 1–2 (Oct. 2017), https://www.transequality.org/sites/default/files/docs/usts/USTSIDStateReport%281017%29.pdf.)  Because of these conditions, opportunities to seek scholarships may be especially important for transgender students.

defeated by cisgender girls in recent races.[20]  There is no evidence that either
of the Connecticut transgender runners has been offered a single athletic
scholarship.  But one of the cisgender athletes who complained of having to
compete against them has accepted an athletic scholarship to run Division I
track at William & Mary.[21]

Further, the vast scope of H.B. 500 belies any genuine concern with
impact on athletic scholarships.  H.B. 500 applies to all women's and girls'
student athletics, including club and intramural sports from the collegiate to
the elementary school level.  It is implausible that concern for access to
athletic scholarships to college could motivate regulation of, to pick just one
example, intramural college softball.

Heightened scrutiny requires that a law solve an actual problem and
the "justification must be genuine, not hypothesized."  *VMI*, 518 U.S. at 533.
The legislative record for H.B. 500 reveals no transgender athletes competing
in sports in Idaho (much less being awarded college scholarships).  Based on
that record, the state has no likelihood of meeting its burden to show that

---

[20] Associated Press, *Cisgender female who sued beats transgender athlete in
high school race*, Fox61 (Feb. 15, 2020, 8:02 PM),
https://www.fox61.com/article/news/local/transgender-athlete-loses-track-
race-lawsuit-ciac-high-school-sports/520-df66c6f5-5ca9-496b-a6ba-
61c828655bc6.
[21] Gerry deSimas, Jr., *Canton's Chelsea Mitchell signs letter of intent to run at
William and Mary*, Collinsville Press (Nov. 16, 2019),
https://collinsvillepress.com/2019/11/cantons-chelsea-mitchell-signs-letter-of-
intent-to-run-at-william-and-mary/22956/.

H.B. 500 substantially advances an important government interest in ensuring access to athletic scholarships for cisgender women.

### D.   H.B. 500 Lacks a Rational Relationship to a Legitimate Governmental Interest.

H.B. 500 also cannot be justified under rational basis review.  It is a sweeping, categorical ban on the participation of a subset of women in women's athletics that applies to all sports, from kindergarten through college, including club and intramural.  "The breadth of the [law] is so far removed from [the] particular justifications" put forth in support of it, that it is "impossible to credit them."  *Romer v. Evans*, 517 U.S. 620, 635 (1996).

Rather than pointing to a legitimate governmental interest that justified overriding existing policy to enact a sweeping, categorical ban, the legislative record points instead to disapproval of transgender women athletes.  The circumstances surrounding H.B. 500's enactment fortify that conclusion.  As the global COVID-19 pandemic escalated and other states adjourned their legislative sessions to prevent the spread of the virus, the Idaho Legislature remained in session to enact H.B. 500 and another law targeting individuals who are transgender by barring accurate designations of their sex on Idaho-issued birth certificates.  And while the Legislature claimed to be seeking to equalize athletic opportunities, the physical characteristics that H.B. 500 focuses on have no correlation to athletic performance and instead ban women and girls who are transgender from athletic participation altogether.

25

The Legislature's decision to "singl[e] out" transgender students for disfavored treatment reveals the "irrational prejudice" on which H.B. 500 actually rests. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 450 (1985). Under any standard of scrutiny, the Legislature's generalized fear, discomfort, or moral disapproval of a group of people is not a legitimate governmental interest. *Id.* at 448.

## III. An Injunction Is Necessary to Avoid Irreparable Harm.

Both Lindsay and Jane face irreparable harm due to violations of their rights under the Equal Protection Clause. "It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (internal citations omitted); *see also* 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.) ("When an alleged deprivation of a constitutional right is involved . . . no further showing of irreparable injury is necessary."); *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) (holding that an equal protection violation constitutes irreparable harm). Beyond this dispositive presumption, if H.B. 500 takes effect, both Lindsay and Jane will suffer "harm for which there is no adequate legal remedy" including the loss of unrecoverable athletic opportunities and emotional distress. *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

If Lindsay is denied the opportunity to try out for and compete on BSU's women's sports teams, she will permanently lose NCAA eligibility time that she can never get back. (Hecox Decl. ¶ 38.) And when Jane tries out for

Boise High School's women's soccer team, she will be subject to the possibility of invasive testing that H.B. 500 requires when a girl's sex is disputed.  (Doe Decl. ¶ 13; Declaration of Jean Doe at ¶¶ 12–13.)  Should her sex be disputed, she will face the severe physical, psychological, and privacy invasions that H.B. 500's sex "verif[ication]" process requires.  Such violations are irreparable.  *See United States v. Miami Univ.*, 294 F.3d 797, 818 (6th Cir. 2002) ("Once personally identifiable information has been made public, the harm cannot be undone.").

