| | |
|---|---|
| Bruce D. Skaug | Kristen K. Waggoner* |
| bruce@skauglaw.com | kwaggoner@ADFlegal.org |
| ID Bar No. 3904 | D.C. Bar No. 242069 |
| Raul R. Labrador | Parker Douglas* |
| raul@skauglaw.com | pdouglas@ADFlegal.org |
| ID Bar No. 5469 | MI Bar No. P83242 |
| Skaug Law, P.C. | Christiana M. Holcomb* |
| 1226 E. Karcher Road | cholcomb@ADFlegal.org |
| Nampa, ID 83687 | D.C. Bar No. 176922 |
| (208) 466-0030 | Alliance Defending Freedom |
| (208) 466-8903 Fax | 440 First St. NW, Suite 600 |
| | Washington, D.C. 20001 |
| Roger G. Brooks* | (202) 393-8690 |
| rbrooks@ADFlegal.org | (202) 347-3622 Fax |
| NC Bar No. 16317 | |
| Jeffrey A. Shafer* | |
| jshafer@ADFlegal.org | *Applications for admission *pro hac vice* |
| IL Bar No. 6230713 | forthcoming |
| Alliance Defending Freedom | |
| 15100 N. 90th St. | |
| Scottsdale, AZ 85260 | |
| (480) 444-0020 | |
| (480) 444-0028 Fax | |

*Attorneys for Proposed Intervenors*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF IDAHO**

| | |
|---|---|
| LINDSAY HECOX, and JANE DOE with her next friends JEAN DOE and JOHN DOE,<br><br>    *Plaintiffs*,<br>  v.<br><br>BRADLEY LITTLE, in his official capacity as Governor of the State of Idaho; SHERRI YBARRA, in her official capacity as the Superintendent of Public Instruction of the State of Idaho and as a member of the Idaho State Board of Education; THE INDIVIDUAL MEMBERS OF THE STATE BOARD OF EDUCATION, in their official capacities; BOISE STATE UNIVERSITY; MARLENE TROMP, in her official capacity as President of Boise State University; | Case No. 1:20-cv-00184-DCN<br><br>**MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE** |

| |
|---|
| INDEPENDENT SCHOOL DISTRICT OF BOISE CITY #1; COBY DENNIS, in his official capacity as superintendent of the Independent School District of Boise City #1; THE INDIVIDUAL MEMBERS OF THE BOARD OF TRUSTEES OF THE INDEPENDENT SCHOOL DISTRICT OF BOISE CITY #1, in their official capacities; THE INDIVIDUAL MEMBERS OF THE IDAHO CODE COMMISSION, in their official capacities, |
| *Defendants*. |

## INTRODUCTION

On April 15, 2020, Plaintiffs filed in this Court a lawsuit raising claims under 42 U.S.C. § 1983, challenging the lawfulness of Idaho's recently enacted H.B. 500, the Fairness in Women's Sport Act. ECF No. 1. Plaintiffs named as defendants several state officials and government entities. Having learned of the lawsuit and discerned its potential to affect interests personal to them, movants now petition this Court, under Federal Rule of Civil Procedure 24, to authorize their intervention as parties to advocate for those interests and in defense of the law Plaintiffs challenge.

## FACTS

Proposed intervenors Madison (Madi) Kenyon and Mary (MK) Marshall are Idaho female athletes for whom sports is a passion and life-defining pursuit. *See* Kenyon Decl. (Ex. A), Marshall Decl. (Ex. B), *passim*. Since early childhood each has pursued what has been to them the delight of athletic training and competition. Kenyon Decl. ¶3; Marshall Decl. ¶3. For Madi, athletics is a family activity, bond, and tradition. Kenyon Decl. ¶3. Madi and MK now run track and cross-country on scholarship at Idaho State University in Pocatello. Kenyon Decl. ¶6; Marshall Decl. ¶7. These young women are committed to the integrity of female athletic

competition as such, earnestly support Idaho's Fairness in Women's Sport Act (H.B. 500), and are distressed by Plaintiffs' request for relief in this lawsuit. Kenyon Decl. ¶¶19-28; Marshall Decl. ¶¶16-20. They wish to have their personal concerns fully set forth and represented in this case in which Plaintiffs aim to establish a legal mandate that would leave them, and other female athletes, defenseless to male participation in their sports competitions.

