LAWRENCE G. WASDEN
ATTORNEY GENERAL

STEVEN L. OLSEN, ISB #3586
DAYTON P. REED, ISB #10775
W. SCOTT ZANZIG, ISB #9361
Deputy Attorneys General
954 W Jefferson, 2nd Floor
P. O. Box 83720
Boise, ID  83720-0010
Telephone:     (208) 334-2400
Facsimile:     (208) 854-8073
steven.olsen@ag.idaho.gov
dayton.reed@ag.idaho.gov
scott.zanzig@ag.idaho.gov

Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LINDSAY HECOX, and JANE DOE with her next friends JEAN DOE and JOHN DOE,<br><br>                    Plaintiffs,<br><br>         v.<br><br>BRADLEY LITTLE, in his official capacity as Governor of the State of Idaho, *et al.*,<br><br>                    Defendants. | Case No. 1:20-cv-00184-DCN<br><br>**RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION (Dkt. 22)** |

## INTRODUCTION

The Court should deny Plaintiffs' motion for a preliminary injunction (Dkt. 22).

Plaintiffs cannot establish that they are likely to succeed on the merits.  As Defendants' motion

to dismiss (Dkt. 40) demonstrates, Plaintiffs cannot meet their burden of establishing standing.

And that burden is even higher when seeking a preliminary injunction.  Moreover, Plaintiffs

cannot succeed on their facial challenge to House Bill 500, because they cannot carry their burden of showing that there are no circumstances under which the law could be constitutionally applied.

Even if Plaintiffs did not face these insurmountable jurisdictional and justiciability hurdles, their Equal Protection claim would fail. Settled Ninth Circuit law permits separate sports teams for males and females, along with rules excluding males from female sports teams, due to males' physiological advantages. That is precisely the purpose of HB 500.

Plaintiffs essentially concede that ensuring fair athletic opportunities for girls and women serves important government purposes. They merely argue that the law is not sufficiently tailored to meet this goal. But science says otherwise. Biological males have an indisputable physical advantage over biological females.[1] That advantage persists even in transgender females, who can then displace biological females in athletics. HB 500 properly protects opportunities for biological females by creating a process designed to verify female status of participants in female-only sports.

---

[1] This case involves issues regarding both sex and gender, or gender identity, as well as physiological differences between the sexes.

"Sex" is defined as the "anatomical and physiological processes that lead to or denote male or female." Typically, sex is determined at birth based on the appearance of external genitalia.

"Gender" is a "broader societal construct" that encompasses how a "society defines what male or female is within a certain cultural context." A person's gender identity is their subjective, deep-core sense of self as being a particular gender.

*Doe ex. rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 522 (3d Cir. 2018), *cert. denied sub nom. Doe v. Boyertown Area Sch. Dist.*, 139 S. Ct. 2636 (2019) (citations omitted). To avoid confusion between sex and gender, this brief uses the terms "biological male" or "biological female" to distinguish between the sexes (as opposed to preferred genders) when their physiological differences are relevant.

RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION (Dkt. 22) - 2

Plaintiffs' case fares no better on the other requirements for injunctive relief.  For the same reasons Plaintiffs lack standing, they cannot establish that, absent an injunction prohibiting State officials from implementing HB 500, they will suffer irreparable harm.  Their alleged potential harm is far too speculative.  Nor can they establish that the balance of hardships and public interest favor an injunction.  As the proposed intervenors have demonstrated, biological female athletes have a strong interest in the protections HB 500 provides to them.

## BACKGROUND

House Bill 500 is the "Fairness in Women's Sports Act."  It is designed to protect opportunities for females to participate in sports due to the physiological advantages males have over females.  In support of the bill, the Idaho legislature made a number of findings based on court decisions, scholarly publications, and scientific studies recognizing these physiological advantages.  Dkt. 1, Exhibit A, HB 500, § 33-6202(8)-(11).  The legislature also described its purpose:

> Having separate sex-specific teams furthers efforts to promote sex equality. Sex-specific teams accomplish this by providing opportunities for female athletes to demonstrate their skill, strength, and athletic abilities while also providing them with opportunities to obtain recognition and accolades, college scholarships, and the numerous other long-term benefits that flow from success in athletic endeavors.

*Id.*, § 33-6202(12).

HB 500 provides that women's athletic teams "shall not be open to students of the male sex."  But the law is not self-executing.  The law comes into play only if a "dispute regarding a student's sex" arises, presumably because someone objects to a student's qualification to participate in female sports.  If such a dispute arises, the statute provides that it will be governed by rules yet to be promulgated by the State Board of Education.  It is impossible to know now how that process will be initiated and what it will entail.  All we know from HB 500 is that the

RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION (Dkt. 22) - 3

school sponsoring the team on which the student is playing will request the student to "provide a health examination and consent form or other statement signed by the student's personal health care provider" to "verify the student's biological sex." Presumably such a form or statement will settle the issue.

Plaintiff Lindsay Hecox was born a male, but identifies as a female. She has participated on co-ed track and cross-country teams in the past, Dkt. 1, ¶ 25, but now wants to try out for Boise State University's ("BSU's") women's cross-country team this August. Dkt. 22-6, ¶ 20. She complains that House Bill 500 will prevent her from doing that.

HB 500 would not necessarily prevent Hecox from trying out in August, but Title IX very well might. The U.S. Department of Education's Office of Civil Rights ("OCR"), the federal agency responsible for enforcing Title IX, recently determined that allowing transgender high school athletes in Connecticut to participate in girls' sports violated the rights of female athletes under Title IX.[2] BSU now has to evaluate this decision and determine whether Title IX permits it to allow transgender women to participate on its women's sports teams and, if so, under what conditions.

Current NCAA rules permit—but do not require—member schools to allow transgender women to participate in women's sports under certain conditions. Member schools who wish to allow such participation must confirm that the transgender athlete has completed one year of

---

[2] *See US: Transgender Sports Inclusion Violates Others' Rights*, ASSOCIATED PRESS, https://apnews.com/5c1d9682fb92ed9c277c7e139bdab9ed (May 28, 2020). For the Court's convenience, a copy of the Office of Civil Rights' decision ("OCR Decision") is attached as Appendix 1. The OCR determined that by permitting transgender girls to compete in girls' sports, the Connecticut high school athletic conference "denied athletic benefits and opportunities to female student-athletes . . . in violation of the regulation implementing Title IX of the Education Amendments of 1972 (Title IX), at 34 C.F.R. § 106.41(a)." OCR Decision, p. 3.

testosterone suppressing treatment, and must apply to the NCAA for a medical exception.[3]  It is uncertain whether that NCAA policy will remain in place following the OCR's recent Title IX determination.  And even if it does, BSU will need to decide whether to allow Hecox to try out in August and risk violating Title IX.  By her own admission, Hecox will not have completed her one-year hormone therapy before BSU's women's cross-country tryouts in August, because she did not begin it until September 2019.  Dkt. 22-6, ¶ 14.

Even if BSU were to risk a Title IX violation by letting Hecox try out, it is uncertain whether HB 500 would have any effect on her ability to participate.  HB 500 doesn't prevent her from trying out.  HB 500 would come into play only if a "dispute regarding [Hecox's] sex" were to arise, presumably because someone might object to Hecox displacing a biological female's spot on the roster.  If it happened, such a dispute would be governed by as-yet-unknown regulations to be developed by the State Board of Education in the future.  So even if BSU were to decide to allow Hecox to try out (which is uncertain given the OCR's Title IX analysis), there is no way to know whether HB 500 would affect Hecox.  Would Hecox perform well enough to qualify for the team?  If she did, would anyone challenge her participation?  There simply is no way to know whether HB 500 will affect Hecox in any way until BSU determines whether it wishes to risk a Title IX violation by allowing her to try out; Hecox tries out; she makes the team; and we wait and see whether anyone disputes her eligibility, and, if so, the outcome of such a dispute under yet-to-be-promulgated Board of Education rules.

Plaintiff Jane Doe was born a female and identifies herself as "a girl."  *See* Dkt. 22-7, ¶ 13.  She participates in school sports.  *See id.*, ¶¶ 4-6.  HB 500 does not prevent her from doing

---

[3] *See* NCAA *Inclusion of Transgender Student-Athletes*, p. 14 (available at https://www.ncaa.org/sites/default/files/Transgender_Handbook_2011_Final.pdf).

that.  But Doe speculates that maybe some unknown person might act spitefully and challenge

her sex.  *See id*., ¶ 13.   Based on this hypothetical concern, Doe worries that HB 500 might

require her to ask her doctor to perform a genital exam or genetic or hormonal testing.  *See id*.,

¶¶ 11-12.

There is no evidence of any actual threat that any person intends to dispute Doe's sex.

But even if the hypothetical spiteful person did, HB 500 allows Doe to participate in sports by

simply submitting her required health examination and consent form or obtaining a statement

from her doctor verifying her sex, neither of which requires any new physical examination or

testing.  HB 500 allows Doe various avenues to verify her sex: (1) through her health

examination and consent form; (2) through a "statement signed by the student's personal health

care provider" to "verify the student's biological sex"; or (3) through a "routine sports physical

examination relying on" one of anatomy, genetics, or testosterone.  Contrary to Doe's

contention, the statute does not require her doctor to use the three criteria mentioned in the

"routine sports physical examination" process.  And even the "routine sports physical

examination" provision itself is permissive, using the term "may."  In short, Doe has exaggerated

her speculative harm by misinterpreting HB 500 to require her personal health care provider to

use the three criteria specified for routine sports physical examinations.[4]

---

[4] Doe's misinterpretation may have resulted from her mistaken belief that language in HB 500 as
it was initially introduced is the same language that exists in the amended bill that became law.
Section 33-6203(3) in HB 500 initially required a physician's statement based on the three
criteria: "If disputed, a student may establish sex by presenting a signed physician's statement
that shall indicate the student's sex based solely on: (a) The student's internal and external
reproductive anatomy; (b) The student's normal endogenously produced levels of testosterone;
and (c) An analysis of the student's genetic makeup."   (available on Idaho Legislature website at
https://legislature.idaho.gov/wp-content/uploads/sessioninfo/2020/legislation/H0500.pdf).  That
section was substantially changed by a Senate amendment, resulting in the very different
language of the bill that was actually enacted.  *See* Dkt. 1, Exhibit A, § 33-6203(3) (reflecting the
operative language passed by both Houses and signed into law by the Governor).

RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION (Dkt. 22) - 6

We know Doe has had physical examinations in the past.  *See* Dkt. 22-7, ¶ 11.  And we know the Idaho High School Athletic Association ("IHSAA") rules require athletes to have a physical examination every other year to participate, and require the examining professional to inquire into and disclose sex-specific information on the prescribed Health Examination and Consent Form.[5]  So even in the unlikely event someone disputed Doe's sex, she could simply refer the school to her IHSAA Health Examination and Consent Form, which she and every other athlete is required to submit to the school before participating in school sports, or ask her doctor to provide a statement verifying that she is female.  Neither approach requires a new, allegedly invasive procedure, which is the harm Doe says she fears.

## ARGUMENT

### A.    Preliminary Injunction Standards

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Resources Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "[I]njunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Id.* at 22.

/ / /

/ / /

/ / /

---

[5] *See* IHSAA Rule 13 (available at https://idhsaa.org/asset/RULE%2013.pdf), and Health Examination and Consent Form (available at https://idhsaa.org/asset/document/99-Physical%20Exam%20and%20Consent%20Form.pdf) (requiring information regarding a student's sex including, among other things, an examination of males' genitalia and details regarding females' menstrual cycles).  For the Court's convenience, a copy of the IHSAA's required Health Examination and Consent Form is attached as Appendix 2.

RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION (Dkt. 22) - 7

B.       **Plaintiffs Cannot Establish Standing**

Plaintiffs bear the burden of establishing standing.  *See Clapper v. Amnesty Int'l USA*,

568 U.S. 398, 408 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)) ("'One element of

the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to

sue'").   That burden is heightened at the preliminary injunction stage.  *See Lujan v. Defenders of*

*Wildlife*, 504 U.S. 555, 561 (1992) ("each element must be supported in the same way as any

other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of

evidence required at the successive stages of the litigation").  As the D.C. Circuit has explained,

this means that to obtain a preliminary injunction, a plaintiff must establish a substantial

likelihood that he has standing.  Mere allegations that might suffice to defeat a motion to dismiss

are not sufficient.  *See Food & Water Watch*, 808 F.3d 905, 913 (D.C. Circuit 2015) ("party who

fails to show a substantial likelihood of standing is not entitled to a preliminary injunction")

(citations and internal punctuation omitted).

The Supreme Court has emphasized the importance of standing, particularly where, as in

this case, the plaintiffs are challenging the conduct of political branches as unconstitutional.

> The law of Article III standing, which is built on separation-of-powers principles,
> serves to prevent the judicial process from being used to usurp the powers of the
> political branches. . . .  In keeping with the purpose of this doctrine, [o]ur standing
> inquiry has been especially rigorous when reaching the merits of the dispute
> would force us to decide whether an action taken by one of the other two branches
> of the Federal Government was unconstitutional.

*Clapper*, 568 U.S. at 408 (internal citations and punctuation omitted).  Principles of federalism

similarly demand an "especially rigorous" approach to standing when plaintiffs ask a federal

court to determine that state officials are violating the Constitution.

To meet the "irreducible constitutional minimum" of standing, Plaintiffs must prove: (1)

that they have suffered an "injury in fact"—an invasion of a judicially cognizable interest which

is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61 (1992).

Plaintiffs cannot meet their burden here. Any potential harm they might suffer is far too speculative. It is neither "actual or imminent," nor traceable to Defendants' actions from applying HB 500, as opposed to the actions of third parties not before the Court or applications of laws or rules Plaintiffs have not challenged.

Title IX or NCAA rules, but not HB 500, may prevent Plaintiff Hecox from trying out for BSU's women's cross-country team in August. Given the OCR's recent decision that allowing transgender girls to compete in girls' high school sports violates Title IX,[6] BSU may not be willing to risk violating Title IX by allowing Hecox to try out in August when she has not completed year-long hormone therapy as required by NCAA rules. Hecox has presented no evidence whether her treatment would satisfy NCAA requirements, regardless of Title IX hurdles, so we don't know whether she would qualify for a medical exemption under NCAA rules. And even if Hecox could meet these burdens, it is far from clear whether HB 500 would

---

[6] The OCR Decision applied to a high school rule allowing transgender girls to participate in girls' sports based on gender identity and behavior, but did not require hormonal treatment. Nevertheless, the Decision was based on a distinction between biological differences between males and females. *See* OCR Decision, p. 2 n.2 ("the terms 'male' and 'female' are defined by biological sex"). And it refers to transgender girls, referred to as Students A and B, as "biologically male student athlete[s]," *id.*, p. 3, or "male student-athletes." *Id.*, p. 4. The OCR concluded that allowing Students A and B to compete in girls' track meets "placed female student-athletes in athletic events against male student athletes, resulting in competitive disadvantages for female student-athletes." *Id.*

RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION (Dkt. 22) - 9

have any effect on her ability to participate.  Would she make the team?  Would anyone object if she did?  Hecox has offered no proof on any of these "what ifs."  Hecox's alleged potential injuries from the statute are neither actual nor imminent, and dependent on the actions of third parties.  She has fallen far short of her especially rigorous, heightened burden of proving that it is substantially likely HB 500 will harm her sometime in the future.

Plaintiff Doe's alleged irreparable harm is perhaps even more speculative.  She is a biological female, qualified to play girls' sports under HB 500.  There is no evidence that any person intends to dispute that she is female.  There is nothing but speculative worry to support Doe's claim that she may suffer some harm.  Like Hecox, Doe's alleged potential injuries from HB 500 are neither actual nor imminent.  Instead, they are based on the highly speculative risk that some irresponsible person not before the Court will challenge her sex.  Even in the unlikely event that occurred, she could easily obtain a statement from her doctor verifying her sex, or simply provide the health examination and consent form from her required physical verifying her sex.  Under the circumstances, Doe has not come close to meeting her burden to establish standing.

## C.  Plaintiffs Cannot Establish They are Entitled to Bring Their Facial Challenge

There are two kinds of challenges a plaintiff can make to a law: as-applied or facial.  An as-applied challenge "contends that the law is unconstitutional as applied to the litigant[ ]."  *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998).  "[A] 'successful as-applied challenge does not render the law itself invalid but only the particular application of the law.'"  *Desert Outdoor Advertising, Inc. v. City of Oakland*, 506 F.3d 798, 805 (9th Cir. 2007) (quoting *Foti*, 146 F.3d at 635).  In contrast, the much broader facial challenge seeks to "invalidate[ ] the law itself."  *Foti*, 146 F.3d at 635.  Proper relief in an as-applied challenge might include injunctive

relief prohibiting application of the law to the plaintiffs in the case, but it would not include a declaration that the law itself is void or an injunction prohibiting the law's application in every case. *See, e.g., Italian Colors Restaurant v. Becerra*, 878 F.3d 1165, 1175 (9th Cir. 2018) (enjoining a "law in its entirety" "would have been appropriate only if plaintiffs had prevailed on a facial challenge").

It is beyond dispute that the relief Plaintiffs seek on their preliminary injunction motion would be available only under a successful facial challenge to HB 500. The injunctive relief they seek would be a wholesale prohibition on implementation of the law. *See* Dkt. 22, p. 2 (requesting an order prohibiting all defendants "from enforcing any of the provisions of House Bill 500").

Facial challenges are disfavored. *See* Dkt. 40-1, pp. 11-12 and cited cases. Under *United States v. Salerno*, 481 U.S. 739, 745 (1987), Plaintiffs must establish that the challenged law is unconstitutional under all circumstances. *See also Almerico v. Denney*, 378 F. Supp. 3d 920, 925-26 (D. Idaho 2019) (applying *Salerno* to bar Equal Protection claim because Ninth Circuit law requires adherence to *Salerno*). This they cannot do. For example, suppose an athletically-talented biological male who identifies as a man wanted to play on BSU's women's basketball team. Due to his physical advantages, the man would certainly displace a woman on the roster. And his superior skills would allow him to dominate the team and the competition, taking opportunities otherwise available to the women on the roster. HB 500 would allow a challenge to the man's status and prevent him from playing on the team.

This application of HB 500 would be plainly constitutional. *See Clark ex rel. Clark v. Arizona Interscholastic Ass'n*, 695 F.2d 1126 (9th Cir. 1982), *cert. denied*, 464 U.S. 818 (1983). In *Clark*, high school boys who wished to play on the girls' volleyball team challenged a policy

prohibiting boys from playing on a girls' sports team.  The Ninth Circuit rejected the boys'

argument that the policy amounted to unconstitutional sex discrimination, even though the boys'

school offered no boys' volleyball team.  The court held that the policy even withstood

heightened scrutiny, because "there is clearly a substantial relationship between the exclusion of

males from the team and the goal of redressing past discrimination and providing equal

opportunities for women," which the court held is unquestionably "a legitimate and important

governmental interest."  *Id.* at 1131.  The policy was constitutional because it "simply

recognize[ed] the physiological fact that males would have an undue advantage competing

against women for positions on the volleyball team."  *Id.*

HB 500 prohibits all males from participating in female sports, regardless of their gender

identity.  *Clark* makes clear that HB 500 can be constitutionally applied to prohibit boys from

participating in girls' sports.  Thus, Plaintiffs cannot meet the *Salerno* test.  Their request for a

preliminary injunction based on their facial challenge to HB 500 must be denied.

## D.     Plaintiffs Cannot Establish that They are Entitled to Injunctive Relief

On top of these justiciability bars that are fatal to their case, Plaintiffs cannot meet their

burden of proving that they are entitled to a preliminary injunction.

### 1.     Plaintiffs are not likely to succeed on the merits

Plaintiffs cannot establish a likelihood of success on the merits of their Equal Protection

challenge to HB 500.[7]  The law protects athletic opportunities for females.  The State has an

---

[7] Plaintiffs suggest that the standard preliminary injunction burdens do not apply, and that
Defendants must prove that Plaintiffs are not likely to succeed on the merits of their Equal
Protection claim.  *See* Dkt. 22-1, p. 12 (citing *Gonzales v. O Centro Espirita Beneficente Uniao
do Vegetal*, 546 U.S. 418, 429 (2006)).  The Ninth Circuit has interpreted this shifted-burden
approach to be applicable in First Amendment cases, where strict scrutiny applies.  *See
Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011) ("in the First Amendment
context, the moving party bears the initial burden of making a colorable claim that its First

important interest in doing so.  And even if the law is subject to heightened scrutiny,[8] HB 500

satisfies that scrutiny because it does what it is intended to do.

