Richard Eppink (Bar No. 7503)
AMERICAN CIVIL LIBERTIES UNION OF IDAHO
FOUNDATION
P. O. Box 1897
Boise, ID 83701
T: (208) 344-9750 ext. 1202
REppink@acluidaho.org

Gabriel Arkles*
James Esseks*
Chase Strangio*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad St.,
New York, NY 10004
T: (212) 549-2569
garkles@aclu.org
jesseks@aclu.org
cstrangio@aclu.org

Kathleen Hartnett*
COOLEY LLP
101 California Street 5th Floor
San Francisco, CA 94111-5800
T: (415) 693-2000
F: (415) 693-2222
khartnett@cooley.com

Elizabeth Prelogar*
COOLEY LLP
1299 Pennsylvania Avenue, NW Suite 700
Washington D.C. 20004-2400
T: (202) 842-7800
F: (202) 842-7899
eprelogar@cooley.com

Andrew Barr*
COOLEY LLP
380 Interlocken Crescent, Ste. 900
Broomfield, CO 80021-8023
T: (720) 566-4000
F: (720) 566-4099
abarr@cooley.com

Catherine West*
LEGAL VOICE
907 Pine Street, Unit 500
Seattle, WA 98101
T: (206) 682-9552
F: (206) 682-9556
cwest@legalvoice.org

* Admitted *pro hac vice*

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| LINDSAY HECOX, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> BRADLEY LITTLE, et al., <br><br> *Defendants*. | No. 1:20-cv-184-DCN <br><br> **PLAINTIFFS LINDSAY HECOX'S AND JANE DOE'S RESPONSE TO MOTION TO DISMISS [DKT. 40]** |

## I. Introduction

H.B. 500 exists for one reason: to categorically exclude women and girls who are transgender from participating on school sports teams in Idaho. It enforces this categorical exclusion through testing for "biological sex" that only women and girls must undergo. Prior to H.B. 500, women and girls who are transgender could play on women's teams under Idaho's statewide rules and the NCAA's nationwide rules applicable to colleges. Now, H.B. 500 prohibits such participation, based on the false claim that women and girls who are transgender have an "absolute advantage" and "performance benefits" over women and girls who are cisgender. Idaho Code § 33-6202(11).

As the State's counsel previously acknowledged, H.B. 500 is "targeted toward transgender and intersex athletes."[1] (A.G. Letter at 6.) Now, arguing for dismissal, Defendants (the "State") seek to avoid H.B. 500's clear terms, effect, and intent. The State mischaracterizes the operation of H.B. 500 and its self-executing exclusion of transgender girls and women, which as of July 1 will bar Plaintiff Lindsay Hecox and other women and girls who are transgender from participating in school sports in Idaho. The State also incorrectly claims that discrimination against transgender girls and women—the targets of H.B. 500's exclusion—cannot be redressed because H.B. 500 also excludes male athletes

---

[1] Letter from Att'y Gen. Wadsen to Rep. Rubel 6 (Feb. 25, 2020), https://www.idahopress.com/attorney-generals-opinionhb-500/pdf_4ebb604a-83eb-5bd4-a232-b13a64f4be47.html ("A.G. Letter").

from women's teams.

The State moves to dismiss on only three grounds: (1) lack of "actual injury" for Article III standing; (2) lack of ripeness; and (3) the alleged impropriety of a "facial attack" on H.B. 500.[2] All of these arguments lack merit and hinge on mischaracterizations of H.B. 500. The standing and ripeness arguments fail because H.B. 500 threatens actual, non-speculative injury to Plaintiffs. Under H.B. 500, it will be illegal as of July 1, 2020, for Boise State University ("BSU") to let Lindsay even try out for its athletic teams, which are not "open" to her. On that date, Plaintiff Jane Doe likewise will immediately be subject to the different rules that H.B. 500 provides for participating on girls' teams compared to boys' teams, and she faces an actual, non-speculative risk that her "biological sex" will be disputed, triggering an invasion of her privacy. Finally, the State's argument that a facial challenge is impermissible fails because H.B. 500 does not simply reaffirm sex separation in sports; it targets transgender athletes, and members of an affected class may challenge a discriminatory law.

