Richard Eppink (Bar No. 7503)
AMERICAN CIVIL LIBERTIES UNION OF IDAHO
FOUNDATION
P. O. Box 1897
Boise, ID 83701
T: (208) 344-9750 ext. 1202
REppink@acluidaho.org

Gabriel Arkles*
James Esseks*
Chase Strangio*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
T: (212) 549-2569
garkles@aclu.org
jesseks@aclu.org
cstrangio@aclu.org

Kathleen Hartnett*
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA 94111-5800
T: (415) 693-2000
F: (415) 693-2222
khartnett@cooley.com

Elizabeth Prelogar*
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington D.C. 20004-2400
T: (202) 842-7800
F: (202) 842-7899
eprelogar@cooley.com

Andrew Barr*
COOLEY LLP
380 Interlocken Crescent, Ste. 900
Broomfield, CO 80021-8023
T: (720) 566-4000
F: (720) 566-4099
abarr@cooley.com

Catherine West*
LEGAL VOICE
907 Pine Street, Unit 500
Seattle, WA 98101
T: (206) 682-9552
F: (206) 682-9556
cwest@legalvoice.org

* Admitted *pro hac vice*

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

LINDSAY HECOX, et al.,

        *Plaintiffs*,

    v.

BRADLEY LITTLE, et al.,

        *Defendants*.

No. 1:20-cv-184-DCN

**PLAINTIFFS LINDSAY HECOX'S AND JANE DOE'S REPLY TO OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION [Dkt. 41]**

**INTRODUCTION**

H.B. 500 excludes women and girls who are transgender from school sports teams and burdens only women and girls to enforce that exclusion. As of July 1, 2020, Plaintiff Lindsay Hecox will be excluded from women's teams at Boise State University ("BSU") because she is transgender and cannot meet the statute's intentionally narrow requirements for proving a female "biological sex." Idaho Code §§ 33-6203(2), (3). And Plaintiff Jane Doe will be subject to a system of sex-based verification that applies only to girls and women.

This case is not, as Defendants ("the State") would have this Court believe, about the lawfulness of separate athletic teams for men and women. That separation preexisted H.B. 500 and is not challenged here. What is new about H.B. 500 is the complete exclusion of women and girls who are transgender from school sports in Idaho. Prior to H.B. 500, these athletes were allowed to participate on women's teams if they met stringent requirements for hormone suppression set forth by the Idaho High School Athletic Association ("IHSAA") for high school sports and the NCAA for collegiate sports, comparable to the Olympic standards for transgender inclusion. Even though those existing rules caused no issues, Idaho enacted H.B. 500 to become the first and only state to wholly ban transgender women and girls from athletics.

Under intermediate scrutiny, which applies here, it is the State's "demanding" burden under the Equal Protection Clause to provide an "exceedingly persuasive" justification for H.B. 500's differential treatment of both women who are transgender and women generally. *United States v. Virginia*, 518 U.S. 515, 533 (1996) ("*VMI*"); *see Bostock v. Clayton Cty., Ga.*, -- S. Ct. --, 2020 WL 3146686, at *7 ("[I]t is impossible to

discriminate against a person for being . . . transgender without discriminating against that individual based on sex."). The State has failed to show that it is likely to satisfy that standard. H.B. 500's definition of "biological sex" intentionally excludes the one factor that drives the differences between male and female athletic performance—circulating testosterone. In contrast, the preexisting Idaho and NCAA rules focused on that factor. The only reason H.B. 500 now omits that factor is to exclude transgender women and girls from qualifying as female.

In short, there is no state interest allegedly served by H.B. 500 that the preexisting rules did not already address—other than the invalid interest of excluding transgender women and girls. Because Plaintiffs are likely to succeed on the merits of their equal protection challenge, and because H.B. 500 will inflict immediate and irreparable injury on transgender women and girl athletes, as well as women and girl athletes more broadly, a preliminary injunction should issue.

## ARGUMENT

### I.   Plaintiffs Have Standing to Challenge H.B. 500.

The State first claims, incorrectly, that Plaintiffs lack Article III standing to challenge H.B. 500. (Dkt. 41 at 8–10.) For the reasons set forth in Plaintiffs' Opposition to the State's Motion to Dismiss, incorporated here by reference, both Plaintiffs have shown actual injury and assert claims that are ripe. (Dkt. 55 at 6–16.) Lindsay plans to try out for the BSU women's cross-country team in the fall, but under H.B. 500, that team "shall not be open" to her. (*Id.* at 7–10, 14–16.) H.B. 500 also treats Lindsay, Jane, and all other women and girl student athletes differently, and less favorably, than similarly situated men and boys. (*Id.* at 10–11, 14–16.)

In addition to claiming lack of injury or ripeness, the State now also argues that any harms Plaintiffs face are not traceable to H.B. 500 as opposed to other laws or third-party actions. (Dkt. 41 at 9–10.) The State is wrong on both counts.

First, the State contends that Title IX, not H.B. 500, blocks women who are transgender, like Lindsay, from playing on women's sports teams. (Dkt. 41 at 4 n.2 & 9.) No court has ever so held.[1] Far from *requiring* exclusion of transgender women and girls, Title IX *forbids* it. The Supreme Court's reasoning in its recent Title VII decision requires this conclusion. *Bostock*, 2020 WL 3146686 (holding that Title VII prohibits discrimination on the basis of transgender status); *Emeldi v. Univ. of Oregon*, 698 F.3d 715, 724 (9th Cir. 2012) (interpreting Title IX in accordance with Title VII).

