LAWRENCE G. WASDEN
ATTORNEY GENERAL

STEVEN L. OLSEN, ISB #3586
W. SCOTT ZANZIG, ISB #9361
DAYTON P. REED, ISB #10775
CORY M. CARONE, ISB #11422
Deputy Attorneys General
954 W Jefferson, 2nd Floor
P. O. Box 83720
Boise, ID 83720-0010
Telephone: (208) 334-2400
Facsimile: (208) 854-8073
steven.olsen@ag.idaho.gov
scott.zanzig@ag.idaho.gov
dayton.reed@ag.idaho.gov
cory.carone@ag.idaho.gov
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LINDSAY HECOX, and JANE DOE with her next friends JEAN DOE and JOHN DOE, | Case No. 1:20-cv-00184-DCN |
| Plaintiffs, | Hon. David C. Nye |
| v. | **DEFENDANTS' OPENING BRIEF IN RESPONSE TO NINTH CIRCUIT ORDER DATED JUNE 24, 2021** |
| BRADLEY LITTLE, in his official capacity as Governor of the State of Idaho, et al. | |
| Defendants, | |
| and | |
| MADISON KENYON, et al., | |
| Intervenors. | |

For over a year, the Court enjoined a law that did not apply to Lindsay Hecox because she withdrew from Boise State University in October 2020. That fact, which Hecox disclosed in a footnote on appeal, caught the Ninth Circuit's attention, prompting supplemental appellate briefing and now this remand to determine whether Hecox's claim is moot.[1] Article III's case-or-controversy requirement ensures that federal courts do not unnecessarily enjoin state laws when plaintiffs have no concrete need for relief. In addition to helping avoid abstract advisory opinions, the case-or-controversy requirement promotes core principles of federalism and democratic government by respecting laws duly enacted by state legislatures. Those principles have been undermined for the past year. Hecox's promised re-enrollment on the day of this briefing deadline[2]—over a year after her withdrawal—fails to provide sufficient assurances that those principles will not be violated again.

The next tryout for the track and cross country teams is in the Fall 2022 semester. Hecox's alleged injuries rely on contingent future events and require substantial guesswork about whether Hecox (1) will enroll again in the Fall 2022 semester, (2) can afford to stay enrolled through Fall 2022, (3) can cope with the stress of school long enough to stay enrolled through Fall 2022, (4) will run fast enough to make the track and cross country teams, and (5) will do well enough academically to satisfy the NCAA's eligibility requirements. That chain of speculation is too much

---

[1] The panel also questioned Kayden Hulquist's (formerly Jane Doe) standing, which Plaintiffs responded to by conceding that her claim is now moot. Appeal Dkt. 135-1, p. 2. The Court should thus dismiss Hulquist's claims and vacate any portions of the preliminary injunction that grant relief only to Hulquist or analyze only Hulquist's claims. *See United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950) ("The established practice of the Court in dealing with a civil case from a court in the federal system which has become moot while on its way here or pending our decision on the merits is to reverse or vacate the judgment below and remand with a direction to dismiss.").

[2] Plaintiffs suggested in their motion for extension that Hecox will re-enroll on November 12, 2021. Dkt. 93, p. 2. Given the overlap with the filing deadline for this brief, Defendants for now will assume that Hecox re-enrolled as planned.

DEFENDANTS' OPENING BRIEF IN RESPONSE TO
NINTH CIRCUIT ORDER DATED JUNE 24, 2021 - 2

to satisfy the case-or-controversy requirement, so the Court should dismiss without prejudice Hecox's claim. Then, the Court need not guess about what Hecox will do over the next year but can instead wait to see whether Hecox will act as promised such that judicial review of Idaho's duly passed law is proper.

I.    **For over a year, the preliminary injunction was unconstitutional and violated principles of federalism and representative government.**

When this lawsuit began in April 2020, Hecox was enrolled at Boise State University and planned "to try out for the Boise State cross country team in August 2020." Dkt. 1, p. 6, ¶ 6. With the tryouts around the corner, the Court found in August 2020 that Hecox had a concrete interest in enjoining House Bill 500 and granted a preliminary injunction.

