UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LINDSAY HECOX, *et al*., | Case No. 1:20-cv-00184-DCN |
| Plaintiffs, | **ORDER ON MOOTNESS ISSUE** |
| v. | |
| BRADLEY LITTLE, *et al*., | |
| Defendants, | |
| and | |
| MADISON KENYON and MARY MARSHALL, | |
| Intervenors. | |

## I. INTRODUCTION

On June 24, 2021, the Ninth Circuit remanded the appeal by the Defendants and

Intervenors to this Court for the limited purpose of determining whether Plaintiff Lindsay

Hecox's claim is moot in light of her changed enrollment status at Boise State University

("BSU").[1] Dkt. 79. Although it otherwise retained jurisdiction over the appeal, the Ninth

---

[1] The Ninth Circuit noted that the parties have agreed Plaintiff Jane Doe's claim is now moot because she has graduated from high school and is attending college out of state. Dkt. 79, at 1 n. 1. While the remand issue was pending, the parties stipulated to the dismissal of the Defendants against whom solely Doe's claims were asserted. Dkt. 104. The parties agreed the stipulated dismissal should not extend to the Court's memorandum decision. *Id*. at ¶ 4. However, the Ninth Circuit remanded to this Court solely to decide whether Plaintiff Lindsay Hecox's claim is moot. The Ninth Circuit did not itself dismiss Doe's claims (or direct this Court to do so) and also retained jurisdiction over Defendants and the Intervenors' appeal. As such, the Court finds dismissing all claims in this case against the Independent School District of Boise City #1, Coby Dennis, and members of the Independent School District of Boise City #1, would exceed the

Circuit directed this Court to "develop the record, resolve any factual disputes, and apply the required caution and care to the initial mootness determination." Dkt. 79, at 4. As detailed below, the parties have submitted supplemental briefs and stipulated facts with respect to the mootness issue.

Having reviewed the record, the Court determines the parties have adequately presented the facts and legal arguments in their briefs. Accordingly, in the interest of avoiding delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, the Court decides the mootness issue on the record and without oral argument.[2] Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B).

For the reasons set forth below, the Court holds Hecox's claim is not moot.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On March 30, 2020, Idaho Governor Bradley Little signed the Fairness in Women's Sports Act (the "Act") into law. Idaho Code § 33-6201 *et seq.*[3] Plaintiff Lindsay Hecox, a transgender woman, was then in her freshman year at BSU. The Act excludes transgender women students from participating on women's school athletic teams. Idaho Code § 33-6203(2).

On April 15, 2020, Hecox filed this lawsuit to challenge the Act's constitutionality. In her Complaint, Hecox alleged she is a life-long runner who intended to try out for BSU's

---

limited scope of the remand order, and declines to dismiss either the aforementioned Defendants, or Doe's claim, at this stage of the litigation.

[2] The parties informally advised the Court that they do not believe an evidentiary hearing is required.

[3] The Act went into effect on July 1, 2020. *Id.*

women's cross-country team and track teams during her Fall 2020 semester, but that she was barred from doing so under the Act. Dkt. 1, ¶ 33. Hecox also alleged that the Act barred her from participating in college athletics at all. *Id.*, ¶ 38.[4]

On August 17, 2020, this Court preliminarily enjoined enforcement of the Act, holding, *inter alia*, that Hecox was likely to succeed on the merits of her claim that the Act violates the Equal Protection Clause. *See generally*, Dkt. 63.[5] Defendants and Intervenors appealed the Court's preliminary injunction.

In her briefing on appeal, Hecox informed the Ninth Circuit of relevant developments since Defendants and Intervenors noticed their appeal on September 16, 2020. Specifically, Hecox notified the Ninth Circuit that with the Act enjoined, she was permitted to try out for the BSU's women's cross-country and track teams during her Fall 2020 semester,[6] but did not make the teams, and had subsequently withdrawn from BSU. Hecox advised the Ninth Circuit that she planned to re-enroll at BSU in January 2022, after achieving in-state residency. Dkt. 79, at 2. Members of the Ninth Circuit panel asked

---

[4] Although Hecox could still participate on men's college athletics under the Act, Hecox alleged in her Complaint that competing on a men's team is not an option for her. *Id.*, ¶ 36. Hecox explained as a woman who is transgender, "it would be painful and humiliating to be forced to be the only woman on a men's team." *Id.* Hecox alleged playing on a men's team would also be contrary to her "medical treatment plan for gender dysphoria, which requires that she live her life in all respects as the woman she is." *Id.* Finally, Hecox alleged she feared harassment from other members of the men's team or competitors if she was forced to compete on a men's team. *Id.*

[5] The Court recognizes that Defendants have not yet disclosed experts or submitted evidence on the issue of whether transgender women athletes have an unfair advantage over biological females. However, the delay in resolving the merits of Hecox's claim is due to the interlocutory appeal, and not to the Court's preliminary injunction.