Finally, forcing women who are transgender to forgo women's athletics altogether communicates the state's moral disapproval of their identity, which the Constitution prohibits.  *See Lawrence v. Texas*, 539 U.S. 558, 582–83 (2003).  H.B. 500 was enacted for the very purpose of barring the perceived "threat" of women and girls who are transgender from participating in women's athletics.  These dignitary harms are cognizable and irreparable injuries.  *See Obergefell v. Hodges*, 135 S. Ct. 2584, 2606 (2015) ("Dignitary wounds cannot always be healed with the stroke of a pen.").

## IV.    The Balance of Equities Strongly Favors an Injunction.

In evaluating the balance of equities, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted).  Plaintiffs' harms are significant and weigh heavily in favor of injunctive relief, as explained above.  Moreover:

> Attempted suicide rates in the transgender community are over 40%. The only treatment to avoid this serious harm is to recognize the gender identity of patients with gender dysphoria and follow appropriate treatment protocols to affirm gender identity and alleviate distress.

(Adkins Decl. ¶ 22.)

In stark contrast to the deeply personal and irreparable harms Plaintiffs face, a preliminary injunction would not harm Defendants. An injunction would merely maintain the status quo while Plaintiffs pursue their claims. If an injunction is issued, the parties would continue to rely on the NCAA policy for college athletes and the IHSAA Policy for high school athletes. Given that no athlete has ever even invoked the IHSAA Policy, maintaining it while this case is pending will not harm Defendants. Similarly, no problems (nationwide or in Idaho) have been reported under the NCAA policy, which has been in effect for nearly a decade. (Carroll Decl. ¶ 31.) Defendants thus face no harm if the status quo is maintained.

Moreover, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (emphasis added) (citation omitted). Indeed, "by establishing a likelihood that [the government's] policy violates the U.S. Constitution," as Plaintiffs have here, they "have also established that both the public interest and the balance of the equities favor a preliminary injunction." *Ariz. Dream Act*, 757 F.3d at 1069 ("[T]he public interest and the balance of the equities favor 'prevent[ing] the violation of a party's constitutional rights.'").

**V.     The Bond Should Be Waived.**

Given the rights at stake in this case, the F.R.C.P. 65(c) bond should be waived.  "[T]o require a bond would have a negative impact on plaintiff's constitutional rights, as well as the constitutional rights of other members of the public affected . . . ."  *Baca v. Moreno Valley Unified Sch. Dist.*, 936 F. Supp. 719, 738 (C.D. Cal. 1996).  Additionally, there is no chance of harm to the State.  *See Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009).  "[R]equiring a bond to issue before enjoining potentially unconstitutional conduct by a governmental entity simply seems inappropriate, because . . . protection of those rights should not be contingent upon an ability to pay."  *Bible Club v. Placentia-Yorba Linda Sch. Dist.*, 573 F. Supp. 2d 1291, 1302 n.6 (C.D. Cal. 2008) (internal quotation marks omitted).  A bond is neither appropriate nor necessary in this case.

## CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the Court grant their Motion for a Preliminary Injunction.

29

Dated:  April 30, 2020                    Respectfully submitted,

                                           /s/ Richard Eppink
                                          _____

Richard Eppink (Bar No. 7503)             Kathleen Hartnett*
AMERICAN CIVIL LIBERTIES UNION            Elizabeth Prelogar
OF IDAHO FOUNDATION                       Andrew Barr
                                          COOLEY LLP
Gabriel Arkles*
James Esseks*                             Catherine West*
Chase Strangio*                           LEGAL VOICE
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION                                *Admitted *Pro Hac Vice*


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 30th day of April, 2020, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means:

Dan Skinner                               Steven L. Olsen
danskinner@cssklaw.com                    steven.olsen@ag.idaho.gov
cssklaw@cssklaw.com                       W. Scott Zanzig
                                          scott.zanzig@ag.idaho.gov
*Attorney for Boise School District,*     Dayton P. Reed
*Individual members of the Board of*      dayton.reed@ag.idaho.gov
*Trustees of Boise School District, Coby*
*Dennis*                                  *Attorneys for Bradley Little, Sherri*
                                          *Ybarra, Individual members of the*
                                          *State Board of Education, Boise State*
                                          *University, Marlene Tromp, Individual*
                                          *members of the Idaho Code Commission*

DATED this 30th day of April, 2020         /s/ Richard Eppink
                                          _____