Madi and MK both have experience facing male participation in their sport. They were incredulous and appalled to discover last year that University of Montana male athlete June (formerly Jonathan) Eastwood[1] was authorized to compete in women's cross-country and track events. Kenyon Decl. ¶8; Marshall Decl. ¶10. Both Madi and MK had the deflating experiences of running against and losing to Eastwood and being knocked down a placement level because of his participation. Kenyon Decl. ¶¶12, 14, 15; Marshall Decl. ¶11. They found the experience of losing to a male runner categorically different than losing to a female. Kenyon Decl. ¶¶12, 14, 16; Marshall Decl. ¶12.

Female defeat by a male athlete is uniquely demoralizing due to the elemental inequity involved in being subjected to the match-up in the first place. Male intrusion represents the elimination from female sport of the relationship of effort to success that makes the draw of sport and competitive striving what it is. Kenyon Decl. ¶20. As long-time athletes, the proposed intervenors are well familiar with the difference in strength and speed potential between comparably gifted and trained male and female athletes. Kenyon Decl. ¶¶9, 22; Marshall Decl. ¶¶10, 12, 13. Putting male athletes up against females is simply not fair and changes the nature and dynamics of sport for young women.

---

[1] *June Eastwood*, Save Women's Sports, https://savewomenssports.com/june-eastwood (last visited May 22, 2020).

Further disturbing to these young women is the message that a sex-defying sports policy sends. The official ratification of male participation in female races symbolically refutes or discredits the meaningfulness of female bodies as *female*. It thus powerfully serves as an unsettling and unwelcome statement about these young women's own identity. As Madi put it, "when sports authorities or the law permit males to compete under the name of female, it sends a disturbing message about who we are as women. I don't agree with what this says about myself and my fellow female competitors." Kenyon Decl. ¶24.

Madi and MK face losses to male athletes in their competitions and stand opposed to any legally sanctioned interference with the opportunities that they have enjoyed as female competitors, and that would deprive them and other young women of viable avenues of competitive enjoyment and success within a context that acknowledges and honors them as females. Kenyon Decl. ¶¶20, 23-27, 29; Marshall Decl. ¶¶17-20.

## ARGUMENT

Federal Rule of Civil Procedure 24 authorizes both intervention as of right and permissive intervention. The Ninth Circuit has repeatedly expressed its strong preference for liberal evaluation of intervention standards to favor its authorization. "[T]he requirements for intervention are broadly interpreted in favor of intervention," *United States v. Alisal Water Corp.*, 370 F.3d 915, 919 (9th Cir. 2004), precisely because a "liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts." *Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1496 n.8 (9th Cir. 1995) (internal citation omitted) (abrogated by further broadening of intervention under a specific statute in *Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir.

4

2011)).[2] As set forth below, proposed intervenors' application satisfies the standards for intervention by right, as well as permissive intervention.

## I. Proposed intervenor female athletes are entitled to intervene as of right.

Given the Ninth Circuit's liberal policy in favor of intervention, a court must broadly construe the following four criteria when evaluating a request to intervene by right under Fed. R. Civ. P. 24(a)(2): (1) the application must be timely; (2) the applicant must have a significant protectable interest in the action; (3) the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; and (4) the existing parties may not adequately represent the applicant's interest. *Prete v. Bradbury*, 438 F.3d 949, 954 (9th Cir. 2006). Courts "are guided primarily by practical and equitable considerations" in assessing these criteria. *Donnelly v. Glickman*, 159 F.3d 405, 409 (9th Cir. 1998).