Assuming *arguendo* that HB 500 must satisfy heightened scrutiny, HB 500 meets that

standard so long as it "'serve[s] important governmental objectives and [is] substantially related

to achievement of those objectives.'"  *Clark*, 695 F.2d at 1129 (quoting *Craig v. Boren*, 429 U.S.

190, 197 (1976)).  *See also* Dkt. 22-1, p. 17 (citing *Craig*, 429 U.S. at 198, and *Latta v. Otter*,

771 F.3d 456, 491 (2014) (law satisfies heightened scrutiny if it "is substantially related to an

important government interest")).  "In applying this standard, the Supreme Court is willing to

take into account actual differences between the sexes, including physical ones."  *Clark*, 695

F.2d at 1129.

---

Amendment rights have been infringed, or are threatened with infringement, at which point the
burden shifts to the government to justify the restriction").  Plaintiffs have not cited, and
Defendants have not found, any authority holding that such a shift also occurs in an Equal
Protection case applying rational basis or intermediate scrutiny.  If such a shift were extended to
a case like this, what would Plaintiffs' initial burden be?  Absent applicable authority,
Defendants submit that Plaintiffs must prove a likelihood of success on their Equal Protection
claim.  Thankfully, the Court need not resolve this issue because under any burden Plaintiffs are
not likely to succeed.

[8] Defendants acknowledge that under *Clark*, HB 500 may be subject to heightened scrutiny
because it excludes all males from female sports.  695 F.2d at 1129.  Plaintiffs argue that
heightened scrutiny also should apply because HB 500 discriminates against transgender and
female athletes.  Defendants disagree.  Defendants acknowledge that the Ninth Circuit and a
judge in this district have held heightened scrutiny applies if a law or policy treats transgender
persons in a less favorable way than it treats all others.  *See Karnoski v. Trump*, 926 F.3d 1180,
1201 (9th Cir. 2019); *F.V. v. Barron*, 286 F. Supp. 3d 1131 (D. Idaho 2018).  But HB 500 is
different.  It does not single out transgender athletes and subject them to discriminatory
treatment.  It treats all biological males the same and prohibits them from participating in female
sports to protect athletic opportunities for biological females.  Therefore, it does not unlawfully
discriminate against transgender athletes.  *See Doe 2 v. Shanahan*, 755 Fed. Appx. 19, 23-25
(D.C. Cir. 2019) (reversing finding that plan requiring military personnel to serve in their
biological sex was a blanket transgender ban and acknowledging that the military had substantial
arguments that the plan complied with equal protection principles).  Nor does HB 500 treat
females differently as Plaintiffs suggest.  It requires any athlete subject to dispute, whether male
or female, to verify his or her sex.

RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION (Dkt. 22) - 13

Plaintiffs do not dispute that HB 500 serves important governmental objectives. *See* Dkt. 22-1, p. 17. Nor could they. The Ninth Circuit long ago established that "[t]here is no question" that "redressing past discrimination against women in athletics and promoting equality of athletic opportunity between the sexes" is "a legitimate and important governmental interest" justifying rules excluding males from female sports. *Clark*, 695 F.2d at 1131. Excluding males from female sports to "promote sex equality" and protect fair opportunities for female athletes is precisely what HB 500 does.

Plaintiffs take issue with the second prong of the test, contending that HB 500 is not substantially related to the important goal of ensuring equal and fair opportunities for females to participate in sports. Plaintiffs' argument flies in the face of a well-established physiological fact recognized by courts and recently confirmed by the OCR: allowing biological males to compete in female sports is unfair to biological females due to males' inherent physical advantages. *See, e.g., Clark*, 695 F.2d at 1131 (noting that rule excluding boys from girls' team "is simply recognizing the physiological fact that males would have an undue advantage competing against women," and would diminish opportunities for females). HB 500's legislative findings specifically cite this physiological fact and case law recognizing it. Dkt. 1, Exhibit A, § 33-6202(8). To protect biological female athletes' athletic opportunities in light of biological males' indisputable physical advantage, HB 500 provides that female sports "shall not be open to students of the male sex." *Id.*, § 33-6203(2). Just as the rule in *Clark* excluding boys from the girls' volleyball team was substantially related to the important objective of preserving equal opportunities for females to participate in sports, so too is HB 500.

Plaintiffs cannot validly challenge this conclusion. So instead, they try to argue that HB 500's objectives could be served by different rules. But as *Clark* makes clear, the fact that

athletic opportunities could be equalized through other means is of no constitutional consequence. 695 F.2d at 1131-32. "[E]ven wiser alternatives than the one chosen does not serve to invalidate the policy [of excluding males from female sports] since it is substantially related to the goal" of providing fair and equal opportunities for females to participate in athletics. *Id.* at 1132.

Ignoring *Clark*'s holding that the Constitution does not require a perfect fit between the legislature's goal and the means used to achieve it, Plaintiffs argue that athletic opportunities for biological females could be adequately protected by requiring transgender male-to-female athletes to undergo one year of hormone therapy. They argue that current circulating testosterone is the only thing that gives males a competitive advantage. *See* Dkt. 22-1, p. 18 ("[t]he *only* physical sex characteristic with a documented effect on athletic performance is circulating (not endogenous) testosterone") (citing Safer Decl.).[9]

Even if Plaintiffs' premise were true, it would be legally irrelevant. But in fact Plaintiffs' premise is false. Indeed, the very source that Plaintiffs' own expert, Dr. Safer, relies on refutes this argument.

> The striking male postpubertal increase in circulating testosterone provides a *major, ongoing, cumulative, and durable physical advantage* in sporting contests by creating larger and stronger bones, greater muscle mass and strength, and higher circulating hemoglobin as well as possible psychological (behavioral)

---

[9] In a similar vein, Plaintiffs argue that HB 500 is not sufficiently narrowly tailored, suggesting that puberty blockers might eliminate biological males' athletic advantages. There are several problems with this argument. First, neither Plaintiff has standing to raise it; it's a purely hypothetical red herring. Second, while it might be legally relevant in a case involving strict scrutiny, it's irrelevant under any heightened scrutiny applicable here, as *Clark* makes clear. Finally, even if this argument were relevant, it is based on the false premise that prepubertal boys have no athletic advantages over girls. In fact, studies have shown that boys have athletic advantages over girls that manifest themselves as early as six years of age. Expert Declaration of Gregory A. Brown, ¶ 23 ("a number of studies indicate that males' athletic advantages over females begin before puberty, and may be apparent as early as six years of age"). *See also id.*, ¶¶ 65-68 (discussing relevant studies comparing boys' and girls' athletic abilities).

RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION (Dkt. 22) - 15

> differences. In concert, these render women, on average, unable to compete effectively against men in power-based or endurance-based sports.

Handelsman DJ, et al. Circulating testosterone as the hormonal basis of sex differences in athletic performance. *Endocrine Reviews* 2018; 39:803-829 (p. 805) ("Handelsman Paper")[10] (emphasis added) (cited in Expert Declaration of Joshua Shafer (Dkt. 22-9), ¶ 25).  This "major, ongoing, cumulative, and durable physical advantage" that Plaintiffs' own expert validates is a problem HB 500 seeks to address.[11]  And as the authors of the Handelsman Paper note, males' larger and stronger bones generally result in males: having a height advantage over females, which provides an obvious physical advantage in many sports; "greater leverage for muscular limb power exerted in jumping, throwing, or other explosive power activities"; and greater bone density, helping them to avoid stress fractures.  *See* Handelsman Paper, p. 818-19.  It is undisputed that the hormone therapy Plaintiffs tout does not change this.  Moreover, other scientific studies confirm that hormone therapy does not eliminate the physical advantages males enjoy over females.  *See* Expert Declaration of Gregory A. Brown ("Brown Decl."), ¶ 11.c. (administration of testosterone suppressing drugs "does not eliminate the performance advantage of men or adolescent boys over women or adolescent girls in almost all athletic events").  *See also id.*, ¶¶ 127-153 (and cited authorities and data).

Plaintiffs' expert, Dr. Safer, is an endocrinologist, not an expert in athletic performance. *See* Dkt. 22-9, ¶¶ 5-15.  His opinion about hormone therapy's effect on athletic performance is based not on his expertise studying athletic performance, but in reliance on one article, whose reliability is subject to serious questions.  Dr. Safer cites an article comparing performances of eight transgender women before and after testosterone therapy.  *Id.*, ¶ 51 (citing Harper J. Race

---

[10] Available at: https://academic.oup.com/edrv/article/39/5/803/5052770.
[11] *See* HB 500, § 33-6202(8)-(12).

RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION (Dkt. 22) - 16

times for transgender athletes.  *Journal of Sporting Cultures and Identities* 2015 ("Harper

Article"); 6:1-9.  The Harper Article and the study it reflects have shortcomings and limitations

"rendering the data and conclusions to be of little to no scientific validity" in proving the overall

efficacy of testosterone therapy's ability to eliminate performance advantages.  Brown Decl.,

¶ 154.  *See also id.*, ¶¶ 155-161 (discussing the flaws of the Harper study, including problems

with subject recruitment and sampling, and techniques for collecting and verifying race times, to

name a few).

      In contrast to Dr. Safer, Defendants' expert, Dr. Gregory Brown, is an expert in sports

science.  He is a professor of exercise science in the University of Nebraska Kearney's

Department of Kinesiology and Sport Sciences.  Brown Decl., ¶ 1.  His thorough opinion,

supported by scientific studies and data, is that biological male physiology—not merely currently

circulating testosterone—is why males have a decided advantage over females in athletic

contests.  *Id.*, ¶ 11.b.  *See also id.*, ¶¶ 77-125 (relying on numerous authorities to describe

physiological differences between the sexes).  Due to males' physiological differences from

women, administration of androgen inhibitors (i.e., drugs designed to reduce circulating

testosterone levels) to male-to-female transgender persons does not eliminate their performance

advantages.  *See id.*, ¶¶ 11.c. 127-153.  Plaintiffs' suggestion that limited hormone therapy is

enough to equal the playing field between males and females does not stand up to scientific

scrutiny.

      The experience of one transgender female athlete provides a good example.  Craig Telfer

was a male on the Franklin Pierce University men's track team in 2016 and 2017.  Brown Decl.,

¶ 152.  During those years Telfer was ranked 200th and 390th (respectively) against other NCAA

Division 2 men and did not qualify for the National Championships in any events.  *Id.*  Telfer

RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION (Dkt. 22) - 17

then transitioned to a transgender female, changed her name from Craig to Cece, and underwent a year of hormone therapy.  *Id.*  In 2019 Cece Telfer competed on the Franklin Pierce University women's team, qualified for the NCAA Division 2 Track and Field National Championships, and placed first in the women's 400-meter hurdles and placed third in the women's 100-meter hurdles.  *Id.*  A comparison of Telfer's pre- and post-transition race times shows that she actually ran a little faster as a woman.  *Id.*, ¶ 153.  Obviously, a year of hormone therapy did not eliminate, or even reduce, Telfer's competitive advantages over biological females women.

The Telfer example does not prove that hormone therapy is ineffective in reducing athletic performance advantages in all male-to-female transgender athletes.  But it does prove that the therapy is not effective in all cases.  And it demonstrates the significant athletic advantages males have over females, where an athlete who ranked no better than 200th in men's competition can win the national championship race in women's competition, a year's worth of hormone therapy notwithstanding.

In an effort to promote their narrative that HB 500 was the product of animus toward transgender persons and was based on unfounded stereotypes, Plaintiffs argue that there is no need to protect athletic opportunities for biological females by excluding biological males from their sports.  But this argument is directly refuted by examples like Cece Telfer; and June Eastwood, the University of Montana runner against whom intervenors Madison Kenyon and Mary Marshall could not effectively compete, Dkts. 30-2, ¶¶ 8-12, 14-16, and 30-3, ¶¶ 10-12, 17; and Connecticut high school Students A and B, who were the subject of the recent OCR Decision.  Instead, as the OCR determined, allowing male-to-female transgender athletes to compete in female sports "place[s] female student athletes in athletic events against male student-athletes, resulting in competitive disadvantages for female student-athletes," denying

female student-athletes "the opportunity to compete in events that [are] exclusively female," and denying "female student-athletes athletic opportunities that [are] provided to male student-athletes."  OCR Decision, p. 4.  Through HB 500, the legislature has provided a reasonable, legally permissible means to prevent these wrongs from occurring.

### 2. Plaintiffs cannot establish that they will suffer any harm, much less irreparable harm

As Plaintiffs' standing problems suggest, there is no proof that either plaintiff will suffer any harm from HB 500.  Title IX, and perhaps NCAA rules (or even COVID-19), may prevent Plaintiff Hecox from trying out for BSU's women's cross-country team in August.  But there is no guarantee HB 500 will affect her chances to participate.  Even if Hecox is able to try out, will she make the team?  Will anyone object if she does?

Plaintiff Doe's alleged irreparable harm is perhaps even more speculative.  She is a biological female, qualified to play girls' sports.  There is no evidence that any person intends to dispute that she is female.  And even if someone did, that would easily be resolved by reference to the IHSAA required Health Examination and Consent Form Plaintiff Doe submitted in order to compete in school sports.  There is nothing but speculative and unfounded worry to support Doe's claim that she may suffer some harm.

Mere speculation of harm does not establish proof of irreparable harm necessary to justify an injunction.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (citing *Winter*, 555 U.S. at 21-22) ("plaintiffs must establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction").

### 3. Neither the balance of hardships nor the public interest weighs in favor of an injunction

In arguing that the equities favor an injunction, Plaintiffs focus solely on themselves and ignore the interests of all female athletes who will benefit from HB 500.  As the declarations of

RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION (Dkt. 22) - 19

intervenors Kenyon (Dkt. 30-2) and Marshall (Dkt. 30-3) demonstrate, there are female athletes whose interests will be harmed if they do not have the protection of rules designed to prevent the unfair advantages males or male-to-female transgender athletes have when competing against females.  Ms. Kenyon and Ms. Marshall describe how discouraging and demoralizing it can be for female athletes to try to compete against biological male athletes who identify as female, and the unfairness of such a process.  *See especially* Dkt. 30-2, ¶¶ 10, 12, 20, 25; Dkt. 30-3, ¶¶ 19-20.  Both Ms. Kenyon and Ms. Marshall note that their team, Idaho State University, sometimes competes against BSU.  They express their concerns about having to compete against Lindsay Hecox or other transgender athletes.  Dkt. 30-2, ¶ 29; Dkt. 30-3, ¶ 14.  Plaintiffs conveniently ignore these interests, but the Court should not.

Moreover, unlike the plaintiff boys in *Clark* who had no school boys' volleyball team to play on, both Plaintiffs here have options to participate in school sports under HB 500.  It is undisputed that Plaintiff Doe qualifies to play girls' sports at Boise High School.  And while Plaintiff Hecox might prefer the option of trying out for women's teams, she has the option of continuing to run in the club she organized, *see* Dkt. 22-6, ¶ 22, or trying out for BSU's men's cross-country or track teams.

Under these circumstances, Plaintiffs cannot satisfy their burden of establishing that the balance of hardships and public interest weigh in favor of injunctive relief.  *See Winter*, 555 U.S. at 24 ("A preliminary injunction is an extraordinary remedy never awarded as of right.  In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.  In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction") (internal citations and punctuation omitted).

RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION (Dkt. 22) - 20

**CONCLUSION**

Plaintiffs' motion for a preliminary injunction must be denied for several reasons. Plaintiffs cannot establish standing.  Nor can they establish that they are entitled to pursue a facial challenge to HB 500.  And even if the Court were to reach the merits of Plaintiffs' Equal Protection challenge, they cannot demonstrate that they are entitled to injunctive relief.  HB 500 would satisfy either the rational basis test or heightened scrutiny because it is substantially related to the important government interest of protecting fair opportunities for females to participate in sports, so Plaintiffs are not likely to succeed on the merits.  Similarly, Plaintiffs cannot establish the other factors necessary for an injunction.

Dated this 4th day of June, 2020.

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL

By:   _/s/  W. Scott Zanzig_
      W. Scott Zanzig
      Deputy Attorney General

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 4, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

Richard Eppink
AMERICAN CIVIL LIBERTIES UNION
OF IDAHO FOUNDATION
REppink@acluidaho.org

Gabriel Arkles
James Esseks
Chase Strangio
AMERICAN CIVIL LIBERTIES FOUNDATION
garkles@aclu.org
jesseks@aclu.org
cstrangio@aclu.org

Kathleen Hartnett
Elizabeth Prelogar
Andrew Barr
COOLEY LLP
khartnett@cooley.com
eprelogar@cooley.com
abarr@cooley.com

Catherine West
LEGAL VOICE
cwest@legalvoice.org

*Attorneys for Plaintiffs*

Matthew K. Wilde
BOISE STATE UNIVERSITY
OFFICE OF GENERAL COUNSEL
mattwilde@boisestae.edu

*Attorney for Defendants Boise State University and Marlene Tromp*

Bruce D. Skaug
Raul R. Labrador
bruce@skauglaw.com
raul@skauglaw.com

Roger G. Brooks
Jeffrey A. Shafer
ALLIANCE DEFENDING FREEDOM
rbrooks@ADFlegal.org
jshafer@ADFlegal.org

Kristen K. Waggoner
Parker Douglas
Christiana M. Holcomb
ALLIANCE DEFENDING FREEDOM
kwaggoner@ADFlegal.org
pdouglas@ADFlegal.org
cholcomb@ADFlegal.org

*Attorneys for Proposed Intervenors*

    */s/  W. Scott Zanzig*
W. Scott Zanzig
Deputy Attorney General

RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION (Dkt. 22) - 22

# APPENDIX 1

**RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION (Dkt. 22)**

*Hecox, et al. v. Little, et al.*

**Case No. 1:20-cv-00184-DCN**



**UNITED STATES DEPARTMENT OF EDUCATION**
OFFICE FOR CIVIL RIGHTS
32 OLD SLIP, 26ᵀᴴ FLOOR
NEW YORK, NEW YORK 10005

TIMOTHY C. J. BLANCHARD
DIRECTOR
NEW YORK OFFICE

May 15, 2020

*Sent via email only to:*

MIZEL001@hartford.gov
Lori Mizerak
Assistant Corporation Counsel
City of Hartford
550 Main Street, Room 210
Hartford, Connecticut 06103
Attorney for Hartford Public Schools

dmonastersky@HL-Law.com
David S. Monastersky, Esq.
Howd & Ludorf, LLC
65 Wethersfield Avenue
Hartford, Connecticut 06114
Attorney for Glastonbury Public Schools
   and Canton Public Schools

pjmurphy@goodwin.com &
lyoder@goodwin.com
Peter J. Murphy, Esq.
Linda L. Yoder, Esq.
Shipman & Goodwin, LLP
One Constitution Plaza
Hartford, Connecticut 06103-1919
Attorneys for Connecticut Interscholastic Athletic Conference
   and Danbury Public Schools

jzelman@fordharrison.com
Johanna Zelman, Esq.
Ford Harrison
CityPlace II
185 Asylum Street, Suite 610
Hartford, Connecticut 06103
Attorney for Bloomfield Public Schools
   and Cromwell Public Schools

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by
fostering educational excellence and ensuring equal access.*

Page 2 of 45 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

Re: Case No. 01-19-4025
    <u>Connecticut Interscholastic Athletic Conference</u>

    Case No. 01-19-1252
    <u>Glastonbury Public Schools</u>

    Case No. 01-20-1003
    <u>Bloomfield Public Schools</u>

    Case No. 01-20-1004
    <u>Canton Public Schools</u>

    Case No. 01-20-1005
    <u>Cromwell Public Schools</u>

    Case No. 01-20-1006
    <u>Danbury Public Schools</u>

    Case No. 01-20-1007
    <u>Hartford Public Schools</u>

Dear Attorneys Mizerak, Monastersky, Murphy, Yoder, and Zelman:

The U.S. Department of Education, Office for Civil Rights (OCR) issues this Letter of Impending Enforcement Action[1] in the above-referenced cases. The Complainant filed complaints against the Connecticut Interscholastic Athletic Conference (CIAC) and the Glastonbury Board of Education (Glastonbury) on behalf of three high school student-athletes and their parents. The Complainant alleged that the CIAC's policy permitting certain biologically male student-athletes to participate in interscholastic athletics (Article IX, Section B of the CIAC By-Laws, adopted May 9, 2013, and titled, "Transgender Participation" (hereinafter referred to as the Revised Transgender Participation Policy)) discriminated against female student-athletes competing in interscholastic girls' track in the state of Connecticut on the basis of their sex.[2] Specifically, the Complainant alleged that the Revised Transgender Participation Policy denied girls opportunities to compete, including in state and regional meets, and to receive public recognition critical to college recruiting and scholarship opportunities. The Complainant further alleged that implementation of the Revised Transgender Participation Policy by Glastonbury, the school attended by one of the complainant student-athletes (Student 1), denied opportunities to girls competing in interscholastic girls' track on the basis of their sex. In addition, the Complainant alleged that the CIAC retaliated against one of the complainant parents (Parent 1), after Parent 1 complained about the Revised

---

[1] Section 305 of OCR's *Case Processing Manual* states as follows: "When following the expiration of the 10 calendar day period referenced in CPM subsection 303(g) . . . the recipient does not enter into a resolution agreement to resolve the identified areas of non-compliance, OCR will prepare a Letter of Impending Enforcement Action."