## II. Background

### a. Plaintiffs

Plaintiffs Lindsay Hecox and Jane Doe (with her next friends Jean and John Doe) are women athletes who wish to participate on women's athletic

---

[2] The State does not argue that Plaintiffs inadequately pleaded their claims or seek dismissal on any other ground.

3

teams at their schools in Fall 2020. (Dkt. 1 at ¶¶ 6–7.) Absent H.B. 500, both Lindsay and Jane would try out for and be eligible to participate on women's teams in Idaho this coming school year. (Dkt. 1 at ¶¶ 32–33, 45.) But when H.B. 500 takes effect on July 1, 2020, Lindsay, a woman who is transgender, will be barred from BSU's women's cross country and track teams. (Dkt. 1 at ¶ 38.) And Jane, a cisgender girl, will be subject to the different rules governing participation on girls' teams and a sex verification process that only affects women athletes. (Dkt. 1 at ¶¶ 46, 50.)

### b.     H.B. 500

The express purpose of H.B. 500 is to force women and girls who are transgender to "compet[e] in the biological sex in which [they] were born."[3] It accomplishes this purpose through several interconnected provisions.

First, H.B. 500 requires all athletic teams to be designated as male, female, or co-ed "based on biological sex" and provides that "[a]thletic teams or sports designated for females, women, or girls ***shall not be open*** to students of the male sex." Idaho Code §§ 33-6203(1) & (2) (emphasis added). On its face, the statute restricts both trying out for and participating on the team, as a women's team "shall not be open" to a student unless the student's "biological sex" is that of "female, women, or girl." *Id.* § 33-6203(2).

Second, H.B. 500 provides that a woman can prove her "biological sex"

---

[3] February 26, 2020 House Debate of H.B. 500 at 41:40–42:01, *available at* http://164.165.67.41/IIS/2020/House/Chambers/HouseChambers02-26-2020.mp4 (statement of H.B. 500's House sponsor) ("Sponsor Statement").

4

only by criteria that have the purpose and effect of excluding women who are transgender. *Id.* § 33-6203(3).[4] Specifically, to resolve a dispute about eligibility to participate on a girls' team, a health care provider's statement "shall verify" a student's "biological sex," "relying ***only*** on one (1) or more of the following: the student's reproductive anatomy, genetic makeup, or normal endogenously produced testosterone levels." *Id.* (emphasis added).[5]

Third, H.B. 500 expressly requires the state board of education to issue

---

[4] These traits are untethered to athletic performance, as the State's counsel has recognized: "[H.B. 500] requires a physician to determine sex based on factors that are not supported in the legislative findings as linked to unfair advantage in competition." (A.G. Letter at 6; *see* Dkt. 22-1 at 5, 13 & n.13.)

[5] The State incorrectly asserts that Idaho Code § 33-6203(3) merely "suggests factors that the health care provider may use" to verify "biological sex" and allows a healthcare provider to verify a student's "biological sex" based on something other than the expressly listed criteria. (Dkt. 40-1 at 3 (claiming that "HB 500 does not require the health care provider . . . to use the three specified factors in providing an 'other statement' verifying 'the student's biological sex'").) That argument contravenes the statutory requirement that a healthcare provider verify "biological sex"—an otherwise undefined term with no recognized medical meaning—by "relying **only** on one (1) or more of" three specified requirements. Idaho Code § 33-6203(3) (emphasis added); *see Only*, Merriam-Webster's Dictionary (defining "only" to mean "solely, exclusively"). To the extent the statute is ambiguous regarding whether a verification by "other statement" can be made independent of the enumerated three criteria, the Court must "ascertain the intent of the legislature" through not only "the literal words of the statute . . . but also the context of those words, the public policy behind the statute, and its legislative history." *State v. Beard*, 22 P.3d 116, 121 (Ct. App. 2001). The State's proposed interpretation—allowing verification of "biological sex" to be untethered to the statutory criteria—would entirely undermine the legislature's intent to require students to "compet[e] in the biological sex in which [they] were born." (Sponsor Statement.) Under such a farcical interpretation, Lindsay could compete on a women's team simply by having her physician state that she is female, without reference to any of the statutory criteria.