Second, the hypothetical scenarios the State conjures to argue that Lindsay may not make the BSU cross-country team regardless of H.B. 500 do not change the fact that H.B. 500 inflicts upon her an imminent redressable injury.[2] The "requisite

---

[1] The recent Connecticut enforcement action by the U.S. Department of Education, Office of Civil Rights ("OCR"), which the State cites as support for its argument (Dkt. 41 at 4–5, 9), explicitly states that "it is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such." (*Id.* at ECF p.68.) In any event, the analysis in the OCR letter conflicts with and has been superseded by the Supreme Court's decision in *Bostock*.

[2] Contrary to the State's claim (Dkt. 41 at 9–10), Lindsay would be eligible to try out and compete for BSU fall sports under NCAA rules. (Dkt. 1 at ¶¶ 29, 31–32 ("Complaint"); Dkt. 22-6 at ¶¶ 14, 17 (Hecox Declaration explaining hormone treatment) ("Hecox Decl."); Dkt. 22-4 at ¶¶ 28–29 (Carroll Declaration explaining NCAA rules).) Lindsay is currently training for tryouts and has a real chance of making the team but for H.B. 500. (Hecox Decl at ¶¶ 23–27.) If precluded from tryouts or participation, Lindsay will irretrievably lose the limited amount of NCAA eligibility time she has. (*Id.* ¶ 38.)

'injury'" for standing purposes is the barrier to "compete," not the ability to obtain the ultimate benefit. *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 665 (1993) (quoting *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 281 n.14 (1978)). H.B. 500 prevents Lindsay from trying out for or competing on women's teams simply because, as a woman who is transgender, she cannot satisfy the statute's intentionally narrow conception of "biological sex." Idaho Code §§ 33-6203(2), (3).[3] This violates her rights and confers standing.

Jane's concrete and particularized injury is also directly traceable to H.B. 500. (Dkt. 41 at 19.) Under H.B. 500, Jane will be treated differently and worse than boys from the very first day of the athletic season, due to the different rules governing participation on girls' teams and the "biological sex" verification process that applies only to those who seek to join girls' teams. Idaho Code § 33-6203.[4] In contrast, H.B. 500 does not restrict who may participate on men's teams. *See id.* Such differential treatment constitutes an injury regardless whether Jane's sex is actually disputed. *Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984) ("discrimination itself . . . can cause serious non-economic injuries") (internal citation omitted).[5]

[3] The State is wrong to suggest that H.B. 500 allows Lindsay to try out for and participate in women's sports until her sex is challenged (Dkt. 41 at 10), given the statute's self-executing directive that women's teams "shall not be open" to her. Idaho Code § 33-6203(3).
[4] Lindsay is known to be transgender and thus categorically prohibited from participation.
[5] Although not necessary for standing, Jane has good reason to fear a challenge to her sex, given that she is high-performing and "people sometimes think of her as masculine." (Dkt. 1 at ¶¶ 46–47; *see* Dkt. 22-7 at ¶ 13 ("Jane Doe Decl."); Dkt. 22-8 at ¶¶ 3, 10–12 ("Jean Doe Decl.").)

The State asserts that if Jane's sex were disputed, then she could simply "refer" her school to her "IHSAA required Health Examination and Consent Form" to resolve the matter. (Dkt. 41 at 7, 19.) Such an approach—without a medical examination based on the statutory criteria for determining "biological sex"—would violate H.B. 500's requirement that "biological sex" be verified by reference to only three criteria, none of which the IHSAA form addresses. Idaho Code §§ 33-6203(2), (3); *see* Dkt. 55 at 5 n.5. Under the State's proposed interpretation, women and girls who are transgender—like Lindsay—could simply submit a doctor's statement accurately indicating that they are female without reference to the three criteria. This would contravene H.B. 500's terms and undermine its entire purpose: to exclude from women's teams those who cannot meet the statutory definition of a female "biological sex." Idaho Code §§ 33-6203(2), (3).

## II.   Plaintiffs Properly Assert Both Facial and As-Applied Challenges.

As in its Motion to Dismiss, the State argues that Plaintiffs have failed to properly assert a facial challenge to H.B. 500, allegedly precluding injunctive relief. This argument misconstrues both the law and Plaintiffs' claims.[6]

As explained in Plaintiffs' Opposition to the Motion to Dismiss, incorporated here by reference, Plaintiffs have properly asserted a facial challenge. (Dkt. 55 at 16–19.) The State claims that a statute may be challenged facially only if all of its applications are unconstitutional (Dkt. 41 at 11–12 (citing *United States v. Salerno*,

---

[6] As explained in Plaintiffs' Opposition to the Motion to Dismiss (Dkt. 55 at 17 n.10), Plaintiffs plead both as-applied and facial claims, but the State incorrectly assumes only a facial claim. The as-applied claim also supports injunctive relief.

481 U.S. 739 (1987))), but that is not the test. As the Supreme Court has explained, "[t]o the extent [it] ha[s] consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of th[e] Court." *City of Chicago v. Morales*, 527 U.S. 41, 51–52, 55 (1999) (plurality).[7] The "proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *City of Los Angeles, Cal. v. Patel*, 576 U.S. 409, 418 (2015).