The facts then changed dramatically. Two months after the Court issued the preliminary injunction (the tryouts were delayed), Hecox failed to make the women's track and cross country teams. Appeal Dkt. 136-3, pp. 2–3, ¶¶ 3–4. Within a week, Hecox withdrew completely from Boise State. Appeal Dkt. 136-2, pp. 2, ¶¶ 3–4. From then on House Bill 500 did not affect Hecox because it applies only to students. Idaho Code § 33-6203(2). For over a year, the preliminary injunction impinged Idaho's sovereignty while providing no relief to Hecox. That violates Article III's case-or-controversy requirement. *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (A case is moot "when it is impossible for a court to grant any effectual relief whatever to the prevailing party."(quotation omitted)).

A violation of the case-or-controversy requirement offends principles of federalism and representative government. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)). "Federal

nullification of a state statute is a grave matter." *Maine v. Taylor*, 477 U.S. 131, 135 (1986). It implicates democratic concerns about overriding the will of the people and federalism concerns about overriding the sovereignty of a state. At the same time, federal courts of course play a fundamental role in protecting individual rights. A balance must be struck, and Article III's case-or-controversy requirement helps strike that balance by allowing individuals to obtain judicial relief but only when they face real and imminent injuries. The requirement "is a means of defining the role assigned to the judiciary in a tripartite allocation of power," and "a part of the basic charter providing for the interaction between the federal government and the governments of the several States." *Spencer v. Kemna*, 523 U.S. 1, 11–12 (1998) (cleaned up). That charter was not honored while Idaho was enjoined from enforcing its duly passed laws despite Hecox not needing any relief.

## II.    To ensure an injunction will not again unduly impinge Idaho's sovereignty, the Court should consider whether Hecox has an actual or imminent need for relief.

Courts have interpreted the case-or-controversy requirement to include doctrines such as standing and mootness. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (citations omitted). Standing requires plaintiffs to establish, among other things, that they will suffer an injury in fact that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quotations and citations omitted). Standing is typically evaluated based on the facts as they existed when the complaint was filed. *See id.* at 569 n.4.

The democratic and federalism interests underlying the case-or-controversy requirement in claims against a state do not fade after a complaint is filed, so a live case or controversy must persist "throughout the litigation." *Spencer*, 523 U.S. at 7; *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160 (2016), as revised (Feb. 9, 2016) ("We have interpreted this requirement to demand

that an actual controversy be extant at all stages of review, not merely at the time the complaint is filed." (cleaned up)). Typically once a plaintiff establishes standing, the baton is passed to the mootness doctrine to ensure the case-or-controversy requirement continues to be met. "The Supreme Court has repeatedly described mootness as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Nevada v. United States*, 783 F. App'x 700, 703 (9th Cir. 2019) (cleaned up). Based on that characterization, courts have understood that "the interest required of a litigant to attain standing is essentially the same as the interest required to maintain a claim under the mootness doctrine." *Nelsen v. King Cnty.*, 895 F.2d 1248, 1250 (9th Cir. 1990) (citation omitted). So to avoid mootness, like to establish standing, a plaintiff's need for relief must have "sufficient immediacy and reality." *Pub. Utilities Comm'n of State of Cal. v. F.E.R.C.*, 100 F.3d 1451, 1458 (9th Cir. 1996) (quotation omitted); *Valdivia v. Brown*, 956 F. Supp. 2d 1125, 1134–35 (E.D. Cal. 2013) ("The mere possibility that a party may suffer future harm is insufficient to preserve a case or controversy; the threat of injury must be 'real and immediate,' not 'conjectural' or 'hypothetical.'" (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983); *City News & Novelty Inc. v. City of Waukesha*, 531 U.S. 278, 283 (2001)).

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc*. and its progeny cast some doubt about the longstanding practice of treating mootness the same as standing. 528 U.S. 167 (2000). There, the Supreme Court considered when a defendant's voluntary cessation of a challenged practice deprives a federal court of jurisdiction. *Id.* at 189. It held that the standard "for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (quotation omitted).

Recognizing that this standard conflicted with the standing standard, the Court noted that "there are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness." *Id.* at 190. The Court also flipped the burden that plaintiffs typically have to establish jurisdiction, stating that the "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Id.* at 189 (cleaned up).