[6] Tryouts for walk-on athletes for the women's track and cross-country teams occur once a year during the fall semester. Dkt. 92, ¶ 13.

questions during oral argument about whether Hecox's claim was moot because she was not then enrolled at BSU, and ordered supplemental briefing on the issue. After finding the supplemental briefing "served only to raise further questions," the Ninth Circuit remanded to this Court for "the limited purpose of determining whether Lindsay Hecox's claim is moot in light of her changed enrollment status at BSU." *Id*. at 3.

The Ninth Circuit identified several questions to aid this Court's mootness determination, including:

(1) "Is Hecox still an admitted student who can re-enroll at BSU whenever she desires, or are there barriers to re-enrollment?"

(2) "Does she have evidence of savings, discussions with administrators, or anything else that shows a concrete plan to re-enroll?"

(3) What was "the Fall deadline for dropping classes[,] and the penalty for dropping out after that deadline?";

(4) Would Hecox "be eligible to play for BSU if she re-enrolled and made the team"?

(5) "[D]oes the fact that she withdrew from classes before the deadline to drop classes impact her status for NCAA eligibility purposes?"

(6) Has the "NCAA created any COVID-related exceptions to its requirements that apply to Hecox?"

(7) "[I]f Hecox is not eligible to play on the NCAA teams or does not make those teams, are there BSU women's club teams that she plans to join instead?"

Dkt. 79, at 3–4.

**ORDER – 4**

Two business days after the Ninth Circuit issued its June 24, 2021 Remand Order ("Remand Order"), this Court's law clerk contacted the parties to establish a plan and schedule for the remand proceedings. It took the parties another month, until July 27, 2021, to reach an agreement to informally exchange information, to thereafter provide the Court with stipulated facts responsive to the Ninth Circuit's questions, and to brief the mootness issue in light of such facts.

Three months after the parties reached the agreement, the parties submitted stipulated facts in response to the Remand Order. Dkt. 92. After a subsequent unopposed Motion for Extension of time, the parties submitted briefing, and the remand issue became ripe on December 3, 2021.

Given its significant case load[7] and a backlog of criminal cases due to the COVID-19 pandemic, the Court was unable to immediately address the parties' submissions. As such, on March 16, 2022, the Court ordered the parties to submit supplemental stipulated facts. Dkt. 101. The Court directed the parties to specifically update the Court on: (1) the status of Hecox's enrollment at BSU; (2) if she was enrolled at BSU, how many credits Hecox was taking and whether she was still attending such classes; (3) whether Hecox had joined and was playing for the BSU Women's club soccer team; and (4) whether Hecox still intends to try out of the BSU Women's cross-country and track teams in the Fall 2022 semester. *Id*.

---

[7] The undersigned is the only active judge in Idaho. The only senior judge is still taking a full load of cases, but was on a sabbatical in March and April, 2022, and has been presiding over a months-long criminal trial since May, 2022.

**ORDER – 5**

The parties filed Supplemental Stipulated Facts on April 13, 2022. Dkt. 102.

### III. FACTUAL FINDINGS[8]

Having carefully reviewed the record on remand, the Court makes the following findings with respect to the issues outlined in the Remand Order.

#### A. Barriers to Re-Enrollment

Hecox's withdrawal from classes during the Fall 2020 semester did not pose a barrier to enrolling in classes at BSU in the Spring 2022 semester. Hecox is enrolled at BSU and took 9 credits during the Spring 2022 semester.

#### B. Discussions with Administrators,  Evidence of Savings, and Concrete Plans to Re-enroll

Prior to the Spring 2022 semester, Hecox met with Joshua Wilkins in the BSU Registrar's Office to discuss her plans to establish in-state residency before returning to BSU. On November 18, 2020, Wilkins advised Hecox via email that she could establish Idaho residency by proving that she had worked full-time for 12 months and by filing an Idaho tax return. When the parties filed stipulated facts on October 15, 2021, Hecox had been working full-time in Idaho since December 2020, had filed an Idaho state tax return, and planned to file Idaho state tax returns in the future.

Hecox registered for 9 credits of courses for the Spring 2022 semester. Hecox subsequently qualified for in-state tuition at BSU of approximately $4,030.00 per semester.

---

[8] Unless otherwise referenced, the following facts are taken from the parties' October 15, 2021 Stipulated Facts and/or from their April 13, 2022 Supplemental Stipulated Facts. Dkt. 92; Dkt. 102.

As of September 23, 2021, Hecox had $23,949.27 available for tuition, textbooks, living expenses, and other costs associated with attending BSU in her bank account. Hecox also applied for financial aid, anticipated receiving some support from family members, and applied for the Pride Foundation Scholarship.[9]

### C.  Fall 2020 Deadlines for Dropping Classes and Associated Penalties

There were two relevant deadlines for withdrawing from classes in the Fall 2020 semester at BSU. The first deadline was September 4, 2020. Students who withdrew from classes by that deadline had nothing recorded on their transcript related to the withdrawal and received a tuition refund. The second deadline was October 30, 2020. Students who withdrew from classes by that deadline had a "W" marked on their transcript for dropped classes and did not receive a tuition refund. Students who withdrew from classes after October 30, 2020 had an "F" marked on their transcript for dropped classes. A "W" would not affect the student's GPA, but an "F" would affect the student's GPA.