### A. The intervention motion is timely filed.

The Ninth Circuit gauges timeliness of filing a motion to intervene by considering "three factors: (1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay." *League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1302 (9th Cir. 1997) (internal quotation marks and citations omitted). The Ninth Circuit found a motion filed four months after the filing of a lawsuit to be filed at "a very early stage." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1397 (9th Cir. 1995). That court also deemed a motion timely when filed "less than three months after the

---

[2] *See also Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 818 (9th Cir. 2001) ("In general, we construe Rule 24(a) liberally in favor of potential intervenors."); *id.* at 822 ("We follow the guidance of Rule 24 advisory committee notes that state that '[i]f an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene.'"); *accord Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 897-98 (9th Cir. 2011).

5

complaint was filed and less than two weeks after [Defendant] filed its answer to the complaint." *Citizens for Balanced Use v. Mont. Wilderness Ass'n,* 647 F.3d 893, 897 (9th Cir. 2011).

Here, proposed intervenors have filed their motion less than six weeks after the filing date of the complaint, and less than four weeks after the filing of Plaintiffs' motion for preliminary injunction. The Defendants have yet to file an answer to the Complaint or a response to Plaintiffs' motion. There has been no delay in proposed intervenors' moving for intervention, and as a result no prejudice to the parties. *See Smith v. L.A. Unified Sch. Dist.*, 830 F.3d 843, 857 (9th Cir. 2016) (holding that "the only 'prejudice' that is relevant under this factor is that which flows from [the] prospective intervenor's" delay after discovering the potential inadequacy of representation, "and not from the fact that including another party in the case might make resolution more 'difficult[]'") (citing *United States v. Oregon*, 745 F.2d 550, 552-53 (9th Cir. 1984)). These female athletes' motion complies with the timeliness requirement.

### B. Proposed intervenors have a significantly protectable interest in the subject matter of this action.

A proposed intervenor will be found to have a "significant protectable interest in an action if (1) it asserts an interest that is protected under some law, and (2) there is a relationship between its legally protected interest and the plaintiff's claims." *Cal. ex rel. Lockyer v. United States*, 450 F.3d 436, 441 (9th Cir. 2006) (quoting *Donnelly*, 159 F.3d at 409). "Whether an applicant for intervention demonstrates sufficient interest in an action is a practical, threshold inquiry. No specific legal or equitable interest need be established." *Berg,* 268 F.3d at 818 (citation omitted). Granting intervention is particularly appropriate where "the injunctive relief sought by the plaintiffs will have direct, immediate, and harmful effects upon [the proposed intervenor's] legally protectable interests." *Id*.

6

Madi and MK are competitive athletes with a direct and experiential interest in the operation of Idaho's Fairness in Women's Sports Act. They wish to have and maintain female-only competitions and a competitive environment shielded from physiologically advantaged male participants to whom they stand to lose.

The Plaintiffs, on the other hand, seek to enjoin and have declared unlawful the very policy that protects proposed intervenors' interests as female athletes. Put simply, the relief the Plaintiffs seek in this case would eliminate the regulatory standards the intervenor athletes deem necessary to sustain fairness in their sport. Because that outcome would have "direct, immediate, and harmful effects upon" movants, the significant protectable interest factor is satisfied. *Berg*, 268 F.3d at 818 (citation omitted).

## C.     The ability of these female athletes to protect their interest may be impaired.

The "significantly protectable interest" requirement is closely linked with the third requirement for intervention of right: that the outcome of the challenge may impair the proposed intervenors' interest. Indeed, once such an interest obtains, a court should have "little difficulty concluding that the disposition of th[e] case may, as a practical matter, affect" the proposed intervenors. *Citizens for Balanced Use*, 647 F.3d at 898 (citation omitted). The question of impaired ability "is a practical one, and the rule is satisfied whenever disposition of the action would put the applicant at a practical disadvantage in protecting its interest. . . . Generally, if the applicant would be substantially affected in a practical sense by the determination of an action, he should be allowed to intervene." *Ctr. for Biological Diversity v. Kelly*, No. 1:13-CV-00427, 2014 WL 3445733 (D. Idaho 2014) at *5. In *Kelly*, this Court found a significantly protectable interest in a circumstance when a general interest "may be impaired" by the lawsuit, and the

movants face the potential to "lose the opportunity to make the Court aware of the specific extent of the impact the rule abrogation will have on their respective interests." *Id*. at \*6.