[2] For the purposes of this letter, the terms "male" and "female" are defined by biological sex. *See Mem. from U.S. Attorney General to U.S. Attorneys Heads of Department Components* (Oct. 4, 2017), available at https://www.justice.gov/ag/page/file/1006981/download; and Brief for the Federal Respondent, *Harris Funeral Homes, Inc. v. EEOC, et al.*, No. 18-107, 2019 WL 3942898 (U.S.) (2019).

Page 3 of 45 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

Transgender Participation Policy; and that a Glastonbury track coach retaliated against Student 1 for her and her parent's (Parent 2's) advocacy against the Revised Transgender Participation Policy.

Pursuant to OCR's *Case Processing Manual* (the *Manual*),[3] Section 103, OCR also opened an investigation of Bloomfield Public Schools (Bloomfield) and Hartford Public Schools (Hartford), based on allegations that these school districts allowed a biologically male student-athlete (Student A) to participate on their girls' track teams. OCR also opened an investigation of Cromwell Public Schools (Cromwell), based on allegations that this school district allowed a biologically male student-athlete (Student B) to participate on its girls' track team. Additionally, OCR opened an investigation of Canton Public Schools (Canton) and Danbury Public Schools (Danbury), the school districts attended by the other two complainant student-athletes (Students 2 and 3, respectively), following a determination that these school districts may have been involved in alleged acts of discrimination related to the complaints filed against the CIAC and Glastonbury. OCR investigated whether these school districts denied athletic benefits and opportunities to female student-athletes competing in interscholastic girls' track through implementation of the Revised Transgender Participation Policy, or limited the eligibility or participation of any female student-athletes competing in interscholastic girls' track through implementation of the Revised Transgender Participation Policy.

## Summary of Findings

As detailed below, the actions of the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury resulted in the loss of athletic benefits and opportunities for female student-athletes. One complainant student-athlete explained to OCR that no matter how hard she trained, she felt that she could never be good enough to defeat Students A and B. She also stated that female student-athletes were missing out on great opportunities to succeed and felt that female student-athletes could be "completely eradicated from their own sports." Another complainant student-athlete explained to OCR that she felt that she could not fairly compete against Students A and B, because they had a physical advantage over her. In this sense, they were denied the opportunities that Connecticut male student-athletes had of being able to compete, on a level playing field, for the benefits that flow from success in competitive athletics. OCR determined that the participation of Students A and B in girls' track events resulted in lost benefits and opportunities for female student-athletes.

OCR determined that the CIAC, by permitting the participation of certain male student-athletes in girls' interscholastic track in the state of Connecticut, pursuant to the Revised Transgender Participation Policy, denied female student-athletes athletic benefits and opportunities, including advancing to the finals in events, higher level competitions, awards, medals, recognition, and the possibility of greater visibility to colleges and other benefits. Accordingly, OCR determined that the CIAC denied athletic benefits and opportunities to female student-athletes competing in interscholastic girls' track in the state of Connecticut through the Revised Transgender Participation Policy, in violation of the regulation implementing Title IX of the Education Amendments of 1972 (Title IX), at 34 C.F.R. § 106.41(a).

---

[3] https://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm.pdf.

Page 4 of 45 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

OCR determined that the participation of Glastonbury, Canton, and Danbury in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Students 1, 2, and 3, and other female student-athletes competing against Students A and B, denied athletic benefits and opportunities to Students 1, 2, and 3, and other female student-athletes, in violation of the regulation implementing Title IX, at 34 C.F.R. § 106.41(a). Glastonbury, Canton, and Danbury placed female student-athletes in athletic events against male student-athletes, resulting in competitive disadvantages for female student-athletes. The athletic events in which the female student-athletes competed were coeducational; female student-athletes were denied the opportunity to compete in events that were exclusively female, whereas male student-athletes were able to compete in events that were exclusively male. Accordingly, the districts' participation in the athletic events sponsored by the CIAC denied female student-athletes athletic opportunities that were provided to male student-athletes. Glastonbury's, Canton's, and Danbury's obligations to comply with the regulation implementing Title IX are not obviated or alleviated by any rule or regulation of the CIAC. 34 C.F.R § 106.6(c).

Student A participated in girls' outdoor track during school year 2017-2018 on the Bulkeley (Hartford) team; and participated in girls' indoor and outdoor track during school year 2018-2019 on Bloomfield's team. OCR determined that the participation of Hartford and Bloomfield in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student A's participating in events against Students 1, 2, and 3, and against other female student-athletes, denied athletic benefits and opportunities to Students 1, 2, and 3, and other female student-athletes, in violation of the regulation implementing Title IX, at 34 C.F.R. § 106.41(a). Student B participated in girls' indoor and outdoor track during school years 2017-2018 and 2018-2019 on Cromwell's team. OCR determined that the participation of Cromwell in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student B's participating in events against Students 1, 2, and 3, and against other female student-athletes, denied athletic benefits and opportunities to Students 1, 2, and 3, and other female student-athletes, in violation of the regulation implementing Title IX, at 34 C.F.R. § 106.41(a). Hartford's, Bloomfield's, and Cromwell's obligations to comply with the regulation implementing Title IX are not obviated or alleviated by any rule or regulation of the CIAC. 34 C.F.R. § 106.6(c).

For the aforementioned reasons, OCR also determined that the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury treated student-athletes differently based on sex, by denying benefits and opportunities to female students that were available to male students.

With respect to the retaliation allegation filed against the CIAC, there was insufficient evidence to substantiate the Complainant's allegation that the CIAC retaliated against Parent 1 after Parent 1 complained about the Revised Transgender Participation Policy. With respect to the retaliation allegation filed against Glastonbury, there was insufficient evidence to substantiate the Complainant's allegation that Glastonbury retaliated against Student 1.

Nothing in this letter should be interpreted to impute misconduct on the part of any biologically male students who participated in these competitions.

Page 5 of 45 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

**Investigation and Issuance of Letter of Impending Enforcement Action**

During the course of the investigation, OCR interviewed the Executive Director of the CIAC; administrators and staff from Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury; and the students and parents on whose behalf the complaint was filed. In addition, OCR reviewed documentation that the Complainant, the CIAC, the school districts, and some of the students and parents submitted. OCR also reviewed publicly available information regarding the CIAC and its member school student-athletes.

At the conclusion of the investigations, OCR informed the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury of its findings and determinations that the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury had discriminated against female student-athletes. OCR requested that the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury enter into resolution agreements to remedy the violations. Because the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury did not enter into resolution agreements, OCR issued letters of impasse to the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury on March 17, 2020, in which it advised the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury that it would issue this letter if each did not reach an agreement with OCR within 10 calendar days of the date of its impasse letter.[4] OCR issues this Letter of Impending Enforcement Action because the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury have to date failed to voluntarily enter into resolution agreements to remedy the identified violations.

**Jurisdiction**

OCR is responsible for enforcing Title IX, as amended, 20 U.S.C. § 1681 et seq., and its implementing regulation at 34 C.F.R. Part 106, which prohibit discrimination on the basis of sex in education programs and activities receiving financial assistance from the U.S. Department of Education (the Department).

OCR has jurisdiction over the CIAC as follows:

  a) The CIAC is a direct recipient of Federal funding from the Department through a grant awarded by the Department's Office of Special Education Programs (OSEP) to support the Special Olympics Unified Champion Schools program administered by the CIAC.

  b) The CIAC is also an indirect recipient of Federal funding. The CIAC is governed by member school representatives who devote official time and district resources to the CIAC (e.g., determine athletic eligibility, make rules for athletic competitions, run state boys' and girls' tournaments, and control state championships). In addition, the CIAC receives revenue through the sale of tickets to tournament contests—revenue that would otherwise go to the schools—and by the assessment of entry fees on schools for

---

[4] In emails dated March 27, 2020, OCR informed the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury that in view of their COVID-19-related duties and responsibilities, OCR was extending the 10-calendar-day deadline to respond to OCR's proposed resolution agreement for a period of 30 days, to April 27, 2020.

Page 6 of 45 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

> participation in various tournaments.  The CIAC is also an indirect recipient of Departmental financial assistance through Special Olympics of Connecticut (which receives grant money from OSEP) because several employees of Special Olympics of Connecticut provide to the CIAC technical assistance in the administration of the Special Olympics Unified Champion Schools program.

> c) The CIAC's member schools also have ceded controlling authority over Connecticut's high school athletic program to the CIAC, whose purpose is to supervise, direct, and control interscholastic athletics in Connecticut.  In addition to the CIAC's governance by local school representatives (noted above), the Connecticut General Assembly's Office of Legislative Research stated that school districts have the power to organize athletic programs and decide in what sports to compete, adding, "Boards have delegated authority over the organization of interscholastic high school athletics to [the CIAC].  CIAC regulates high school sports, promulgates eligibility and safety and health rules for teams, and organizes and controls games and championships."

OCR has jurisdictional authority under Title IX to investigate Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury, because each is a recipient of financial assistance from the Department.

## I.     ATHLETIC BENEFITS AND OPPORTUNITIES

**Findings of Fact**

### *The CIAC's Organizational Structure*

The CIAC is the only association governing interscholastic athletic programs for secondary schools in Connecticut.[5]  The CIAC is a division of the Connecticut Association of Schools (CAS). Any public or parochial school accredited by the Connecticut State Department of Education, as well as any private school or academy, and any private school holding associate institutional membership in the CAS can become a member of the CIAC.  The CIAC currently has 188 member schools.  Member schools sign an annual Membership Agreement, pay annual dues, and agree to abide by the CAS Constitution and the CIAC By-Laws and Eligibility Rules.  During school year 2018-2019, the CIAC authorized its member schools to participate in 14 boys' sports and 13 girls' sports.  The CIAC By-Laws allow female athletes to participate on boys' teams, but do not permit male athletes to participate on girls' teams.  The CIAC administers its athletics programs by way of the CAS Constitution, by-laws, and tournament regulations.[6]

The CIAC has 27 committees corresponding to each of the CIAC-sanctioned sports.  Each committee includes representatives from member schools, including principals, coaches, and

---

[5] *See* CIAC Handbook 2019-2020, Section 2.2 ("The CIAC is the only Association which governs interscholastic athletic programs for secondary schools in Connecticut.").

[6] The by-laws constitute the general rules and policies for athletic administration and participation in the CIAC. Specific policies, such as the Revised Transgender Participation Policy, are contained within the by-laws.  Further policies regarding sport-specific tournament participation ("tournament regulations") are published each season in a sports information packet.

Page 7 of 45 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

athletic directors, as well as former coaches.  These committees coordinate the activities of the sports, including game rules, playing conditions, tournament policies, and sportsmanship initiatives.  The by-laws, along with the CAS constitution, are published every year as part of the CIAC Handbook, which is available on the CIAC website.[7]  The Handbook includes detailed rules and regulations governing athletic administration, scheduling, and eligibility, among other topics. The CAS Legislative Body is authorized to make changes to the CAS Constitution and the by-laws.  The principals of the CIAC member schools are the voting delegates to the Legislative Body. The CAS Constitution states that any voting member school may submit a proposed change to the by-laws/regulations through its representative.  The CIAC Board of Control is the governing body for high school interscholastic sports in Connecticut and has 14 voting and 3 non-voting members; the CIAC Board of Control has representatives from large, medium, and small schools, urban and rural schools, as well as public, parochial, and technical schools.[8]  The by-laws require that the Board of Control consider any proposed change to a by-law/regulation, act upon it, and submit any proposed by-law/regulation change to member schools for a vote at the annual meeting of the Legislative Body.  The by-laws, including the rules, regulations, and policies contained therein, as well as the tournament regulations are binding on its member schools,[9] and the CIAC has the authority to penalize schools for violation of the by-laws.[10]

During interviews, district staff members confirmed that the districts regarded the by-laws, rules, and regulations, including the Revised Transgender Participation Policy, as binding.  The witnesses further stated that they regarded the CIAC as the only athletic association in Connecticut that could provide sufficient competitive opportunities for their students.[11]  Witnesses told OCR that if their schools were to withdraw from the CIAC, they likely would encounter difficulties scheduling games against other schools and would be unable to participate in statewide competitions.  An Athletic Director for one of the Districts advised OCR that a CIAC member school would not benefit from playing against a nonmember school because it would not add to

---

[7] http://www.casciac.org/pdfs/ciachandbook_1920.pdf (site last visited on April 24, 2020).

[8] The CIAC Board of Control is elected each year by the Legislative Body at the Annual Meeting of the CAS.  The CIAC Board of Control meets monthly during the school year.

[9] See the CIAC Handbook 2019-2020, Section 2.4 ("Each member school has the responsibility of knowing and adhering to all CIAC rules and regulations and administering its athletic programs according to those rules.").

[10] See the CIAC Handbook 2019-2020, Section 3.0, CIAC By-Laws, Article III, Section C ("The Board of Control shall have the power to assess and to enforce such penalties, including fines, against member schools, principals, athletic directors, coaches and/or members of the coaching staff, as it deems suitable for violations of its Bylaws, Regulations, Rules, Standards of Courtesy, Fair Play and Sportsmanship, Code of Ethics, or any other standard of conduct or any other provision of this Handbook.").  Witnesses OCR interviewed, including the CIAC Executive Director and administrators of member schools, stated that, in general, member schools are responsible for ensuring their own compliance with the CIAC's rules and for self-reporting any violations of those rules.  Member schools can also report other schools for potential violations.  The CIAC Executive Director informed OCR that, to date, no member school has self-reported or reported another member school for a violation of the Revised Transgender Participation Policy.

[11] The CIAC Executive Director stated that there are private schools within Connecticut, such as Taft, Choate, and Kent, that do not belong to the CIAC. These schools belong to the Founders League, whose website describes the league as comprising "highly selective college preparatory schools."  The Founders League includes ten schools from Connecticut and one school from New York.  The Founders League holds its Championship in 13 boys' sports and 12 girls' sports separately, and the CIAC precludes any Founders League schools from competing in any post-season events hosted by the CIAC.  Witnesses opined that they did not know if the Founders League was a feasible alternative for a public school in lieu of becoming a member of the CIAC.

Page 8 of 45 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

the school's record for purposes of qualifying for the state championship. The same Athletic Director also stated that having a state-wide association makes all of the athletics programs stronger and more consistent with set rules for play and eligibility.

*The CIAC's Adoption of its Revised Transgender Participation Policy*

The CIAC stated that its Board of Control began discussions regarding transgender participation in athletics during school year 2007-2008. During its 56th Annual Meeting, held on May 8, 2008, the CIAC membership adopted a by-law change concerning the eligibility of transgender athletes, adding new language to Article IX of the CIAC by-laws (the 2008 policy). Specifically, the 2008 policy allowed transgender student-athlete participation only in accordance with the gender stated on the student's birth certificate unless the student had undergone "sex reassignment."[12] The 2008 policy set forth specific requirements for post-pubescent sex reassignment, including surgery; legal recognition of the reassignment by proper governmental authorities; hormonal therapy; and a two-year waiting period post-surgical and anatomical changes.[13] The 2008 policy also provided that a student-athlete seeking participation as a result of a sex reassignment would be able to appeal eligibility determinations through the CIAC's eligibility appeal process. The stated rationale for the 2008 policy was that "[w]hile the eligibility of transgendered students has not yet been a 'live' issue in Connecticut, the CIAC Board felt that it should be pro-active and have a policy in place for any future eventualities."[14] The 2008 policy remained in effect until 2013. The CIAC advised OCR that, during that time period, the CIAC did not receive any requests for a student-athlete to participate on a team that was different from the student's "assigned gender at birth."

The CIAC stated that in 2012, after the Connecticut Legislature passed Public Act 11-55, expanding the scope of Connecticut's anti-discrimination laws to prohibit discrimination on the basis of "gender identity or expression,"[15] the CIAC decided to review and revise the 2008 policy.

---

[12] https://www.casciac.org/pdfs/ciachandbook_1213.pdf (site last visited on April 24, 2020)

[13] Under the 2008 policy, a student-athlete who had undergone sex reassignment before puberty was not subject to the requirements detailed above.

[14] The CIAC Annual Meeting minutes. https://www.casciac.org/pdfs/adopted_bylaw_changes_CIAC.pdf (site last visited on April 24, 2020).

[15] P.A. 11-55, which became effective on October 1, 2011, defines "gender identity or expression" as follows:

> "Gender identity or expression" means a person's gender-related identity, appearance or behavior, whether or not that gender-related identity, appearance or behavior is different from that traditionally associated with the person's physiology or assigned sex at birth, which gender-related identity can be shown by providing evidence including, but not limited to, medical history, care or treatment of the gender-related identity, consistent and uniform assertion of the gender-related identity or any other evidence that the gender-related identity is sincerely held, part of a person's core identity or not being asserted for an improper purpose.

*See* Conn. Gen. Stat. § 46a-51. Specifically, with respect to the public schools, P.A. 11-55 amended § 10-15c of the Connecticut General Statutes to prohibit discrimination on the basis of gender identity or expression, among other bases. The legislative history of P.A. 11-55 indicates that the topic of athletics was briefly raised during the Connecticut House proceedings on May 19, 2011, in a discussion between Rep. Fox (the bill's proponent) and Rep. Shaban. In response to Rep. Shaban's question concerning whether, under the bill, a high school boy who wanted to play on the school's girls' basketball team could not be prohibited from doing so, Rep. Fox indicated that he believed, but was not certain, that in that context the intent of the bill was to apply only to a male athlete who had undertaken

Page 9 of 45 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

The CIAC did so at its Annual Meeting, held on May 9, 2013, when the current Revised Transgender Participation Policy was enacted.  This Policy states, in relevant part:

> [T]his policy addresses eligibility determinations for students who have a gender identity that is different from the gender listed on their official birth certificates. . . . Therefore, for purposes of sports participation, the CIAC shall defer to the determination of the student and his or her local school regarding gender identification.   In this regard, the school district shall determine a student's eligibility to participate in a CIAC gender specific sports team based on the gender identification of that student in current school records and daily life activities in the school and community at the time that sports eligibility is determined for a particular season.  Accordingly, when a school district submits a roster to the CIAC it is verifying that it has determined that the students listed on a gender specific sports team are entitled to participate on that team due to their gender identity and that the school district has determined that the expression of the student's gender identity is bona fide and not for the purpose of gaining an unfair advantage in competitive athletics. . . . The CIAC has concluded that [these] criteria [are] sufficient to preclude the likelihood that a student will claim a particular gender identity for the purpose of gaining a perceived advantage in athletic competition.[16]

Thus, the Revised Transgender Participation Policy eliminated any requirement that transgender student-athletes provide any medical information or documentation to the CIAC or its member schools.

The Connecticut State Department of Education (CSDE) issued a document entitled, "Guidance on Civil Rights Protections and Supports for Transgender Students – Frequently Asked Questions," dated September 2017 (the 2017 FAQs).[17]   The 2017 FAQs state, in relevant part:

---

what Rep. Shaban had described as "affirmative physical changes." Conn. Gen. Assembly House Proceedings 2011, Vol. 54, Part 12 (May 19, 2011) at 4017-4022.