5

rules "consistent with" the statutory provisions that provide that women's teams "shall not be open to students of the male sex." *Id.* § 33-6203(2). Those provisions allow only three criteria for determining "biological sex," all of which preclude women who are transgender from joining women's teams. *Id.* § 33-6203(3).

Finally, as an enforcement mechanism, H.B. 500 creates a private cause of action against a "school or institution of higher education" for a student "who is deprived of an athletic opportunity or suffers any direct or indirect harm" due to participation of a woman who is transgender on a women's team. *Id.* § 33-6205(1). Under this private cause of action, any student who claims to be aggrieved by a "violation" of H.B. 500 can seek injunctive relief, damages, and any other relief available under law. *Id.*[6]

### III. Argument

#### a. Plaintiffs Have Shown "Injury in Fact"[7]

To adequately plead Article III "injury in fact," Plaintiffs must allege that they have suffered, or are likely to imminently suffer, a "concrete and particularized" injury to a "judicially cognizable interest." *Bennett v. Spear*, 520 U.S. 154, 167 (1997); *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158

---

[6] H.B. 500 creates two other private rights of action to deter transgender inclusion: against Idaho schools for any "retaliation or other adverse action" against those reporting a "violation" of H.B. 500, Idaho Code § 33-6205(2), and against government entities, licensing entities, and athletic associations based on a "violation" of H.B. 500, *id.* § 33-6205(3); *see id.* § 33-6204.

[7] Of the three requirements for Article III standing (injury, causation, and redressability), the State challenges only the pleading of injury.

(2014) (requiring "certainly impending" legally cognizable harm or a "substantial risk that the harm will occur"). As long as Plaintiffs "demonstrate a realistic danger of sustaining a direct injury" from H.B. 500, *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979), and their fear of negative impact is not "imaginary or wholly speculative," *Susan B. Anthony*, 573 U.S. at 159 (citation omitted), then they have adequately alleged injury in fact. *See id*. at 160. At bottom, Plaintiffs must demonstrate that they have a "personal stake in the outcome of the controversy." *Id*.

Plaintiffs have satisfied the standard for pleading an injury-in-fact. H.B. 500 categorically excludes Lindsay from participating on BSU's women's cross country and track teams in violation of the Constitution and Title IX. (Dkt. 1 at ¶¶ 32–35.) This deprivation of a legal right is not speculative, nor is it contingent on any third party's actions. Instead, it is precisely what H.B. 500 was designed to do: ensure that women who are transgender cannot participate on women's athletic teams. *See* Idaho Code § 33-6203.

The State incorrectly suggests that Lindsay will not be harmed until she joins the BSU team and someone seeks to exclude her through a sex verification challenge. (Dkt. 40-1 at 7.) That argument ignores H.B. 500's self-executing exclusion of transgender girls and women, which bars Lindsay from joining the team at all and discriminates against her because she is transgender. Under H.B. 500, it is impossible for Lindsay to demonstrate a "biological sex" permitting participation on a women's team based on the only three criteria the

7

statute permits for sex verification: "reproductive anatomy, genetic makeup, or normal endogenously produced testosterone levels." (Dkt. 1 at ¶ 35.) Thus, any team "designated for females, women, or girls" "shall not be open" to her. Idaho Code § 33-6203(2). BSU would violate H.B. 500 at its peril—and subject itself to a private enforcement action, *see id*. § 33-6205—were it to "open" its women's team to Lindsay for tryouts and participation before and until her "biological sex" is disputed. Given BSU's awareness that Lindsay is a woman who is transgender, H.B. 500 directs that BSU "shall not" permit her to join the women's team. *Id*. § 33-6203(2).