Existing law and rules already prevented boys from playing on girls' teams in Idaho before H.B. 500's enactment. The law accordingly does nothing with regard to general sex separation in sports. *See* Idaho High School Activities Association's *Non-Discrimination Policy*, https://idhsaa.org/asset/RULE%2011.pdf (last visited Jun. 28, 2020) ("If a sport is offered for both boys and girls, girls must play on the girls team and boys must play on the boys team. . . . If a school sponsors only a single team in a sport . . . Girls are eligible to participate on boys teams. . . . Boys are not eligible to participate on girls teams."). Instead, H.B. 500 targets women and girls who are transgender (who are categorically excluded) and women and girls generally (who are subject to different rules and a testing regime not applicable to boys and men). The State cannot avoid a facial challenge by focusing on a different group—cisgender boys—whom H.B. 500 does not target and for whom the rules have not changed.[8]

---

[7] Plaintiffs inadvertently omitted noting the *Morales* plurality opinion in their Opposition to the Motion to Dismiss. (Dkt. 40-1.)

[8] Proposed intervenors incorrectly claim that intersex individuals are the only individuals potentially harmed by H.B. 500 in "rare and speculative" situations

## III.    Plaintiffs are Likely to Succeed on the Merits of their Equal Protection Claim.

Plaintiffs are likely to succeed on the merits. H.B. 500 is subject to heightened equal protection scrutiny and the State has not—and cannot—meet its "demanding" burden of demonstrating an "exceedingly persuasive" justification for this discrimination. *VMI*, 518 U.S. at 533.[9]

### A.    H.B. 500 Must Be Tested Under Heightened Scrutiny.

The State concedes that H.B. 500 must be tested under heightened scrutiny, but for the wrong reason—that H.B. 500 excludes men from women's sports. (Dkt. 41 at 13 & n.8.) Plaintiffs do not challenge the preexisting sex separation in sport. Rather, Plaintiffs challenge what is new about H.B. 500: (1) its categorical exclusion of women and girls who are transgender (on the basis of their sex and transgender status); and (2) its different rules governing participation in women's sports, which burden women and girls through a sex verification system that applies only to their teams. Both of these claims trigger heightened scrutiny.

With respect to transgender exclusion, the State acknowledges that Circuit precedent (and a prior decision from this Court) "have held heightened scrutiny

---

(Dkt. 46 at 18); H.B. 500 discriminates against (and is targeted at) transgender women and girl athletes, as well as all women and girl athletes. *See supra.*

[9] As Plaintiffs have explained (Dkt. 22-1 at 12), it is the State's burden to prove Plaintiffs' likely lack of success on the claim that H.B. 500 fails heightened scrutiny under Supreme Court precedent establishing that "the burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). That the Ninth Circuit has implemented this reasoning in the First Amendment context (Dkt. 46 at 12 n.7) does not mean that it also does not apply in the equal protection context, where the government equally "bears the burden of proof on the ultimate question of [H.B. 500's] constitutionality." *Id.* (internal quotation marks and citation omitted).

applies if a law or policy treats transgender persons in a less favorable way than it treats all others." (Dkt. 41 at 13 n.8. (citing *Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019)).) Since the time of the State's brief, the Supreme Court has likewise made clear that anti-transgender discrimination is sex discrimination. *See Bostock*, 2020 WL 3146686 ("[I]t is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex"). Therefore, anti-transgender discrimination triggers heightened scrutiny under the Equal Protection analysis because it is sex discrimination.

The State and the United States seek to avoid this clear precedent by arguing that H.B. 500 does not discriminate on the basis of transgender status because it does not expressly use the term "transgender." (Dkt. 41 at 13 n.8; Dkt. 53 at 13.) This argument ignores H.B. 500's intent, terms, and effect and is wrong as a matter of law. As the State's counsel previously conceded, H.B. 500 is "targeted toward transgender and intersex athletes." (A.G. Letter at 6.[10]) That is so because its criteria for determining "biological sex" are designed to exclude women and girls who are transgender and to reverse the prior rules that implemented general sex-separation in sports while permitting transgender women to compete. *See* Idaho Code § 33-6203(3). Incredibly, the United States' description of the statute's "key substantive provisions" (Dkt. 53 at 3–4) omits the statutory criteria for determining "biological

---

[10] *See,* Letter from Att'y Gen. Wadsen to Rep. Rubel (Feb. 25, 2020), https://www.idahostatesman.com/latest-news/article240619742.ece/BINARY/HB%20500%20Idaho%20AG%20response.pdf (last visited Jun. 28, 2020) ("A.G. Letter").

sex," which exists only to exclude transgender people.[11] H.B. 500's legislative findings further reinforce that the law is directed at excluding women and girls who are transgender. Those findings expressly refer to "a man [sic] who identifies as a woman and is taking cross-sex hormones." *Id.* § 33-6202(11). Likewise, in the legislative debate, the bill sponsors repeatedly described the goal of the statute as excluding women and girls who are transgender from women's sports. (Dkt. 22-1 at 13–14; Dkt. 22-3 at Exs. A–C.) The State's insistence on referring to women and girls who are transgender as "biological males"—in addition to being injurious and disrespectful— cannot mask H.B. 500's discriminatory design, operation, and effect. *See Bostock*, 2020 WL 3146686, at *9 ("[I]t's irrelevant what an employer might call its discriminatory practice, how others might label it, or what else might motivate it.").