Although *Laidlaw*'s standard suggests an easier path for plaintiffs to avoid mootness, it articulated the standard for a specific purpose: to "determin[e] whether a case has been mooted by the defendant's voluntary conduct." *Id.* Recognizing that unique purpose, the Ninth Circuit and multiple judges in this district have characterized voluntary cessation, including its stringent standard, not as mootness but as an *exception* to mootness. *Native Vill. of Nuiqsut v. Bureau of Land Mgmt.*, 9 F.4th 1201, 1215 (9th Cir. 2021) ("Thus, the voluntary cessation exception to mootness would apply if . . ."); *Rosemere Neighborhood Ass'n v. EPA*, 581 F.3d 1169, 1173 (9th Cir. 2009) ("Courts have long recognized, however, a 'voluntary cessation' exception to mootness."); *Mickelsen Farms, LLC v. Animal & Plant Health Inspection Servs.*, No. 1:15-cv-143-EJL-CWD, 2018 WL 1413183, *10 (D. Idaho Mar. 20, 2018) ("The voluntary cessation exception applies . . ."); *Taylor v. Brasuell*, No. 1:14-cv-273-REB, 2015 WL 4139470, *6 (D. Idaho July 9, 2015) ("Separately, even when assuming this case to be otherwise moot, courts have long recognized a "voluntary cessation" exception to mootness."); *Watters v. Otter*, 986 F. Supp. 2d 1162, 1186 (D. Idaho 2013) ("The mootness doctrine, however, contains a "voluntary cessation" exception to mootness.").

The Court should not apply *Laidlaw*'s standard here because this is not a voluntary cessation case. That distinction is more than a formalism. When a defendant voluntarily ceases challenged conduct seemingly to avoid a federal court's jurisdiction, a court needs to "protect[] plaintiffs from defendants who seek to evade sanction by predictable protestations of repentance and reform." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 67 (1987) (quotation omitted); *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) ("We have recognized, however, that a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued . . . . Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." (citation omitted)); *McCormack v. Hiedeman*, 900 F. Supp. 2d 1128, 1138 (D. Idaho 2013) ("[A] party cannot conjure up mootness by ceasing the challenged conduct only for practical or strategic reasons—such as avoiding litigation."). A similar need to protect the parties was present in *City of Erie v. Pap's A.M.*—a case that Plaintiffs relied on heavily before the Ninth Circuit—as there the concern was that the plaintiff had mooted its case to preserve the favorable decision it received before the Supreme Court granted certiorari. 529 U.S. 277, 288–89 (2000). That protection interest does not apply here because Defendants have done nothing to try to evade judicial review.  Instead, Hecox's actions—withdrawing from school within a week of failing at tryouts—have raised the specter of mootness.

Further, when the challenged conduct is a private action or policy, instead of a state law, a court need not balance an interest in protecting a plaintiff from an evasive defendant against the democratic and federalism interests implicated when enjoining a state law. Here a state law is at issue, so the Court does need to consider the implicated democratic and federalism interests. That

balance cuts against applying *Laidlaw*'s stringent standard, especially when Defendants have not tried to evade review.

Finally, in voluntary cessation cases, it makes sense to require the party seeking mootness to carry the burden of proof because that party is in the best position to prove whether it will refrain from resuming the challenged conduct in the future. *See Idaho Aids Found., Inc. v. Idaho Hous. & Fin. Ass'n,* No. CV-04-155-S-BLW, 2006 WL 1897226, *2 (D. Idaho July 11, 2006) ("The defendant has the burden of proving that *their actions* mooted the case." (emphasis added)). But here, Hecox's own voluntary actions mooted her case and her future actions are relevant to determining whether she can revive it. Hecox of course is in the best position to prove what she will do. She should thus bear the burden of proving the facts needed to maintain her action, just as a plaintiff seeking to establish standing based on a future injury would bear the evidentiary burden. *See Gemtel Corp. v. Cmty. Redevelopment Agency of City of Los Angeles*, 23 F.3d 1542, 1545 (9th Cir. 1994) ("[Plaintiff] had the burden of demonstrating jurisdiction, in the face of the apparent mootness of the claim, and put forward no evidence of any reasonable likelihood that the hotel would be built.").