Hecox withdrew from some of her classes on October 26, 2020, and from the remainder of her classes on October 28, 2020. She received "Ws" on her transcript, but withdrew early enough from all of her classes to avoid having any "Fs" on her transcript. Hecox did not receive a tuition refund, and she had to repay $793.00 of her Pell Grant.

### D.  NCCA Eligibility[10]

---

[9] In their Supplemental Stipulated Facts, the parties did not address whether Hecox ultimately received financial aid, financial assistance from her family, or the Pride Foundation Scholarship for the Spring 2022 semester.

[10] Hecox retained an expert witness, Ellen Staurowsky, to offer an expert opinion on the NCAA's eligibility rules. Dkt. 99-2.

**ORDER – 7**

In her Fall 2022 semester, Hecox will be considered a third-year student for purposes of NCAA eligibility because she will have attended classes in four previous semesters (Fall 2019, Spring 2020, Fall 2020, and Spring 2022). NCAA Bylaw 14.4.3.2 requires a student-athlete to complete 40% of the requirements for their degree program by the start of the student-athlete's third year of collegiate enrollment. During her Fall 2020 semester, Hecox selected psychology as her degree program. A psychology major at BSU requires 120 credits. To satisfy the minimum number of credits to complete 40% of her degree program, Hecox would need to earn a total of 48 credits by the end of her Spring 2022 semester. Hecox has earned 24 credits at BSU, received 18 credits based on her SAT and AP test scores in high school, and was enrolled in 9 credits during the Spring 2022 semester. Hecox has accordingly completed 51 credits, and has satisfied NCAA Bylaw 14.4.3.2.

NCAA Bylaw 14.01.2.1 requires a student-athlete to be in good academic standing. An undergraduate at BSU is deemed to be in good academic standing if they have earned a minimum of a 1.75 cumulative grade point average while earning between 0 to 25 academic credits, or a minimum of a 2.00 cumulative grade point average while earning 26 or more academic credits. As of October 15, 2021, Hecox's cumulative grade point average was 3.38. Although her Spring 2022 grades are not before the Court, Hecox would still meet the 2.0 minimum grade point average required to be in good academic standing even if she received a 1.0 for the Spring 2022 semester.

NCAA Bylaw 14.4.3.1(c) requires a student athlete to complete 6 credit hours

during the semester preceding the competition. Hecox was enrolled in 9 credit hours during the Spring 2022 semester, and has met NCAA Bylaw 14.4.3.1(c).

NCAA Bylaw 14.4.3.1(b) requires a student athlete to complete 18 credit hours since the beginning of the previous fall term, or since the beginning of BSU's preceding two semesters. Because she has completed 9 credits since the beginning of the Fall 2021 term, as well as since the beginning of the preceding two semesters (Spring 2022 and Fall 2021), Hecox does not meet this standard.

However, NCAA Bylaw 14.4.3.6(a) provides a student athlete "may" qualify for a one-time exception to NCAA Bylaw 14.4.3.1(b). This exception allows a student athlete who has withdrawn from school to complete a prorated requirement of 9 credits per term of actual attendance. Hecox completed 24 credits at BSU prior to the Spring 2022 semester. Although she took an additional 9 credits during the Spring 2022 semester, Hecox cannot satisfy the 14.4.3.6(a) exception for the Fall 2022 semester because she has 33 total credits—3 credits short of the 36 she would need to have 9 credits for each of her four terms of actual attendance.

NCAA Bylaw 14.4.3.6(b) provides that a student athlete "may" qualify for a separate exception to Bylaws 14.4.3.1(b) if the student was not recruited, did not receive athletically related financial assistance, has never practiced or participated in intercollegiate athletics, and is otherwise eligible under all institutional, conference, and NCAA rules. Hecox was not recruited and has not received athletically related financial assistance. However, it appears she has played intercollegiate athletics because she now

plays for the women's club soccer team.[11] As such, it appears that Hecox cannot qualify for the 14.4.3.6(b) exception.

If Hecox makes the women's cross-country or track teams in the Fall 2022 semester, but is not eligible under one or more NCAA Bylaw—either because the Bylaws do not provide for an exception or because she does not qualify for an exception—BSU can nevertheless submit a waiver request to the NCAA. BSU does not submit waiver requests to the NCAA until after a student athlete has made a team. BSU's general practice is to submit waiver requests when there is a reasonable and good faith justification for the request. If Hecox makes the women's cross-country or track teams, BSU will treat Hecox the same as all other student athletes and will submit a waiver request if it determines that there is a reasonable and good-faith justification for doing so. The NCAA decides whether to grant waivers, and the NCAA's waiver guidelines provide that waivers can be granted for unforeseeable hardships.