The distinct possibility of impairment of the movant young women's interests is present here. If the Plaintiffs prevail, Madi and MK would be stripped of the protections of legislation tailored to their vital concerns. And if they are not permitted to intervene, they "will have no legal means to challenge [any] injunction" that might be granted by this Court. *Forest Conservation Council*, 66 F.3d at 1498; *see also Lockyer*, 450 F.3d at 443 (finding impairment where proposed intervenors would have "no alternative forum . . . [to] . . . contest [the] interpretation" of a law that was "struck down" or had its "sweep substantially narrowed"); *United States v. Oregon*, 839 F.2d 635, 638-39 (9th Cir. 1988) (court recognizing the "*stare decisis* effect" impeding relief in later litigation, and the "practical limitations on the ability of intervention applicants to protect interests in the subject of litigation after court-ordered equitable remedies are in place").

Under such circumstances, movants satisfy the impairment factor.

### D. No existing parties to the action adequately represent proposed intervenors' interests.

As Madi and MK's unique interest in the continuing operation of the challenged statute is not adequately represented by the Defendants, their application complies as well with the fourth and final factor of the intervention criteria.

Proposed intervenors need only show that representation of their interests "'may be' inadequate; and the burden of making that showing should be treated as minimal." *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972). *See also Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003) (same). A proposed intervenor "should be treated as the best judge of whether the existing parties adequately represent his or her interests, and . . . any doubt regarding

adequacy of representation should be resolved in [movant's] favor." 6 Moore's Federal Practice § 24.03[4][a] (3d ed. 1997); *see also In Def. of Animals v. U.S. Dept. of the Interior*, No. 2-10-cv-1852, 2011 WL 1085991 (E.D. Cal. Mar. 21, 2011) (same); Wright & Miller, 7C *Fed. Pract. & Proc. Civ.* § 1909 (3d ed.) ("Since [Rule 24(a)] is satisfied if there is serious possibility that the representation may be inadequate, all reasonable doubts should be resolved in favor of allowing [intervention] so that [the absentee] may be heard in his own behalf.").

There are three factors for evaluating adequacy of representation:

> (1) whether the interest of a present party is such that it will *undoubtedly* make all of a proposed intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether a proposed intervenor would offer any necessary elements to the proceeding that other parties would neglect.

*Arakaki*, 324 F.3d at 1086 (citation omitted, emphasis added).

### 1. Defendants will not "undoubtedly" make all intervenor athletes' arguments.

At this early stage (in which none of the defendants has presented a substantive filing), the available evidence of their posture toward the issues to be litigated in this case is unsurprisingly limited. For this reason, it is not the proposed intervenors' responsibility

> to anticipate specific differences in trial strategy. It is sufficient for Applicants to show that, because of the difference in interests, it is likely that Defendants will not advance the same arguments as Applicants. Resolution of this case will decidedly affect Applicants' legally protectable interests and "there is sufficient doubt about the adequacy of representation to warrant intervention."

*Berg*, 268 F.3d at 824 (*quoting Trbovich*, 404 U.S. at 538). Proposed intervenors readily make this showing.

Plaintiffs have sued a number of government officials and entities. Courts have stated that in the ordinary course there is "an assumption of adequacy when the government is acting on behalf of a constituency that it represents, which must be rebutted with a compelling showing."

9

*Citizens for Balanced Use*, 647 F.3d at 898 (cleaned up). But that "assumption" is either inapplicable or incoherent here for several reasons.

First, Plaintiffs have named multiple agencies and voices of the Idaho government that represent multiple constituencies including constituencies with views and interests more aligned with Plaintiffs than proposed intervenors. Merely reciting the government's abstract obligation to "act on behalf of a constituency" fails to address or explain how adequacy of representation is actually carried out when the constituents themselves are divided variously on the policy being challenged. Government cannot simultaneously affirm incompatible or otherwise diverging positions (thus revealing "representation" for all such variants to be impossible), nor can government reasonably be assumed to adequately represent absentee parties with singular interests not uniformly shared across the community. "Inadequate representation is most likely to be found when the applicant asserts a personal interest that does not belong to the general public." 3B Moore's Federal Practice, ¶ 24.07[4] at 24–78 (2d ed. 1995). Thus the "general public interest" cannot be considered equivalent to the specific interest of the intervenors in this litigation.