[16] The CIAC informed OCR that the Revised Transgender Participation Policy has been in effect since its adoption on May 9, 2013. The CIAC stated to OCR that the policy contained in the revised by-law no longer required student-athletes to undergo medical treatment or sex reassignment surgery in order to participate in athletics consistent with their gender identity, nor would a student-athlete be required to seek permission from the CIAC in order to participate under the policy in accordance with the student's gender identity; rather, the policy required member schools to submit rosters that reflected the gender identities of their students.  The CIAC further stated that this decision was based on "a determination that a member school is in the best position to identify and confirm that a student-athlete's gender is consistent with the student's gender identity at school and to place the student on the correct team roster." Accordingly, the Board of Control determined that students would not be required to disclose their transgender status to the CIAC.

[17] https://portal.ct.gov/-/media/SDE/Title-IX/transgender_guidance_faq.pdf?la=en (site last visited on April 24, 2020).  This guidance indicates that the CIAC is responsible for establishing statewide policies for transgender participation in interscholastic competitive sports.

> For issues concerning participation in interscholastic competitive sports, schools and districts should consult their counsel and the Connecticut Interscholastic Athletic Association ("CIAC").[18]

On October 11, 2018, the CAS Board of Directors requested that an ad hoc committee examine all the CIAC rules and regulations that relate to gender. The meeting minutes of the CIAC stated that the purpose of the review was to ensure that the regulations were in alignment with state law.[19] The CIAC established a Gender By-Law Subcommittee in December 2018 to review all of the by-laws relating to gender in order to confirm the current policies and practices or make recommendations for improvements. In its report to the CIAC Board of Control, dated April 4, 2019, the Subcommittee concluded that the by-laws reviewed were "in alignment with Connecticut law and the CAS-CIAC mission."[20]

### The CIAC's and School Districts' Implementation of the Revised Transgender Participation Policy

School district witnesses interviewed stated that none of the districts had a specific written procedure or practice in place to implement the Revised Transgender Participation Policy, but that they followed or would follow the plain language of the policy. Districts that had not had a transgender student request to participate in athletics stated that should they receive a request from a transgender student to participate in athletics, they would look at the gender identity listed in the student's current school records and then whether the gender identity the student is expressing during the day is consistent with the gender identity listed in the student's school records; e.g., whether the student has requested to use a name and pronouns consistent with that sex. Witnesses stated that often this process would involve the student's parents, particularly if the student were a minor and school records needed to be changed; but that once the student had established his or her gender identity, the school would place the student on the roster of the team associated with that gender. Witnesses from districts that have had transgender students request to participate in athletics detailed a similar internal process; namely, that upon a request from a transgender student, they would review the student's records, speak with the student's teachers/counselors, meet with the student's parents, and if all was consistent, thereafter, place the student on the team roster associated with the student's gender identity.

Every district confirmed to OCR that it believed that no specific documentation, medical or otherwise, was required in order for the district to comply with the policy. District administrators

---

[18] 2017 FAQs, p. 7. *See* https://portal.ct.gov/-/media/SDE/Title-IX/transgender_guidance_faq.pdf?la=en (site last visited on April 24, 2020).

[19] https://portal.ct.gov/-/media/SDE/Title-IX/transgender_guidance.pdf?la=en (site last visited on April 24, 2020).

[20] The CAS mission statement is as follows: "The Connecticut Association of Schools provides exemplary programs and services that promote excellence in the education of all children." The CIAC mission statement is as follows: "The CIAC believes that interscholastic athletic programs and competition are an integral part of a student's academic, social, emotional and physical development. The CIAC promotes the academic mission of schools and honorable competition. As such, the CIAC serves as the regulatory agency for high school interscholastic athletic programs and exists to assure quality experiences that reflect high ethical standards and expectations for fairness, equity and sportsmanship for all student-athletes and coaches. The CIAC provides leadership and support for member schools through the voluntary services of dedicated school administrators, athletic directors, coaches and consultants."

reported that they had not received specific training regarding implementation of the Revised Transgender Participation Policy, although some stated that they had attended workshops or presentations on the topic of transgender athletes generally. Principals and athletics directors interviewed by OCR indicated that transgender student-athlete participation had been discussed either formally or informally at annual professional development conferences, as well as during professional association meetings, and through their respective regional conferences. Witnesses from the districts stated, and the CIAC confirmed to OCR, that the CIAC has not questioned any decisions made by a member school under the policy, nor has it investigated any rosters submitted by member schools with respect to the policy. Glastonbury noted that, in the past, when it had a transgender student wish to participate in athletics, the student's parent offered to provide medical documentation to support their request under the Revised Transgender Policy; however, the CIAC advised Glastonbury that the information was not required.

Additionally, multiple district witnesses stated to OCR that, according to their understanding of the Revised Transgender Participation Policy, it is not the school's or district's role to determine a student's gender. Witnesses from Bloomfield, Danbury, Glastonbury, and Hartford stated that the student initiates the process and informs the district of the student's gender identity; and the district's role is to review the current school records, speak with school staff regarding the student's current gender expression during the school day, and then place the student on the appropriate roster. Witnesses from Bloomfield and Cromwell also stated that if a student were to initially register with the school under a gender identity that differed from the student's biological sex, the school would place the student on the roster of the gender identified in the school registration records; i.e., the district and student would not need to have a discussion or review the student's participation under the Revised Transgender Participation Policy. Both Cromwell and Bloomfield have used this process in their districts.

### *Concerns Raised by Parents and Others to the CIAC Regarding the Policy and the Participation of Biologically Male Students in Track Events*

In 2019, the CIAC received several emails from parents of Connecticut high school students, in which the parents expressed concerns about the policy and specifically about the participation in female track events of biologically male students.

From January 2019 to March 2019, the CIAC received four emails from the father of a female student-athlete at Glastonbury High School (Parent 3). On January 29, 2019, Parent 3 sent an email to the CIAC stating that he and many parents of other female track athletes, as well many of the athletes themselves, believed that the policy was unfair to female track athletes[21] and that the policy raised safety concerns as well, particularly with respect to sports involving physical contact.[22] With respect to track, he suggested that a compromise could be reached whereby a boy

---

[21] In part, Parent 3 stated as follows: "Should a boy who identifies as a girl with all of the physiological and anatomical advantages of a boy be able to compete in Connecticut Girls Indoor Track, obtain medals over other girls who have trained hard and care deeply about the results, eradicate existing girls event and state track records and push what would have been the final girl qualifier out of selection for All-Conference and All-State honors?"

[22] In part, Parent 3 stated as follows: "Should safety be compromised in girls high school track or other girls sports such as basketball, soccer or lacrosse to accommodate a boy who identifies as a girl with all of the physiological and anatomical advantages of a boy?"

Page 12 of 45 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

identifying as a girl would be able to compete but would not have the results used for purposes of conference or state records or for all-conference or all-state selection.  Parent 3 requested a meeting with the CIAC officials to discuss the topic.[23]

On February 17, 2019, Parent 3 sent an email to the CIAC stating that the transgender policy affected the outcome of the CIAC State Open Girls Indoor Track Championship held on February 16, 2019.  Specifically, he stated that the performance of a transgender athlete "with all the physiological and anatomical attributes of a male athlete" in the Championship had enabled Bloomfield High School to win the team championship over Glastonbury.  Parent 3 again urged the CIAC to change the policy.  On February 25, 2019, the Executive Director of the CIAC responded to Parent 3, stating that Parent 3's correspondence would be provided to a CIAC subcommittee reviewing the policy.

On March 3, 2019, Parent 3 sent an email to the CIAC again urging the CIAC to change the policy.  He further stated that at the New England Regional Indoor Track Championship, held on March 2, 2019, a biologically male athlete finished first in the 55-meter and 300-meter sprints and had helped Bloomfield win first place over Glastonbury in the girls' 4 x 400 meter relay.  On March 10, 2019, Parent 3 sent an email to the CIAC stating that the National Scholastic Athletic Foundation, an organization that hosts the New Balance National high school track and field competition, had established a policy whereby female transgender athletes are required to meet applicable rules established by the National Scholastic Athletics Foundation, USA Track & Field, and International Olympic Committee, which required such athletes to demonstrate that they had undergone hormone treatment.  Parent 3 stated that when Bloomfield's girls' 4 x 400 team recently competed in the New Balance Nationals, it did so without the participation of its biologically male athlete, and that this resulted in a slower time than Bloomfield's team had achieved at the New England championships, when the biologically male athlete had competed.

From February 2019 to March 2019, the CIAC received three emails from a parent (Parent 4).  On February 25, 2019, Parent 4 sent an email to the CIAC expressing concerns about the fairness of the policy.[24]  He stated that as a result of the participation of transgender girl track athletes, seven cisgender girl athletes had been deprived of the opportunity to compete at the New England Regional Championship and to gain additional exposure to college coaches and recruiters.  He stated that "[a]t the heart of the competitive fairness issue regarding competition between transgender girls and cisgender girls is the abundance of testosterone present in young biological males."

---

[23] In addition, Parent 3 attached a copy of an email dated January 27, 2019, that he had sent to officials from the Glastonbury District. In this email, Parent 3 expressed his concerns about the policy's fairness and safety, and he described several recent track meets in which a transgender athlete had finished ahead of other athletes.  Parent 3 asked the Glastonbury officials to make efforts to have the policy changed.

[24] Specifically, he stated that "there are many, myself included, who cannot begin to fathom the policy of the CIAC that has allowed the competitive record of Connecticut Girls High School Track and Field Competitions to be altered by the tabulation and classification of results that include transgender athletes that has now spread its impact to not only athletes that have competed directly in these events, but now also their teammates, especially 75 members of the Glastonbury Girls Indoor Track Team, when team records and scoring are impacted."

Page 13 of 45 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

Further, Parent 4 stated that the CIAC maintains different qualifying standards for girls' and boys' track, which he contended was an acknowledgment that there was a measurable difference in the performance capabilities between genders.  He requested that the CIAC adjust the results of the 2019 State Girls Open Competition so as not to include the results of the transgender athletes, and he requested that the policy be changed going forward.  He offered several suggestions for a new policy (e.g., establishing a new competitive category for transgender athletes).

The Executive Director of the CIAC responded the same day, stating that Parent 4's correspondence would be shared with the subcommittee reviewing the Revised Transgender Participation Policy.  On March 1, 2019, Parent 4 sent an email to the CIAC, stating that he would like to arrange a meeting with the members of the subcommittee reviewing the policy.  On March 5, 2019, Parent 4 sent an email to the CIAC stating that, during the New England Indoor Regional Championships on March 2, 2019, spectators from other states had expressed "surprise and concern" that Connecticut permitted transgender athletes to participate.

On June 20, 2019, the CIAC received an email from the mother of a rising female high school student in Connecticut (Parent 5).  Parent 5 expressed her concern that the policy was unfair to female athletes because it would allow "genetic males (no matter how they identify themselves) to usurp genetically female athletes in competition."

In a letter to the CIAC, dated April 11, 2017, a head track coach at a Connecticut high school stated that Student B was at a great advantage unless or until the student began taking hormone blockers.  He also referred to average high school testosterone levels according to the Mayo Clinic.  He then argued that Student B had gender characteristics that females cannot compete with, and that Student B was taking advantage of the CIAC's policies and rules.  He requested that the CIAC find a solution that allowed Students A and B to compete but also protected female athletes.

### The CIAC's Rules for Girls' Indoor and Outdoor Track Competition

The CIAC is organized into various boards and committees, including one committee for each CIAC-sanctioned sport.  Each year, the CIAC committee for the respective sport publishes a "Sports Packet/Information Sheet" for the season.  The Sports Packet/Information Sheets for girls' indoor and outdoor track set forth, among other things, the procedures for entering student-athletes in events; how many events a student-athlete may participate in;[25] submitting qualifying performances; entrance fees; rules regarding electronic devices; protest procedures; scrimmages; and, regular season score reporting.

---

[25] For both girls' indoor and outdoor track, the sport packets state that a competitor shall not compete in more than three events including relays, and any athlete on the tournament roster shall not be entered in more than three events excluding relays; e.g., an athlete may be entered in the 4 x 800, 1600, 3200, and 4 x 400 events, but can only run or be a competitor in three events. A contestant becomes a competitor when the contestant reports to the clerk of course. The rules also state that a competitor who competes in three events at any of the class meets cannot enter any other event at the State Open Championship.  The stated rationale is that class championship meets and the State Open are really one meet because advancing to the State Open Championship is predicated on class meet performance.  Athletes listed as alternates for relay events may only run if they ran two events or fewer at the class meet; i.e., they are still limited to three events.

The CIAC sets the rules for athletic eligibility and competition across the state. Each sport is divided into divisions/classes, based on the size of the school. The CIAC sports committees determine the tournament or championship class divisions for each sport based on the grade 9-12 enrollments of each school as of October 1 of the past school year. A school can have different classes for each of its sports, and a school's class/division can change depending on the year. The Sports Packet/Information Sheet for each sport sets forth the class/divisions for the current year. For example, during school year 2018-2019, for girls' indoor track, the CIAC had the following classes, from smallest school enrollment to largest: Class S, Class M, Class L, and Class LL. For girls' outdoor track, the CIAC had the following classes: Class S, Class M, Class MM, Class L, and Class LL.

There are eleven conferences/leagues[26] that are based mostly on geographic location, which can include schools from the different CIAC classes. The CIAC does not set regular season competitive schedules; these are set by the individual member schools, individually or through conferences/leagues.[27] However, the CIAC does mandate certain "season limitations," including when the opening day of practice occurs, the minimum number of required practice days prior to the first contest, the maximum number of games or meets played per week, and the maximum number of contests scheduled per season.[28]

For post-season competition, if they met qualifying standards,[29] participants in girls' indoor and outdoor track can participate in a conference/league championship; a class statewide championship; the State Open Championship; and the New England Regional Championship. Each of the eleven conferences/leagues holds a conference/league championship at the end of the indoor and outdoor seasons; and each class holds a class statewide championship at the end of the indoor and outdoor seasons. A student-athlete's eligibility to compete at the indoor and outdoor track State Open Championships is determined by the finish order at the respective class statewide championships as set forth in the Sports Packet/Information Sheet.[30] For example, for indoor track for school year 2018-2019, the top 14 finishers in all events in class statewide championships for Classes LL, L, M, and S were eligible to compete in the indoor State Open Championship. For outdoor track for school year 2018-2019, the top 5 finishers in each of the class statewide championships automatically qualified for the outdoor State Open Championship, as well as all athletes who obtained the special (automatic) standard for their event at the class statewide championship.[31]

---

[26] http://ciacsports.com/site/?page_id=131 (site last visited on April 24, 2020).

[27] *See* CIAC Handbook, Section 5.0 ("The CIAC has no jurisdiction over regular season interscholastic scheduling problems except as these relate to violation of CIAC policies. Schedul[ing] of interscholastic contests within CIAC season limitations is the responsibility of individual schools and/or leagues.")

[28] *See id.* at page 47.

[29] Schools may only enter athletes who meet the minimum requirements for the event as established by the sports committee for that year, as set forth in the sports information packet.

[30] The Sports Packet/Information Sheet provides information about the Class/Division Championships and the State Open Championship; including qualifying distances and times for entry into the class championships, as well as eligibility to compete in the State Open Championship.

[31] From at least school years 2012-2013 through 2016-2017, the outdoor sports packet set a CIAC State Open Championship qualifying standard for each event. For the 100-meter dash, the qualifying standard was 12.60 for all years and for the 200-meter dash, the qualifying standard was 26.70 for all years except 2016-2017, when it was lowered to 26.14. The sports packets during those years stated that the automatic standard approximated the 8th place

Page 15 of 45 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

The CIAC awards medals to the top 6 competitors based on the order of finish in events at the State Open Championships (both indoor and outdoor), and the top 6 competitors also qualify for the New England Regional Championships.[32]  Thereafter, a student may go on to compete at the national championships, held by the National Scholastic Athletics Foundation (the New Balance Indoor and Outdoor Championships), based on the student's qualifying time.[33]

The CIAC uses a point system to award points by school to determine a school state champion for indoor and outdoor track.  For indoor track, the CIAC uses team scoring based on six places (from first to sixth place, the CIAC awards 10, 8, 6, 4, 2 and 1 points, respectively) for all events.  For outdoor track, the CIAC uses team scoring based on eight places (from first to eighth; 10, 8, 6, 5, 4, 3, 2 and 1 points) only when an eight lane track is used; otherwise the CIAC uses team scoring based on six places (from first to sixth; 10, 8, 6, 4, 2 and 1 points) for the event.  The points earned by each school are then tallied, and the CIAC ranks schools in the order of points from highest to lowest to determine the state champion.[34]

### *Complainant Students and Competition Against Students A and B*

The complaint was filed on behalf of three high school female students competing in girls' track in the state of Connecticut: Student 1, attending Glastonbury High School (School 1); Student 2, attending Canton High School (School 2); and Student 3, attending Danbury High School (School 3).  The Complainant specifically complained about two students who participated in girls' track in the state of Connecticut: Student A, who competed for Bulkeley High School in the Hartford School District (School A1) in the spring of school year 2017-2018, and Bloomfield High School (School A2) during school year 2018-2019 to the present; and Student B attending Cromwell High School (School B).  The CIAC's list of sanctioned sports includes boys' track.  Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury each maintained boys' track teams.

---

finish established in the prior year State Open.  Starting in school year 2017-2018, and continuing in school year 2018-2019, per the Sports Packet, "The special standard will be set each year after the class meets have ended. The special standard will be determined by looking at the performance rankings for each event that includes the top five (5) qualifying performances from each of the class meets. The 12th place performance from the qualifiers will become the automatic standard for that year. All athletes who meet that standard during the current year's class championship will advance to the open."

[32] For outdoor track, the 7th and 8th place finishers in the final for any event will be considered as alternates.

[33] The National Scholastic Athletics Foundation's Transgender Participation Policy & Procedure, updated December 2019, allows for a transgender student-athlete to submit a qualified entry into a National Scholastic Athletics Foundation competition or make a written request for participation, which the National Scholastic Athletics Foundation then evaluates on a case-by-case basis, including evaluation by an Eligibility Committee comprising at least one medical professional, event director, active age-appropriate coach, and lawyer.  The Eligibility Committee can request any information it believes relevant to the application, including but not limited to interviews with the athlete and/or parents/guardians and coaches, and a review of relevant medical and legal records.  The policy states that a male-to-female athlete who is not taking hormone treatments related to gender transition may not compete in female competitions, but that a female-to-male athlete not taking testosterone related to gender transition may compete in male competitions.

[34] In the outdoor State Open Championship, seeding is done electronically based on an athlete's performance at the Class meets.  An athlete's seed determines the athlete's lane assignment; the athlete with the fastest projected time based on performance at the Class meets is assigned to a middle lane (usually lane 4) and athletes are then placed in lanes in order of seed, working towards the outside lanes.

Page 16 of 45 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

In order to determine the impact of the Revised Transgender Participation Policy on Students 1, 2, and 3, OCR reviewed the participation of Students 1, 2, 3, A, and B in post-season conference/league championships, class championships, State Open Championships, and the New England Regional Championships. OCR reviewed information for school years 2017-2018 and 2018-2019.

### *Student 1*

OCR determined that Student 1 was enrolled at School 1 as a 10th grade student during school year 2017-2018, and as an 11th grade student during school year 2018-2019. Student 1 was a student-athlete on School 1's girls' varsity indoor and outdoor track teams. Regionally, School 1 participated in the Central Connecticut Conference (CCC). Statewide, School 1 participated in Class LL for indoor and outdoor track.

The Complainant asserted that pursuant to the Revised Transgender Participation Policy, and the resulting participation of Students A and B, the CIAC denied Student 1 opportunities to advance to the finals in an event, to advance to higher levels of competition, and/or win titles at events such as the CIAC Outdoor State Open Championship, held on June 4, 2018; the CIAC Indoor State Open Championship, held on February 16, 2019; and the Indoor New England Regional Championship, held on June 8, 2019.

During an interview with OCR, Student 1 stated that she and other female student-athletes with whom she had spoken found it very difficult to go into a race knowing that no matter what they do, they would never be good enough to win. In a video provided by the Complainant, Student 1 asserted that by permitting transgender athletes to participate in girls' track competitions, she and other athletes had lost opportunities to compete at track meets, to win titles, and to gain attention from college coaches. She further stated that women have fought hard for many years to have opportunities and a voice in sports; and that it is upsetting to realize that no matter how hard she and other female student-athletes train, they will never be good enough to compete against transgender athletes. Student 1 also stated: "I respect these transgender athletes, and I understand that they are just following CIAC policy. But at the same time, it is demoralizing and frustrating for me and for other girls."