The State also mischaracterizes the Complaint, arguing that Plaintiffs "acknowledge[d]" their harm would occur "only if a third party disputed [their] sex." (Dkt. 40-1 at 6.) In the very portion of the Complaint the State cites, Plaintiffs point out that H.B. 500 "bar[s]" women and girls who are transgender "from athletic competition consistent with their gender identity"—a prohibition on the face of the statute that exists separate from and prior to any sex-verification dispute. (Dkt. 1 at ¶ 145.) Put simply, Lindsay's exclusion from the team is legally required and foreordained. *See Addington v. U.S. Airline Pilots Ass'n*, 606 F.3d 1174, 1179 (9th Cir. 2010) ("[A] litigant need not await the consummation of threatened injury to obtain preventive relief") (citation omitted).[8]

---

[8] The State briefly claims in footnotes (Dkt. 40-1 at 7 n.1 & 10 n.2) that Lindsay has not pleaded facts showing that she would be qualified to participate in Fall 2020 sports under the NCAA rules, which require one year of hormone therapy

Nor does it matter whether Lindsay ultimately makes the team if she were permitted to try out, as her constitutional injury flows from the discrimination under the terms of the statute itself. The disparate treatment that confers standing under Supreme Court precedent is the barrier the law imposes and not the ultimate inability to participate on the team. *See Ne. Fla.*

---

before a student participates in an NCAA-sponsored event. (Dkt. 22-4 at ¶¶ 27, 30.) But Lindsay has sufficiently alleged her eligibility: the Complaint alleges her hormone treatment and qualification under NCAA rules (Dkt. 1 at ¶¶ 29, 31, 32), and her Declaration in support of Plaintiffs' Motion for a Preliminary Injunction further explains that her one year of hormone treatment will be complete in September, allowing her to participate this Fall (Dkt. 22-6 at ¶¶ 14, 17). To the extent the State suggests that the NCAA rules would bar Lindsay from trying out for the BSU team before she completes one year of hormone therapy, that is incorrect. (Dkt. 22-4 at ¶¶ 27, 30 (explaining that NCAA rules apply only to participation in NCAA-sponsored events, such as conference or league tournaments).)

In the same footnotes, the State suggests that Lindsay "may be precluded" by Title IX from participating in women's sports, by reference to a U.S. Department of Education Office of Civil Rights ("OCR") matter concerning certain schools in Connecticut that has no legal weight or bearing here. This "Letter of Impending Enforcement Action" that OCR issued in May 2020 specifically states that "it is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such." (Dkt. 41 at ECF p.68); *see also Parents for Privacy v. Barr*, 949 F.3d 1210, 1229 (9th Cir. 2020) (rejecting Title IX claims brought by cisgender students alleging harm from policy that treated transgender students consistent with gender identity). In any event, the analysis in the OCR letter conflicts with and has been superseded by the Supreme Court's recent decision in *Bostock v. Clayton County, Georgia*, -- S. Ct. --, 2020 WL 3146686 (June 15, 2020), which clarifies that the prohibition on discrimination because of sex in Title VII of the Civil Rights Act of 1964 includes discrimination based on an individual's transgender status. *Id.* at *7; *see, e.g., Emeldi v. University of Oregon*, 698 F.3d 715, 724 (9th Cir. 2012) (interpreting Title IX provisions in accordance with Title VII because "the Supreme Court has often looked to its Title VII interpretations of discrimination in illuminating Title IX" and "the legislative history of Title IX strongly suggests that Congress meant for similar substantive standards to apply under Title IX as had been developed under Title VII") (internal quotation marks and citations omitted).

*Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993) ("When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing"); *see Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 280 n.14 (1978) (finding injury based on "University's decision not to permit [the plaintiff] to compete for all 100 places in the class" and noting that "even if [the plaintiff] had been unable to prove that he would have been admitted in the absence of the [barrier], it would not follow that he lacked standing.").