The United States turns H.B. 500 further on its head by arguing that transgender people seek "special" treatment by challenging H.B. 500. (*E.g.*, Dkt. 53 at 9–10 (claiming that Plaintiffs seek "*a special exemption* for biological males if and only if they are transgender" (emphasis in original)).) This argument ignores that H.B. 500 was designed to, and does, exclude only transgender women and girls. Lindsay seeks what every cisgender student already has—an opportunity to participate as herself in sports with her peers.

---

[11] The United States' argument that *Karnoski* applied heightened scrutiny because the government required only transgender people, and not cisgender people, to serve in their "biological sex" (Dkt. 53 at 13) misses the point for the same reason. All cisgender people already serve in the military in what the United States would describe as their "biological sex," so the policy in *Karnoski* had no reason to refer to them—but the targeting of transgender individuals in the *Karnoski* policy and in H.B. 500 is the same.

Under the United States' flawed reasoning, there would never be actionable transgender discrimination, because it would always be permissible to insist that transgender people act contrary to their gender identity—that is, to demand they try to become, or act as if they were, cisgender. This is not the law. The Supreme Court recognized in *Bostock* that it was sex discrimination to fire someone for disclosing that she was transgender and planned to come to work as her authentic self.[12] Women and girls who are transgender do not have a mere "personal objection" to participating in men's sports as the United States claims. (Dkt. 53 at 12). Being forced to participate in sports on teams that contradict one's gender identity is equivalent to gender identity conversion efforts, which every major medical association has found to be dangerous and unethical. (Expert Declaration of Jack L. Turban, MD, MHS ("Turban Decl.") ¶¶ 24–28.)

H.B. 500 additionally triggers heightened scrutiny by singling out members of girls' and women's teams for sex verification. *See VMI*, 518 U.S. at 555 ("[A]ll gender-based classifications today warrant heightened scrutiny") (internal quotation marks and citation omitted). The State's only retort is the false claim that H.B. 500 does not treat "females differently as Plaintiffs suggest" because it "requires any athlete subject to dispute, whether male or female, to verify his or her sex." (Dkt. 41 at 13 n.8.) To the extent the State is arguing that those who play men's sports would also

---

[12] Arguing that H.B. 500 does not discriminate because transgender women could opt to play men's sports is analogous to rejected arguments, in support of same-sex marriage bans, that lesbians and gay men theoretically could marry someone of a different sex. *See, e.g., Latta v. Otter*, 771 F.3d 456, 467 (9th Cir. 2014).

be subject to sex verification, that is not true. The statute's only exclusion is from women's teams. *See* Idaho Code § 33-6203(2). To the extent the State is arguing that people of any sex who seek to play women's sports would be subject to sex verification, the State misses the point. The legislature deliberately created a different, more onerous set of rules for women's sports when compared to men's sports. Where spaces and activities for women are "different in kind . . . and unequal in tangible and intangible" ways from those for men, they are tested under heightened scrutiny. *VMI*, 518 U.S. at 547. The intentional sex classification triggers this level of review; the sex of the people affected is irrelevant except to the extent it reveals a sex-based motivation. *See e.g.*, *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 273 (1979).[13]

## B.   H.B. 500 Is Not Substantially Related to Any Important Governmental Interest.

Rather than focus on the central question of whether H.B. 500's exclusion of women and girls who are transgender is substantially related to an important government interest, the State (and the United States) seeks to distract by defending the general separation of men's and women's athletics. Plaintiffs do not challenge that separation. Plaintiffs seek only to return to the status quo ante: the separation of teams for men and women, as well as a rule for inclusion of transgender athletes

---

[13] Proposed Intervenors apply an inconsistent standard of review throughout their brief, but ultimately appear to agree with the State that H.B. 500 must satisfy heightened scrutiny. (Dkt. 46 at 9-14.) To the extent their discussion of "physiological differences between men and women" is intended to dispute the application of heightened scrutiny (Dkt. 46 at 10-14), that is contrary to Supreme Court precedent, which applies heightened scrutiny to sex discrimination based on physiological or biological characteristics. *See Tuan Anh Nguyen v. INS*, 533 U.S. 53, 70, 73 (2001).

that required one year of testosterone suppression before women and girls who are transgender could participate on women's teams.

The State has failed to show how a sweeping ban excluding transgender women from women's athletics altogether is substantially—or even rationally—related to the asserted interest in "redressing past discrimination against women in athletics and promoting equality of athletic opportunity between the sexes." (Dkt. 41 at 14 (quoting *Clark by Clark v. Arizona Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982)).) *Clark*—the State's central authority—pertained to sex separation in sport generally and is not determinative here, as the State's counsel has previously recognized: "[t]he issue of a transgender female wishing to participate on a team with other women requires considerations beyond those considered in *Clark* and presents issues that courts have not yet resolved." (A.G. Letter at 4.)

Now, relying almost exclusively on *Clark*, the State advances two faulty arguments, one legal and one factual. The flawed legal argument is that excluding women who are transgender from women's teams is the same as excluding cisgender men from women's teams. (Dkt. 41 at 14–15.) The flawed factual argument is that women who are transgender have average physiological advantages on the same scale as cisgender men.