In sum, the balance of interests is different here compared to the balance in voluntary cessation cases. Unlike in *Laidlaw*, the Court need not protect Hecox from any Defendant's evasion because her actions alone have jeopardized her case. And, again unlike in *Laidlaw*, the Court should consider the democratic and federalism interests implicated when a federal court enjoins a duly enacted state law in favor of a plaintiff who lacks a pressing need for relief. Whether Hecox will need an injunction in Fall 2022 turns on guesses about what she, not Defendants, will do between now and then. She is in the best position to provide the facts needed to persuade the Court that those guesses will become reality, so she should carry the evidentiary burden. *See*

*United States v. King*, 891 F.3d 868, 870–71 (9th Cir. 2018) (to avoid mootness, plaintiff had the burden of proving he may have to register as a sex offender). What's more, Defendants did not move for relief. The Ninth Circuit raised the issue sua sponte, so the procedural posture here is more like a show cause order where Hecox would bear the burden of showing why her case should continue than a motion where a movant would need to prove they are entitled to the relief sought.

In fact, last term, the Supreme Court implied that the case-or-controversy requirement applies differently than *Laidlaw* suggests in cases involving judicial oversight of representative government. In *Trump v. New York*, the Supreme Court considered a challenge to a memorandum from the President, an elected representative, directing exclusion of unlawful immigrants from the base used to calculate congressional apportionment. 141 S. Ct. 530 (2020). The lower court held that the plaintiffs "had standing to proceed in federal court because the memorandum was chilling aliens and their families from responding to the census." *Id.* at 534. But during litigation, that "chilling effect from the memorandum dissipated upon the conclusion of the census response period." *Id.* The Supreme Court then dismissed the case for lack of standing and ripeness. *Id.* at 536 ("At the end of the day, the standing and ripeness inquiries both lead to the conclusion that judicial resolution of this dispute is premature.").

In *Carney v. Adams*, the Supreme Court considered a challenge to a Delaware constitutional provision prohibiting third-party candidates from serving on the state's major courts. 141 S. Ct. 493 (2020). There, the Court noted that the plaintiff "bears the burden of establishing standing as of the time he brought this lawsuit *and maintaining it thereafter*." *Id.* at 499 (emphasis added) (citations omitted).

*Trump* and *Carney* "impl[y] that in certain cases a plaintiff may have to maintain standing"—which includes the actual or imminent injury requirement—"throughout the lawsuit,"

even though that implication contradicts "past precedent that confined the standing inquiry to the moment when the lawsuit was filed." *Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 557 (6th Cir. 2021). Whether that implication means in cases involving democratic and federalism concerns courts should extend the timeline for evaluating standing despite contrary precedent or instead cabin *Laidlaw* to voluntary cessation cases and treat mootness like standing set in a time frame, the effect is the same: for this case to continue, Hecox's injury needs to have sufficient immediacy and reality to warrant judicial intervention.

In sum, the Court should not apply the voluntary cessation standard set out in *Laidlaw*. Instead, the Court should treat mootness like standing set in a time frame and require Hecox to prove that she has a real and imminent need for an injunction.

## III. Hecox's stated interest in playing soccer does not warrant continued enforcement of the current preliminary injunction.

Hecox's claims and the Court's preliminary injunction have always been about protecting Hecox's interests in track and cross country. The complaint alleges that "she plans to try out for the Boise State cross country team." Dkt. 1, p. 6, ⁋ 6. That plan was based on Hecox's demonstrated interest in the sport, as she "loves to run" and "ran track and cross-country on co-ed teams in high school." *Id.* at p. 12, ⁋⁋ 24–25. In fact, Hecox "chose to go to Boise State University because she fell in love with the running trails and natural beauty" around campus and "[s]he also knew Boise State had strong track and cross country teams." *Id.* at pp. 12–13, ⁋ 26. Hecox hoped to have "opportunities to make friends with other women running on the team," and she feared missing "the motivation, challenge, camaraderie, and joy that sport has brought her in the past." *Id.* at p. 15, ⁋ 38.