Finally, NCAA policy required Hecox to complete at least 12 months of testosterone suppression treatment leading up to the Fall 2022 semester to compete on the women's track and cross-country teams. Hecox contends, and the Defendants and Intervenors do not currently dispute, that she has undergone testosterone suppression treatment from

---

[11] NCAA Bylaw 12.8.3.7 suggests that playing club soccer counts as participation in intercollegiate athletics, since an individual participating on a club team "is charged with a season of competition for participation in intercollegiate competition." NCAA Division 1 Manual, *available at* https://web3.ncaa.org/lsdbi/reports/getReport/90008. Further, the NCAA's definition of "intercollegiate competition" creates an exception for participation on club teams *only* if the athlete's school does not have a varsity team in the same sport. *Id*. This exception does not appear to apply because BSU has a varsity women's soccer team. *See* https://broncosports.com/sports/women-soccer.

**ORDER – 10**

September 2019 until the present. Hecox thus meets the NCAA's policy with respect to testosterone suppression.

### E.  Impact of Withdrawal on NCAA Eligibility

Because Hecox attended classes during the Fall 2020 semester, the semester counts as an attempted semester for NCAA eligibility purposes even though she ultimately withdrew. For example, the Fall 2020 semester counts in determining Hecox will be a third-year student in the Fall 2022 semester for purposes of NCAA Bylaw 14.4.3.2, and in calculating the amount of credits she is required to have completed for purposes of NCAA Bylaw 14.4.3.1(b).

Given her apparent inability to qualify for the NCAA Bylaw 14.4.3.6(a) and (b) exceptions, Hecox can only obtain NCAA eligibility in the Fall 2022 semester if she makes the women's cross-country or track teams, BSU determines there is a reasonable and good faith justification for submitting a waiver request, and the NCAA grants the waiver request based on an unforeseeable hardship. The committee designated to make determinations on waiver requests, known as the "NCAA-Progress-Towards-Degree Waiver Committee," also has "the authority to waive all other progress-toward degree requirements based on objective evidence that demonstrates circumstances that warrant the waiver of the normal application of those regulations." Dkt. 99-2, ¶ 11 (citing NCAA Bylaw 14.4.3.10). There is no information in the record to clarify what type of evidence would meet the aforementioned criteria.

### F.  COVID-19 Waivers

The NCAA has not implemented COVID-19 waivers that would apply to Hecox

**ORDER – 11**

if she makes the women's cross-country or track teams in the Fall 2022 semester.

### G. Plans to Play on Other Teams

Hecox intends to try out for the BSU Women's cross-country and track teams in her Fall 2022 semester. If Hecox does not make the women's cross-country or track teams, or does make the teams but does not receive a waiver of the NCAA eligibility requirements in in the Fall 2022 semester, she plans to try out for the cross-country and track teams again in her senior year, and may then satisfy the NCAA eligibility requirements depending on the number of credits she takes during the 2022-2023 school year. In addition, Hecox has joined, and is playing for, the BSU women's club soccer team.

## IV. LEGAL STANDARD

"The jurisdiction of federal courts depends on the existence of a 'case or controversy' under Article III of the Constitution." *Pub. Utils. Comm'n of Cal. v. FERC*, 100 F.3d 1451, 1458 (9th Cir. 1996). Although this Court determined there was an actual case and controversy when Hecox filed her Complaint, Dkt. 63, at 31–41, a party must maintain a live controversy throughout all stages of the litigation process.[12] *Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 797 (9th Cir. 1999) (citation omitted). If an action or claim loses its character as a live controversy, then the action or claim becomes moot, and federal courts lack jurisdiction to resolve the underlying dispute. *Id*. at 798 (citing *Ruiz v.*

---

[12] The case and controversy limitation on federal judicial authority underpins the doctrines of both standing and mootness. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs*., 528 U.S. 167, 180 (2000). The two inquiries differ in that standing is assessed by the facts that exist at the time a complaint is filed, while mootness involves changing circumstances that arise after a complaint is filed. *Clark v. City of Lakewood*, 259 F.3d 996, 1006 (9th Cir. 2001).

*City of Santa Maria*, 160 F.3d 543, 549 (9th Cir. 1998); *see also Lindquist v. Idaho State Bd. of Corr.*, 776 F.2d 851, 853–54 (9th Cir. 1985) ("A case, or an issue in a case, is considered moot if it has lost its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract propositions of law") (cleaned up).

Mootness must be approached "cautiously and with care to ensure that the party claiming the benefit of mootness . . . has carried its burden of establishing that the claim is moot." *United States v. Larson*, 302 F.3d 1016, 1020 (9th Cir. 2002); *S. Oregon Barter Fair v. Jackson Cty.*, 372 F.3d 1128, 1134 (9th Cir. 2004) ("*Barter Fair*") ("The party asserting mootness bears the burden of establishing that there is no effective relief remaining that the court could provide.").[13] Because it "is no small matter to deprive a litigant of the rewards of its efforts," a case will be dismissed for mootness "only if it [is] absolutely clear that the litigant no longer ha[s] any need for the judicial protection" sought. *Larson*, 302 F.3d at 1020.