Next, even assuming Defendants would join the proposed intervenors in seeking to vindicate the statute that Plaintiffs challenge, the various named defendants "represent[] … the *public* interest," which is not "identical to the *individual* parochial interest" of the movant female athletes in the instant action. *Citizens for Balanced Use*, 647 F.3d at 899 (cleaned up, emphasis added). The personal distress and other negative effects suffered by female athletes from the inequity of authorized male competition against females is not felt by institutional administrators. It is borne by the young women who are subjected to that unfair competition environment, and who will suffer the losses. *Cf. In Def. of Animals*, 2011 WL 1085991 at *3

10

("As the Safari Club points out, the federal defendants do not participate in hunting or recreational activities in or near the Twin Peaks HMA, but its members do. The Safari Club consequently have specific interests in this regard that may not be shared by the [government]."). It is young women athletes—not the general public or the state—who will either enjoy or be denied fair competition and a level playing field. *Forest Conservation Council*, 66 F.3d at 1499 (citing *Mille Lacs Band of Chippewa Indians v. Minn.,* 989 F.2d 994, 1000–01 (8th Cir.1993)) (finding that, because the "local and individual interests" were not shared by the general state citizenry, the State would not adequately represent those interests).

Finally, the government officials and agencies named as defendants have their own partisan outlook on matters of policy. *Cf. id.* (citing *Conservation Law Found. v. Mosbacher*, 966 F.2d 39, 44-45 (1st Cir. 1992) ("The Secretary's judgments are necessarily constrained by *his view* of the public welfare.") (emphasis added)). None of Defendants have revealed that they share proposed intervenors' particular commitments on the personal and legal significance of the sex binary and of the propriety of regulating athletics in terms of it rather than by principles of subjective gender identity (as preferred by Plaintiffs and others in Defendants' constituencies). And as set out below, evidence of government antagonism to proposed intervenors' points of view on the contested issues in this case reinforce these female athletes' doubts that Defendants will make all of their arguments.

### a. *Boise State University*

Defendant Boise State has created a "Gender Equity Center" which includes in its aims the advancing of the interests of persons identifying as transgender. *Gender Equity Center Launches New Inclusivity Program*, Boise State University (July 25, 2019), https://www.boisestate.edu/saem/2019/07/25/gender-equity-center-launches-new-inclusivity-

11

program/. The Gender Equity Center registers among its goals the resistance to "cissexism," which appears to refer to the traditional understanding of human identity in terms of immutable sex, rather than individually asserted identifications. The university's office of Student Diversity and Inclusion announced its apology to "folx in the trans and non-binary community" for harms the diversity office allegedly perpetuated, and announced it will "re-commit to our students from the trans and non-binary population, especially during this time when they have been subject to messages of dehumanization from beyond our campus." *Student Diversity and Inclusion*, Boise State University, https://www.boisestate.edu/sdi/ (last visited May 20, 2020).

Boise State has adopted a policy entitled "Crafting Inclusive Classrooms" that encourages such practices as pronoun innovation (repurposing pronouns for use according to individual selection rather than objective description) and "challenging cissexism" in curriculum and classroom communication. Jasper Varley, et al., *Crafting Inclusive Classrooms*, Boise State University Gender Equity Center (May 2020), https://www.boisestate.edu/genderequity/files/2020/04/crafting-inclusive-classrooms.pdf. The university also publishes online a language guide in which it urges persons to avoid words identifying the sex of persons that may imply an identity description. Office of Communications and Marketing, *Inclusive Excellence Communication Guide*, Boise State University, https://www.boisestate.edu/communicationsandmarketing/communications/inclusive-excellence-communication-guide/ (last visited May 22, 2020). Accordingly, words such as "male" and "female" are discouraged until other persons' authorization to use them is obtained; "they/their/them" are encouraged for use as if they were singular pronouns, in order to accomplish gender neutrality in reference; the speech guide encourages students to say "different gender" rather than "opposite sex"; and so forth.