The Athletic Director for School 1 acknowledged that some parents had complained that their children did not place at certain meets, but she stated that she was unaware of whether any female students had lost out on competitive opportunities, awards, or wins. School 1's Athletic Director denied that any of the female student-athletes on the girls' indoor or outdoor track teams were denied participation opportunities as a result of having transgender athletes participate in track events. She stated that student-athletes were eligible to participate in all meets that the District participated in if they met the requirements. School 1's Assistant Athletic Director stated that she is aware of Student 1's complaining that she felt she was deprived of an opportunity to advance to the New England Regional Championship due to the participation of transgender athletes.

Page 17 of 45 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

### *Student 2*

Student 2 was enrolled at School 2 as a 10th grade student during school year 2017-2018, and as an 11th grade student during school year 2018-2019. During school years 2017-2018 and 2018-2019, Student 2 was a student-athlete on School 2's varsity girls' indoor and outdoor track teams. Regionally, School 2 participated in the North Central Connecticut Conference (NCCC). Statewide, School 2 participated in Class S for indoor and outdoor track.

The Complainant asserted that, pursuant to the Revised Transgender Participation Policy and the resulting participation of Students A and B, the CIAC denied Student 2 opportunities to advance to higher levels of competition and/or win titles at events such as the 2017 Outdoor State Open Championship, held on June 6, 2017; the New England Regional Championship, held on June 10, 2017; the Class S Indoor Championship held on February 10, 2018; the Outdoor State Open Championship, held on June 4, 2018; the Class S Indoor Championship, held on February 7, 2019; the Indoor State Open Championship, held on February 16, 2019; the Class S Outdoor Championship, held on May 30, 2019; and the Outdoor State Open Championship, held on June 3, 2019.

During an interview with OCR, Student 2 stated that, in addition to the impact the participation of Students A and B had on her and other female student-athletes' ability to win titles and awards, their participation also has had an impact on her and other female student-athletes' ability to obtain recognition from media and college coaches. Student 2's mother (Parent 1) noted that some biologically female track student-athletes had lost out on media recognition because the winner of an event at the state championships gets the opportunity to be interviewed by reporters, while the second and third place finishers do not. Specifically, Parent 1 stated that at the state championships there is a bank of reporters waiting to interview the winners and the winners' names are put in the local papers, and that student-athletes typically do not receive any media recognition when they come in second. Further, Student 2 stated that the participation of Student A, in particular, had an impact on her ability to set class records for the CIAC Class S 100-meter and 200-meter races.

School 2's principal stated that no student-athletes were prohibited from participating; student-athletes went to every meet that the school participated in, and all student-athletes who qualified for state tournaments had the opportunity to compete. However, the principal acknowledged that, at the state level, some people might argue that a transgender athlete defeated a District student (i.e., Student 2); therefore, that student lost out on an award.

### *Student 3*

OCR determined that Student 3 was enrolled at School 3 as a 9th grade student during school year 2018-2019. Regionally, School 3 participated in the Fairfield County Interscholastic Athletic Conference (FCIAC). Statewide, School 3 participated in Class LL for indoor and outdoor track. During school year 2018-2019, Student 3 was a student-athlete on School 3's girls' varsity outdoor track team.

The Complainant asserted that, pursuant to the Revised Transgender Participation Policy and the resulting participation of Students A and B, the CIAC denied Student 3 opportunities to advance

Page 18 of 45 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

to higher levels of competition and/or win titles at events, such as the Outdoor State Open Championship, held on June 3, 2019. During an interview with OCR, Student 3 stated that when competing against transgender athletes, it was frustrating for her to know that she would not be able to do as well as she otherwise could do. In a video the Complainant provided, Student 3 asserted that even before she gets to the track, she already knows that she is not going to win first or second place if she races against transgender athletes; and that no matter how hard she works, she will not be able to win the top spot.

### *Competition Against Students A and B*

Descriptions of some of the girls' track indoor and outdoor post-season events in which Students 1, 2, and/or 3 participated with Students A and/or B during school years 2017-2018 and 2018-2019 are set forth below.

1. During school year 2017-2018, in the Indoor State Open Championships, Student B participated in the 55-meter dash. In the preliminary for the 55-meter dash, Student B placed 2nd and Student 2 placed 16th. The top 8 finishers advanced to the finals; however, even though Student 2 would not have advanced to the finals even absent Student B's participation, Student B's finish in the top 8 in the preliminary denied an opportunity for the 9th place finisher to advance to the finals. See chart summarizing the results:

| 2017-2018 Indoor State Open Championships Girls 55-Meter Dash Preliminaries (Top 7 Advance to Finals) | | | | | |
|---|---|---|---|---|---|
| **Place** | **Student** | **Time** | **School** | **Seed** | **Heat** |
| 1 | * | 7.26q | * | 7.31 | 1 |
| **2** | **Student B** | **7.30q** | School B | 7.31 | 1 |
| 3 | * | 7.34q | * | 7.39 | 3 |
| 4 | * | 7.35q | * | 7.28 | 2 |
| 5 | * | 7.40q | * | 7.39 | 3 |
| 6 | * | 7.42q | * | 7.48 | 3 |
| 7 | * | 7.43q | * | 7.38 | 2 |
| 8 | * | 7.44 | * | 7.44 | 1 |
| 9T | * | 7.53 | * | 7.47 | 3 |
| 9T | * | 7.53 | * | 7.40 | 2 |
| … | … | … | … | … | |
| 16 | Student 2 | 7.78 | School 2 | 7.46 | 2 |

2. During school year 2017-2018, in the Outdoor State Open Championships, Student A and Student B participated in the 100-meter dash. In the preliminary for the 100-meter dash, Student A placed 1st and Student B placed 4th. The top 8 finishers advanced to the finals, including Student 2 (who placed 2nd) and Student 1 (who placed 8th); however, Student A's and Student B's finishes in the top 8 in the preliminary denied an opportunity for two female student-athletes to advance to the finals. In the finals of the 100-meter dash, Student A placed 1st, Student B placed 2nd; Student 2 placed 4th;

and Student 1 placed 6th. The top six finishers were awarded medals and advanced to the New England Regional Championships, including Student 1 and Student 2; however, Student A's and Student B's finishes in 1st and 2nd place, respectively, denied an opportunity for two female student-athletes to advance to the New England Regional Championships, along with the benefit of receiving a medal for the Outdoor State Open Championships.[35] Student A placed 1st at the preliminaries of the 100-meter dash at New England Regional Championships. The top 8 finishers advanced to the finals, including Student 2 (who placed 7th);[36] however, Student A's finish in the top 8 in the preliminary denied an opportunity for a female student-athlete to advance to the finals.[37] See charts summarizing the results below:

| 2017-2018 Outdoor State Open Championships Girls 100-Meter Dash Preliminaries (Top 8 Advance to Finals) | | | | | |
|---|---|---|---|---|---|
| **Place** | **Student** | **Time** | **School** | **Seed** | **Heat** |
| **1** | **Student A** | 11.75q | School A1 | 11.77 | 3 |
| 2 | Student 2 | 12.26q | School 2 | 12.61 | 2 |
| 3 | * | 12.38q | * | 12.33 | 1 |
| **4** | **Student B** | 12.39q | School B | 12.22 | 2 |
| 5 | * | 12.46q | * | 12.57 | 3 |
| 6 | * | 12.52q | * | 12.74 | 2 |
| 7 | * | 12.54q | * | 12.34 | 1 |
| 8 | Student 1 | 12.58q | School 1 | 12.91 | 3 |
| 9 | * | 12.63 | * | 12.73 | 3 |
| 10 | * | 12.64 | * | 12.68 | 2 |
| … | … | … | … | … | … |
| 25 | * | 13.17 | * | 12.98 | |

| 2017-2018 Outdoor State Open Championships Girls 100-Meter Dash Finals | | | | |
|---|---|---|---|---|
| **Place** | **Student** | **Time** | **School** | **Points** |
| **1** | **Student A** | 11.72# | School A1 | 10 |
| **2** | **Student B** | 12.29 | School B | 8 |
| 3 | * | 12.36 | * | 6 |
| 4 | Student 2 | 12.39 | School 2 | 5 |
| 5 | * | 12.47 | * | 4 |
| 6 | Student 1 | 12.67 | School 1 | 3 |
| 7 | * | 12.71 | * | 2 |
| 8 | * | 12.80 | * | 1 |

[35] Student A, Student B, and Student 2 also participated in the 200-meter dash, and finished 1st, 7th and 10th, respectively, in the final. Student A's 1st place finish denied an opportunity for one female student-athlete to advance to the New England Regional Championships in the 200-meter dash, along with the benefit of receiving a medal for the Outdoor State Open Championships.

[36] Student 1 placed 25th.

[37] In the finals of the 100-meter dash, Student A placed 1st, while Student 2 placed 7th.

**2017-2018 Outdoor New England Regional Championships**
**Girls 100-Meter Dash Preliminaries (Top 8 Advance to Finals)**

| Place | Student | Time | School | Heat | Tie-breaker | State |
|---|---|---|---|---|---|---|
| **1** | **Student A** | 12.46q | School A1 | 5 | | CT |
| 2 | * | 12.59q | * | 4 | | MA |
| 3 | * | 12.64q | * | 3 | | MA |
| 4 | * | 12.65q | * | 1 | | MA |
| 5 | * | 12.81q | * | 1 | 12.805 | CT |
| 6 | * | 12.81q | * | 2 | 2.809 | CT |
| 7 | Student 2 | 12.82q | School 2 | 2 | | CT |
| 8 | * | 12.92q | * | 5 | | RI |
| 9 | * | 12.94 | * | 3 | | MA |
| 10 | * | 12.95 | * | 5 | | MA |
| … | … | … | … | … | … | … |
| 25 | Student 1 | 13.5010 | School 1 | 3 | 13.497 | CT |
| | | | | | | |
| 33 | * | 13.84 | * | 1 | | RI |

**2017-2018 Outdoor New England Regional Championships**
**100-Meter Dash Finals**

| Place | Student | Time | School | Tie breaker | State |
|---|---|---|---|---|---|
| **1** | **Student A** | 11.97 | School A1 | | CT |
| 2 | * | 12.26 | * | | MA |
| 3 | * | 12.31 | * | | MA |
| 4 | * | 12.50 | * | | MA |
| 5 | * | 12.56 | * | 12.554 | CT |
| 6 | * | 12.56 | * | 12.559 | CT |
| 7 | Student 2 | 12.58 | School 2 | | CT |
| 8 | * | 12.69 | * | | RI |

3. During school year 2018-2019, in the Indoor Class S Statewide Championships, Student A and Student B participated in the 55-meter dash. In the preliminary for the 55-meter dash, Student A placed 1st and Student B placed 2nd. The top 7 finishers advanced to the finals, including Student 2 (who placed 3rd); however, Student A's and Student B's finishes in the top 7 in the preliminary denied an opportunity for two female student-athletes to advance to the finals. In the finals of the 55-meter dash, Student A placed 1st, Student 2 placed 2nd, and Student B placed 3rd. The top 14 finishers advanced to the State Open Championship. While all three student-athletes advanced to the State Open Championship, Student A's and Student B's participation denied an opportunity to two female student-athletes to participate in the State Open Championship for the 55-meter dash.[38] See charts summarizing results below:

---

[38] Student A also placed 1st in the finals of the 300-meter dash, which denied an opportunity to one girl to participate in the State Open Championship for the 300-meter dash.

| 2018-2019 Indoor Class S Statewide Championships<br>Girls 55-Meter Dash Preliminaries (Top 7 Advance to Finals) | | | | |
|---|---|---|---|---|
| **Place** | **Athlete** | **Time** | **High School** | **Heat** |
| **1** | **Student A** | 7.16q | School A2 | 8 |
| **2** | **Student B** | 7.30q | School B | 6 |
| 3 | Student 2 | 7.38q | School 2 | 7 |
| 4 | * | 7.61q | * | 1 |
| 5 | * | 7.63q | School A2 | 1 |
| 6 | * | 7.63q | * | 5 |
| 7 | * | 7.68q | * | 3 |
| 8 | * | 7.70 | * | 5 |
| 9 | * | 7.71 | * | 2 |
| 10 | * | 7.74 | * | 4 |
| . . . . | . . . . | . . . . | . . . . | . . . . |
| 48 | * | 8.37 | * | 3 |

| 2018-2019 Indoor Class S Statewide Championships<br>Girls 55-Meter Dash Finals | | | | |
|---|---|---|---|---|
| **Place** | **Athlete** | **Time** | **High School** | **Points** |
| **1** | **Student A** | 7.03 | School A2 | 10 |
| 2 | Student 2 | 7.27 | School 2 | 8 |
| **3** | **Student B** | 7.33 | School B | 6 |
| 4 | * | 7.48 | * | 4 |
| 5 | * | 7.51 | School A2 | 2 |
| 6 | * | 7.53 | * | 1 |
| 7 | * | 7.54 | * | - |

4. During school year 2018-2019, in the Indoor State Open Championship, Student A and Student B participated in the 55-meter dash. In the preliminary for the 55-meter dash, Student A placed 1st and Student B placed 2nd. The top 7 finishers advanced to the finals, including Student 2 (who placed 4th); however, Student A's and Student B's finishes in the top 7 in the preliminary would have denied an opportunity for two female student-athletes to advance to the finals, including Student 1 (who placed 8th). In the finals of the 55-meter dash, Student A placed 1st, Student B placed 2nd, and Student 2 placed 3rd. The top six finishers are awarded medals and advance to the New England Regional Championships; however, Student A's and Student B's finishes in 1st and 2nd place, respectively, denied an opportunity for two female student-athletes to advance to the New England Regional Championships, along with the benefit of receiving a medal for the Outdoor State Open Championships.[39] Further, since Student 2 placed 3rd, Student A's and Student B's participation denied an opportunity to Student 2 to place 1st in the 55-meter dash and receive the benefit of a 1st place medal. In the Indoor

---

[39] Student A also placed 1st in the finals of the 300 meter dash in the Indoor State Open Championships, which denied an opportunity to a female student-athlete to advance to the New England Regional Championships, along with the benefit of receiving a medal for the Indoor State Open Championships.

New England Regional Championship, in the preliminaries for the 55-meter dash, Student A placed 2nd, Student B placed 3rd, and Student 2 placed 8th. The top 8 finishers advanced to the finals. Although all three advanced to the finals, Student A's and Student B's 2nd and 3rd place finishes, respectively, denied an opportunity to two female student-athletes to advance to the finals. In the finals of the 55-meter dash, Student A placed 1st, Student B placed 3rd, and Student 2 placed 8th. See charts summarizing results below:

| 2018-2019 Indoor State Open Championships<br>Girls 55-Meter Dash Preliminaries (Top 7 Advance to Finals) | | | | |
|---|---|---|---|---|
| Place | Athlete | Time | High School | Heat |
| 1 | **Student A** | 7.00q | School A2 | 3 |
| 2 | **Student B** | 7.07q | School B | 3 |
| 3 | * | 7.24q | * | 2 |
| 4 | Student 2 | 7.27q | School 2 | 1 |
| 5 | * | 7.27q | * | 1 |
| 6 | * | 7.29q | * | 2 |
| 7 | * | 7.34q | * | 3 |
| 8 | Student 1 | 7.37 | School 1 | 2 |
| 9 | * | 7.41 | * | 3 |
| 10 | * | 7.45 | * | 2 |
| . . . . | . . . . | . . . . | . . . . | . . . . |
| 16 | * | 7.85 | School A2 | 2 |

| 2018-2019 Indoor State Open Championships<br>Girls 55-Meter Dash Final | | | | |
|---|---|---|---|---|
| Place | Athlete | Time | High School | Points |
| 1 | **Student A** | 6.95 | School A2 | 10 |
| 2 | **Student B** | 7.01 | School B | 8 |
| 3 | Student 2 | 7.23 | School 2 | 6 |
| 4 | * | 7.24 | * | 4 |
| 5 | * | 7.26 | * | 2 |
| 6 | * | 7.33 | * | 1 |
| 7 | * | 7.39 | * | - |

| 2018-2019 Indoor New England Regional Championships<br>Girls 55-Meter Dash Preliminaries (Top 8 Advance to Finals) | | | | |
|---|---|---|---|---|
| Place | Athlete | Time | High School | Heat |
| 1 | * | 7.08q | * MA | 2 |
| 2 | **Student A** | 7.09q | School A2- CT | 4 |
| 3 | **Student B** | 7.24q | School B- CT | 3 |
| 4 | * | 7.28q | *- MA | 3 |
| 5 | * | 7.29q | *- MA | 4 |
| 6 | * | 7.30q | * -CT | 1 |

| 2018-2019 Indoor New England Regional Championships<br>Girls 55-Meter Dash Preliminaries (Top 8 Advance to Finals) | | | | |
|---|---|---|---|---|
| Place | Athlete | Time | High School | Heat |
| 7 | * | 7.30q | *- MA | 1 |
| 8 | Student 2 | 7.30q | School S - CT | 1 |
| 9 | * | 7.39 | *- MA | 1 |
| 10 | * | 7.40 | * - RI | 4 |
| . . . . | . . . . | . . . . | . . . . | . . . . |
| 30 | * | 7.92 | * - VT | 3 |

| 2018-2019 Indoor New England Regional Championships<br>Girls 55-Meter Dash Finals | | | |
|---|---|---|---|
| Place | Athlete | Time | High School |
| **1** | **Student A** | 6.94 | School A2- CT |
| 2 | * | 7.04 | * - MA |
| **3** | **Student B** | 7.17 | School B- CT |
| 4 | * | 7.23 | * - MA |
| 5 | * | 7.27 | * - MA |
| 6 | * | 7.27 | * - CT |
| 7 | * | 7.31 | * - MA |
| 8 | Student 2 | 7.32 | School S - CT |

5.   During school year 2018-2019, in the Outdoor Class S Statewide Championships, Student A participated in the 100-meter dash and the 200-meter dash; and Student B participated in the 100-meter dash.  In the preliminary for the 100-meter dash, Student A placed 2nd and Student B placed 3rd.  The top 8 finishers advanced to the finals, including Student 2 (who placed 1st); however, Student A's and Student B's finishes in the top 8 in the preliminary denied an opportunity for two female student-athletes to advance to the finals.  In the finals of the 100-meter dash, Student A placed 1st, Student 2 placed 2nd, and Student B placed 3rd.  While all three student-athletes advanced to the State Open Championship, Student A's participation denied Student 2 the benefit of a 1st place finish in the Class S Statewide Championship for the 100-meter dash.  Similarly, in the finals of the 200-meter dash, Student A placed 1st and Student 2 placed 2nd.[40]  While both students advanced to the State Open Championship, Student A's participation denied Student 2 the benefit of a 1st place finish in the Class S Statewide Championship for the 200-meter dash.  See charts summarizing results below:

| 2018-2019 Outdoor Class S Statewide Championships<br>Girls 100-Meter Dash Preliminaries (Top 8 Advance to Finals) | | | | |
|---|---|---|---|---|
| Place | Student | Time | School | Heat |
| 1 | Student 2 | 12.14 | School 2 | 4 |
| 2 | **Student A** | 12.18 | School A2 | 5 |
| 3 | **Student B** | 12.50 | School B | 3 |

---

[40] Student B scratched.