In addition, both Jane and Lindsay have also demonstrated an "injury in fact" by alleging that H.B. 500 treats women and girl student athletes differently, and less favorably, than similarly situated men and boy student athletes. This different treatment will be in operation immediately when H.B. 500 takes effect on July 1, 2020. Even if the Plaintiffs are never ultimately subject to sex-verification disputes, they have standing based on the different rules that H.B. 500 creates to govern their participation in sports compared to boys and men. The Supreme Court has "long recognized [that] unequal treatment . . . because of [] gender" like that codified by H.B. 500 is an "injury in fact" sufficient to convey standing. *See Heckler v. Mathews*, 465 U.S. 728, 738, 739–40 (1984) (finding that standing exists for "those persons who are personally denied equal treatment solely because of their membership in a disfavored

10

group" because "discrimination itself, by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' . . . can cause serious non-economic injuries") (citation omitted); *Davis v. Guam*, 785 F.3d 1311, 1315 (9th Cir. 2015) (finding standing because "equal treatment under law is a judicially cognizable interest that satisfies the case or controversy requirement of Article III").

Here, when Jane participates on the girls' soccer team starting August 10, she will be subject to the different rules for participation on girls' teams, including the risk that her "biological sex" will be disputed and that she will have to undergo a verification process to participate on the team. Idaho Code § 33-6203. (Lindsay is known to be transgender and thus H.B. 500 categorically prohibits her participation, as explained above; otherwise, she too would immediately face the risk of a sex-verification challenge.) Similarly situated men and boys are not subject to the same treatment because H.B. 500 does not restrict who may participate on men's teams. *See id.*

Moreover, if Jane's "biological sex" is "disputed," as it well may be given that she is high-performing and "people sometimes think of her as masculine," (Dkt. 1 at ¶¶ 46–47), H.B. 500 requires her to undergo a sex verification process. Idaho Code § 33-6203(3). That non-speculative risk of an invasion of privacy under federal law also states an "injury in fact." *See Susan B. Anthony*, 573 U.S. at 159 (holding that a "plaintiff satisfies the injury-in-fact requirement where [she] alleges 'an intention to engage in a course of conduct arguably affected with

11

a constitutional interest, but proscribed by a statute" (quoting *Babbitt*, 442 U.S. at 298)); *see also Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 987 (D. Ariz. 2011), *aff'd* sub nom. *Melendres v. Arpaio*, 695 F.3d 990, 998 (9th Cir. 2012) (holding that Latino Plaintiffs had standing to challenge policy targeting Latinos in connection with vehicular stops based on their "[e]xposure to this policy while going about [their] daily li[ves]," even though "the likelihood of a future stop of a particular individual plaintiff may not be 'high'") (citation omitted).[9]

### b. Plaintiffs' Claims Are Ripe

The State's argument that this case is not ripe fails for largely the same reasons that the State's standing arguments lack merit.

As the State acknowledges, the constitutional component of the ripeness inquiry is coextensive with the injury-in-fact prong of standing analysis. (Dkt. 40-1 at 9); *see Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 81 (1978) (finding that the "conclusion that appellees will sustain immediate injury from [the challenged conduct] and that such injury would be redressed by the relief requested [for purposes of Article III standing] would appear to satisfy [the ripeness] requirement"); *see Colwell v. Dep't of Health & Hum. Servs.*, 558 F.3d 1112, 1123 (9th Cir. 2009) ("Standing and ripeness under Article III are

---

[9] If the Court determines that either Lindsay or Jane has standing, the State's motion must be denied because this Court need only satisfy itself that one Plaintiff has standing to confirm its subject-matter jurisdiction. *See, e.g.*, *Melendres*, 695 F.3d at 999 ("[O]nce the court determines that one of the plaintiffs has standing, it need not decide the standing of the others."); *Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993) (same).

closely related."). Here, because Plaintiffs have adequately pleaded "injury in fact," Plaintiffs' claims are ripe. *See Duke Power*, 438 U.S. at 81 (finding that an Article III "injury in fact" satisfies the ripeness inquiry); *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) ("The constitutional component of the ripeness inquiry is often treated under the rubric of standing and, in many cases, ripeness coincides squarely with standing's injury in fact prong.").