       1.   <u>Excluding Women Who Are Transgender from Women's Teams is Not the Same as Excluding Cisgender Men.</u>

In *Clark*, the Ninth Circuit held that it was lawful to exclude men from women's volleyball teams because (1) women had historically been deprived of athletic opportunities in favor of men; (2) as a general matter, men had equal athletic

opportunities compared to women; and, (3) according to the stipulated facts, average physiological differences meant that "males would displace females to a substantial extent" if permitted to play on women's volleyball teams. *Clark*, 695 F.2d at 1131. None of these premises hold true for women and girls who are transgender.

First, women who are transgender have historically been discriminated against, not favored. Second, under H.B. 500, women and girls who are transgender will be unable to participate in any school sports,[14] unlike the men in *Clark*, who generally had equal athletic opportunities. Third, transgender women have not and could not "displace" cisgender women in athletics "to a substantial extent."[15] Elite international athletic organizations—including World Athletics and the Olympics— permit women who are transgender to compete in women's events after undergoing

---

[14] (*See*, *e.g.*, Turban Decl. ¶¶ 24–28 (forcing a transgender woman to participate on a men's team would be tantamount to forcing her to be cisgender which is "associated with adverse mental health outcomes.").)

[15] The United States misreads *Clark by and through Clark v. Arizona Interscholastic Ass'n*, 886 F.2d 1191 (9th Cir. 1989) (*Clark II*), in suggesting (Dkt. 53 at 10) that participation by just one cisgender boy on the girls' volleyball team can be barred because it would "set back" the "goal of equal participation by females in interscholastic sports." *Id.* at 1193. That part of the decision responded to the boy's "mystifying" argument that the school association "ha[d] been wholly deficient in its efforts to overcome the effects of past discrimination against women." *Id.* It noted that the court could not see how the boy's "remedy [of allowing him to play on the girls' team] will help." *Id.* But the court remained focused on the risk that a ruling in the boy's favor would extend to other boys as well and so risk substantial displacement of girls in school sports. *See id.* (observing that the issue of "males . . . outnumber[ing] females by two to one" in school sports would "not be solved by opening the girls' volleyball team to Clark *and other boys*") (emphasis added); *id.* ("Clark does not dispute our conclusion in *Clark I* that 'due to physiological differences, males would displace females to a substantial extent if they were allowed to compete for positions on the volleyball team.'"). Notably, *Clark* is premised on a notion of sex separation where the only relevant groups are cisgender boys and cisgender girls, which is not the present context.

hormone therapy, reflecting the scientific consensus that such a rule (which mirrors the prior rule in Idaho) does not risk substantial displacement of women. (Supplemental Declaration of Joshua D. Safer, MD, FACP, FACE ("Safer Supp. Decl.") ¶ 10.) In fact, no woman who is transgender has ever even made a women's Olympic team. (*Id.*) Nor is there any evidence of displacement in Idaho under the prior policy permitting girls who are transgender to participate on girls' teams after hormone suppression. Indeed, the State has pointed to only one example of a transgender athlete ever defeating an Idaho cisgender woman in any competition— and that transgender athlete lives outside Idaho and would not be barred from participation under H.B. 500 even if she had not already graduated. One or a handful of transgender athletes doing well in sports is not the "substantial" "displace[ment]" feared in *Clark*.[16]

> 2.  Women Who are Transgender and Have Suppressed
> Testosterone Do Not Have the Physiological Advantages of
> Cisgender Men.

The State's flawed factual argument is that women who are transgender and who have suppressed testosterone for a period of one year are physiologically the same as cisgender men and will thus displace athletic opportunities for cisgender women. (Dkt. 41 at 15–19.) For this argument, the State relies on a putative expert, Dr. Gregory Brown, who largely focuses on performance differences between

---

[16] Losing to a transgender woman has not deprived Proposed Intervenors of the opportunity to participate in Division I sports on athletic scholarships. (Dkt. 30-1 at 2.) Likewise, the transgender Connecticut runners noted by Proposed Intervenors were regularly defeated by cisgender women. (*See* Motion to Intervene, *Soule v. Connecticut Association of Schools, Inc.*, No. 3:20-cv-00201-RNC (D. Conn. Feb. 21, 2020), at 8.)

cisgender men and cisgender women (not at issue here), rather than transgender women and cisgender women. (Dkt. 41-1 ("Brown Decl.") at ¶¶ 12–112, 114–125; Dkt. 22-2 ("Safer Decl.") ¶¶ 11–15.) The only relevance of Dr. Brown's otherwise inapposite analysis is his repeated acknowledgement that circulating testosterone is the primary reason cisgender men on average outperform cisgender women in sports after puberty. (Brown Dec. ¶¶ 81, 86, 87, 105, 120.) That is why the IHSAA and NCAA used circulating testosterone as a basis for regulation in Idaho before H.B. 500 and why the Olympics and World Athletics rely on it as well. Yet H.B. 500 ignores circulating testosterone altogether. No study concludes that transgender women and girl athletes who have suppressed circulating testosterone for one year, as per the policies in place prior to H.B. 500, have a competitive advantage. (*See* Safer Supp. Decl. ¶ 11.)[17]

Although he confirms the relevance of the criterion used prior to H.B. 500, Dr. Brown offers no scientific evidence linking the *new* H.B. 500 criteria— reproductive anatomy, endogenous as opposed to circulating testosterone levels, or sex chromosomes—to athletic performance. He further fails to rebut the explanation of Plaintiffs' expert, Dr. Joshua Safer, that larger bones may actually be an athletic