Now a year later and facing scrutiny about her ability to bring a suit based on her interest in track and cross country, Hecox says that "she plans to try to join the women's club soccer team."

Dkt. 92, p. 10, ¶ 25. Hecox never mentioned this interest to the Ninth Circuit. And her complaint, which governs her claims, does not allege an interest in soccer or that House Bill 500 prevents Hecox from joining Boise State's women's club soccer team. It is thus unclear whether she needs an injunction to join the team. Even if she does, Hecox has merely "browsed the women's club soccer team's webpage" and played soccer "almost weekly" in an indoor soccer league for about six months. Dkt. 92, p. 10, ¶ 25. That minimal interest is not real and imminent enough to satisfy the case-or-controversy requirement.

Further, if Hecox's claims shift to advance her emergent interest in soccer then that raises questions about the propriety of the preliminary injunction. The Court dismissed Plaintiffs' facial Fourteenth Amendment claim, so the current preliminary injunction rests on an as-applied analysis of Hecox's interest in trying out for the women's track and cross country team. Dkt 63, p. 54. Soccer is a different sport that implicates different interests. For example, soccer is much more likely to lead to physical contact between players than track or cross country. As a result, a cisgender woman may face greater risk of injury if she is hit by a transgender woman that is bigger and stronger because she went through male puberty. That fact affects Idaho's interests underlying House Bill 500, and thus could affect Hecox's likelihood of success on the merits. Further, the Court's assessment of Hecox's irreparable harm was based, in part, on the potential of losing a year of NCAA eligibility. *Id.* at 84. That concern does not apply to the club soccer team.

The Court should not find that Hecox has a live case or controversy based on her interest in soccer.

/ / /

/ / /

/ / /

**IV.  Hecox's interest in trying out for the track and cross country teams in Fall 2022 fails to satisfy the case-or-controversy requirement because it is not real or imminent but based on contingencies and speculation.**

The next tryout for the track and cross country teams is in the Fall 2022 semester. Dkt. 92, p. 7, ¶ 13. For Hecox to need an injunction come Fall 2022, she will need to overcome the financial and emotional pressures of college (which she has already struggled with once) to complete the Spring 2022 semester and then overcome those same pressures again to re-enroll and stay enrolled in the Fall 2022. Hecox then needs to run fast enough to make the team, which is unlikely based on the current record. Hecox has already failed to make the team once, and there is no evidence in the record that Hecox has improved her times. She advised the Ninth Circuit that she was preparing for a half marathon, but she has not provided any updates on whether she completed that training or if her times were competitive for Boise State. Appeal Dkt. 135-2, p. 4, ¶ 17. In the unlikely event that Hecox makes the team, Boise State would then assess whether she satisfies the NCAA eligibility requirements. Dkt. 92, p. 7, ¶ 13. Her ability to satisfy those requirements turns on her performance in the Spring 2022 semester or her ability to qualify for an exception or waiver. At bottom, Hecox's claim rests on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotation omitted). That is not enough to satisfy the case-or-controversy requirement. *Id.* Instead, "this case is riddled with contingencies and speculation that impede judicial review." *Trump*, 141 S. Ct. at 535.

Hecox may plan to do everything needed to try out in Fall 2022, but as her actions have revealed, plans can change. Hecox already unexpectedly withdrew from Boise State once, within a week of failing to make the track and cross country teams. Appeal Dkt. 136-3, pp. 2–3, ¶¶ 3–4; Appeal Dkt. 136-2, p. 2, ¶¶ 3–4. Just as Hecox changed her plans about staying at Boise State, it seems that her plans to return to Boise State either changed or were confused. During briefing in December 2020, Hecox's counsel represented that Hecox would "return to BSU next school year."