## V. DISCUSSION

Before addressing the parties' arguments regarding the mootness issue, the Court corrects a misconception perpetuated throughout the briefing by Defendants. Defendants

---

[13] Defendants devote much of their opening brief to arguing they do not have the burden to show mootness because this is not a case involving voluntary cessation by a defendant. Dkt. 96, at 5–10. However, in *Barter Fair*, the Ninth Circuit held the defendant had the burden of establishing mootness even where, as here, the *plaintiff* ceased the relevant conduct. 372 F.3d at 1134. Further, Defendants argue, without citing any authority, that they do not have the burden to show Hecox's claim is moot because the Ninth Circuit raised the mootness issue *sua sponte*. Regardless of how the issue arose, Defendants still seek the benefit of mootness, and thus bear the burden of establishing Hecox's claim is moot. *Id.*; *Larson*, 302 F.3d at 1020. Nevertheless, for the reasons explained below, even if Hecox has the burden of establishing her claim is not moot given the procedural posture of this case, the Court finds she has met this burden.

open their brief with the contention: "For over a year, the Court enjoined a law that did not apply to Lindsay Hecox because she withdrew from Boise State University in October 2020." Dkt. 96, at 2. Defendants go on to suggest "for over a year" this Court's preliminary injunction order "was unconstitutional," "impinged Idaho's sovereignty," and "violated principles of federalism and representative government." *Id*. at 3–4, 8.

Defendants' claim ignores that this case was already pending on an appeal they initiated before Hecox withdrew from BSU. Every decision and ruling from this Court prior to the appeal occurred while Hecox was enrolled at BSU and while mootness was not an issue. Also, while Hecox was still enrolled at BSU, the parties—including Defendants—asked the Court to stay these proceedings during Defendants and Intervenors' interlocutory appeal to the Ninth Circuit. Dkt. 70. It is blatantly wrong for Defendants to suggest that this Court issued a preliminary injunction that did not apply to Hecox because she was not enrolled at BSU. Hecox absolutely was enrolled at BSU when the injunction issued.

Defendants also ignore that the Court was unaware that Hecox did not make the cross-country team, or that she had withdrawn from BSU, until the Ninth Circuit remanded this case on June 24, 2021. Dkt. 79. Further, as Hecox points out, Defendants' claim of harm to their sovereignty rings hollow given that Defendant BSU knew in October 2020 that Hecox had withdrawn from school to establish in-state residency, yet BSU did nothing to notify either this Court, or the Ninth Circuit, about any mootness concerns. Dkt. 99, at 7 n. 3. Although the Court lacks clairvoyance, it did not impinge Idaho's sovereignty or violate principles of federalism by failing to address changed circumstances of which it was unaware, or by honoring the parties' stay request.

**ORDER – 14**

The Court turns next to the parties' contentions regarding mootness.

**A. Hecox's Status as a BSU Student**

Among other things, the Act prevents transgender women from participating on women's sport teams that are sponsored by public institutions of higher education. Idaho Code § 33-6203(1)–(2). As such, Hecox's changed enrollment status at BSU, effective after the case went up on appeal, called into question whether the Ninth Circuit could grant Hecox "any effectual relief whatever," since the Act would not apply to Hecox if she was not, or did not have concrete plans to become, a college student. Dkt. 79, at 3 (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992)). Many of the questions regarding mootness the Ninth Circuit identified thus involved Hecox's enrollment status at BSU. After assessing each of these questions based on the stipulated facts, the Court finds Hecox not only had concrete plans to re-enroll, but in fact followed through with such plans.

When this case was before the Ninth Circuit, Hecox declared she had plans to re-enroll in January 2022, after achieving in-state residency. Dkt. 79, at 2. Hecox withdrew from her classes in 2020 in time to receive "Ws" on her transcript, and did not face any barriers to re-enrollment. Dkt. 92, ¶¶ 1, 9–12. Hecox subsequently established in-state residency, qualified for in-state tuition for the Spring 2022 semester, re-enrolled in nine credits for the Spring 2022 semester, and was attending her classes as of April 13, 2022. Dkt. 102, ¶¶ 1–4.

Qualifying for in-state tuition required Hecox to satisfy multiple contingencies. Specifically, Hecox had to show that she received less than 50% of her financial support

from her parent or guardian and had "continuously resided and maintained a bona fide domicile in the state of Idaho primarily for purposes other than educational for twelve (12) months preceding the opening day of the term for which the student matriculates." Idaho Code § 33-3717B(1)(b). To establish she maintained a bona fide domicile in Idaho, Hecox had to prove at least five of the following criteria for the twelve months before the term (Spring 2022) for which she obtained in-state residency: (1) ownership or leasing of a residence in Idaho; (2) registration and payment of Idaho taxes or fees, other than sales tax; (3) registration to vote in Idaho; (4) holding an Idaho driver's license or ID card; (5) evidence of abandonment of previous domicile; (6) establishment of accounts with Idaho financial institutions; or (7) other similar factors such as enrollment of dependent children in Idaho elementary or secondary schools, acceptance of permanent employment in Idaho, documentation of need to care for relative in Idaho, utility statements, or employment documentation. Dkt. 92, ¶ 4 (citation omitted).