By contrast, the proposed intervenors intend to argue, present scientific evidence, and cite legal authority to defend the proposition that the male/female binary of reproductive sex is an objective fact, a legally legitimate category, and a reasonable and proper basis for the division of athletic competition.

Both the communication guidance material and the "Crafting Inclusive Classrooms" policy promote the article "3 Examples of Everyday Cissexism" and provide its weblink (Sian Ferguson, *3 Examples of Everyday Cissexism*, everyday feminism (March 21, 2014), https://everydayfeminism.com/2014/03/everyday-cissexism/). This promoted article instructs, among other things, that a person with a penis who identifies as a woman "*is* a woman"; that it is harmful "to assume that only women have vaginas"; that critiques the idea of there being a "woman's reproductive system" and a "man's reproductive system"; and encourages readers to "remember that many men can fall pregnant, and they might need abortions." *Id*.

Boise State's policies and public advocacy on human sexuality do not invite the conclusion that it "will undoubtedly make all of proposed intervenors' arguments." *Arakaki*, 324 F.3d at 1086.

### b. *The Idaho Attorney General*

The potential for collision between the governments' interest and advocacy and that of uniquely situated individuals (like proposed intervenors) is also illustrated by an executive branch critique of a draft version of H.B. 500, the Fairness in Women's Sport Act. This critique is contained in a February 25, 2020 letter from the Idaho Attorney General to Representative Ilana Rubel.[3]

---

[3] *See* Plaintiffs' Complaint ¶83 and footnote 14 (ECF No. 1 at 29).

The letter sets forth analyses not compatible with the intervenor athletes' interests and arguments in defense of the Act. Indeed, the letter casts doubt on the very category and significance of sex on which the Fairness in Women's Sport Act is predicated.

For instance, the Attorney General's equal protection analysis distinguishes between transgender and non-transgender persons, though the legislation does no such thing, nor has reason to do so. The Attorney General further opined that while "men" likely could be lawfully excluded from participating in women's sports, *id.* at 3-4, he expressed doubt that "transgender females" may be so excluded—as if that were a different question, and as if persons whom H.B. 500 identifies as men actually are not men. The Attorney General proposed that the Ninth Circuit's decision in *Clark v. Arizona Interscholastic Association*, 695 F.2d 1126 (9th Cir. 1982), demonstrates only the propriety of excluding "men" from women's sport competitions, not "transgender females"—whom the Attorney General designated as "other women." (February 25, 2020 letter, at 4.) This frame of analysis stands opposed to intervenor female athletes' interests and legal position, and conflicts with the categories of the Act they seek to defend.

Proposed intervenors are likewise concerned with and dispute several other standards the Attorney General proffered in his analysis of H.B. 500. They dispute the letter's "meaningful opportunity" test (*id.* at 4), its "substantial extent" test (*id.*), and its "absolute necessity" test (*id.* at 5), believing none to be expressions of the governing law, and knowing all to be contrary to their own arguments and interests.

The Idaho executive legal office's assessment of now-enacted portions of the Fairness in Women's Sport Act is not just different from, but at points antithetical to, the intervenor female athletes' legal position and personal concerns. "Where government has already offered a limiting construction of the challenged statute . . . and proposed intervenors do not wish to concede a

14

potentially meritorious reading of the statute, this is not merely a difference in litigation strategy, but goes to heart of the statute." *California ex rel. Lockyer*, 450 F.3d at 445. The Ninth Circuit describes such a circumstance between proposed intervenors and the parties as one "irreconcilably in conflict." *Id.*

Defendants are not obliged to repeat or follow in this litigation the analysis in the February 25 letter. But the fact that officials on behalf of the State of Idaho presented that analysis illustrates how government perspectives and efforts are not presumptively representative of private concerns. The February 25, 2020 letter amply justifies the proposed intervenors' fear that it "may be" that Defendants will not adequately represent their interests, *Trbovich*, 404 U.S. at 538 n.10, and that it is not "undoubtedly" true that they will present all of these female athletes' arguments. *Arakaki*, 324 F.3d at 1086.