**2018-2019 Outdoor Class S Statewide Championships**
**Girls 100-Meter Dash Preliminaries (Top 8 Advance to Finals)**

| Place | Student | Time | School | Heat |
|-------|---------|------|--------|------|
| 4 | * | 12.73 | * | 1 |
| 5 | * | 13.05 | * | 1 |
| 6 | * | 13.08 | * | 2 |
| 7 | * | 13.16 | School A2 | 4 |
| 8 | * | 13.22 | * | 5 |
| 9 | * | 13.27 | * | 3 |
| 10 | * | 13.30 | * | 4 |
| … | … | … | … | … |
| 35 | * | 14.28 | * | 5 |

**2018-2019 Outdoor Class S Statewide Championships**
**Girls 100-Meter Dash Finals**

| Place | Student | Time | School | Points |
|-------|---------|------|--------|--------|
| **1** | **Student A** | 11.93# | School A2 | 10 |
| **2** | Student 2 | 12.02 | School 2 | 8 |
| **3** | **Student B** | 12.28 | School B | 6 |
| 4 | * | 12.82 | * | 5 |
| 5 | * | 12.86 | * | 4 |
| 6 | * | 13.13 | * | 3 |
| 7 | * | 13.14 | * | 2 |
| 8 | * | 13.31 | School A2 | 1 |

**2018-2019 Class S Statewide Championships**
**Girls 200-Meter Dash Finals**

| Place | Student | Time | School | Heat | Points |
|-------|---------|------|--------|------|--------|
| 1 | **Student A** | 24.47# | School A2 | 6 | 10 |
| 2 | Student 2 | 24.79 | School 2 | 6 | 8 |
| 3 | * | 25.92 | School A2 | 6 | 6 |
| 4 | * | 26.17 | * | 6 | 5 |
| 5 | * | 26.30 | * | 3 | 4 |
| 6 | * | 26.41 | * | 6 | 3 |
| 7 | * | 26.76 | School A2 | 6 | 2 |
| 8 | * | 26.85 | * | 3 | 1 |
| 9 | * | 26.93 | * | 5 | |
| 10 | * | 27.02 | * | 6 | |
| … | … | … | … | … | … |
| 32 | * | 28.95 | * | 2 | |
| … | … | … | … | … | … |
| -- | **Student B** | SCR | School B | | |

Page 25 of 45 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

6.  During school year 2018-2019, in the Outdoor State Open Championship, Student A and Student B participated in the 100-meter dash.  In the preliminary for the 100-meter dash, Student A placed 1st and Student B placed 5th.  The top 8 finishers advanced to the finals, including Student 2 (who placed 3rd) and Student 3 (who placed 4th)[41]; however, Student A's and Student B's finishes in the top 8 in the preliminary denied an opportunity for two female student-athletes to advance to the finals.  In the finals of the 100-meter dash, Student 2 placed 1st, Student 3 placed 3rd, and Student B placed 4th.[42]  The top 6 finishers were awarded medals and advanced to the New England Regional Championships; however, Student B's finish in 4th place denied an opportunity for a female student-athlete to advance to the New England Regional Championships, along with the benefit of receiving a medal for the Outdoor State Open Championships. Student A, Student 2 and Student 3 also participated in the 200-meter dash and finished 1st, 4th, and 3rd, respectively, in the final.  Student A's 1st place finish denied an opportunity for one female student-athlete to advance to the New England Regional Championships, along with the benefit of receiving a medal for the Outdoor State Open Championships.  Student A placed 1st in the finals of the 200-meter dash at the Outdoor New England Regional Championships; Student 3 placed 3rd and Student 2 placed 5th. See charts summarizing results below:

| 2018-2019 Outdoor State Open Championships Girls 100-Meter Dash Preliminaries (Top 8 Advance to Finals) | | | | | |
|---|---|---|---|---|---|
| Place | Student | Time | School | Heat | Tie |
| 1 | **Student A** | 11.64q | School A2 | 3 | |
| 2 | * | 11.98q | * | 1 | |
| 3 | Student 2 | 12.07q | School 2 | 2 | |
| 4 | Student 3 | 12.11q | School 3 | 3 | |
| 5 | **Student B** | 12.20q | School B | 1 | |
| 6 | * | 12.44q | * | 2 | 12.433 |
| 7 | * | 12.44q | * | 1 | 12.436 |
| 8 | * | 12.45q | * | 3 | |
| 9 | * | 12.50 | * | 3 | |
| 10 | * | 12.56 | * | 1 | |
| *** | | | | | |
| 14 | Student 1 | 12.79 | School 1 | 3 | |
| *** | | | | | |
| 24 | * | 13.25 | * | 3 | |

| 2018-2019 Outdoor State Open Championships Girls 100-Meter Dash Finals | | | | | |
|---|---|---|---|---|---|
| Place | Student | Time | School | Points | Tie |
| 1 | Student 2 | 11.67 | School 2 | 10 | |
| 2 | * | 11.92 | * | 8 | |

---

[41] Student 1 placed 14th.
[42] Student A had a false start and was disqualified.

**2018-2019 Outdoor State Open Championships**
**Girls 100-Meter Dash Finals**

| Place | Student | Time | School | Points | Tie |
|---|---|---|---|---|---|
| 3 | Student 3 | 12.04 | School 3 | 6 | |
| **4** | **Student B** | 12.22 | School B | 5 | |
| 5 | * | 12.36 | * | 4 | |
| 6 | * | 12.38 | * | 3 | 12.375 |
| 7 | * | 12.38 | * | 2 | 12.378 |
| -- | **Student A** | FS | School A2 | | |

**2018-2019 Outdoor State Open Championships**
Girls 200 Meter Dash Finals

| Place | Student | Time | School | Heat | Points |
|---|---|---|---|---|---|
| **1** | **Student A** | 24.33 | School A2 | 3 | 10 |
| 2 | * | 24.75 | * | 3 | 8 |
| 3 | Student 3 | 25.01 | School 3 | 3 | 6 |
| 4 | Student 2 | 25.24 | School 2 | 3 | 5 |
| 5 | * | 25.38 | * | 3 | 4 |
| 6 | * | 25.55 | * | 3 | 3 |
| 7 | * | 25.63 | * | 2 | 2 |
| 8 | * | 25.79 | * | 2 | 1 |
| 9 | * | 26.28 | * | 2 | |
| 10 | * | 26.44 | * | 2 | |
| … | … | … | … | … | … |
| -- | Student 1 | DNS | School 1 | 2 | |

*Team School Championships Involving Students A and B*

OCR reviewed the race results for the 2018-2019 Indoor State Open Championship and confirmed the following order of finish of schools for the state championship:

- School A2 – 54 points
- School 1 – 39 points
- School 3 – 34 points
- Hillhouse – 34 points
- Norwich Free Academy – 21 points

OCR further confirmed that School A2 earned 10 points for each of Student A's 1st place finishes.  OCR determined that other School A2 student-athletes at the meet earned the team the following points:

- 2nd place in the 300-meter dash, earning School A2 8 points,
- 1st place in the 600-meter run, earning School A2 10 points;
- 5th place in the 4 x 200 relay, earning School A2 2 points; and

- 3rd place in the shot put, earning School A2 6 points

OCR also reviewed the results for the 2018-2019 Outdoor State Open Championships, held on June 3, 2019.  OCR determined that School A2 placed 3rd (38 points) in the team championship, a full 20 points behind School 2, which placed first (58 points) and Windsor, which placed 2nd (43 points).  The top 5 finishers were as follows:

- School 3 – 58 points
- Windsor – 43 points
- School A2 – 38 points
- Norwich Free Academy – 32 points
- Immaculate – 30 points

Student A participated in the 100-meter dash, the 200-meter dash, and the 4 x 400 relay in the 2018-2019 Indoor State Open Championship, and earned 10 points for School A2 for Student A's first place finish in the 200-meter dash; and was also on School A2's 4 x 400 relay team, which placed 1st and also earned 10 points for School A2.

### *School Districts Investigated by OCR*

#### ***Glastonbury:***

Glastonbury advised OCR that as a CIAC member school, it must comply with all of the CIAC's by-laws, policies, rules, and regulations, including the Revised Transgender Participation Policy.  Glastonbury reported that it does not currently have any transgender students of which it is aware participating in its athletics program.  Glastonbury stated that it must allow students to participate on the athletics team consistent with their gender identity because of state law and the Revised Transgender Participation Policy.  Glastonbury stated that it has not challenged the CIAC's Revised Transgender Participation Policy because it is consistent with the requirements of state law, with which Glastonbury already must comply.

Glastonbury's Athletic Director stated that no female athletes were denied participation on any of their athletic teams as a result of having transgender athletes participate, and that student-athletes were eligible to participate in all meets that the District participated in if they met the requirements (i.e., qualifying marks, selection for relay team which is a determination made at the coaching level).  The Athletic Director stated that the complaint filed with OCR addresses what is perceived as an inability to win.

Glastonbury's Principal stated that some district parents complained that a female student was affected by having a transgender student from another team participate in track events.  The principal advised OCR that she never verified the times or records brought to her attention, nor did she make a determination regarding the allegations.

In emails dated May 2-10, 2018, Parent 2 requested guidance from the Athletic Director regarding the participation of Student A in girls' track events and whether it was consistent with the CIAC'

Revised Transgender Participation Policy.  The Athletic Director stated that she had spoken with someone at the CIAC who indicated that Student A would have had to declare her gender identity prior to the start of the school year in August.  Parent 2 stated that she informed the CIAC that Student A participated as a male during the indoor season and then as a female during the outdoor season in 2017-2018; and stated that the CIAC advised her that it would be following up with School A1.  On May 10, 2018, the Athletic Director advised Parent 2 that she was following up and had placed a call to the CIAC.  In an email dated May 11, 2018, the Athletic Director responded to Parent 2, advising her that based on her reading of the CIAC rule, as well as confirmation she received from the CIAC, Student A's participation was in compliance with the Revised Transgender Participation Policy.  She noted that if Parent 2 had been told Student A had to declare prior to the start of the school year, that was misinformation, as that requirement is nowhere in the language of the policy.  The Athletic Director advised Parent 2 that she also shared this information with the track coach.

On May 23, 2018, Parent 2 advised the Athletic Director via email that she had been discussing transgender eligibility with her legislative office and wanted to make the Athletic Director aware.  In an email dated May 29, 2018, Parent 2 asked the Athletic Director if students declaring a gender identity are required to produce any supporting documentation, or if there is a waiting period.  In an email dated June 6, 2018, Parent 2 advised the Athletic Director that she intended to request a meeting with the CIAC regarding the transgender policy; the Athletic Director acknowledged the email and stated that there had been articles and some troubling behavior around the issue, and advised that a letter to the CIAC was probably the best route for the parent to take.

In an email dated July 2, 2018, to the Athletic Director, Parent 2 stated that the CIAC had refused to entertain any policy changes in response to her correspondence with them; it was her understanding that member schools set policy; and she wanted to meet with the Athletic Director to share her research.  The Athletic Director responded attempting to schedule a time to meet.  Thereafter, in an email dated July 18, 2018, Parent 2 forwarded to the Athletic Director copies of responses she had received from the CIAC Executive Director.  In the email, she stated that, although the CIAC stated that the state legislature needed to make a change, her state representatives informed her that athletics policies fall under the CIAC's jurisdiction.

In an email dated January 27, 2019, to School 1 administrators, Parent 3 alleged that Student A, whom Parent 3 identified as a boy who identifies as a girl, was participating in track and creating an unfair and unsafe environment in girls track.  He provided, as an example, that during the 4 x 400 relay event on January 26, 2019, in the second leg, Student A "had physicality" with a runner from Windsor, resulting in a significant lead for Bloomfield.  The student-athlete running the last leg of the relay for Windsor was unable to close the gap that Student A had created.  He also provided an example that at the Yale Invitational held on January 12, 2019, a student-athlete came in second to Student A, despite having run a faster time than 182 other girls in the 300-meter sprint.  He asked that the unsafe and unfair situation be addressed now before it affected other sports.

In response, on January 29, 2019, the District's school board chair emailed Parent 3 and thanked him for sharing his experiences and concerns; but noted that the CIAC handbook indicated that it would be contrary to state and federal law to preclude transgender students from participating.  She

Page 29 of 45 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

stated that, accordingly, she did not believe that exclusion was an option; but advised that this was just her opinion.

In an email dated February 17, 2019, to School 1 administrators and the CIAC Executive Director, among others, Parent 3 asserted that the Revised Transgender Participation Policy directly affected the outcome of School 1's winning the 2018-2019 Indoor State Open Championship held on February 16, 2019.  Specifically, Parent 3 stated that School A2 earned the highest number of points due to the participation of Student A, who earned 20 points for the team by herself.  Parent 3 alleged that, but for Student A's participation, School 1 would have won the state title.  Specifically, Parent 3 asserted that School A2 was only able to win because Student A placed first in two separate events, earning School A2's team 20 of its total 54 points.  Parent 3 also noted that Student A participated on the 4 x 400 relay, which earned the school 8 points for second place.  Parent 3 acknowledged in his email that it was possible that School A2 still would have placed 2nd in the 4 x 400 relay, even if another athlete had run in Student A's place.[43]

In an email dated February 25, 2019, to School 1 administrators and the CIAC Executive Director, among others, Parent 4 questioned the inclusion of transgender athletes' competitive times in results, which he argued affected all of the other athletes competing.  Parent 4 further stated that recognizing the transgender athletes' results insulted the current cisgender athlete record holders.  Parent 4 also asserted that the potential to compete for a college scholarship was at stake because the participation of transgender athletes resulted in other athletes not being able to compete at the New England Regionals, expand their résumés, and gain additional exposure to college recruiters and coaches.  Parent 4 alleged that the CIAC was violating its own rules by allowing transgender athletes to compete; and asked that the results of the State Open Championship be recalculated, and points redistributed, and that the Revised Transgender Participation Policy be changed for the outdoor 2019 season.  Parent 4 also suggested potential solutions to continue to allow transgender athletes to compete but change the competitive categories or "which scores count."

In an email dated March 3, 2019, to School 1 administrators and the CIAC Executive Director, among others, Parent 3 followed up on his original request that the Revised Transgender Participation Policy be revised.  Parent 3 alleged that the policy prevented deserving girls from qualifying for the New England Regionals.  For example, Parent 3 stated that at the New England Regionals on March 2, 2019, a Bloomfield transgender athlete (Student A) placed first in the 55-meter and 300-meter dash events.  He also stated that by participating in the 4 x 400-meter relay event, Student A provided Bloomfield with a .06 second lead over Glastonbury in the final results.

In an email dated March 5, 2019, to School 1 administrators and the CIAC Executive Director, among others, Parent 4 stated that no other states at the New England Regionals had transgender student-athletes participating, and many people were surprised and concerned that cisgender girls were forced to compete with transgender girls.  In another email dated March 5, 2019, to School 1 administrators, Parent 4 requested a meeting to review the current policy regarding transgender

---

[43] Parent 3 further asked that the CIAC adopt the NCAA and IOC policy, whereby a transgender athlete must undergo hormone treatment for one year before being able to compete; allow transgender athletes to run in events as exhibition participants where their results do not count; or "another fair and safe solution."

athletes and its impact on competitive fairness; and alleged that cisgender girls were being deprived of fair and equal opportunity.

In an email dated March 7, 2019, to the District Superintendent, a parent (Parent 5) stated her opinion that the CIAC should adopt NCAA standards regarding transgender participation.  In an email dated March 10, 2019, to School 1 administrators and the CIAC Executive Director, Parent 3 advised that the National Scholastic Athletic Foundation (NSAF), which hosts the national championships, had released statements regarding its transgender policy, which required athletes to take gender affirming hormones.  Parent 3 then stated that at the New England Regionals on March 2, 2019, Bloomfield beat Glastonbury in the 4 x 400 relay with Student A participating on Bloomfield's team.  He then noted that at the New Balance National championships held over March 8-10, 2019, Glastonbury's 4 x 400 relay team came in 14th in the nation, while Bloomfield's came in 34th, running without Student A.

On March 15, 2019, Parent 2 and the Parent 4 met with the Athletic Director and the Principal. The Principal stated that Parent 2 wanted School 1 to put forth a request for the CIAC to change its policy, and she communicated to them that the school was comfortable with the CIAC's following state law and was not willing to ask the CIAC to change their policy.  The Athletic Director did not recall that Parent 2 and Parent 4 raised any specific concerns about the policy, other than that the policy set up an uneven playing field.  The Athletic Director stated that it was difficult to keep Parent 2 focused on what was Parent 2's real issue, as Parent 2 had started talking about separate math classes.  The Athletic Director stated that she did not leave the meeting with any clear understanding of what Parent 2 was saying.  She noted that Parent 2 and Parent 4 also wanted to show them photos of other non-district students, which they refused to discuss due to Family and Educational Rights and Privacy Act of 1974 (FERPA).  In an email dated March 18, 2019, following their meeting, Parent 2 summarized her continued concerns that the transgender policy may violate Title IX; included information from her state legislative office that there is no law to be changed and that any changes would be the responsibility of the CIAC and member schools; and provided examples of contradictions within the CIAC policies, relative to co-ed teams.

On March 18, 2019, Parent 3 requested a meeting with administrators at School 1 to discuss the transgender policy.  In an email dated March 25, 2019, to School 1 administrators, Parent 3 stated that he learned that the CIAC had sent out a survey to member schools regarding the transgender policy.  He included links to resources in his email and urged School 1 not to just "rubber stamp" the policy.  In response to his request, on April 2, 2019, the principal and School 1's Athletic Director met with Parent 3.  Both the principal and Athletic Director described the meeting as lasting thirty minutes, per Parent 3's request.  The Athletic Director stated that, during the meeting, Parent 3 discussed biological differences and the challenges female athletes face, and what could happen when transgender athletes participate in other sports.  The principal stated that Parent 3 was focused on the safety of his child with allowing a transgender student to participate in track. The principal stated that she communicated to Parent 3 that the district was not looking at asking the CIAC to change the transgender policy.  On April 2, 2019, Parent 3 emailed the principal and Athletic Director thanking them for meeting with him; he emphasized two points relative to the fairness of the policy and the implications if an elite transgender athlete were ever to participate.

Page 31 of 45 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

He also included resources related to Oregon's policy, as well an NSAF's press release regarding transgender participation.

In an email dated April 12, 2019 to the District Director of Health and Physical Education, K-12 (the Director), Parent 2 acknowledged their recent conversation regarding Title IX; asked the Director for clarification regarding why the principal, as a voting CIAC member, could set different athletic expectations for girls and boys teams; and questioned why that did not violate Title IX. Parent 2 also questioned why the CIAC had separate competitions for boys and girls if the CIAC's purpose was just participation, and whether the concept of gender fluidity would satisfy Title IX when there was no distinction between the sexes.

   *Canton:*

Canton advised OCR that it was required to comply with the CIAC's Revised Transgender Participation Policy because the CIAC is the governing body for interscholastic athletics. Canton also noted that the Revised Transgender Participation Policy follows state law. Canton reported that it does not currently have any transgender students of which it is aware participating in its athletics program, nor has it challenged the CIAC's Revised Transgender Participation Policy.

   *Danbury:*

Danbury stated that it was required to follow the Revised Transgender Participation Policy because the CIAC is the governing body of athletics for the state and it is required to follow all of the CIAC rules, regulations, and policies. Danbury reported that it does not currently have any transgender students of which it is aware participating in its athletics program. Danbury stated that it has not expressed concerns about the policy to the CIAC.

   *Hartford (School A1):*

Student A was a 10th grade student who participated on School A1's athletics program during school year 2017-2018.[44] During the indoor track season of school year 2017-2018, Student A was a student-athlete on School A1's boys' indoor track team. During the outdoor track season of school year 2017-2018, Student A was a student-athlete on School A1's girls' outdoor track team. School A1 staff stated that as a CIAC member, School A1 is required to follow the CIAC policy and is also required to follow state law.

   *Bloomfield:*

Student A was enrolled in School A2 in Bloomfield as an 11th grade student during school year 2018-2019. Bloomfield stated that as a member of the CIAC, it is required to follow the CIAC rules regarding participation, eligibility, and other matters, including the Revised Transgender

---

[44] During school year 2017-2018, Student A attended another school in Hartford that does not have a sports program; as a result, Student A participated in athletics through School A1's program.

Page 32 of 45 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

Participation Policy.[45]  Bloomfield denied that Student A's participation has had a negative impact on other female students in the district, as Bloomfield does not cut any students from the girls' indoor or outdoor track teams; therefore, anyone who wishes to participate can.  Bloomfield staff opined that while a student may have lost to a transgender student, overall, everyone's performance has benefited from the participation of Student A; and that participation in athletics is not about winning.

*Cromwell:*

Student B was enrolled in School B in Cromwell as a 10th grade student during school year 2017-2018, and as an 11th grade student during school year 2018-2019.  During school years 2017-2018 and 2018-2019, Student B was a student-athlete on School B's varsity girls' indoor and outdoor track teams.

Cromwell stated that it has one transgender student (Student B) participating in its interscholastic athletics program, and noted that Student B's records since her enrollment at School B in school year 2016-2017 have indicated that she was female; accordingly, Student B was placed on female rosters.  Cromwell staff stated that they are required to follow the Revised Transgender Participation Policy as it is set by the CIAC, which is their governing body.  Cromwell staff stated that none of their district students have been affected negatively by Student B's participation.