Prudential ripeness, in turn, involves two overarching considerations: "the fitness of the issues for judicial review and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967) (abrogated on other grounds).

With respect to fitness for review, relevant considerations include "whether the action has a direct and immediate effect on the complaining parties; whether the action has the status of law; and whether the action requires immediate compliance with its terms." *Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 780 (9th Cir. 2000); *see also US West Commc'ns v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1118 (9th Cir. 1999) ("A claim is fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final." (citation omitted)).

Here, all of these considerations demonstrate that H.B. 500 is fit for review. First, H.B. 500 will have the status of law as of its imminent effective date, July 1, 2020. (Dkt. 1 at ¶ 93.) The State's assertion that "HB 500 is not yet

13

effective" (Dkt. 40-1 at 9) ignores that it will be in effect even before the briefing on the motion to dismiss is complete.

Second, once H.B. 500 takes effect, compliance with its prohibitions will be mandatory and it will have an immediate effect on both Lindsay and Jane. (Dkt. 1 at ¶¶ 38, 50.) Lindsay will not be eligible to participate on school-sponsored women's sports teams in Idaho this Fall. (Dkt. 1 at ¶¶ 38, 121, 145); Idaho Code § 33-6203(2) ("Athletic teams or sports designated for females, women, or girls ***shall not be open*** to students of the male sex." (emphasis added)). Jane will be subject to the different rules governing girls' sports teams compared to boys' teams and will face the risk of an invasive sex-verification inquiry if her sex is disputed (as would Lindsay, if BSU were to violate the law and allow her to join the women's team, exposing itself to private lawsuits, *see* Idaho Code § 33-6205). (Dkt. 1 at ¶¶ 46, 49, 88, 124.)

The "rules and regulations" that the State emphasizes are "forthcoming" (Dkt. 40-1 at 10) cannot affect H.B. 500's core prohibitions and requirements, but will merely establish ancillary procedures applicable to sex-verification disputes. *See* Idaho Code § 33-6203(3). Those regulations cannot, consistent with H.B. 500, allow transgender women and girls to participate on women's teams. Nor can they exempt women and girls whose sex is disputed from sex "verification," or add to the narrow list of criteria that can be used to "verify" a girl's "biological sex." *See id.* §§ 33-6203(2) & (3). The State is simply wrong that the regulations could possibly "alleviate some or all of Plaintiffs' concerns" or that such rules

14

must be established before Lindsay can be excluded from sport and before Plaintiffs can be subjected to sex "verification." (Dkt. 40-1 at 10.) As of July 1, 2020, H.B. 500 itself will inflict those harms. (Dkt. 1 at ¶¶ 35, 38, 50.)

Finally, the issues the Plaintiffs raise are primarily legal: whether H.B. 500 violates the Constitution and Title IX in light of its categorical exclusion of women and girls who are transgender from school sports and its sex-verification scheme for all women and girls, designed to enforce the categorical transgender exclusion. (*See, e.g.*, Dkt. 1 at ¶¶ 37, 148.)

In short, H.B. 500's legality is "fit for decision now." *Oklevueha Native Am. Church of Hawaii, Inc. v. Holder*, 676 F.3d 829, 838 (9th Cir. 2012) (determining that a case is fit for decision because "this is not an abstract disagreement but rather involves the application of well-developed law"); *Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1434–35 (9th Cir. 1996) (determining that a case is ripe when issues are purely legal).

Plaintiffs also would suffer significant harm from delayed adjudication. Both Plaintiffs are lifelong athletes for whom team sports are critically important. (Dkt. 1 at ¶¶ 31, 40–41.) Both seek to participate in school-sponsored athletics on women's teams in Idaho in Fall 2020. (Dkt. 1 at ¶¶ 6–7.) H.B. 500 takes effect on July 1, 2020, and thus applies to the Fall 2020 season. (Dkt. 1 at ¶¶ 38, 50, 93.) Plaintiffs promptly moved for a preliminary injunction after H.B. 500 was enacted precisely to protect their ability to participate in the Fall 2020 season. (Dkt. 22.) Lindsay is actively training for Fall tryouts at BSU (Dkt.