---

[17] H.B. 500 even excludes transgender women and girls who began puberty-blocking hormonal treatment early enough to avoid experiencing any effects of elevated levels of circulating testosterone during puberty. Dr. Brown attempts to address this point by citing a few studies that show some differences in performance outcomes between pre-pubertal boys and girls, but as Dr. Safer explains, such studies "do not determine the cause for whatever is observed," which is more likely "explained by, among other things, greater encouragement of athleticism in boys and greater opportunities to play sports." (Safer Supp. Decl. ¶ 12.)

disadvantage for women who are transgender and on hormone suppression, because their muscle-to-bone ratio will be lower than that of cisgender women. (Safer Dec. ¶ 53–54.) Dr. Brown likewise fails to address Dr. Safer's point that any slight variations in the bodies of transgender women that could be relevant to athletic performance must be viewed in the context of the significant differences in size, strength, and natural ability that exist among cisgender women. (*Id.* ¶ 55–56.)

The State and the United States also both misconstrue a study cited in H.B. 500's legislative findings as supporting the notion that transgender women retain a physiological advantage after hormone suppression. The findings claim that "[t]he benefits that natural testosterone provides to male athletes is not diminished through the use of puberty blockers and cross-sex hormones." (Dkt. 53 at 6 n.2 (quoting Idaho Code § 33-6202(11)).) But the study cited in support of this proposition dealt with adults and did not address "puberty blockers" at all. Anna Wiik et al., *Muscle Strength, Size, and Composition Following 12 Months of Gender-affirming Treatment in Transgender Individuals*, J. CLIN. METAB., 105(3):e805-e813 (2020). Overall, it showed that transgender men increased strength and muscle mass with testosterone treatment while transgender women lost some strength and muscle mass with testosterone suppression (although not as much as expected, which could be partly due to the "learning effects" of repeating the test). (*Id.* ¶ 19.) As Dr. Safer explains, "[a]ll the Wiik [18] [Lundberg] study shows is that testosterone makes a

_____

[18] The legislative findings and the citations in the State and United States briefs cite this study as Tommy Lundberg et al., *Muscle strength, size and composition following 12 months of gender-affirming treatment in transgender individuals: retained*

difference with regard to muscle. More testosterone is associated with more strength and more muscle mass." (*Id.*) The study authors themselves explain that because the subjects were not athletes, "'it is still uncertain how the findings would translate to transgender athletes . . . .'" (*Id.*) In contrast, the available research on transgender *athletes* indicates that testosterone suppression for a period of a year *does impair* pre-suppression performance—explaining why the Olympics, World Athletics, the NCAA, and IHSAA (prior to H.B. 500) regulate women's events based on circulating testosterone. (Safer Decl. ¶ 51.)[19]

In any event, one study showing that certain transgender women retained some muscle strength after a year of hormone suppression does not provide an "exceedingly persuasive" justification for H.B. 500's sweeping ban on the participation of all women and girls who are transgender from sport in Idaho. *VMI*, 518 U.S. at 533. Among other things, such a study does not evidence substantial "displacement" of cisgender women athletes. *Clark*, 695 F.2d at 1131. It certainly does not support the notion that a woman who is transgender who has undergone a year of hormone therapy has strength *equivalent* or even close to that of a cisgender man.

---

*advantage for the transwomen*, Karolinksa Institutet (Sept. 26, 2019). The proper reference is Anna Wiik et al., *Muscle Strength, Size, and Composition Following 12 Months of Gender-affirming Treatment in Transgender Individuals*, J. CLIN. METAB., 105(3):e805-e813 (2020). (See Brown Decl. ¶ 20(o).)

[19] The State's attempt to discredit the rigor of the Harper study does not change the results. As Dr. Safer explains "This study, even with its limits, supports the conclusion that suppression of testosterone does diminish performance outcomes for women who are transgender. . . . Research with greater rigor must be done along the lines of the Harper study, but until that time there is no reason to conclude that the opposite of the Harper findings is true." (Safer Supp. Decl. ¶¶ 22–23.)

Ultimately, the lone study cited in the legislative findings is not enough for the State to carry its demanding burden. As the Supreme Court has made clear, the Equal Protection Clause applies to women "outside the average description" as well as those within it. *VMI*, 518 U.S. at 517.

Lacking any scientific study of transgender athletes to support its position, the State turns to an example of a single transgender woman runner, Cece Telfer, who showed slightly improved performance during one sports season after hormone therapy. (Dkt. 41 at 18.) From that example, the State improperly extrapolates that all transgender athletes must have a permanent advantage compared to cisgender women. (*Id.*) This is contrary to the reasoning of the State's own expert, who repeatedly emphasizes that circulating testosterone, not endogenous testosterone, is the most important determinant of sex-based physical advantage in sports. (Brown Dec. ¶¶ 81, 86–87, 105, 120.) The State also does not consider the possibility that Cece's improved performance could have been due to more and better training, or the mental health benefits of transition, which can relieve otherwise debilitating symptoms of gender dysphoria. (Dkt. 22-2 ("Adkins Decl.") ¶¶ 20, 23.) Athletes, including cisgender women, sometimes improve dramatically from one season to the next; if Cece had not suppressed her testosterone levels, it is entirely possible that her times would have improved far more than they actually did.

Plaintiffs do not demand a "perfect fit" (Dkt. 41 at 15) between H.B. 500 and the asserted government interest. Rather, as Plaintiffs have argued, H.B. 500 has no "exceedingly persuasive" justification. *VMI*, 518 U.S. at 533. At the end of the day,

the State cannot carry its heavy burden of showing that H.B. 500's departure from the preexisting regime (requiring hormone treatment for a year for women and girls who are transgender to participate in school sports) to the current categorical bar is substantially related to an important government interest.