Appeal Dkt. 65, p. 26, n.4. To most, that would convey a return in the fall when the school year begins. Hecox's counsel apparently thought so, as he represented at oral argument in May 2021 that Hecox "is intending to return to school in the fall." Ninth Circuit Oral Argument Recording, 27:49–28:06 (available at https://www.ca9.uscourts.gov/media/video/?20210503/20-35813/). But either because of confusion or a change of plans, Hecox later stated that she did not intend to return for the Fall 2021 semester when the school year started but that she intended to return for the upcoming Spring 2022 semester. Appeal Dkt. 135-2, p. 4, ¶ 16. Hecox has also changed her plans for trying out for the track and cross country teams. In December 2020, Hecox said she would *maybe* try out for the team one more time. Dawn Ennis, *Outsports Transgender Athlete Advocate of the Year: Lindsay Hecox*, OUTSPORTS (Dec. 29, 2020) ("'I plan to try out maybe once more,' she wrote, 'because if I fail to make it on twice, then it's probably not meant to be.'").[3] More recently, Hecox has dropped the "maybe" for junior year and said she will try out senior year as well. Dkt. 92, p. 10, ¶ 25.

Even if Hecox's plans do not change again, she needs not only to *want* to attend Boise State she needs to *afford* to attend Boise State. Hecox reportedly withdrew from Boise State "to work full time, establish her Idaho residency, and save money for school." Appeal Dkt. 65, p. 26, n.4. The insinuation was that Hecox was struggling to afford out-of-state tuition at Boise State and would be more stable financially with in-state tuition and more savings.

Determining whether Hecox has sufficient financial stability and will maintain that stability in future semesters requires speculation and guesswork. What's known is that Hecox withdrew from Boise State after the deadline to receive a tuition refund and that she had to partially repay a

---

[3] The article is available at https://www.outsports.com/2020/12/29/22199463/outsports-transgender-athlete-advocate-lindsay-hecox-idaho-mitch-harrison-trans-titan-games-ncaaw.

federal grant, so she will start her return to Boise State worse off financially. Dkt. 92, pp. 6–7, ¶ 12. Hecox will bear any debt incurred during the Fall 2020 semester *and* needs to pay to take those credits again upon returning to Boise State.

What's unknown is whether any reductions to her future tuition will offset those sunk costs. To qualify for in-state tuition as an independent student, Lindsay needs to receive less than 50% of financial support from a parent or guardian and continuously reside and maintain a bona fide domicile in Idaho for the previous 12 months. Dkt. 92, p. 4, ¶ 4. Hecox now says that she receives less than 50% of her financial support from her parents, but in May she said that tuition at Boise State was "a significant amount of money for me *and my family* to pay." *Id.*; Appeal Dkt. 135-2, p. 3, ¶ 4 (emphasis added). Regardless, whether Hecox ultimately establishes residency will depend on her continued domicile in Idaho through the end of the year. Dkt. 92, p. 4, ¶ 4. Even with in-state tuition, Hecox's financial situation may not improve much. In the Fall 2020 semester, Hecox's tuition was "slightly reduced" by $6,445 per semester after receiving the Western Undergraduate Exchange Scholarship. Appeal Dkt. 135-2, p. 3, ¶ 4; Dkt. 92, p. 3, ¶ 2. As an in-state student in the Spring 2022 semester, Hecox's base tuition rate will decrease but she will no longer receive the Western Undergraduate Exchange Scholarship. Dkt. 92, pp. 3–5, ¶¶ 3–4. Her in-state tuition is estimated to be about $4,030 per semester: a net reduction of about $2,137 (using her out-of-state rate minus the Western Undergraduate Exchange Scholarship) but still more than the $2,994 she was personally responsible for in Fall 2020. *Id.* at pp. 3–4, ¶¶ 2–3. Hecox plans to apply for other scholarships and federal grants and she plans to receive money from family, but whether, and to what extent, those resources will be available during the duration of Hecox's time at Boise State is merely a matter of speculation. *Id.* at pp. 5–6, ¶ 6.

Even if Hecox can afford to attend Boise State, she needs to handle the stress of attending Boise State. Hecox reported that in the Fall 2020 semester "I was really struggling with schoolwork" as she was not "motivated to excel by my athletic teams and virtual learning was difficult for me." Appeal Dkt. 135-2, p. 3, ¶ 10. Hecox further reported that "I also felt I needed a break from school" and "I knew I would do better academically without the additional stress of working." *Id.* at p. 4, ¶ 12. Hecox may again need to face the stress of virtual learning, working while in school, or not having a team sport for motivation. Or Hecox could again feel that she needs a break from school. Whether in the next year those stressors will re-emerge and how Hecox will respond require more speculation, but Hecox's past decisions—which are established facts—reveal that there is a real possibility she will withdraw again before benefitting from an injunction.