To meet these requirements, Hecox leased a residence in Idaho since August 2020, began working full-time in Idaho in December 2020, has been registered to vote in Idaho since September 2019, obtained an Idaho ID card in January 2020, abandoned her domicile in California when she relocated her personal possessions to Idaho in August 2019, had the ability to present employment documentation and pay stubs reflecting her full-time employment in Idaho since December 2020, had the ability to provide employment documentations such as work schedules and pay stubs reflecting her full-time employment in Idaho since December 2020, and received less than 50% of her financial report from her

parents.[14] *Id*. Hecox also amassed considerable savings during her absence from BSU, and saved nearly $24,000.00 prior to the Spring 2022 semester. *Id*., ¶ 6.

While Defendants and the Intervenors fault Hecox for withdrawing in October 2020, and argue she may have another change of heart, Hecox has illustrated far more than a "bare statement of intention," and has instead steadfastly followed through with her plans to obtain in-state residency and to re-enroll in BSU. Dkt. 95, at 6 (quoting *Fox v. Bd. of Trs. of State Univ. of N.Y.*, 42 F.3d 135, 143 (2d Cir. 1994)); *see also* Dkt. 96, at 12–15. To the extent Defendants and the Intervenors suggest Hecox may change her mind and decide not to enroll for the Fall 2022 semester, such arguments are not only belied by the record, but are also misplaced. When assessing mootness, the Ninth Circuit has held it is the defendant's burden to show a plaintiff will *not* take certain action, rather than the plaintiff's burden to show that it will do so. *Rosemere Neighborhood Assoc. v. U.S. Envtl. Prot. Agency*, 581 F.3d 1169, 1174 (9th Cir. 2009) ("[W]hen there is an argument about whether a plaintiff will again encounter a challenged activity, this court has required little more than what Rosemere has already supplied: a stated intention to resume the actions that led to the litigation"). Hecox has expressed her intent to continue as a BSU student and has actually reenrolled and continued as a BSU student. There is no evidence in the record to suggest Hecox will not continue as a BSU student this fall, and Hecox has expressed an intent to continue as a BSU student. *See, e.g.*, Dkt. 97-1, ¶¶ 17, 24. Defendants and the Intervenors' speculation that Hecox's plans may change falls far short of establishing her claims are

---

[14] Although each of these facts are as of October 15, 2021, the Court assumes they did not change through December 2021 since Hecox qualified for in-state tuition for the Spring 2022 semester. *Id*.; Dkt. 102, at 1.

moot. *Rosemere*, 581 F.3d at 1174; *Barter Fair*, 372 F.3d at 1134 (holding plaintiff had a sufficient ongoing interest in the outcome of the case to preclude mootness where plaintiff stated it intended to hold an event in the future if the challenged statute was declared unconstitutional); *Clark*, 259 F.3d at 1012 (finding plaintiff's constitutional challenge to adult cabaret ordinance was not moot even where plaintiff's license to operate an adult cabaret had expired because plaintiff's stated intention was to return to business).

Defendants and the Intervenors also attempt to cast doubt on Hecox's financial stability. Dkt. 95, at 6–7; Dkt. 96, at 13–15. Such arguments overlook that Hecox had enough money saved to pay for approximately six semesters of in-state tuition—even without any financial aid—as of October 15, 2022. Dkt. 92, ¶ 6. Hecox's financial stability does not require "speculation and guesswork," as Defendants contend, but is instead established by the stipulated facts. Dkt. 96, at 13. By taking multiple material steps toward her stated goals of establishing in-state residency and saving money prior to re-enrolling in the Spring 2022 semester, Hecox has ensured that she can afford the remainder of her education at BSU.

In sum, Hecox did not face any barriers to re-enrollment, has evidence of significant savings, took concrete steps to re-enroll and has re-enrolled at BSU, and withdrew from her classes by the October 30, 2020 deadline for doing so.

### B. NCAA Eligibility

#### 1. *Qualifying for the BSU women's cross-country or track teams*

Defendants and the Intervenors argue Hecox's claims are moot because she may not qualify for the BSU women's cross-country or track teams. Dkt. 95, at 4–5, 8–10; Dkt. 96,

at 2, 12. Defendants and the Intervenors highlight that the only evidence in the record about Hecox's capability as a runner is that she was unable to post a qualifying time during the Fall 2020 try-outs for the BSU women's cross-country and track teams. Dkt. 95, at 4–5; Dkt. 96, at 12. As such, Defendants and the Intervenors argue Hecox's interest in running for the BSU women's cross-country or track teams is based on nothing more than speculation. *Id*.

As this Court previously emphasized, absent an injunction, the Act categorically bars Hecox from trying out for BSU's women's cross-country and track teams. The Act mandates "[a]thletic teams or sports designated for females, women, or girls *shall not be open* to students of the male sex." Idaho Code § 33-6203(2) (emphasis added). The Act also provides that "any student" who suffers "any" unspecified "direct or indirect harm" as a result of a violation of the Act can sue BSU for injunctive relief and damages. *Id*. at § 33-6205(1). Thus, if BSU were to violate the Act by allowing Hecox to try out for its women's cross-country or track teams, it could be liable to essentially any student who claims any injury as a result. BSU cannot "open" its try-outs for the women's cross-country or track teams to Hecox without being exposed to such liability. *Id*. at § 33-6203(2). Defendants and the Intervenors' suggestion that Hecox cannot be adversely affected by the Act unless she first makes the BSU women's cross-country or track teams ignores that the express terms of the Act bar Hecox from trying out for the teams at all.