### 2. It is not certain that Defendants will make proposed intervenors' arguments.

The second point of intervention evaluation is similar to the first: whether the named defendants are "capable and willing to make" the proposed intervenors' arguments. *Arakaki*, 324 F.3d at 1086. For reasons set forth in the preceding sections, at this early stage of the case there exists doubt that Defendants will offer those arguments. Defendants' outlooks, institutional commitments, and constituent diplomacy may forbid them to register the full range of arguments that these young women deem essential and would themselves put forth.

### 3. Proposed intervenor female athletes would offer necessary elements to these proceedings that other parties would neglect.

"Applicants would likely offer important elements to the proceedings that the existing parties would likely neglect." *Berg*, 268 F.3d at 823. The brunt of the loss of the statute's protections would be suffered by the female athletes themselves. The harm to Madi and MK

15

from unfair competition and losses to male athletes is unique and personal, and in the nature of the case cannot be felt by institutions, be they aligned in policy concern with these young women or not. *See Ctr. for Biological Diversity*, 2014 WL 3445733 at *7 ("The impact of any revision to the rule will be suffered by intervenors, not the [government]. The Court therefore considers intervenors to have made the necessary showing."). The inequity of male athletic participation in their competitions touches the female participants, and their own perspective, experience, and argument is a necessary feature when the issues in contest land so personally with them.

Further, proposed intervenors as young women are alarmed at the wider threat that Plaintiffs' arguments and demands pose to the very category of "female" as defined by biology in law, and thus to the coherence and efficacy of Title IX and other laws that seek to protect the rights of women. For example, on Plaintiffs' argument, Hecox, though a person of the male sex, must be admitted to female competitions because he asserts a "female" gender identity. But another athlete of the male sex would be *excluded* from those same female competitions because he asserts a "male" gender identity. Thus do Plaintiffs attack *sex-separation* in sports in order to replace it with a regime of *gender identity discrimination* in sports. And discrimination it surely is, for there is neither logic nor state interest to justify the inclusion or exclusion of an athlete from competitions based on what he asserts about his "internal, innate sense" of identity. *See* Complaint, ¶95, ECF No. 1 at 33.

Sports are physical contests. The justification for Idaho's Fairness in Women's Sport Act is that it establishes equitable competition by accounting for the objectively identifiable differences between male and female physiology, and the marked performance differentials resulting from those differences. Proposed intervenors intend to establish these scientific facts thoroughly through expert testimony. In contrast to these physical realities, and as just noted,

self-perceptions like gender identity present no reason to exclude athletes from competitions. Plaintiffs, then, aim to replace a coherent system with an incoherent one; a rational system with an ideological and discriminatory one.

Similarly, Plaintiffs' equal protection claim is not a vindication, but a repudiation, of the category of sex that receives special solicitude under equal protection jurisprudence. Plaintiffs' Title IX argument also gets things backward: The introduction of male athletes into female competitions violates female athletes' rights under Title IX's mandate that they receive equal treatment and competitive opportunities that accommodate their different abilities as women. And Plaintiffs' equivocal use of words and categories that are universally used to mark sex, to instead mark categories of mind used to *deny* sex, is a legally fraught practice meriting critical scrutiny. Proposed intervenors' deep concern to preserve their prerogatives as female athletes is bound up with their concern for the survival in law of *female* as a truthful, objective, and historically recognizable category.

Proposed intervenors' personal experiences and interests equip them to contribute necessary details and nuance likely to be passed over by Defendants who are differently situated and motivated.

### 4. Intervention of right is proper.

In this early stage of the case, proposed intervenors can state nothing with certainty about the strategy and categories of interest in Defendants' representation. But the caselaw does not require such certainty. It requires only what the available evidence reveals: an adequate basis to conclude that the named defendants may not adequately represent their interests. While Defendants may share a general goal of defending the Act, the interests of these female athletes and the government defendants are distinct. It is, in short, proper to conclude that the existing

defendants will not "advance the same arguments as" will Madi and MK, and will not "simply []

confirm" these young women's interests in this action. *Berg*, 268 F.3d at 823-24. The guidance

of the Supreme Court and the Ninth Circuit on this factor compels a conclusion that these

proposed intervenors have met their burden to establish merely possible inadequacy in

Defendants' representation of their unique interests.