## Legal Standards

Subpart D of the regulation implementing Title IX prohibits discrimination on the basis of sex in education programs and activities.  34 C.F.R. § 106.31(b)(7) of Subpart D states that in providing any aid, benefit, or service to a student, a recipient shall not, on the basis of sex, limit any person in the enjoyment of any right, privilege, advantage, or opportunity.  34 C.F.R. § 106.41 of Subpart D specifically applies to athletics.  The regulation implementing Title IX, at 34 C.F.R. § 106.41(a), states that no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person, or otherwise be discriminated against, in any interscholastic athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.  The regulation implementing Title IX, at 34 C.F.R. § 106.41(b), states that, notwithstanding the requirements of § 106.41(a), a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport.[46]  The regulation implementing Title IX, at 34 C.F.R. § 106.6(c), states that the obligation to comply with the regulation is not obviated or alleviated by

---

[45] Bloomfield denied that it has received any requests from students to participate in its interscholastic athletics program pursuant to the Revised Transgender Participation Policy.  Bloomfield stated that it currently has a transgender student participating on its girls track team (Student A), but noted that the student registered and enrolled at School A2 as a female, i.e., the student's school records indicated that she was female; therefore, Bloomfield was not required to make any determinations pursuant to the policy.

[46] Where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try out for the team offered unless the sport involved is a contact sport.  34 C.F.R. § 106.41(b).

any rule or regulation of any athletic or other league, which would render any student ineligible to participate or limit the eligibility or participation of any student, on the basis of sex, in any education program or activity operated by a recipient.[47]

## Analysis and Conclusions

The Complainant alleged that the CIAC's Revised Transgender Participation Policy discriminated against female student-athletes competing in interscholastic girls' track in the state of Connecticut on the basis of their sex. Specifically, the Complainant alleged that as a result of the CIAC's Revised Transgender Participation Policy, Students A and B were permitted to compete in girls' track athletic competitions, which resulted in female student-athletes being denied opportunities to participate in higher level and/or post-season competitions.

**The CIAC:**

OCR determined that the CIAC, by permitting the participation of biologically male students in girls' interscholastic track in the state of Connecticut, pursuant to the Revised Transgender Participation Policy, denied female student-athletes benefits and opportunities, including to advance to the finals in events; to advance to higher level competitions, such as the State Open Championship or the New England Regional Championship; to win individual and team state championships, along with the benefit of receiving medals for these events; to place higher in any of the above events; to receive awards and other recognition; and possibly to obtain greater visibility to colleges and other benefits. For these same reasons, OCR also determined that the CIAC treated students differently based on sex, by denying opportunities and benefits to female student-athletes that were available to male student-athletes.

With respect to the three student-athletes on whose behalf the complaint was filed (Student 1, Student 2, and Student 3), Student A's and Student B's 1st and 2nd place finishes, respectively, in the preliminaries of the 2018-2019 Indoor State Open Championship for the 55-meter dash, denied Student 1, who placed 8th, the opportunity of advancing to the finals in this event, since only the top 7 finishers advanced to the finals. Student A's and Student B's participation in girls' interscholastic track in the state of Connecticut, pursuant to the Revised Transgender Participation Policy had the most significant impact on Student 2. Specifically, Student A's 1st place finish, in the finals of the 2018-2019 Outdoor Class S Statewide Championship for the 100-meter dash and the 200-meter dash, denied Student 2, who placed 2nd in both events, the benefit of a 1st place finish; and Student A's and Student B's 1st and 2nd place finishes, in the 2018-2019 Indoor State Open Championship for the 55-meter dash, denied an opportunity for Student 2, who placed 3rd, to place 1st in the event and receive the benefit of a 1st place medal. Denying a female student a chance to win a championship is inconsistent with Title IX's mandate of equal opportunity for both sexes.[48]     Accordingly, OCR determined that the CIAC denied athletic benefits and

---

[47] OCR understands that the CIAC and the individual school districts maintain that the Revised Transgender Participation Policy is consistent with, and required by, Connecticut state law. OCR takes no view on the requirements of Connecticut law except to note that the duty to comply with Title IX and its implementing regulation is independent of any such requirements.

[48] See *McCormick v. School District of Mamaroneck*, 370 F.3d 275, 294-95 (2d Cir. 2004) ("A primary purpose of competitive athletics is to strive to be the best. . . . Treating girls differently regarding a matter so fundamental to the

Page 34 of 45 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

opportunities to female student-athletes competing in interscholastic girls' track in the state of Connecticut through the Revised Transgender Participation Policy, in violation of the regulation implementing Title IX, at 34 C.F.R. § 106.41(a). OCR also has concerns that additional violations may have resulted from the Policy and from Student A's and B's participation in girls' track, including but not limited to losses or lowered placement in regular season meets; losses or lowered placement in conference championships; and an inability for some female student-athletes to participate generally in a race at any level (not just championship level).

With respect to the Team Championships for the 2018-2019 Indoor State Open Championship, absent Student A's participation, School A2 earned 26 points in 4 different events. Adding the 8 points for the 4 x 200 relay, in which School A2 may have placed and earned points even without Student A, School A2 would have earned 34 points, behind School 1, which had 39 points. Subtracting the 8 relay points would have also placed School A behind School 3. Thus, Student A's participation may have denied School 1 and its female student-athletes the benefit of a team championship, and may have denied School 3, and other schools, the benefit of a higher placement.[49]

**Glastonbury**:

OCR determined that the participation of Glastonbury in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student 1, and other female student-athletes competing against Students A and B, denied athletic benefits and opportunities to Student 1 and other female student-athletes, in violation of the regulation implementing Title IX, at 34 C.F.R. Section 106.41(a). Glastonbury placed female student-athletes in athletic events against male student-athletes, resulting in competitive disadvantages for female student-athletes. The athletic events in which the female student-athletes competed were coeducational; female student athletes were denied the opportunity to compete in events that were exclusively female, whereas male students were able to compete in events that were exclusively male. Accordingly, the districts' participation in the athletic events sponsored by the CIAC denied female student-athletes athletic opportunities that were provided to male student-athletes. Glastonbury's obligation to comply with the regulation implementing Title IX is not obviated or alleviated by any rule or regulation of the CIAC. 34 C.F.R § 106.6(c).

The participation of Glastonbury in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student 1, and other female student-athletes competing against Students A and B, denied Student 1 the opportunity to place higher in events, such as the 100-meter dash at the 2017-2018 Outdoor State Championship and New England Regional Championship; the 55-meter dash at the 2018-2019 Indoor CCC Regional Championship; and the 200-meter dash at the 2018-2019 Outdoor State Championship. Student A's and Student B's 1st and 2nd place finishes, respectively, in the preliminaries of the 2018-2019

---

experience of sports—the chance to be champions—is inconsistent with Title IX's mandate of equal opportunity for both sexes.").

[49] With respect to the 2018-2019 Outdoor State Open Championships, held on June 3, 2019. The top five finishers were as follows: School 3: 58 points; Windsor: 43 points; School A2: 38 points; Norwich Free Academy: 32 points; Immaculate: 30 points. Student A's participation earned school A2 an additional 10 to 20 points and a third-place finish when School A2 might otherwise have finished no better than 5th.

Page 35 of 45 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

Indoor State Open Championship for the 55-meter dash, denied Student 1, who placed 8th, the opportunity of advancing to the final in this event, since only the top 7 finishers advanced to the finals.

**Canton**:

OCR determined that the participation of Canton in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student 2, and other female student-athletes, competing against Students A and B, denied athletic benefits and opportunities to Student 2, and other female student-athletes, in violation of the regulation implementing Title IX, at 34 C.F.R. Section 106.41(a). Canton placed female student-athletes in athletic events against male student-athletes, resulting in competitive disadvantages for female student-athletes. The athletic events in which the female student-athletes competed were coeducational; female student athletes were denied the opportunity to compete in events that were exclusively female, whereas male students were able to compete in events that were exclusively male. Accordingly, the districts' participation in the athletic events sponsored by the CIAC denied female student-athletes athletic opportunities that were provided to male student-athletes. Canton's obligation to comply with the regulation implementing Title IX is not obviated or alleviated by any rule or regulation of the CIAC. 34 C.F.R § 106.6(c).

The participation of Canton in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student 2, and other female student-athletes competing against Students A and B, denied Student 2 the opportunity to place higher in events, such as the Class S Outdoor Championships; the Indoor and Outdoor State Open Championships; and the New England Regional Championships. Specifically, Student A's and Student B's 1st and 2nd place finishes respectively, in the 2018-2019 Indoor State Open Championship for the 55-meter dash, denied an opportunity for Student 2, who placed 3rd, to place 1st in the event and receive the benefit of a 1st place medal. Student A's 1st place finish, in the finals of the 2018-2019 Outdoor Class S Statewide Championship for the 100-meter dash and the 200-meter dash, denied Student 2, who placed 2nd in both events, the benefit of a 1st place finish. Student A's 1st place finish in the finals of the State Open Championship in the 200-meter dash denied Student 2, who finished 4th, the benefit of a top-three finish.

**Danbury**:

OCR determined that the participation of Danbury in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student 3, and other female student-athletes, competing against Students A and B, denied athletic benefits and opportunities to Student 3, and other female student-athletes, in violation of the regulation implementing Title IX, at 34 C.F.R. Section 106.41(a). Danbury placed female student-athletes in athletic events against male student-athletes, resulting in competitive disadvantages for female student-athletes. The athletic events in which the female student-athletes competed were coeducational; female student athletes were denied the opportunity to compete in events that were exclusively female, whereas male students were able to compete in events that were exclusively male. Accordingly, the districts' participation in the athletic events sponsored by the CIAC denied female student-athletes athletic opportunities that were provided to male student-athletes.

Danbury's obligation to comply with the regulation implementing Title IX is not obviated or alleviated by any rule or regulation of the CIAC. 34 C.F.R § 106.6(c).

The participation of Danbury in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student 3, and other female student-athletes competing against Students A and B, denied Student 3 the opportunity to place higher in events, such as at the Outdoor State Open Championships and the New England Regional Championships. Specifically, Student A's 1st place finish in the finals of the State Open Championship in the 200-meter dash denied Student 3, who finished 3rd, the benefit of placing 2nd in the event; and Student A's 1st place finish in the finals of the 200-meter dash at the Outdoor New England Regional Championships denied Student 3, who finished 3rd the benefit of placing 2nd in the event.

### Hartford (School A1):

Student A participated in girls' outdoor track on School A1's team in Hartford during school year 2017-2018. OCR determined that the participation of School A1 in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student A's participating in events against Students 1, 2, and 3, and against other female student-athletes, denied athletic benefits and opportunities to Students 1, 2, and 3, and other female student-athletes, in violation of the regulation implementing Title IX, at 34 C.F.R. Section 106.41(a). Hartford's obligation to comply with the regulation implementing Title IX is not obviated or alleviated by any rule or regulation of the CIAC. 34 C.F.R. § 106.6(c).

### Bloomfield:

Student A participated in girls' indoor and outdoor track for Bloomfield during school year 2018-2019. OCR determined that the participation of Bloomfield in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student A's participating in events against Students 1, 2, and 3, and against other female student-athletes, denied athletic benefits and opportunities to Students 1, 2, and 3, and other female student-athletes, in violation of the regulation implementing Title IX, at 34 C.F.R. Section 106.41(a). Bloomfield's obligation to comply with the regulation implementing Title IX is not obviated or alleviated by any rule or regulation of the CIAC. 34 C.F.R. § 106.6(c).

### Cromwell:

Student B participated in girls' indoor and outdoor track for Cromwell during school years 2017-2018 and 2018-2019. OCR determined that the participation of Cromwell in athletic events sponsored by the CIAC, consistent with the CIAC's Revised Transgender Participation Policy, which resulted in Student B's participating in events against Students 1, 2, and 3, and against other female student-athletes, denied athletic benefits and opportunities to Students 1, 2, and 3, and other female student-athletes, in violation of the regulation implementing Title IX, at 34 C.F.R. Section 106.41(a). Cromwell's obligation to comply with the regulation implementing Title IX is not obviated or alleviated by any rule or regulation of the CIAC. 34 C.F.R. § 106.6(c).

Page 37 of 45 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

For the aforementioned reasons, OCR also determined that the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury treated student-athletes differently based on sex, by denying opportunities and benefits to female student-athletes that were available to male student-athletes.

## II.   RETALIATION

The Complainant also alleged that (1) the CIAC retaliated against Parent 1, after Parent 1 complained about the Revised Transgender Participation Policy, by informing Parent 1, in March 2019, that the CIAC's Executive Director would no longer accept communications from her; and (2) that Glastonbury's track coach retaliated against Student 1, for her and Parent 2's advocacy against the Revised Transgender Participation Policy, by (a) replacing Student 1 on the sprint medley relay team in February 2019; (b) telling Student 1 and her parents that he could not give a good report to college coaches about her in March and May 2019; (c) denying Student 1 a position as a team captain in March 2019; and (d) suggesting that Student 1 should leave the outdoor track team due to her schedule, in March and May 2019.

**Findings of Fact**

### 1.   Allegation Regarding the CIAC's Retaliation

OCR determined that the CIAC Handbook in effect during school year 2018-2019 sets forth the CIAC's "Communication Protocol Rules, Regulations and Interpretations" (Communication Protocol). According to the Communication Protocol, the CIAC Board of Control is the official body charged with the responsibility of interpreting the CIAC's rules and regulations. The Communication Protocol provides, in pertinent part, that "[i]nquiries to the CIAC office from parents, student-athletes, coaches and the public requesting an interpretation of the rules and regulations will be referred back to the member school principal or his/her designee." In addition, Section 4.21 of the CIAC Handbook, "Regulation Interpretation/CIAC Protocol in Providing Decisions to School Personnel and Public (Effective July 1, 2006)," provides, in pertinent part, "The CIAC staff will not discuss CIAC rules and regulations with anyone other than school administrators and athletic directors. Telephone inquiries from parents and coaches will not be honored. **All calls from anyone other than the athletic director or school administrator will be referred back to the school.**" (Emphasis in original.)

OCR determined that Parent 1 initially contacted the CIAC about the policy when she sent a letter dated February 21, 2018, to the CIAC's former Executive Director, in which she requested that the CIAC establish a rule to address transgender athletes' participating in the girls' state championship track competitions. In an email dated March 10, 2018, the former Executive Director responded by acknowledging that issues surrounding transgender student-athlete participation are complicated; advising Parent 1 that the CIAC's policy is directly aligned with state anti-discrimination law, including the state's definition of gender to include gender identity; and reminding Parent 1 that most high school athletes are minors and are therefore afforded a unique level of legal protection regarding their right to privacy.

Page 38 of 45 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

On January 24, 2019, Parent 1 sent an email to the CIAC's current Executive Director, attaching a letter in which she again requested that the CIAC establish a rule for transgender athletes' participating in state championship track competitions and setting forth her own proposal for the placement and scoring of transgender female athletes participating in state championships.[50]  The Executive Director responded by email the same day, advising Parent 1 that the appropriate process for addressing her proposal would be to speak with the athletic director or principal at her child's school, as policy or rule proposals "may be submitted through member leagues, sport committees, member principals, [the Connecticut Association of Athletic Directors], or the Connecticut High School Coaches Association."  Parent 1 replied to the director's email that same day, January 24, 2019, stating that she would follow up with the principal and athletic director at her child's school to see if they would be willing to submit her proposal.

OCR determined that on February 1, 2019, the principal and the Executive Director spoke by telephone, regarding Parent 1's letter and proposal.  The Executive Director memorialized the call in an email to the principal that same day, in which he stated that the CIAC would be convening a gender subcommittee meeting on February 7, 2019, with the task of reviewing all the CIAC bylaws, processes, procedures in which gender plays a role, including the Revised Transgender Participation Policy; and that he would share a redacted copy of Parent 1's letter with the subcommittee members, in order "to provide all points of view to ensure a rich discussion among committee members."

OCR determined that in response to Parent 1's request, made through her building principal, for an in-person meeting with a CIAC representative, the Executive Director attended a meeting at the school with Parent 1 and the principal on February 28, 2019.  The Executive Director stated that, at the meeting, he explained to Parent 1 why the CIAC believed that the Revised Transgender Participation Policy was in alignment with Title IX and Connecticut state law, and advised Parent 1 that he believed that Title IX did not apply to the parent's concerns because Title IX does not address winning.  Following the meeting, that same day, Parent 1 sent an email to the Executive Director, in which she thanked him for visiting the school and wrote that "[i]t was helpful to hear from you directly regarding the transgender policy and to understand what the CIAC process will be for reviewing this issue."

OCR determined that on March 28, 2019, Parent 1 sent an email to the Executive Director, in which she attached a letter and included links to several websites concerning issues related to the Revised Transgender Participation Policy.  The Executive Director responded by email that same day, stating that he had read her email, and cordially reminded her that any further correspondence to the CIAC should come through her principal.  The Complainant did not provide, nor did OCR find, evidence of any further communications between Parent 1 and the Executive Director.

---

[50] Specifically, Parent 1 proposed the following: "Male-to-female transgender athletes who have not yet undergone hormone therapy should compete as exhibition athletes, with results not included for scoring and placing. This would ensure that the needs of both of these protected classes are met. The transgender athletes would still be able to **participate** on the team in which they identify and the female-born athletes would be afforded the opportunity to **compete** in a race that is not clouded by questions of unfair advantage." (Emphasis in original.)

The Executive Director denied that he banned Parent 1 from sending communications to him. Rather, the Executive Director stated that he treated Parent 1 in a manner consistent with how he treated other individuals in similar situations, by reminding her of the CIAC's policy that communications must go through the member school's representative.  OCR determined that the Executive Director has responded in a similar manner to other parents who sought to communicate directly with him in a similar fashion.  OCR determined that none of the similarly situated parents had engaged in protected activities.

## 2.   Allegations Regarding Glastonbury Track Coach Retaliation

The Complainant also alleged that a Glastonbury track coach retaliated against Student 1, for her and Parent 2's advocacy against the Revised Transgender Participation Policy, by (a) replacing Student 1 on the sprint medley relay team in February 2019; (b) telling Student 1 and her parents that he could not give a good report to college coaches about her in March and May 2019; (c) denying Student 1 a position as a team captain in March 2019; and (d) suggesting that Student 1 should leave the outdoor track team due to her schedule, in March and May 2019.

**Allegation (a)**:

OCR determined that a team made up of students from Glastonbury's girls' indoor track team competed at the 2019 New Balance Nationals Track and Field championships ("Nationals").  The track coach stated that the meet is not a CIAC or school-sanctioned meet; therefore, any student who participates does so on an individual basis, not on behalf of Glastonbury.  The track coach stated that, accordingly, the Glastonbury coaches do not choose who may attend the meet or choose which athletes will participate in which events.  Rather, the individual students choose, on their own, whether to compete in the meet, and who will compete in the events, including relays.  The track coach further stated that it was his understanding that Student 1 was not selected to run in a relay at the meet, but he denied that he played a role in this decision.  He further stated that his understanding was that the other athletes decided that Student 1 would not compete in the relay, but he did not know why they had made that decision.

Student 1 confirmed that it is each individual student-athlete's decision whether to attend Nationals, if she qualifies; however, she stated that for relay events, a track coach was responsible for signing up the various teams.  Parent 2 indicated that this is to prevent students from different schools entering themselves as a single "power team."  Student 1 stated that although she had a qualifying time for the sprint medley relay in December 2018,[51] she was not asked to join the sprint medley relay team for Nationals in March 2019.  Student 1 stated that, during the regular season, coaches pick the best athletes that are capable of running times that they would like to see for an overall split in the event, but that she was not fully aware of how the coaches make those determinations.  Student 1 acknowledged that she was not sure which coach picked the sprint medley relay team for Nationals, but she assumed that a coach picked the team because that was what was done for all other meets during the season.

---

[51] The records Glastonbury provided indicate that Student 1 participated on a sprint medley relay team during a meet held on December 22, 2018.

**Allegation (b):**

The Complainant stated that at the first practice of the outdoor season on March 16, 2019, the track coach told Parent 4 that he had nothing good to say about Student 1 to a college coach; and on or about May 1, 2019, the track coach told Student 1 that he could not give a good report of her to college coaches.