1 at ¶ 33), but as a woman who is transgender she will be categorically barred from participating on BSU's women's teams this Fall. (Dkt. 1 at ¶¶ 33, 35.) If the Court delays adjudicating her claims, she will miss the Fall season.

Jane's season begins on or about August 10, 2020 (Dkt. 1 at ¶ 45), at which point she will be subject to sex "verification" if her sex is challenged, with no ability to obtain immediate resolution of her claims at that time. (Dkt. 1 at ¶¶ 50, 126.) Not only will Lindsay be excluded and Jane face the prospect of a sex-verification dispute once H.B. 500 takes effect, but on that day, both Jane and Lindsay will suffer constitutional injury as a result of being treated less favorably than their male counterparts by the government. (Dkt. 1 at ¶¶ 49, 50, 123.) These harms and hardships are real and immediate, and delaying adjudication would only perpetuate them.

### c. Plaintiffs Have Adequately Pleaded Both Facial and As-Applied Challenges to H.B. 500

The State seeks to dismiss the entire Complaint under Rule 12(b)(6) based on one argument: that Plaintiffs have failed to plead a proper facial challenge to H.B. 500's legality because H.B. 500 can constitutionally be applied to exclude men (not transgender women) from women's sport. (Dkt. 40-1 at 11–13.) This argument is legally incorrect. H.B. 500 specifically targets girls and women who are transgender for categorical exclusion from participation in school sports consistent with their gender identity, and further subjects all girls and women to sex "verification" to enforce this policy of transgender exclusion. Plaintiffs have properly pleaded both a facial and as-applied challenge to H.B. 500's

16

discriminatory scheme.[10]

To begin with, a motion to dismiss is not the proper vehicle for the State's opposition to Plaintiffs' facial challenge, as the distinction between facial and as-applied challenges "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010) (explaining that the distinction "is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge"); *see Bucklew v. Precythe*, 139 S. Ct. 1112, 1128 (2019) ("The line between facial and as-applied challenges can sometimes prove amorphous and not so well defined.") (internal quotation marks and citations omitted).

Furthermore, the language in *United States v. Salerno*, 481 U.S. 739 (1987), central to the State's argument, does not represent the Supreme Court's standard for adjudicating facial challenges. *See, e.g.*, *City of Chicago v. Morales*, 527 U.S. 41, 51-52, 55 (1999) (determining that an ordinance was facially invalid even though it also had constitutional applications and observing that "[t]o the

---

[10] The State appears to contend that Plaintiffs have brought **only** a facial challenge (Dkt. 40-1 at 11 ("Plaintiffs' challenge to HB is facial.")), but that is incorrect: Plaintiffs' pleading and requested relief are both facial and as-applied. *See Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011) ("A paradigmatic as-applied attack . . . challenges only one of the rules in a statute, a subset of the statute's applications, or the application of the statute to a specific factual circumstance, under the assumption that a court can separate valid from invalid subrules or applications."). Here, Plaintiffs allege that H.B. 500 is unconstitutional both generally and as applied to them. (Dkt. 1 at ¶¶ 1, 81.) The State's only argument—that the law is constitutional when applied to exclude men from women's teams—is irrelevant to Plaintiffs' as-applied challenge.

17

extent [the Supreme Court] ha[s] consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of th[e] Court, including *Salerno* itself"). The State's entire attack on Plaintiffs' facial challenge thus is based on a case that "does not accurately characterize the standard for deciding facial challenges." *Janklow v. Planned Parenthood, Sioux Falls Clinic*, 517 U.S. 1174, 1175 (1996) (stating that the "dicta in *Salerno* does not accurately characterize the standard for deciding facial challenges, and neither accurately reflects the Court's practice with respect to facial challenges, nor is it consistent with a wide array of legal principles" (internal citations omitted)).