## IV.   Plaintiffs Will Suffer Irreparable Harm Without an Injunction, and the Balance of Equities Favors an Injunction.

Unless H.B. 500 is enjoined, it will violate Lindsay and Jane's rights under the Equal Protection Clause. This alone constitutes irreparable injury sufficient to justify a preliminary injunction. *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (internal citations omitted). Likewise, when a party's constitutional rights are violated, the balance of equities and hardships favors injunctive relief. (Dkt. 22-1 at 28 (citing *Ariz. Dream Act Coalition v. Brewer,* 757 F.3d 1053, 1069 (9th Cir. 2014)).) The grave harms the Plaintiffs will suffer far outweigh the imaginary harms the State claims will be inflicted upon it or the public interest generally by enjoining H.B. 500.

In addition to violating her constitutional rights, H.B. 500 will deprive Lindsay of athletic opportunities, cause her emotional distress, and create shame and humiliation as she is singled out for exclusion and discriminatory treatment. (Dkt. 22-1 at 9, 27.) Jane will be treated worse than similarly situated boys and will suffer emotional distress from the prospect of unnecessary and invasive sex "verif[ication]" if someone disputes her sex. (Dkt. 22-1 at 26–27.) None of these prospective and irreparable harms have adequate remedies at law. *See Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Edu.,* 858 F.3d 1034, 1046 (7th

Cir. 2017); *Evancho v. Pine-Richland Sch. Dist.,* 237 F. Supp. 3d 267, 294 (W.D. Pa. 2017). They therefore justify an injunction. (Dkt. 22-1 at 27.)[20]

The State argues that Lindsay does not face irreparable harm because she could "tr[y] out for the BSU's men's cross-country or track teams." (Dkt. 41 at 20.) But that is not a viable option for Lindsay, who is not a man. Being forced to participate on a team contrary to one's gender identity is essentially a gender identity conversion effort—a practice deemed dangerous and unethical by every major medical association. (Turban Decl. ¶¶ 24–28.) Nor does the law require her to exercise such an option—just as it does not require gay men and women to marry a member of the opposite sex. Lindsay reports that transition has "drastically improved [her] body image," given her a sense of "peace," and allayed her gender dysphoria. (Hecox Decl. ¶¶ 15, 17.) Being treated as if she were a man would mean losing all that: "I would not compete on a men's team. I am not a man, and it would be embarrassing and painful to be forced onto a team for men—like constantly wearing a big sign that says 'this person is not a "real" woman.'" (Hecox Decl. ¶37.)[21] Data show that medical

---

[20] The State oddly and incorrectly claims that "Plaintiffs focus solely on themselves" rather than the "interest of all female athletes" benefitting from H.B. 500. (Dkt. 41 at 19.) Plaintiffs, both female athletes, explain how H.B. 500 adversely impacts all women and girl athletes who are transgender (by excluding them) and all women and girl athletes generally (by subjecting them to different rules and a framework imposing "biological sex" testing on women and girls but not men and boys).

[21] Courts recognize the serious harms that occur from systematically misgendering transgender people. *Adams by and through Kasper v. Sch. Bd. of St. Johns Cty., Fla.*, 318 F. Supp. 3d 1293, 1312 (M.D. Fla. 2018) (finding that policy caused transgender boy anxiety and depression when he walked "past the boys' restroom on his way to a gender-neutral bathroom, knowing every other boy is permitted to use it but him"); *Evancho v. Pine-Richland Sch. Dist.,* 237 F. Supp. 3d 267, 294 (W.D. Pa. 2017) (granting preliminary injunction based in part on irreparable injury to transgender

treatment for gender dysphoria, including social transition, is the sole means to avoid the serious harms it causes if untreated. (Adkins Decl. ¶ 22.) The State's suggestion that Lindsay be treated as a man, or that the harm of being excluded from the women's team is somehow "self-inflicted" injury, contravenes both contemporary medical science and case law. *Whitaker,* 858 F.3d at 1045–46 (determining that the psychologist's account of transgender student's "psychological distress" justified injunctive relief, and that student's distress was not "self-inflicted"); *cf. Grimm v. Gloucester Cty. Sch. Bd.*, 400 F. Supp. 3d 444, 459 (E.D. Va. 2019) ("The Board's assertion that Mr. Grimm has suffered no harm as a result of its policy is strikingly unconvincing. Mr. Grimm broke down sobbing at school because there was no restroom he could access comfortably.").