Even if Hecox enrolls for the Fall 2022 semester, has enough financial stability to remain at Boise State, and avoids or copes with the stressors that led to her previous withdrawal, she needs to meet the NCAA's eligibility requirements to compete. Her eligibility, like much else about her claim, depends on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas*, 523 U.S. at 300. The NCAA has hundreds of pages of Bylaws, but most relevant to Hecox's decision to withdraw from Boise State are the "progress-toward-degree requirements."[4] In the Fall 2022 semester, Hecox will be a third-year student for purposes of NCAA eligibility (assuming she attends classes in the Spring 2022 semester). Dkt. 92, p. 7, ¶ 14. NCAA Bylaw 14.4.3.2 requires a student-athlete to complete 40% of the student-athlete's degree requirements by the start of the third year. *Id.* Hecox is six credits short of meeting that requirement. *Id.* Whether Hecox will complete those credits turns on her future actions.

---

[4] The full manual can be found at https://web3.ncaa.org/lsdbi/reports/getReport/90008.

NCAA Bylaw 14.01.2.1 requires a student to be in good academic standing. *Id.* at p. 8, ¶ 15. Hecox is currently in good academic standing, but in Fall 2020 she "was really struggling with my schoolwork." *Id.*; Appeal Dkt. 135-2, p. 3, ¶ 10. She even reportedly "need[ed] a break from school since I didn't do too well this past semester[.]" Dawn Ennis, *Outsports Transgender Athlete Advocate of the Year: Lindsay Hecox*, OUTSPORTS (Dec. 29, 2020).[5] Hecox withdrew before her presumably poor grades would affect her GPA, but given these past struggles another difficult semester or two could cause her to lose her good academic standing. Dkt. 92, pp. 6–7, ¶ 12.

NCAA Bylaws 14.4.3.1(b) & (c) require student-athletes to complete a certain number of credit hours in the semesters preceding competition. NCAA Bylaw 14.4.3.1(b) requires a student-athlete to complete 18 credit hours in the prior year. Dkt. 92, p. 8, ¶ 17. Come Fall 2022, in the prior year Hecox will have at most attended Boise State for one semester (Spring 2022) so she will need to complete 18 credits during that semester. Or if she can invoke an exception under NCAA Bylaw 14.4.3.6(a), she will need to complete 12 credits. *Id.* at ¶ 18. NCAA Bylaw 14.4.3.1(c) requires a student-athlete to complete six credits in the semester preceding competition. *Id.* at ¶ 16. Regardless of the total required, whether Hecox will complete the required credits is again contingent on her unknown future actions.

NCAA Bylaw 14.4.3.6(b) creates an exception for NCAA Bylaws 14.4.3.1(b) & (c) if a student-athlete (1) was not recruited, (2) did not receive athletically related financial assistance, (3) has never practiced or participated in intercollegiate athletics, and (4) is otherwise eligible under all institutional, conference, and NCAA rules. *Id.* at pp. 8–9, ¶ 19. As of October 15, 2021,

---

[5] The article is available at https://www.outsports.com/2020/12/29/22199463/outsports-transgender-athlete-advocate-lindsay-hecox-idaho-mitch-harrison-trans-titan-games-ncaaw.

Hecox appeared on track to satisfy those requirements. But Hecox has shown that much can change in a year, and whether she will be eligible for the exception come Fall 2022 is, like much else, unknown and contingent on future events.

In sum, despite Hecox's stated intentions that she will enroll at Boise State in Fall 2022 and do what is necessary to satisfy the NCAA's eligibility requirements, there are a host of actions that she needs to execute according to plan. Any one of those actions, when viewed in isolation, may not seem that daunting, but as the list extends the Court is left with a case "riddled with contingencies and speculation that impede judicial review." *Trump*, 141 S. Ct. at 535. As a result, the Court faces "a significant degree of guesswork" to conclude that Hecox needs relief. *Id.* at 536. But as the Ninth Circuit has held even after *Laidlaw*, "[a] moot case cannot be revived by alleged future harm that is so remote and speculative that there is no tangible prejudice to the existing interests of the parties." *Doe No. 1 v. Reed*, 697 F.3d 1235, 1239 (9th Cir. 2012) (quotation and emphasis omitted). The Court should thus dismiss without prejudice Hecox's claims. Then, if she