Further, the Supreme Court has long held that the "injury in fact" required for standing in equal protection cases is denial of equal treatment resulting from the imposition of a barrier, not the ultimate inability to obtain the benefit. *Ne. Florida Chapter of*

ORDER – 19

*Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) ("When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing"); *Clements v. Fashing*, 457 U.S. 957, 962 (1982) (finding political officers had standing to challenge a provision of the Texas Constitution requiring automatic resignation for some officeholders upon their announcement of candidacy for another office because their injury was the "obstacle to [their] candidacy" for a new office, not the fact that they would have been elected to a new office but for the law's prohibition); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 281 n. 14 (1978) ("*Bakke*") (holding twice-rejected white male applicant had standing to challenge medical school's admissions program which reserved 16 of 100 places in the entering class for minority applicants, because the requisite "injury" was plaintiff's inability to *compete* for all 100 places in the class, simply because of his race, not that he would have been *admitted* in the absence of the special program).

Thus, even if the Court accepted Defendants and the Intervenors' arguments regarding Hecox's ability to qualify for the BSU women's cross-country or track teams, her claims are not moot because, but for the Court's injunction, Hecox cannot compete for a spot on the women's cross-country or track teams. *Bakke*, 438 U.S. at 281 n. 14. Nor, as further discussed below, could Hecox continue to play for the BSU women's club soccer team absent an injunction.

   *2.  NCAA Eligibility*

**ORDER – 20**

Hecox filed a declaration stating she is committed to trying out for the BSU women's cross-country and track teams in the Fall 2022 semester. Dkt. 97-1, ¶ 24. If she does not make the teams during the Fall 2022 try out, she intends to try out for both teams again the following year.[15] *Id.*

As noted, Hecox cannot try out for the teams at all absent an injunction. However, if Hecox is permitted to try out for, and makes the women's cross-country or track teams, she will have to obtain an eligibility waiver from the NCAA to run for either team in her junior year. The Court lacks information to assess either whether BSU will find a reasonable and good faith justification for submitting an eligibility waiver, or whether the NCAA will grant a waiver based on an unforeseeable hardship or other unspecified circumstances.[16] Yet, Hecox may not need an eligibility waiver to run for the teams if she tries out again in the Fall 2023 semester, depending on the number of credits she takes during her junior year. Hecox's expressed intent to try out again in the Fall of 2023 appears to satisfy the Ninth Circuit's mootness concerns, particularly because Hecox is currently an enrolled BSU student. Dkt. 79, at 2–4. If "the person who initially brought the suit may

---

[15] Hecox alleged in her Complaint that she only has five potential years to participate in NCAA sports. Dkt. 1, ¶ 34. The parties did not address this issue in their stipulated facts or briefing, but it appears Hecox will still be within her five total years of NCAA eligibility during the 2023-2024 school year.

[16] Indeed, there is simply no way to accurately predict whether the NCAA will grant a waiver. As one reporter noted, "[w]hen it comes to being unpredictable, nothing tops Chicago weather, moody teenagers and the NCAA." Shannon Ryan, *Denying a Waiver to Illinois Tight End Luke Ford is Another Illogical Move From the NCAA After Recent Improvements to Transfer Rules*, CHICAGO TRIBUNE (Apr. 24, 2019), *available at* https://www.chicagotribune.com/sports/college/ct-spt-illinois-luke-ford-ncaa-transfer-waiver-20190424-story.html.

ORDER – 21

again be subject to the challenged conduct, she has a stake in preserving the court's holding." *Camreta v. Greene*, 563 U.S. 692, 703 (2011) (citations omitted).

In short, Hecox may again be subjected to the Act because she intends to try out for the women's cross-country and track teams in the Fall 2022 and Fall 2023 semesters.

### C.  BSU Women's Club Soccer Team

Even if Hecox cannot obtain an NCAA eligibility waiver, or qualify for the BSU women's cross-country or track teams, her claim is not moot because she is currently playing for the BSU women's club soccer team. Club soccer is not an NCAA sport and Hecox can play for the BSU women's club soccer team regardless of the NCAA's eligibility rules. Hecox expressed her desire to join the women's club soccer team in the parties' October 15, 2021 Stipulated Facts. Dkt. 92, ¶ 25. As with her plans to re-enroll at BSU and to obtain in-state residency, Hecox followed through with her intention and joined the women's club soccer team during her Spring 2022 semester. Dkt. 102, ¶ 5.