## II. In the alternative, movant female athletes should be granted permissive intervention.

In addition to satisfying the requirements for intervention as of right, proposed

intervenors qualify for permissive intervention. Federal Rule of Civil Procedure 24(b)(1)

provides that "[o]n timely motion, the court may permit anyone to intervene who . . . has a claim

or defense that shares with the main action a common question of law or fact." In making this

determination a court must also consider "whether the intervention will unduly delay or

prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

As discussed above, proposed intervenors' motion is timely filed and their participation

will cause no undue delay or prejudice to the original parties. They have tendered a responsive

pleading (Ex. C) and their participation not only presents no impediment to efficient litigation by

the parties, it constitutes a vital addition for a full airing of the issues in contest in the case. The

young women's legal position "shares with the main action a common question of law or fact,"

Fed. R. Civ. P. 24(b)(1), as their interests situate and compel them to defend the propriety of the

statute that Plaintiffs challenge in their Complaint. Finally, these female athletes, unlike

Defendants, have a personal, experiential perspective to share. And they can present that

perspective and associated plain arguments unhindered by the muting restraint and caution

attending Defendants' navigation of conflicting institutional and constituency concerns. As

intervenors, they would provide this Court with a perspective otherwise out of view, thereby

aiding in the disposition of the case. *See Ctr. for Biological Diversity*, 2014 WL 3445733 at *7 (court finding the "unique perspectives" of the intervenors would aid the Court in reaching an equitable resolution). Accordingly, movants' application satisfies the conditions for permissive intervention.

## CONCLUSION

For the foregoing reasons, Madi and MK qualify for intervention in this case, both permissively and as of right, and respectfully request this Court to issue an order authorizing them to intervene as parties.

Respectfully submitted this 26th day of May, 2020.

By: */s/Bruce D. Skaug*

Roger G. Brooks*
rbrooks@ADFlegal.org
NC Bar No. 16317
Jeffrey A. Shafer*
jshafer@ADFlegal.org
IL Bar No. 6230713
ALLIANCE DEFENDING FREEDOM
15100 N. 90th St.
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 Fax

Kristen K. Waggoner*
kwaggoner@ADFlegal.org
D.C. Bar No. 242069
Parker Douglas*
pdouglas@ADFlegal.org
MI Bar No. P83242
Christiana M. Holcomb*
cholcomb@ADFlegal.org
D.C. Bar No. 176922
ALLIANCE DEFENDING FREEDOM
440 First St. NW, Suite 600
Washington, D.C. 20001
(202) 393-8690
(202) 347-3622 Fax

Bruce D. Skaug
bruce@skauglaw.com
ID Bar No. 3904
Raul R. Labrador
raul@skauglaw.com
ID Bar No. 5469
SKAUG LAW, P.C.
1226 E. Karcher Road
Nampa, ID 83687
(208) 466-0030
(208) 466-8903 Fax

*Applications for admission *pro hac vice* forthcoming

*Attorneys for Proposed Intervenors*

## CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2020, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected in the Notice of Electronic Filing:

Andrew Barr
abarr@cooley.com

Catherine West
cwest@legalvoice.org

Chase Strangio
cstrangio@aclu.org

Elizabeth Prelogar
eprelogar@cooley.com

Gabriel Arkles
garkles@aclu.org

James Esseks
jesseks@aclu.org

Kathleen Hartnett
khartnett@cooley.com

Richard Eppink
reppink@acluidaho.org

*Attorneys for Plaintiffs*

Dayton Reed
dayton.reed@ag.idaho.gov

Steven Olsen
steven.olsen@ag.idaho.gov

W. Scott Zanzig
scott.zanzig@ag.idaho.gov

*Attorneys for Defendants*

Matthew Wilde
mattwilde@boisestate.edu

*Attorney for Defendants Boise State University and Marlene Tromp*

        */s/ Bruce D. Skaug*
        Bruce D. Skaug
        Attorney for Proposed Intervenors