The track coach denied that he told either Student 1 or her parents that he could not give a good report to college coaches about Student 1.  The track coach stated that it is his practice to be completely honest with college coaches, to ensure that college coaches continue to trust and rely on his recommendations of athletes.  The track coach stated that because of this, on or about March 16, 2019, in the course of a discussion with Parent 4 about the Student 1's workouts and her college future, he told Parent 4 that he is "100% honest with a college coach when asked any questions about any of the athletes."[52]  The track coach stated that he had also told Student 1 that he would be 100% honest with college coaches, although he did not recall the date of this conversation or the specific context in which the subject was raised.  The track coach also advised OCR that Student 1 has not requested that he give a recommendation or report to any college coach on her behalf, nor has any college coach requested information about Student 1.

Student 1 denied that the track coach told her that he would be honest with any college coaches, and instead maintained that the track coach told her, and Parent 4, that he did not have anything good to say about her and could not give a good report about her.  Student 1 stated that the track coach made this statement to her one day when she was letting him know that she was leaving practice for work.  Student 1 confirmed that she has not asked the track coach to speak with any coaches on her behalf.

**Allegation (c):**

The Complainant stated that the track coach told Student 1 that he did not select her as team captain because she departed early from practice on Fridays for work, despite her having served as team captain during the indoor season and not receiving any complaints about her as a captain.  The track coach stated that students who wish to be considered for a team captain position are required to submit a written statement concerning their interest at the beginning of each season, indoor and outdoor. All of the coaches then select the team captains as a group.  If there are any disagreements among the coaches, the track coach makes the final decision regarding the selection. The track coach stated that the qualifications for team captain are hard work, dedication, leadership, sportsmanship, and appropriately representing the high school.  The track coach stated that the number of captains for the team typically ranges from three to seven for each season, depending on the size of the team and the number of qualified athletes who apply.

The track coach stated that in December 2018, Student 1 was selected as a captain for the indoor season 2018-2019; but that the decision was not unanimous because at least two coaches questioned Student 1's qualifications for a captain position, stating that they believed that she had

---

[52] The track coach stated that in reply to his remark, Parent 4 stated that he understood.

Page 41 of 45 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

not shown enough leadership, dedication and maturity.[53]  The track coach stated that despite the concerns raised by other coaches, he chose Student 1 to be a captain for that season because he had observed her helping new athletes on the team and he believed that she would step up to the challenge.

The track coach stated that in March 2019, Student 1 applied to be a captain for the outdoor season 2018-2019.  He stated that after speaking with all of the coaches, it was unanimous that they would not select Student 1 to be a captain for a number of reasons.  He stated that the main reason was that during the indoor season (December 2018 – January 2019), Student 1 had, on several occasions, displayed poor sportsmanship at meets by ripping off her headband and storming away at the conclusion of her race.  In addition, the track coach stated, and another coach confirmed, that during the indoor season, Student 1 often skipped her sprint workouts in favor of spending more time doing her long jump workouts; or claimed that she had an injury and could not do her sprint workouts, despite being able to do her long jump workouts and being cleared by the trainer.  An assistant coach confirmed that during the indoor season, Student 1 failed to follow his instructions during practice, often did not complete her workouts, and exhibited poor sportsmanship at meets.  Both the assistant coach and another coach agreed that Student 1 should not be selected as a captain for the outdoor season.  The track coach stated that during a prior school year, he declined to select a student as team captain because she similarly failed to demonstrate leadership qualities/maturity.  Glastonbury stated that this student had not engaged in protected activities.

**Allegation (d):**

The Complainant alleged that on or about March 25, 2019, the track coach told Student 1 that she should consider leaving the team if she did not attend full practice every day.  The Complainant alleged that the track coach had not asked other student-athletes to leave the team due to missing practices for work commitments.  The Complainant also alleged that on or about May 1, 2019, the track coach complained to Student 1 about her missing Friday practices.

The track coach denied that he had an issue with Student 1's leaving practice early on Fridays and denied that he specifically told her that she should leave the team.  The track coach stated that he and the other coaches emphasized the importance of practice during meetings held at the beginning of the season with the student-athletes and their parents; but he denied having told any students recently, including Student 1, that they should consider leaving the team if they did not attend full practice every day.  The track coach further stated that he was aware that Student 1 left practice early on Fridays for work; and stated that he did not object to this, particularly because the team often ends practice early on Fridays during the winter when the gym is used for high school basketball games and because Friday practices are typically lighter prior to the track team competitions on the weekends.

---

[53] Specifically, an assistant track coach stated that he had concerns about Student 1's being selected as captain because he did not believe that Student 1 had the maturity to be a captain.

Page 42 of 45 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

**Legal Standards**

The regulation implementing Title IX, at 34 C.F.R. § 106.71, incorporates by reference 34 C.F.R. § 100.7(e) of the regulation implementing Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., which provides that no recipient or other person shall intimidate, threaten, coerce or discriminate against any individual for the purpose of interfering with any right or privilege secured by regulations enforced by OCR or because one has made a complaint, testified, assisted or participated in any manner in an investigation, proceeding, or hearing held in connection with a complaint. The following three elements must be satisfied to establish a prima facie case of retaliation: (1) an individual engaged in a protected activity; (2) an individual experienced an adverse action caused by the recipient; and (3) there is some evidence of a causal connection between the adverse action and the protected activity. When a prima facie case of retaliation has been established, OCR then determines whether there is a facially legitimate, non-retaliatory reason for the adverse action; and if so, whether the facially legitimate, non-retaliatory reason is a pretext for retaliation.

**Analysis and Conclusions**

### 1. Allegation Regarding the CIAC's Retaliation

The Complainant alleged that the CIAC retaliated against Parent 1, after Parent 1 complained about the Revised Transgender Participation Policy, by informing Parent 1, in March 2019, that the CIAC's Executive Director would no longer accept communications from her. OCR determined that Parent 1 engaged in protected activity on February 22, 2018, January 24, 2019, and March 28, 2019, when she sent emails expressing concern regarding the Revised Transgender Participation Policy to the CIAC's Executive Director;[54] and on February 28, 2019, when Parent 1 met with the Executive Director in person to discuss her concerns about the policy. OCR determined that the CIAC was aware of Parent 1's protected activity.

OCR determined, however, that the CIAC proffered a legitimate, non-retaliatory reason for the Executive Director's statement to Parent 1 that "further correspondence to CIAC has to come through your principal"; namely, that the CIAC staff typically did not communicate directly with parents and Parent 1 should have communicated her concerns with the athletic director or school administrator. OCR determined that the proffered reason was not a pretext for retaliation, as the Executive Director's instruction was consistent with the CIAC policy and the Executive Director's directives to other parents who had not engaged in protected activities. Therefore, OCR determined that there was insufficient evidence to substantiate the Complainant's allegation that the CIAC retaliated against Parent 1, after Parent 1 complained about the Revised Transgender Participation Policy, by informing Parent 1, in March 2019, that the Executive Director would no longer accept communications from her. Accordingly, OCR will take no further action with respect to this allegation.

---

[54] As discussed previously, Parent 1 communicated with the former the Executive Director in her email on February 22, 2018; and with the current Executive Director from January 24, 2019, onward.

## 2.   Allegations Regarding Glastonbury Track Coach Retaliation

OCR determined that Parent 2 engaged in protected activity by sending emails to the Athletic Director in May, June, and July 2018, expressing her concerns that the Revised Transgender Participation Policy was unfair to cisgender female athletes; meeting with the Athletic Director, the principal, and the superintendent, on or about August 1, 2018, to discuss these concerns; meeting with the Athletic Director and Parent 4, on or about March 15, 2019, to again discuss these concerns; and telephoning and sending an email to the School's Title IX Coordinator in March and April 2019.  OCR determined that Parent 2 also engaged in protected activity in May and June 2018, and in March 2019, when she sent emails to the track coach regarding her objections to the policy and a petition that she had initiated in opposition to the policy.  OCR determined that the Glastonbury track coach was aware of the Parent 2's protected activity.

With respect to Allegation (a), OCR determined that neither the track coach nor any other Glastonbury employee denied Student 1 an opportunity to participate on a sprint medley relay team at the New Balance Nationals.  Rather, the students themselves chose who would participate.  Accordingly, OCR could not substantiate that the track coach or other Glastonbury employee subjected Student 1 to an adverse action.  Absent an adverse action, OCR does not proceed further with retaliation analysis.  Accordingly, OCR will take no further action regarding Allegation (a).

With respect to Allegation (b), OCR must often weigh conflicting evidence in light of the facts and circumstances of each case and determine whether the preponderance of evidence supports the allegation.  Here, OCR did not find that the preponderance of the evidence supported the Complainant's assertion that the track coach told Parent 2 or Student 1 that he would not give a good report about Student 1 to college coaches.  Based on the foregoing, OCR determined that there was insufficient evidence to substantiate that the track coach subjected Student 1 to the alleged adverse action.  Absent an adverse action, OCR does not proceed further with a retaliation analysis.  Accordingly, OCR will take no further action regarding Allegation (b).

With respect to Allegation (c), OCR determined that the Glastonbury proffered a legitimate, non-retaliatory reason for not selecting Student 1 as a captain for the spring 2019 outdoor season; namely, that track coaches had concerns about Student 1's maturity and dedication after the winter 2018 indoor season.  Even assuming that the track coach also told Student 1 that the decision had to do with her leaving practice early on Fridays, OCR determined that would still be a legitimate, non-retaliatory reason for not selecting her.  OCR determined that the proffered reasons were not a pretext for retaliation, as other coaches corroborated the reasons for the decision and the track coach gave an example of another student who had not been re-selected as captain based on similar behaviors, who had not engaged in protected activities.  Additionally, OCR determined that there was no causal connection between the protected activity and the alleged adverse action, as the track coach selected Student 1 as a captain for the indoor season after she and Parent 2 had engaged in protected activities in 2018 and prior to their again engaging in protected activities in 2019.  Therefore, OCR determined that there was insufficient evidence to substantiate the Complainant's allegation that the Glastonbury track coach retaliated against Student 1, for her and Parent 2's advocacy against the Revised Transgender Participation Policy, by denying Student 1 a position as a team captain in March 2019.  Accordingly, OCR will take no further action regarding Allegation (c).

Page 44 of 45 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

With respect to Allegation (d), OCR must often weigh conflicting evidence in light of the facts and circumstances of each case and determine whether the preponderance of evidence supports the allegation. Here, OCR did not find that the preponderance of the evidence supported the Complainant's assertion that the track coach told Student 1 in March 2019 and May 2019, that she should consider leaving the team if she had to leave practice early. Based on the foregoing, OCR determined that there was insufficient evidence to substantiate that the track coach subjected Student 1 to the alleged adverse action. Absent an adverse action, OCR does not proceed further with a retaliation analysis. Accordingly, OCR will take no further action regarding Allegation (d).

## Attempts to Resolve the Complaint

Via e-mail on February 12, 2020, OCR notified the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury that it had determined that the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury violated Title IX, and provided a proposed resolution agreement (the Agreement) to each that would resolve OCR's compliance concerns. During subsequent telephone calls with counsel for the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury, held during the period of February 13, 2020, through March 13, 2020, OCR informed counsel for the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury of the specific violation, and explained the nature of the violations and the basis of its findings. On multiple occasions during these communications, OCR informed counsel for the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury of the 90-calendar day timeframe for negotiations as set forth in Section 303(f) of the *Manual*. OCR also informed counsel for the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury that the *Manual* states that OCR may end the negotiation period at any time prior to the expiration of the 90-calendar day period when it is clear that agreement will not be reached. On March 12, 2020, counsel for Bloomfield, Hartford, and Cromwell, and on March 13, 2020, counsel for the CIAC, Glastonbury, Canton and Danbury, informed OCR that their clients would not sign the Agreements.

On March 17, 2020, OCR issued impasse letters to the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury notifying the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury that the negotiations had reached an impasse and a final agreement had not been reached. Further, the letter informed the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury that in accordance with the *Manual*, Section 303(g), if an agreement was not reached within 10 calendar days of the date of the letter, i.e., by March 30, 2020, OCR would issue a Letter of Impending Enforcement Action indicating that the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury are in violation of Title IX. OCR also referred the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury to the *Manual*, at https://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm.pdf, in particular, Sections 303-305 and 601-602, for more information.

In emails dated March 27, 2020, OCR informed the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury that in view of their COVID-19-related duties and responsibilities, OCR was extending the ten-calendar day-deadline to respond to OCR's proposed resolution agreements for a period of 30 days, to April 27, 2020; and that if agreement was not reached by that date, OCR would issue a Letter of Impending Enforcement Action on April 28,

Page 45 of 45 – Case Nos. 01-19-4025, 01-19-1252, 01-20-1003, 01-20-1004, 01-20-1005, 01-20-1006, and 01-20-1007

2020, pursuant to Section 305 of the *Manual*. To date, the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury have not entered into resolution agreements with OCR to remedy the violations.

Based on the failure of the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury to resolve the identified areas of noncompliance, OCR will either initiate administrative proceedings to suspend, terminate, or refuse to grant or continue and defer financial assistance to the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury, or refer the cases to the U.S. Department of Justice for judicial proceedings to enforce any rights of the United States under its laws. OCR will take further enforcement action after no fewer than 20 calendar days from the date of this letter if resolution of these complaints has not yet been reached.

This Letter of Impending Enforcement Action is not intended and should not be interpreted to address the compliance of the CIAC, Glastonbury, Bloomfield, Hartford, Cromwell, Canton, and Danbury with any other regulatory provision or to address any issues other than those addressed in this letter. This letter sets forth OCR's determination in these individual OCR cases; it is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such. OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public. The complainant may file a private suit in federal court whether or not OCR finds a violation.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. In the event that OCR receives such a request, it will seek to protect, to the extent provided by law, personally identifiable information that, if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy.

If you have any questions, please contact Nadja Allen Gill, Compliance Team Leader, at (646) 428-3801, or nadja.r.allen.gill@ed.gov.

Sincerely,

Timothy C. J. Blanchard

cc:   Glenn Lungarini, CIAC Executive Director, via email only
      Alan B. Bookman, Glastonbury Superintendent, via email only
      Kevin D. Case, Canton Superintendent, via email only
      Dr. Enza Macri, Cromwell Superintendent, via email only
      Dr. Sal V. Pascarella, Danbury Superintendent, via email only
      Dr. James Thompson, Jr., Bloomfield Superintendent, via email only
      Dr. Leslie Torres-Rodriguez, Hartford Superintendent, via email only
      Roger G. Brooks, Alliance Defending Freedom, Complainant, via email only

# APPENDIX 2

**RESPONSE TO MOTION FOR
PRELIMINARY INJUNCTION (Dkt. 22)**
*Hecox, et al. v. Little, et al.*
**Case No. 1:20-cv-00184-DCN**



# HEALTH EXAMINATION *and* CONSENT FORM

It is required all students complete a history and physical examination prior to his/her first 9th and 11th grade practice in the interscholastic (9-12) athletic program in the State of Idaho. The exam is at the expense of the student and may not be taken prior to May 1 of the 8th and 10th grade years. This examination is to be done by a licensed physician, physician's assistant or nurse practitioner under optimal conditions. Interim history forms are required during the 10th and 12th grade years and must be submitted to the school administration prior to the first practice.

Name: _____    Sex:  M / F    Date of birth: _____    Age: _____

Address: _____    Phone: _____

School: _____    Sports: _____    Participation Grade: _____

## MEDICAL HISTORY

Fill in details of "YES" answers in space below:

| | Yes | No | | | Yes | No |
|---|---|---|---|---|---|---|
| 1. Have you ever been hospitalized? | ☐ | ☐ | 6. Have you ever had a head injury? | | ☐ | ☐ |
| Have you ever had surgery? | ☐ | ☐ | Have you ever been knocked out or unconscious? | | ☐ | ☐ |
| 2. Are you presently taking any medication or pills? | ☐ | ☐ | Have you ever been diagnosed with a concussion? | | ☐ | ☐ |
| 3. Do you have any allergies (medicine, bees, other insects)? | ☐ | ☐ | Have you ever had a seizure? | | ☐ | ☐ |
| 4. Have you ever passed out during or after exercise? | ☐ | ☐ | Have you ever had a stinger, burned or pinched nerve? | | ☐ | ☐ |
| Have you ever been dizzy during or after exercise? | ☐ | ☐ | 7. Have you ever had heat or muscle cramps? | | ☐ | ☐ |
| Have you ever had chest pain during or after exercise? | ☐ | ☐ | Have you ever been dizzy or passed out in the heat? | | ☐ | ☐ |
| Do you tire more quickly than your friends during exercise? | ☐ | ☐ | 8. Do you have trouble breathing or do you cough during or after exercise? | | ☐ | ☐ |
| Have you ever had high blood pressure? | ☐ | ☐ | | | | |
| Have you been told you have a heart murmur? | ☐ | ☐ | 9. Do you use special equipment (pads, braces, neck rolls, mouth guard or eye guards, etc.)? | | ☐ | ☐ |
| Have you ever had racing of your heart or skipped heartbeats? | ☐ | ☐ | 10. Have you ever had problems with your eyes or vision? | | ☐ | ☐ |
| Has anyone in your family died of heart problems or a sudden death before age 50? | ☐ | ☐ | Do you wear glasses, contacts or protective eyewear? | | ☐ | ☐ |
| 5. Do you have any skin problems (itching, rash, acne)? | ☐ | ☐ | 11. Have you had any other medical problems ( infectious mononucleosis, diabetes, ect.)? | | ☐ | ☐ |

**12. Have you had a medical problem or injury since your last evaluation?**   ☐ Yes  ☐ No

13. Have you ever sprained/strained, dislocated, fractured, broken or had repeated swelling or other injuries of any of bones or joints?

☐ head  ☐ back  ☐ shoulder  ☐ forearm  ☐ hand  ☐ hip  ☐ knee  ☐ ankle
☐ neck  ☐ chest  ☐ elbow  ☐ wrist  ☐ finger  ☐ thigh  ☐ shin  ☐ foot

14. Were you born without a kidney, testicle, or any other organ?   ☐ Yes  ☐ No

15. When was your first menstrual period?

When was your last menstrual period? _____

What was the longest time between your periods last year? _____

Explain "YES" answers: _____

## CONSENT FORM

(Parent or guardian and student permission and approval)

I herby consent to the above named student participating in the interscholastic athletic program at his/her school of attendance. This consent includes travel to and from athletic contests and practice sessions. I further consent to treatment deemed necessary by physicians designated school authorities for any illness or injury resulting from his/her athletic participation. I also consent to release of any information contained in this form to carry out treatment and healthcare operations for the above named student.

If the health care provider's exam will be performed without compensation as part of the school's health examination program for participation in high school activities, I agree to the waiver provisions as set forth in Idaho Code Section 39-7703 and agree that the health care provider shall be immune from liability as specified in said section.

PARENT OR GUARDIAN SIGNATURE _____    DATE: _____

This application to compete in interscholastic athletics for the above school is entirely voluntary on my part and is made with the understanding that I have not violated any of the eligibility rules and regulation of the State Association.

SIGNATURE OF STUDENT _____    DATE: _____

# Idaho High School Activities Association
# Physical Examination Form

**Name:** _____   **Date of Birth:** _____

| Height _____ Weight _____ BP _____ / _____ Pulse _____ |
|---|
| Vision  R 20 / ____   L 20 / ____   Corrected: Y   N |

|  | **Normal** | **Abnormal findings** |
|---|---|---|
| **Medical** | | |
| Pulses | | |
| Heart | | |
| Lungs | | |
| Skin | | |
| Ears, nose, throat | | |
| Pupils | | |
| Abdomen | | |
| Genitalia (males) | | |
| **Musculoskeletal** | | |
| Neck | | |
| Shoulder | | |
| Elbow | | |
| Wrist | | |
| Hand | | |
| Back | | |
| Knee | | |
| Ankle | | |
| Foot | | |
| Other | | |

## CLEARANCE / RECOMMENDATIONS

Clearance:

A.  Cleared for all sports and other school-sponsored activates.

B.  Cleared after completing evaluation/rehabilitation for:

_____

C.  NOT cleared to participate in the following IHSAA sponsored sports /activities:

| baseball | basketball | cheer/dance | cross country | football | golf | |
|---|---|---|---|---|---|---|
| soccer | softball | swimming | tennis | track | volleyball | wrestling |

NOT cleared for other school-sponsored activities *(example: lacrosse)*:

_____

D.  Student is NOT permitted to participate in high school athletics.

Reason: _____

Recommendation:

Name of physician: _____

Address: _____   Phone: _____

Signature of physician/medical provider: _____   Date: _____

(This *Physical Examination Form* MUST be signed by a licensed physician, physician assistant or nurse practitioner)