In assessing a facial challenge, the "proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *City of L.A., Cal. v. Patel*, 576 U.S. 409, 418 (2015) (internal quotation marks and citations omitted). H.B. 500 bars transgender women and girls from women's teams and subjects all women and girls (but not boys and men) to sex "verification."[11] Those are the groups targeted by H.B. 500 and "for whom the law is a restriction." *Id*. The operation of the law itself makes that plain, as do the statements of its sponsors. Counsel for the State has

---

[11] Preexisting law and rules already prevented men and boys from playing on women's and girls' teams. *See Idaho High School Activities Association's Non-Discrimination Policy*, available at https://idhsaa.org/asset/RULE%2011.pdf (last visited June 22, 2020) ("If a sport is offered for both boys and girls, girls must play on the girls team and boys must play on the boys team. … If a school sponsors only a single team in a sport: a. Girls are eligible to participate on boys teams. b. Boys are not eligible to participate on girls teams.").

acknowledged it as well. (A.G. Letter at 6.) And the State does not argue that H.B. 500 has any constitutional application with respect to these targeted groups. Rather, the State tries to side-step this issue, asking this Court to "***[s]et[] aside the issue of transgender athletes***" while dismissing a complaint alleging discrimination by a transgender athlete because "[a]n[] application of HB 500 to exclude boys from girls' teams would be a set of circumstances in which it operated constitutionally." (Dkt. 40-1 at 13 (emphasis added).) The State's argument misses the point, as the "proper focus of constitutional inquiry is" the group targeted by the restriction. *Patel*, 576 U.S. at 418.

Plaintiffs have also pleaded valid as-applied challenges to H.B. 500: namely, that H.B. 500 is unlawful because it (1) excludes Lindsay from participating on BSU's women's teams and (2) subjects Jane to the risk of a sex-verification inquiry and less favorable treatment than boys who participate on boys' teams. The State's silence regarding Plaintiffs' as-applied challenge demonstrates the adequacy with which it was pleaded.

## IV. Conclusion

Plaintiffs have standing, their claims are ripe, and they have adequately pleaded that H.B. 500 is unconstitutional on its face and as applied to Lindsay and Jane. The State's Motion should be denied.

| | |
|---|---|
| Dated: June 22, 2020 | /s/ Richard Eppink |
| Richard Eppink<br>AMERICAN CIVIL LIBERTIES<br>UNION OF IDAHO FOUNDATION | Kathleen Hartnett<br>Elizabeth Prelogar<br>Andrew Barr<br>COOLEY LLP |
| Gabriel Arkles<br>James Esseks<br>Chase Strangio<br>AMERICAN CIVIL LIBERTIES<br>UNION FOUNDATION | Catherine West<br>LEGAL VOICE<br>*Attorneys for Plaintiffs* |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 22nd day of June, 2020, I filed the foregoing electronically through the CM/ECF system as more fully reflected on the Notice of Electronic Filing:

Bruce D. Skaug (bruce@skauglaw.com)
Raul Labrador (raul@skauglaw.com)
Roger G. Brooks (rbrooks@ADFlegal.org)
Jeffrey Shafer (jshafer@ADFlegal.org)
Kristin Waggoner (kwaggoner@ADFlegal.org)
Parker Douglas (pdouglas@ADFlegal.org)
Christiana Holcomb (cholcomb@ADFlegal.org)
*Attorneys for Proposed Intervenors*

Matt Wilde (mattwilde@boisetate.edu)
*Attorney for BSU and Marlene Tromp*

Eric S. Dreiband (eric.dreiband@usdoj.gov)
Bart M. Davis (bart.davis@usdoj.gov)
Peter L. Wucetich (peter.wucetich@usdoj.gov)
Matthew J. Donnelly (matthew.donnelly@usdoj.gov)
*Attorneys for United States of America*

Steven L. Olsen (steven.olsen@ag.idaho.gov)
W. Scott Zanzig (scott.zanzig@ag.idaho.gov)
Dayton P. Reed (dayton.reed@ag.idaho.gov)
*Attorneys for Bradley Little, Sherri Ybarra, Individual members of the State Board of Education, BSU, Marlene Tromp, Individual members of the Idaho Code Commission*

By: /s/ Richard Eppink