Proposed Intervenors devote extensive briefing and testimony to unfounded and offensive arguments that Lindsay will not be harmed by H.B. 500 because she has not alleged a personal risk of suicide, and that transgender individuals are harmed by transitioning despite that it is the widely accepted standard of care for treating gender dysphoria. Proposed Intervenors have no legal support for their position that a plaintiff must allege she "will commit suicide" to experience irreparable injury, (Dkt. 46 at 6 (twisting Plaintiffs' citation of general suicide rates in the transgender community)), which is not the standard for irreparable harm. Proposed Intervenors' putative expert also falsely claims that there are "no studies

---

students of not being permitted to use restrooms consistent with their gender identities, in part because this marginalization was "causing them genuine distress, anxiety, discomfort and humiliation").

whatsoever that demonstrate that 'social transition'—including participation in girls' or women's athletics—decreases suicide or suicide attempts in children, adolescents, or young adults who suffer from gender dysphoria." (Dkt. 46 at 7.) In fact, multiple peer-reviewed studies confirm that social transition is *necessary* treatment for gender dysphoria. (Turban Decl. ¶ 11.) Dr. Levine's assertions about social transition are simply incorrect, and, among other things, misleadingly rely on a body of literature about pre-pubertal children. (*Id.* ¶ 9, 10.) Every major medical association supports affirming treatment for transgender individuals and all existing data show positive outcomes when transgender people of all ages are supported in their gender identity. (Turban Decl. ¶¶ 11, 20–23, 25; Adkins Supp. Decl. ¶¶ 11–12, 14.)

The State's further claim that "it is undisputed" that Jane "qualifies to play girls' sports" is irrelevant. Her injury arises from being treated differently than similarly situated boys, which includes the prospect of having to undergo invasive examination were her sex to be disputed. (Dkt. 41 at 20.) Also, much of the value she derives from sport is the opportunity to work hard toward a common goal with her teammates in an inclusive and welcoming environment. (Dkt. 1 ¶ 44; Dkt 22-5 ("Fry Decl.") ¶¶ 30, 32, 45, 49–50.) Excluding women and girls just because they are transgender or intersex would diminish those benefits for both Jane and the girls who are wholly barred from competing. (Dkt. 22-1 at 21; Fry Decl. ¶¶ 49, 50.)

In contrast to the grave harms that Plaintiffs face without injunctive relief, the State will suffer no harm. An injunction would simply preserve the status quo ante. The preexisting policies from the NCAA and IHSAA for the inclusion of transgender

athletes would apply. (Dkt. 22-1 at 28.) To the contrary, if the law remains in effect, the State's economy will suffer severe, negative economic consequences.[22]

That some cisgender women strongly dislike the idea of possibly competing against Lindsay, (Dkt. 46 at 4–5), is not a legally cognizable harm, as this Circuit does not recognize the desire to exclude transgender people from single-sex environments as a legally protected interest. *Parents for Privacy v. Barr,* 949 F.3d 1210, 1228 (9th Cir. 2020). But even if competing with women who are transgender were legally relevant (Dkt. 46 at 4), it would have to be put in context and weighed against the Plaintiffs' harms. Proposed Intervenors could continue to run on their teams, while Lindsay would be shut out of sports altogether, simply because she is transgender. *Cf. Doe by and through Doe v. Boyertown*, 897 F.3d 518, 530 (3d Cir. 2018) ("Nothing in the record suggests that cisgender students who voluntarily elect to use single-user facilities to avoid transgender students face the same extraordinary consequences as transgender students would if they were forced to use them"). And "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citation omitted).

## CONCLUSION

For the foregoing reasons, and the reasons set forth in Plaintiffs' opening submission, the Court should grant Plaintiffs' Motion for Preliminary Injunction.

---

[22] Kristin Muchow et al., *Idaho's anti-transgender bills will have a deep economic impact on tourism and business* (June 29, 2020, 4:00 AM), https://www.idahostatesman.com/opinion/readers-opinion/article243819502.html?fbclid=IwAR2jFuByjLAziZM7bu1JqNq_guJhuUdtx0OxbtNeu_El60QRcJt1gp-XlBI.

Dated: June 29, 2020                          /s/ Richard Eppink

Richard Eppink                                Kathleen Hartnett
AMERICAN CIVIL LIBERTIES                      Elizabeth Prelogar
UNION OF IDAHO FOUNDATION                     Andrew Barr
                                              COOLEY LLP

Gabriel Arkles
James Esseks                                  Catherine West
Chase Strangio                                LEGAL VOICE
AMERICAN CIVIL LIBERTIES                      *Attorneys for Plaintiffs*
UNION FOUNDATION


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 29th day of June, 2020, I filed the foregoing electronically through the CM/ECF system as more fully reflected on the Notice of Electronic Filing:

Bruce D. Skaug (bruce@skauglaw.com)          Steven L. Olsen
Raul Labrador (raul@skauglaw.com)            (steven.olsen@ag.idaho.gov)
Roger G. Brooks (rbrooks@ADFlegal.org)       W. Scott Zanzig
Jeffrey Shafer (jshafer@ADFlegal.org)        (scott.zanzig@ag.idaho.gov)
Kristin Waggoner (kwaggoner@ADFlegal.org)    Dayton P. Reed
Parker Douglas (pdouglas@ADFlegal.org)       (dayton.reed@ag.idaho.gov)
Christiana Holcomb (cholcomb@ADFlegal.org)   *Attorneys for Bradley Little,*
*Attorneys for Proposed Intervenors*         *Sherri Ybarra, Individual members*
                                             *of the State Board of Education,*
                                             *BSU, Marlene Tromp, Individual*
Matt Wilde (mattwilde@boisetate.edu)         *members of the Idaho Code*
*Attorney for BSU and Marlene Tromp*          *Commission*

Eric S. Dreiband (eric.dreiband@usdoj.gov)
Bart M. Davis (bart.davis@usdoj.gov)
Peter L. Wucetich (peter.wucetich@usdoj.gov)
Matthew J. Donnelly
(matthew.donnelly@usdoj.gov)
*Attorneys for United States of America*

By: /s/ Richard Eppink