/ / /

/ / /

/ / /

DEFENDANTS' OPENING BRIEF IN RESPONSE TO
NINTH CIRCUIT ORDER DATED JUNE 24, 2021 - 17

Hecox appeared on track to satisfy those requirements. But Hecox has shown that much can change in a year, and whether she will be eligible for the exception come Fall 2022 is, like much else, unknown and contingent on future events.

If Hecox ultimately cannot satisfy the NCAA eligibility requirements, then she can submit a waiver request to the NCAA. *Id.* at pp. 9–10, ¶ 23. The power to grant a waiver ultimately rests with the NCAA, but its guidelines provide that waivers can be granted for "unforeseeable hardships." *Id.* Given that Hecox knew the financial burden of attending Boise State as a non-resident when she decided to attend the school, it is unclear why that hardship would be considered unforeseeable. But regardless, whether the NCAA would grant the waiver is just another unknown fact.

In sum, despite Hecox's stated intentions that she will enroll at Boise State in Fall 2022 and do what is necessary to satisfy the NCAA's eligibility requirements, there are a host of actions that she needs to execute according to plan. Any one of those actions, when viewed in isolation, may not seem that daunting, but as the list extends the Court is left with a case "riddled with contingencies and speculation that impede judicial review." *Trump*, 141 S. Ct. at 535. As a result, the Court faces "a significant degree of guesswork" to conclude that Hecox needs relief. *Id.* at 536. But as the Ninth Circuit has held even after *Laidlaw*, "[a] moot case cannot be revived by alleged future harm that is so remote and speculative that there is no tangible prejudice to the existing interests of the parties." *Doe No. 1 v. Reed*, 697 F.3d 1235, 1239 (9th Cir. 2012) (quotation and emphasis omitted). The Court should thus dismiss without prejudice Hecox's claims. Then, if she

/ / /

/ / /

/ / /

DEFENDANTS' OPENING BRIEF IN RESPONSE TO
NINTH CIRCUIT ORDER DATED JUNE 24, 2021 - 17

does everything she says she will do over the next year, she can return to the Court with a concrete

interest and ask for the same or a similar preliminary injunction.

DATED this 12th day of November, 2021.

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL

By: */s/  W. Scott Zanzig*
W. SCOTT ZANZIG
Deputy Attorney General

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 12, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

Richard Eppink
Aadika Jaspal Singh
AMERICAN CIVIL LIBERTIES UNION
OF IDAHO FOUNDATION
REppink@acluidaho.org
asingh@acluidaho.org

James Esseks
Chase Strangio
AMERICAN CIVIL LIBERTIES FOUNDATION
garkles@aclu.org
jesseks@aclu.org
cstrangio@aclu.org

Catherine Ann West
LEGAL VOICE
cwest@legalvoice.org

Kathleen Hartnett
Andrew Barr
Julie Veroff
Elizabeth Reinhardt
Katelyn Kang
COOLEY LLP
khartnett@cooley.com
abarr@cooley.com
jveroff@cooley.com
ereinhardt@cooley.com
kkang@cooley.com

*Attorneys for Plaintiffs*

Matthew K. Wilde
BOISE STATE UNIVERSITY
OFFICE OF GENERAL COUNSEL
mattwilde@boisestae.edu

*Attorney for Defendants Boise State University and Marlene Tromp*

Roger G. Brooks
Kristen K. Waggoner
Jeffrey A. Shafer
Christiana M. Holcomb
ALLIANCE DEFENDING FREEDOM
rbrooks@ADFlegal.org
kwaggoner@ADFlegal.org
jshafer@ADFlegal.org
cholcomb@ADFlegal.org

Bruce D. Skaug
Raul R. Labrador
SKAUG LAW
bruce@skauglaw.com
raul@skauglaw.com

*Attorneys for Intervenors*

*/s/ W. Scott Zanzig*
W. SCOTT ZANZIG
Deputy Attorney General