Defendants argue Hecox's complaint, and the Court's preliminary injunction, solely involved Hecox's interests in track and cross-country, and suggest the Court's preliminary injunction does not apply to Hecox's interest in club soccer. The Court disagrees. In her Complaint, Hecox alleged that the Act barred her from preventing in college athletics at all.[17] Dkt. 1, ¶ 38. Hecox explained she is shy and that being on sports teams gave her a way to make friends. *Id*. She alleged that if the Act were in effect at the start of the Fall 2020 season, she would miss the opportunity to make friends, as well as the motivation,

---

[17] *See*, *supra*, text accompanying note 4.

challenge, camaraderie, and joy that sport had brought her in the past. *Id*. Moreover, multiple allegations in the Complaint addressed the injury the Act causes transgender women student athletes in general, and were not limited to track or cross-country. *Id*., ¶¶ 2–5, 38, 57, 59–65, 107, 121–124, 127–137.

Similarly, the Court's preliminary injunction was not limited to Hecox's involvement with the cross-country and track teams. When assessing whether Hecox had standing to challenge the Act, the Court noted the harm she alleged—the inability to participate on women's teams—arose when the Act went into effect on July 1, 2020. Dkt. 63, at 33. The Court's analysis of Hecox's likelihood of success also involved Hecox's ability to participate in women's student sports in general, rather than to specifically participate on the women's cross-country or track teams. *Id*. at 60–79.

For instance, the Court held: "Based on the dearth of evidence in the record to show excluding transgender women from *women's sports* supports [the justification for the Act], [Hecox] is likely to succeed in establishing the Act violates her right to equal protection." *Id*. at 76 (emphasis added). The Court went on to note Defendants failed to identify "a legitimate interest served by the Act that the preexisting rules in Idaho did not already address, other than an invalid interest of excluding transgender women and girls from *women's sports entirely*, regardless of their physiological characteristics. As such, [Hecox] is likely to succeed on the merits of her equal protection claim." *Id*. at 79 (emphasis added).

The Court also held the Act subjected Hecox to irreparable harm due to the latter constitutional violation, as well as because the Act communicated the State of Idaho's "moral disproval" of her identity. *Id*. at 84. Neither of these harms were limited to Hecox's

ability to join the cross-country or track teams.[18] With respect to the balance of the equities

and the public interest, the Court explained:

> In stark contrast to the deeply personal and irreparable harms Plaintiffs face, a preliminary injunction would not harm Defendants because it would simply maintain the status quo while Plaintiffs pursue their claims. If an injunction is issued, Defendants can continue to rely on NCAA policy for college athletes and IHSAA policy for high school athletes, as they did for nearly a decade prior to the Act. In the absence of any evidence that transgender women threatened equality in sports, girls' athletic opportunities, or girls' access to scholarships in Idaho during the ten years such policies were in place, neither Defendants nor the Intervenors would be harmed by returning to the status quo.

*Id*. at 85.

In short, nothing in the Court's Equal Protection Clause analysis of Hecox's claim

turned on the specifics of running as compared to other school athletics.

Finally, Hecox has proven that she has a real and imminent need for relief because

she cannot continue to play for the BSU women's club soccer team absent an injunction.

Defendants speciously suggest "[n]othing in the record suggests that [the Act] prevents

Hecox from joining the club soccer team." Dkt. 98, at 5. Under its express terms, the Act

applies to all "[i]nterscholastic, intercollegiate, intramural, or *club athletic teams or

sports*," that, like the BSU women's club soccer team, are sponsored by "a public

institution of higher education[.]" Idaho Code § 33-6203(1) (emphasis added).[19] As such,

---

[18] In light of such harms, that the Court's irreparable harm analysis also considered Hecox's loss of a year of NCAA eligibility without an injunction does not undermine the propriety of the injunction with respect to Hecox's interest in soccer, as Defendants contend. Dkt. 96, at 11.

[19] Notably, in its preliminary injunction order, the Court also specifically highlighted that the Act's purported interest in advancing athletic scholarships for women was undermined by the fact that the Act applies to club and intermural athletic teams, whether sponsored by a public primary or secondary school, or by a public institution of higher education. *Id*. at 75–76.

Hecox needs the judicial protection she seeks through this litigation in order to continue playing on the BSU women's club soccer team. *Larson*, 302 F.3d at 1020.

## VI. CONCLUSION

Hecox has re-enrolled at BSU and is participating on the women's club soccer team. She also intends to try out for the women's track and cross-country teams in the Fall 2022 semester, and again in the Fall 2023 semester. Although there are some questions about Hecox's NCAA eligibility, she cannot continue to play soccer, or compete for a spot on the women's track or cross-country teams, absent an injunction. Thus, Hecox's claim is not moot.

## VII. ORDER

Now, therefore, **IT IS HEREBY ORDERED**:

1. Hecox's claim is not moot;

2. Pursuant to the Remand Order, the parties shall advise the Ninth Circuit of the instant decision within seven (7) days;

3. The parties' Stipulated Dismissal (Dkt. 104) is **DENIED**;

4. This case is, once again, **STAYED** pending the Ninth Circuit's resolution of the Defendants and Intervenors' appeal of this Court's preliminary injunction order.

DATED: July 18, 2022

David C. Nye
Chief U.S. District Court Judge